# **<u>EXHIBIT 4</u>**

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI LYNN HEETHUIS,
        Plaintiff,
    vs.      Case No. 1:19-cv-00940
             Hon. Paul L. Maloney
COUNTY OF MUSKEGON; and,
RYAN BOIKE, Individually,
        Defendants.

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
LORI LYNN HEETHUIS

The Videoconference Deposition of LORI LYNN
HEETHUIS, located in Grand Rapids, Michigan, was taken for
the purpose of discovery in the above-entitled cause,
remotely by Sharon Bayerl, (CSR-3406), a Notary Public in
and for the County of Wayne, Michigan, (acting in Wayne
County, Michigan), on Friday, September 25, 2020,
commencing at 9:07 a.m.

Page 2

 1  APPEARANCES:
 2  (All parties via videoconference)
 3
 4  STEPHEN R. DREW
 5  Drew, Cooper & Anding
 6  80 Ottawa Avenue, NW, Suite 200
 7  Grand Rapids, Michigan 49503
 8  616.454.8300
 9  sdrew@dca-lawyers.com
10      Appearing on behalf of the Plaintiff.
11
12  LAURA S. AMTSBUECHLER
13  Rosati, Schultz, Joppich & Amtsbuechler, PC
14  27555 Executive Drive, Suite 250
15  Farmington Hills, Michigan 48331
16  248.489.4100
17  lamtsbuechler@rsjalaw.com
18      Appearing on behalf of the Defendants.
19
20  ALSO PRESENT:
21  Jodie C. Chapa, CLVS
22  Ryan Boike
23  Michael Poulin
24
25

Page 3

 1          TABLE OF CONTENTS
 2
 3  WITNESS                    PAGE
 4  LORI LYNN HEETHUIS
 5
 6  EXAMINATION
 7  BY MS. AMTSBUECHLER:          8
 8  EXAMINATION
 9  BY MR. DREW:                288
10  RE-EXAMINATION
11  BY MS. AMTSBUECHLER:        321
12
13          EXHIBITS
14
15  Exhibit                    Page
16  (Exhibits attached to transcript.)
17
18  DEPOSITION EXHIBIT 1          19
19  DEPOSITION EXHIBIT 2          20
20  DEPOSITION EXHIBIT 3          21
21  DEPOSITION EXHIBIT 4          23
22  DEPOSITION EXHIBIT 5          25
23  DEPOSITION EXHIBIT 6          29
24  DEPOSITION EXHIBIT 7          34
25  DEPOSITION EXHIBIT 8          38

Page 4

 1  DEPOSITION EXHIBIT 9          41
 2  DEPOSITION EXHIBIT 10         41
 3  DEPOSITION EXHIBIT 11         49
 4  DEPOSITION EXHIBIT 12        102
 5  DEPOSITION EXHIBIT 14        122
 6  DEPOSITION EXHIBIT 13        123
 7  DEPOSITION EXHIBIT 15        137
 8  DEPOSITION EXHIBIT 16        147
 9  DEPOSITION EXHIBIT 17        150
10  DEPOSITION EXHIBIT 18        162
11  DEPOSITION EXHIBIT 19        166
12  DEPOSITION EXHIBIT 20        166
13  DEPOSITION EXHIBIT 21        176
14  DEPOSITION EXHIBIT 22        180
15  DEPOSITION EXHIBIT 23        192
16  DEPOSITION EXHIBIT 24        192
17  DEPOSITION EXHIBIT 25        208
18  DEPOSITION EXHIBIT 26        209
19  DEPOSITION EXHIBIT 27        219
20  DEPOSITION EXHIBIT 28        220
21  DEPOSITION EXHIBIT 29        223
22  DEPOSITION EXHIBIT 30        253
23  DEPOSITION EXHIBIT 31        259
24  DEPOSITION EXHIBIT 32        260
25  DEPOSITION EXHIBIT 33        260

Page 5

1    DEPOSITION EXHIBIT 34          265
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1    Grand Rapids, Michigan
2    Friday, September 25, 2020
3    9:07 a.m.
4
5          VIDEO TECHNICIAN: We are on the record at 9:07
6    a.m. This is the video conference video recorded
7    deposition of Lori Lynn Heethuis taken in the case of Lori
8    Lynn Heethuis, Plaintiff, versus County of Muskegon and
9    Ryan Boike, Individually, Defendants, United States
10   District Court, Western District of Michigan, Southern
11   Division, Case Number 119-cv-00940. Today's
12   videoconference is held from 80 Ottawa Avenue Northwest,
13   Suite 200, Grand Rapids, Michigan. Today's date is
14   September 25, 2020. My name is Jodie C. Chapa, CLVS.
15   Today's court reporter is Sharon Bayerl, CSR. Please read
16   in your statement and swear in the witness.
17         THE REPORTER: My name is Sharon Bayerl,
18   certified stenographic reporter and notary public in the
19   State of Michigan. This deposition is being held via
20   videoconferencing equipment. The witness and reporter are
21   not in the same room. The parties and their counsel
22   consent to this arrangement and waive any objections to
23   this manner of reporting. Please indicate your agreement
24   by stating your name and your agreement on the record and
25   please announce anyone in the room with you.

Page 7

1          MR. DREW: This is Steven Drew, attorney for
2    Lori Heethuis, the plaintiff. We agree to that procedure.
3    No one is in the room with Lori, and I am in a separate
4    room due to, we had an echoing problem, and no one is in
5    the room with me.
6          MS. AMTSBUECHLER: This is Laura Amtsbuechler,
7    attorney for defendants. I am alone in my office. Also
8    appearing are defendant Ryan Boike and the sheriff, as
9    representative of the county. I understand they are also
10   alone each in their separate locations.
11         MR. DREW: Can they verify that?
12         MS. AMTSBUECHLER: That's fine.
13         Jodie, can you unmute Ryan so that he can verify
14   he's alone? Ryan, can you hear?
15         MR. BOIKE: Yes, ma'am, I am alone.
16         MS. AMTSBUECHLER: Okay. Thank you.
17         MR. POULIN: And Sheriff Poulin is alone also.
18         MS. AMTSBUECHLER: Okay. Jody, can you make
19   sure they are muted again?
20         THE VIDEOGRAPHER: Yes. Would you administer
21   the oath?
22         THE REPORTER: Yes. Could you please raise your
23   right hand?
24         Do you solemnly state that the testimony you are
25   about to give in this cause now pending will be the truth,

Page 8

1    the whole truth, and nothing but the truth, so help you
2    God?
3          THE WITNESS: I do.
4          THE REPORTER: Thank you.
5          LORI LYNN HEETHUIS
6    was thereupon called as a witness herein, and
7    after having first been duly sworn to testify to the
8    truth, the whole truth and nothing but the truth, was
9    examined and testified as follows:
10         MS. AMTSBUECHLER: This is the deposition, as
11   has been explained, of Ms. Heethuis taken pursuant to
12   notice to be used for all purposes under the court rules.
13         EXAMINATION
14   BY MS. AMTSBUECHLER:
15   Q.  Ms. Heethuis, my name is Laura Amtsbuechler. I am the
16   attorney for Deputy Boike and for the county. As you have
17   heard, Sheriff Poulin is also present at this deposition.
18   Today is my opportunity to ask you questions regarding
19   your knowledge of the facts and circumstances surrounding
20   your lawsuit.
21   A.  Yes.
22   Q.  Yes. Are you able to proceed today?
23   A.  Yes.
24   Q.  Is there any reason why you are not physically or mentally
25   able to fully and accurately and completely answer the

2 (Pages 5 to 8)

LORI LYNN HEETHUIS,  9-25-2020

| Page 9 |
|---|
| 1    questions that I ask of you today? |
| 2    **A.  None that I'm aware of.** |
| 3    Q.  Okay.  Are you on any medication today? |
| 4    **A.  Yes, I am.** |
| 5    Q.  What medication? |
| 6    **A.  Vyvanse 70 milligram.** |
| 7    Q.  I'm sorry, what did you just say? |
| 8    **A.  I'm sorry.  Vyvanse, V-A-V-A-N-C-E [sic], I believe, 70** |
| 9    **milligram.** |
| 10    Q.  Okay.  What else? |
| 11    **A.  Just a Colace pill and a Zyrtec 10 milligram for my** |
| 12    **allergies.** |
| 13    Q.  What was the second thing you said, a Colace pill? |
| 14    **A.  Colace.** |
| 15    Q.  Colace, okay. |
| 16    **A.  It's to help go to the bathroom.** |
| 17    Q.  For some reason, I don't know, there might be an echo. |
| 18    Hopefully we will be okay as we proceed, but if we have |
| 19    trouble, we will have to readjust. |
| 20    **A.  Okay.** |
| 21    Q.  Vyvanse, what is that for? |
| 22    **A.  Vyvanse is for my -- to help control my PTSD.  It's to** |
| 23    **help with anxiety, a little ADHD, that's about it.** |
| 24    Q.  Okay.  Have you taken any other medication besides what |
| 25    you have just listed in the past three days? |

| Page 10 |
|---|
| 1    **A.  No, other than my night meds.** |
| 2    Q.  What are your night meds? |
| 3    **A.  Seroquel, I was just changed from amitriptyline to** |
| 4    **Seroquel 100 milligrams, and 2 milligrams of Ativan.** |
| 5    Q.  So you took the Ativan and the Seroquel last night? |
| 6    **A.  Yes.** |
| 7    Q.  What time? |
| 8    **A.  9:00, about 9:45 approximately.** |
| 9    Q.  Okay.  So in your mind -- you don't believe that those |
| 10    impact in any way your ability to testify today? |
| 11    **A.  No.** |
| 12    Q.  Have you ever testified in a deposition before? |
| 13    **A.  Yes, I have.** |
| 14    Q.  When? |
| 15    **A.  Late 2016.** |
| 16    Q.  Was that the ACLU case? |
| 17    **A.  Yes.** |
| 18    Q.  Any other time? |
| 19    **A.  No.  I have given testimony, but not a deposition that I** |
| 20    **can recall.** |
| 21    Q.  Testimony in court? |
| 22    **A.  Yes.** |
| 23    Q.  Was that related to your job as a corrections officer? |
| 24    **A.  Yes, it was.** |
| 25    Q.  When was that? |

| Page 11 |
|---|
| 1    **A.  2000 -- actually I don't recall the dates at this time,** |
| 2    **but one was Robert Johnson case, and the other one was a** |
| 3    **Rapp case.  I believe Rapp was in 2000 -- early 2017.** |
| 4    Q.  You said rat, R-A-T? |
| 5    **A.  Rapp, R-A-P-P, Rapp.** |
| 6    Q.  Okay.  What does that stand for? |
| 7    **A.  That's his last name.** |
| 8    Q.  Okay.  Was he a prisoner? |
| 9    **A.  Yes, he was.** |
| 10    Q.  Was Robert Johnson a prisoner? |
| 11    **A.  Yes.** |
| 12    Q.  So your testimony on those was related to your job? |
| 13    **A.  Yes, it was.** |
| 14    Q.  When did you get married to Damon? |
| 15    **A.  I married Damon February 20th of 2016.** |
| 16    Q.  How did you meet him? |
| 17    **A.  I met him in my mother's apartment.** |
| 18    Q.  How did that come to be? |
| 19    **A.  I had went there for dinner.  My mother had made dinner** |
| 20    **and asked me over.  He had stopped in to see if she needed** |
| 21    **any garbage taken out to the dumpster in the apartment** |
| 22    **complex, and that's how we met.** |
| 23    Q.  Is he a neighbor of hers? |
| 24    **A.  He was, yes.** |
| 25    Q.  What is his occupation? |

| Page 12 |
|---|
| 1    **A.  He is retired.** |
| 2    Q.  From what? |
| 3    **A.  He worked at Bennett Pump Company as -- he did several** |
| 4    **jobs within there, mainly calibrating machines.** |
| 5    Q.  When did he retire? |
| 6    **A.  Approximately 28 years ago.** |
| 7    Q.  Okay.  I just got a message from the videographer that she |
| 8    thought perhaps you were trying to talk loudly, and that |
| 9    may be what is causing the echo. |
| 10    **A.  Oh.** |
| 11    Q.  So you don't have to talk loud.  You can talk normal, and |
| 12    it will come -- |
| 13    **A.  Okay.** |
| 14    Q.  Just so you know, if we can't hear you, we will let you |
| 15    know.  That might make it a little more clear.  Okay? |
| 16    **A.  Okay.  That sounds good.** |
| 17    Q.  Yeah, you sound better now.  I think you probably thought |
| 18    you had to talk louder, and you really don't. |
| 19    **A.  Okay.** |
| 20    Q.  So you changed -- Damon -- you changed your name to |
| 21    Heethuis in 2016? |
| 22    **A.  Heethuis, yes.** |
| 23    Q.  Before that you were Lori Johnson? |
| 24    **A.  Yes.** |
| 25    Q.  And before that you had another name, correct? |

3 (Pages 9 to 12)

LORI LYNN HEETHUIS, 9-25-2020

---

Page 13

1  A.  Yes.
2  Q.  Abraham, was that it?
3  A.  Abraham, yes.
4  Q.  Okay.  Did you marry someone named Johnson?
5  A.  No, that's my maiden name.
6  Q.  Okay.  How did you change from Abraham to Johnson?  That's
7     where I am having a disconnect to.
8  A.  We had no children in common or anything, so when I
9     divorced Abraham, then I asked the judge if I could take
10    back my maiden name of Johnson, and they agreed.
11 Q.  Okay.  I made the assumption it was the other way around.
12 A.  Uh-huh.
13 Q.  You married Johnson and divorced Johnson?
14 A.  Yeah.
15 Q.  I mean Abraham.  Sorry.
16 A.  Yes.
17 Q.  When, what were the dates, please?
18 A.  I married Mike Abraham in October of 2000, and I divorced
19    him in February of 2006, I believe, to the best of my
20    recall.
21 Q.  All right.  Have you had any other marriages?
22 A.  No.
23 Q.  Okay.  One of the things I should have done before I
24    launched into this was talk a little bit about some of the
25    background -- some of the deposition rules.  I'm assuming

---

Page 14

1     that you talked to your attorney to prepare, and I'm not
2     going to ask you about that, but what did you do to
3     prepare other than perhaps meeting with your attorney?
4  A.  I went over some of my deposition.  I went over my -- some
5     of my interrogatory questions, and just the prepping, and
6     that was it.
7  Q.  Have you looked at any of the documents that I have
8     indicated to your attorney would be premarked as exhibits?
9  A.  He did show me an exhibit of the third floor office in the
10    jail.
11 Q.  Okay.  Anything else that you looked at that was premarked
12    as an exhibit?
13 A.  No.
14 Q.  Okay.  So as we go through this today, we will -- it's
15    going to be a long day, and if I believe that you are not
16    really understanding or answering the question I'm asking,
17    I may interrupt, but hopefully that won't have to happen.
18    It seems that you are -- you have been -- you know what
19    you are doing here, but you need to answer with a yes or a
20    no rather than an uh-huh or an uh-hun, and if you do an
21    uh-huh or an uh-hun, and I interrupt you and say is that a
22    yes or a no, it's not to suggest that you answer one way
23    or another, it's simply to ask you to clarify.  Okay?
24 A.  Yes, I understand.
25 Q.  All right.  And we will take breaks from time to time.  If

---

Page 15

1     you need a break, please let us know, and we will do that.
2     By no means is this a marathon where you are expected to
3     struggle through if you are uncomfortable.
4              If you don't understand what I am asking you,
5     let me know, and I will rephrase the question for you.  I
6     want to make sure that when we leave here today, it's
7     clear that we are on the same page.  What I don't want to
8     have happen is we leave and I say, you know, she didn't
9     understand me or you say, gee, I really didn't understand
10    that and I didn't really mean that answer.  Okay?
11 A.  I understand.
12 Q.  If you answer, I'm going to assume that you understood or
13    at least that you think you understand.  Okay?
14 A.  Yes.
15 Q.  All right.  You were hired in 1998 as a corrections
16    officer; is that right?
17 A.  Yes.
18 Q.  And you were never certified for road, were you?
19 A.  No.
20 Q.  You are not a sworn police officer?
21 A.  No.
22 Q.  What did you have to do to become a corrections officer?
23 A.  I had to have an associates degree with 30 hours of
24    criminal justice, and then when I hired in they sent us,
25    the new deputies, to Corrections Academy up in Newago

---

Page 16

1     County Jail.
2  Q.  As part of your training, did you receive copies of the
3     General Orders?
4  A.  I'm not exactly sure when you are speaking of General
5     Orders.  Was it during training?
6  Q.  When you started, let me clarify, with the sheriff's
7     department, did you receive copies of the General Orders
8     as they existed at that time?
9  A.  At that time, yes.
10 Q.  And did you understand at that time that it was your
11    responsibility to understand and keep track of those
12    General Orders?
13 A.  In 1998, yes, I did.
14 Q.  And did those change during the course of your years with
15    the department?
16 A.  Yes, it did.
17 Q.  So from time to time, would it be accurate to state that
18    from time to time you would receive updates to those
19    General Orders?
20 A.  After they were changed, I -- at the time it was Captain
21    Poulin, we did get a few updates, yes.
22 Q.  How did you receive notice that there were changes or
23    updates to the General Orders?
24 A.  At times the command staff would make sure that we had
25    them in the morning, and we would sign off for them.  At

---

4  (Pages 13 to 16)

LORI LYNN HEETHUIS, 9-25-2020

Page 17

1    other times they were noted by e-mail.
2    Q. And you always -- would it be accurate to state that you
3       always understood that it was your responsibility to
4       understand and follow the General Orders that were in
5       place?
6    A. Yes.
7    Q. As a corrections officer, would you agree that as a
8       corrections officer in dealing with inmates and people
9       that were in the jail that some of those General Orders
10      were in place to protect the safety of you and your
11      coworkers?
12   A. At times, yes.
13            MARKED FOR IDENTIFICATION:
14            DEPOSITION EXHIBIT 1
15            9:23 a.m.
16   BY MS. AMTSBUECHLER:
17   Q. I'm going to show you what I have marked as Exhibit Number
18      1. Let me see if I can get this right.
19   A. Okay.
20   Q. It's not coming up on my screen. It should be sharing up
21      on my -- okay. Why is this not working? Oh, you know
22      what? Here we go. Bear with me a minute.
23   A. No problem.
24   Q. Okay. Exhibit Number 1, can you see that?
25   A. Yes, I can.

Page 18

1    Q. That's General Order 3.01, which was Bates stamped in
2       discovery page 650-D, okay, and this pertains to
3       discrimination. The effective date on the copy I have
4       here is 5-1-2017. Have you ever seen that before?
5    A. I have, yes.
6    Q. When did you first see any General Order at the sheriff's
7       department or from the sheriff pertaining to
8       discrimination, whether it was this one or some other one?
9    A. I believe a General Order would have been this one, if I'm
10      correct. From what I can recall, it was this one.
11   Q. So is it your testimony that you do not recall a General
12      Order regarding discrimination in existence prior to this
13      one?
14   A. I -- I did, but I never had a direct General Order like
15      this, but we were made aware of that earlier in the career
16      most definitely.
17   Q. What were you made aware of earlier in the career?
18   A. That there was a no discrimination, no harassment,
19      retaliation, just a generalized thing of what this -- that
20      you have in front of me is.
21   Q. How did you become aware of it earlier in your career?
22   A. I believe that it was given out to the union reps, and
23      then it was disbursed, and I know that verbally I had
24      gotten the information from a couple of the command
25      officers as well.

Page 19

1    Q. When -- you said earlier in your career you became aware
2       that discrimination, harassment, and retaliation were
3       prohibited. When was that?
4    A. Probably shortly after I hired in, and then not
5       frequently, but throughout.
6    Q. Did you understand when you first started, when you first
7       became aware of this, did you understand what you should
8       do if you believed that there was discrimination,
9       harassment, or retaliation?
10   A. Yes.
11   Q. What was your understanding regarding what you should do?
12   A. My understanding was to go to your direct command officer,
13      and if nothing was done at that level, to go to the -- go
14      through the chain of command.
15   Q. Were you aware that you could also go to the county?
16   A. No.
17   Q. Okay. Did you -- this Exhibit 1, the 2017 policy, did you
18      read that policy when you were working at the department?
19   A. I probably did read that, yes. I don't really recall 2017
20      of actually sitting down reading it, but...
21   Q. So in -- on section F of this policy, there is a section
22      regarding reporting. Do you see that on here?
23   A. Yes, F.
24   Q. And it says to report it either in writing or in person to
25      the Commanding Officer, Captain or Jail Administrator.

Page 20

1       Was that your understanding of one of your options?
2    A. Yes.
3            MARKED FOR IDENTIFICATION:
4            DEPOSITION EXHIBIT 2
5            9:28 a.m.
6    BY MS. AMTSBUECHLER:
7    Q. I'm showing you what we are marking as Deposition Exhibit
8       Number 2, the County of Muskegon Anti-Harassment Policy,
9       Bates stamp 651-D through 652-D. Do you recall seeing
10      that when you were working at the county? If you need me
11      to scroll it down, I will. Just let me know when.
12   A. Yes, if you could scroll it down, please.
13   Q. Just tell me when to move it.
14   A. If you could move it just a little bit more, please.
15      Thank you. A little bit more, please. A little bit more,
16      please.
17            At this time I don't recall reading this one or
18      seeing this one.
19   Q. When you said you don't recall, does that mean that it's
20      possible you did, but you just don't recall?
21   A. Yes.
22   Q. Okay. Now, there is a Complaint Procedure that is on the
23      screen now, which is part of this. Were you ever aware of
24      that Complaint Procedure?
25   A. No. I was told that we should go through the chain of

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 21

1       command, and then at that point then go to the -- if you
2       were told to, which I was, to go to the EEO.
3    Q.  So at some point you were told to go to the EEO?
4    A.  Yes, I was instructed to to go to the EEO.
5    Q.  And by the EEO, you mean the county's EEO office?
6    A.  Yes, the officer, yes, EEO office.
7    Q.  Which is separate from the EEOC, which is part of the
8       Federal Government, correct?
9    A.  I'm not sure.
10          MARKED FOR IDENTIFICATION:
11          DEPOSITION EXHIBIT 3
12          9:32 a.m.
13   BY MS. AMTSBUECHLER:
14   Q.  Okay.  Fair enough.  Let's go next to -- let's see, this
15      screen sharing -- what I marked as Exhibit Number 3, which
16      is the County of Muskegon Anti-Retaliation Policy, Bates
17      stamp 653-D through 654-D.  Did you ever see that during
18      the time you were working at the sheriff's office?
19   A.  Could you scroll it just a little bit, please?  A little
20      bit more, please.  I recall seeing several different forms
21      throughout my employment.  This could be one that I did
22      see.  I am just not recalling which one it is or when this
23      one was written.
24   Q.  Were you ever aware that you could report to anyone if you
25      believed you were being retaliated against?

Page 22

1    A.  My understanding of it was that you had to go through the
2       chain of command, that you had to go through your sergeant
3       first, and then lieutenant, and then the captain, or
4       multiple sergeants, there were several sergeants you could
5       go to.
6    Q.  So you said you believe you needed to go through the chain
7       of command to report harassment or retaliation.  Who told
8       you that?
9    A.  I can't really recall.  It was discussed with the
10      coworkers.  It was discussed with a few command staff.
11   Q.  Where did you get the idea you had to go through the chain
12      of command?
13   A.  From a command officer.
14   Q.  Who?
15   A.  I believe it was -- it was either -- I can't really
16      recall, but I know Wood and talked about it, Sergeant
17      Wood.  I also had talked about it with Lieutenant Burns.
18   Q.  Anybody else?
19   A.  Not that I'm recalling.
20   Q.  When did you talk with Wood about it?
21   A.  Sergeant Wood, in 2014, I believe, approximately.
22   Q.  When did you talk with Burns about it?
23   A.  I know it was sometime in 2014.  I really don't recall.
24      We did talk about it again after that.
25   Q.  The first time you talked with anyone about your

Page 23

1       obligation to go through the chain of command was in 2014?
2    A.  2014 was the second time.  I was in -- sometime in 2009, I
3       was directed to go to the EEO, and after talking to
4       several levels of command, so no, 2014 would have been a
5       second time.
6    Q.  Okay.  Well, we will get back to all that.  I think I have
7       digressed off the issue of who told you you had to use the
8       chain of command.  So your testimony, if I heard you
9       right, was that Wood and Burns told you you needed to go
10      through the chain of command, correct?
11   A.  From what I can recall of that, yes.
12          MARKED FOR IDENTIFICATION:
13          DEPOSITION EXHIBIT 4
14          9:37 a.m.
15   BY MS. AMTSBUECHLER:
16   Q.  I've put up on the screen what I marked as Exhibit Number
17      4, Bates stamp page 16-D.  Is that your signature?
18   A.  Yes.
19   Q.  And it's dated 2-14-18, and it states that you had amended
20      the EEO training and been a made aware of the
21      Anti-Harassment and Anti-Retaliation Policies.  Did you
22      read this before you signed it?
23   A.  Kristen Wade did a ten-minute presentation and said we
24      just need you to sign this stating I was here and did the
25      presentation.

Page 24

1    Q.  Well, that really wasn't my question.  That's part of what
2       I was --
3    A.  Sorry.
4    Q.  Did you read this document before you signed it?
5    A.  Yes.
6    Q.  Okay.  So you understood that you were attesting to the
7       fact that you had attended the training, that you
8       understood the policies were on the intranet page, and
9       that you understood the city has zero tolerance for
10      harassment, correct?
11   A.  Yes.
12   Q.  Now, you said the training was done by Kristen Wade; is
13      that your testimony?
14   A.  That -- it's fuzzy because of the dates, because there
15      were several of these over the years, but that is what
16      I -- what I can recall.  I shouldn't say that I know.  I
17      don't know for a fact, but I -- from what I can recall, it
18      was Kristin.
19   Q.  There were several of what over the years?
20   A.  These little harassment things came out.
21   Q.  Was there several training classes?
22   A.  Not that I'm aware of.  I can't recall.
23   Q.  How many trainings do you recall attending?
24   A.  Hers was the only one that I recall actually having
25      someone speak about it.

6  (Pages 21 to 24)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

## Page 25

1  Q.  Do you recall going to a training where there was a
2  PowerPoint presentation?
3  A.  Could you tell me what year?
4  Q.  I'm asking you if you recall going to one.  Either you
5  recall or you don't.
6  A.  I don't recall.
7  Q.  Okay.  Do you recall anybody from the EEO, as opposed to
8  Kristin Wade at human resources, putting on any training
9  that you attended?
10  A.  I don't recall.
11  Q.  Okay.  On the screen now is, let's see, General Order 1.
12  Do you see that?
13  A.  Yes.
14          MARKED FOR IDENTIFICATION:
15          DEPOSITION EXHIBIT 5
16          9:40 a.m.
17  BY MS. AMTSBUECHLER:
18  Q.  I'm marking that as Exhibit Number 5 for the deposition.
19  It's Bates stamp page 618 through 620-D.  Are you familiar
20  with that General Order?
21  A.  Can you move it down a little bit, please?
22  Q.  All right.  Do you need to read the General Order to know
23  whether or not you are familiar with the General Order,
24  Standard of Conduct?
25  A.  I do, but -- I do, but it has been over almost two years

## Page 26

1  now, so...
2  Q.  All right.  Let me ask you -- let me ask you a different
3  question.  When you were working at the department, were
4  you aware that there was a General Order pertaining to
5  Standard of Conduct?
6  A.  Yes.
7  Q.  Were you aware that you had to abide by that?
8  A.  Yes.
9  Q.  Were you aware that failure to abide by that could result
10  in discipline?
11  A.  Yes.
12  Q.  Okay.  And I have marked as Exhibit 5 General Order Number
13  1, which is Standard of Conduct.  Do you need to see any
14  of it now since you have been away for two years?
15  A.  I do -- I did understand it at that time.
16  Q.  Okay.  Let me go to section -- there is a section up here,
17  Conduct Affecting Departmental Reputation.  Were you aware
18  of that when you were there?
19  A.  I think those were made when Captain Poulin was put on
20  nights, and they asked him to redo all the policies.
21  Q.  So you were aware of that when you were working at the
22  department?
23  A.  I was aware of, yes.
24  Q.  Did you understand why this section, Conduct Affecting
25  Departmental Reputation was there, did you understand the

## Page 27

1  purpose of it?
2  A.  I understood that we should uphold the department and act
3  in its best interest, yes.
4  Q.  Okay.  And it says in the last, second to last sentence
5  the conduct of a public employee on and off duty reflects
6  upon the department.  Next sentence, therefore, employees
7  must avoid conduct which might discredit themselves or the
8  good name of the department.
9  A.  Yes.
10  Q.  Do you disagree with that?
11  A.  Do I disagree with that?
12  Q.  Yeah.
13  A.  No.  You would have to do your best.  I mean nobody is
14  perfect to that, but we try our best to do that.
15  Q.  There is a section on Courtesy.  Were you aware that
16  existed?
17  A.  Yes.
18  Q.  Did you understand the reason for that?
19  A.  Yes.
20  Q.  What was the reason?
21  A.  That you should be courtesy -- courteous to everyone.
22  Q.  And anything else that you understood to be the reason for
23  that?
24  A.  Just that that's the way human beings should be toward
25  each other, whether you are in corrections or anywhere,

## Page 28

1  it's just be courteous.
2  Q.  Did you understand that as a representative of the office
3  of the sheriffs that it was important that you be
4  courteous to the residents, citizens that you came into
5  contact with?
6  A.  Yes.
7  Q.  Attention to Duty, were you aware that that existed?
8  A.  Actually I did not know that.  I must have not saw that
9  from my recollection.  I did not know at the time.  I did
10  find out later what it was.
11  Q.  You did not know at what time?
12  A.  In the past, prior to --
13  Q.  I don't want to interrupt you.  You stopped talking.
14  A.  Oh, I'm sorry.  I thought you were going to say something.
15  I'm sorry.
16  Q.  No.  I asked you, you did not know -- what time is it that
17  you said you did not know, and you said in the past,
18  prior.  When was that?
19  A.  Prior to Captain Poulin redoing the policies, I had never
20  heard of that particular policy that I can recall.
21  Q.  When are you -- when do you believe Captain Poulin redid
22  the policies?
23  A.  When the sheriff put him on nights.
24  Q.  When was that?
25  A.  I don't recall.

7  (Pages 25 to 28)

LORI LYNN HEETHUIS, 9-25-2020

---

Page 29

1 Q. You are saying Sheriff Roesler?
2 A. Yes.
3 Q. Okay. This policy is dated May 1, 2017. Do you see that?
4 A. Yes.
5 Q. Okay. Are you saying that this Standard of Conduct policy
6 never existed prior to that date or do you just not
7 recall?
8 A. No, I know that he had made some changes to different
9 things, different policies and so forth, so I don't recall
10 that one. I'm not saying I didn't read it. I just don't
11 recall at this point.
12 Q. Okay. Regardless of a policy, did you understand that as
13 a corrections officer dealing with criminals in the jail
14 that it was important that you be attentive to your duties
15 and your surroundings?
16 A. Yes.
17 Q. Showing you Exhibit Number -- wait a minute. I think I'm
18 off on an exhibit number. Hold on.
19 A. No problem.
20 MARKED FOR IDENTIFICATION:
21 DEPOSITION EXHIBIT 6
22 9:46 a.m.
23 BY MS. AMTSBUECHLER:
24 Q. That is not what I wanted. I want this one, General Order
25 Number 2.01, Rules and Regulations, Exhibit Number 6,

---

Page 30

1 Bates stamp page 630-D through 638-D. Were you aware that
2 there were Rules and Regulations?
3 A. Yes.
4 Q. This is effective date 5-1-2017. Were you aware of Rules
5 and Regulations prior to that date?
6 A. Yes.
7 Q. And in the Rules and Regulations, there is another 2.01.5
8 regarding Courtesy. Were you aware that that was in the
9 Rules and Regulations?
10 A. Yes, in all the Rules and Regulations from the time I
11 started courtesy was one of the portions of the policy of
12 conduct and so forth.
13 Q. All right. 2.01.8, Inattention to Duty, were you aware
14 that that was one of the Rules and Regulations?
15 A. I was not aware of the actual name Inattention of Duty,
16 but within it I understood it.
17 Q. Okay. I'm not quite sure I understand what you are
18 saying. Are you saying that you weren't aware that there
19 was a rule and regulation pertaining to inattention to
20 duty?
21 A. No, I never really had heard it called Inattention to
22 Duty. I probably at some point saw it. It was just that
23 the Rules and Regulations, when they were redone, were in
24 the computer, and sometimes it was hard to get to that to
25 actually read absolutely everything while you were doing

---

Page 31

1 your duties of the day.
2 Q. Is it your testimony that you had never read this 2017
3 version of the Rules and Regulations?
4 A. That is incorrect. I had read parts of it and probably
5 all of it. I'm just saying it was a little difficult
6 because we didn't have it in a paper form. We had to go
7 into the computer, into another portion of the computer to
8 get to that, and most of the time it was so busy on the
9 floor that it wasn't like we had a downtime of an hour to
10 go back in and read absolutely everything in it. So at
11 some point I'm sure I got through all of it, but it was --
12 just made it a little more difficult.
13 Q. When did you think you finally got through all of it?
14 A. I don't recall.
15 Q. Had you gotten through all of it by 2018?
16 A. I really don't recall. Like I said, we go back and forth
17 to it, so I can't tell you where I started it, where I
18 stopped it. I'm sure that I got through most of it. I
19 can't say all of it at this point in time because I don't
20 recall.
21 Q. Did you print out -- why didn't you print off a copy for
22 yourself?
23 A. They told us we couldn't print it out, that it would cause
24 it to stop updating.
25 Q. Did you ever tell anybody that you didn't know the rules

---

Page 32

1 because you didn't have time to read them?
2 A. I did know the majority of the rules.
3 MR. DREW: Well, wait a minute. I object to the
4 form of the question. That mischaracterizes her earlier
5 testimony.
6 MS. AMTSBUECHLER: That's fine.
7 BY MS. AMTSBUECHLER:
8 Q. Did you tell anybody --
9 MR. DREW: If you want me to (inaudible) -- I
10 will.
11 (Speaking simultaneously.)
12 BY MS. AMTSBUECHLER:
13 Q. My question stands. I will take an answer. Did you ever
14 tell anybody that you didn't know the rules because you
15 didn't have time to read them?
16 MR. DREW: Same objection.
17 A. I don't recall. I believe I had talked to a couple of the
18 union reps, but I don't truly recall.
19 BY MS. AMTSBUECHLER:
20 Q. You understood it was your obligation to know the rules?
21 A. I understood it was my obligation to do my job to the best
22 of my ability and keep everyone safe and keep --
23 Q. Okay. My question is did you --
24 MR. DREW: Wait, wait. Don't interrupt her,
25 Counsel.

---

LORI LYNN HEETHUIS, 9-25-2020

Page 33

1    MS. AMTSBUECHLER: I'm going to interrupt her
2  because it's a yes --
3    MR. DREW: She was answering your --
4    MS. AMTSBUECHLER: No, she wasn't.
5    MR. DREW: She was answering your question. Let
6  her finish the answer --
7    MS. AMTSBUECHLER: No, she wasn't.
8    MR. DREW: -- and then if you don't think she
9  answered it right, then you can ask her another question.
10   MS. AMTSBUECHLER: Okay. We have a limited
11 amount of time for this deposition today. It's a yes or
12 no question.
13   MR. DREW: It was not.
14   MS. AMTSBUECHLER: Can you read the question
15 back, please, Sharon?
16   (The following record was read by the reporter
17   At 9:51 a.m.:
18   "QUESTION: You understood it was your
19   obligation to know the rules.")
20 BY MS. AMTSBUECHLER:
21 Q. Yes or no, did understand it was your obligation to know
22 the rules?
23   MR. DREW: Same objection.
24 **A. Yes, as I understood them.**
25 BY MS. AMTSBUECHLER:

Page 34

1  Q. Section 2.01.11, did you understand that it was a
2  requirement in the rules that you be truthful?
3  **A. Yes.**
4  Q. Do you understand that pertained in your statements to
5  your command?
6  **A. Yes.**
7  Q. Did you understand that pertained to your statements to
8  your coworkers?
9  **A. Yes.**
10 Q. Did you also understand that that pertained to your
11 statements in your logs?
12 **A. In my logs?**
13 Q. Your daily entries.
14 **A. Yes. To what -- to the best of my knowledge, yes.**
15   MARKED FOR IDENTIFICATION:
16   DEPOSITION EXHIBIT 7
17   9:52 a.m.
18 BY MS. AMTSBUECHLER:
19 Q. Okay. I am going to now go to Exhibit Number 7, General
20 Order 1.14, Duties and Responsibilities of a Corrections
21 officer. This has got an effective date of January 17,
22 '19. I don't know -- I don't have the policy as it
23 existed prior to that date. So let me ask you this.
24 First of all, did you see this version of it, effective
25 January 17, 2019?

Page 35

1  **A. Yes.**
2  Q. How is it that you came to see this version of the policy?
3  **A. I believe, or I recall, to the best of my knowledge, that**
4  **it was an e-mail sent.**
5  Q. By who?
6  **A. By the command.**
7  Q. Telling you this is a new revised policy and to read it?
8  **A. Yes, that is what I recall.**
9  Q. And this has a review date of January 16, '19. I don't
10 know what that means to us, but did you know there was a
11 policy that existed prior to this January 17, 2019 date
12 that defined your duties and responsibilities?
13 **A. Yes.**
14 Q. Did you ever -- well, let me rephrase the question.
15 Going to section L, it states -- well, let me back up.
16 Policy states: Quote, "All corrections staff to (to
17 include command and all deputies) are responsible for the
18 well being of all prisoners and staff, and maintaining
19 security and orderliness of the jail facility" period, end
20 quote.
21   Were you aware that that was part of your duties
22 even prior to this January '19 policy?
23 **A. Yes.**
24 Q. And then it states Master Control operations include all
25 of the first floor of Muskegon County Jail with the

Page 36

1  exception of Booking and Inmate. Were you a Master
2  Control operation deputy?
3  **A. Yes, I was.**
4  Q. And under that, Section L, it states quote, "Any personal
5  electronic devices, reading material, books, magazines,
6  newspapers, bottles, civilian clothing or non-work related
7  property that interferes with job performance or can be
8  viewed by the general public shall not be allowed" period,
9  end quote.
10   Were you aware of that provision existing during
11 the time that you were working at the sheriff's office?
12 **A. I was, but these -- this type of number L was very loosely**
13 **done by other deputies, as well as probably all of us. I**
14 **mean whether they were command or whether they were**
15 **workers, it wasn't -- it's not a cut and dry part of the**
16 **policy, I guess.**
17 Q. So my question was only whether you were aware that this
18 policy existed, and your answer to that is yes, right?
19 **A. Not in the detail of how. So I knew.**
20 Q. What did you know?
21 **A. I knew that they didn't, you know, want anything that**
22 **civilians could see and that, you know, keep stuff on the**
23 **down low, and if you have got it, if you have got a**
24 **magazine in there, if you have got materials, if you have**
25 **got books, electronic devices, to just keep it on the --**

9 (Pages 33 to 36)

LORI LYNN HEETHUIS, 9-25-2020

---

Page 37

1      you know, out of the sight of the public and so forth.
2   Q.  Did you also understand that these were not to allow --
3      not to interfere with your job performance?
4   A.  Yes, I understood that.  It's just it was loosely done.
5      No one really adhered to any of that.
6   Q.  Nobody followed -- is that your testimony, nobody followed
7      it?
8   A.  A lot of people did not follow that to a tee.  It wasn't
9      something that was direct, like you could absolutely not,
10     so...
11  Q.  Did you understand that you were responsible to -- well,
12     let me back up, because there is also a section for Floor
13     Officers Duties and Responsibilities.  Were you a Floor
14     Officer or were you a Master?
15  A.  I rotated within the jail.  I was several different -- you
16     know, we just rotated.  We were cross-trained.
17  Q.  Okay.  Because section L is also in that section as well.
18     So no matter where you were, you understood that that was
19     a policy, but your testimony is that nobody followed it;
20     is that what your testimony is?
21  A.  A lot of people didn't follow it.
22  Q.  Did you understand that it was your responsibility to
23     report a violation of the rules, the General Orders, if
24     you were aware, that you saw them?
25  A.  Yes.

---

Page 38

1   Q.  And similarly, it would be the responsibility of others to
2      report if they saw them, right?
3   A.  Yes.
4          MARKED FOR IDENTIFICATION:
5          DEPOSITION EXHIBIT 8
6          9:59 a.m.
7   BY MS. AMTSBUECHLER:
8   Q.  Okay.  I'm showing you what I marked as Exhibit Number 8,
9      a General Order regarding electronic weapons, and there is
10     also use of force.  It's Bates stamp page 553 through 565.
11     These are produced under protective order.  Were you
12     familiar with the policy regarding use of the Taser?
13  A.  We had training on the Taser, but there was no policy at
14     the time on the Tasers.
15  Q.  This is effective July 2016.  Were you aware this existed?
16     Let me know when you want me to scroll down.
17  A.  A little bit more, yes.  Thank you.  Not that I recall.
18  Q.  What did you get -- what did you learn in your training on
19     Taser?
20  A.  We went downstairs.  I was the only female there.  The
21     guys were joking around.  It was a loosely led training,
22     and they said, okay, we are going to have you hit this
23     dummy, you know.  So we each put the Taser at, you know,
24     our time to do it, and then we were critiqued, and that
25     was about it.

---

Page 39

1   Q.  When was that?
2          THE REPORTER:  Could you speak up a little bit,
3      please, Lori?  Your voice was getting a little bit lower
4      there.
5          THE WITNESS:  Oh, I'm sorry.  I was trying not
6      to get loud.
7   BY MS. AMTSBUECHLER:
8   Q.  I think all of a sudden it changed.  I don't know if you
9      leaned back in your chair.
10  A.  I probably did, yeah, I did.
11         I recall -- from what I recall, maybe 2000 --
12     somewhere around 2014, early '14, maybe late '13.
13         MR. DREW:  Can you get closer, Lori?  Because I
14     can't hear you very well either.
15         THE WITNESS:  Okay.  Let me scooch up.
16  BY MS. AMTSBUECHLER:
17  Q.  There you go.  That's better.
18  A.  From what I recall, I would say somewhere in approximately
19     late 2013 and '14.
20  Q.  All right.  Did you learn the difference between passive
21     resistance and active resistance?
22  A.  No, that wasn't discussed during the training.
23  Q.  Okay.  Did you learn what I have got highlighted here in
24     the screen, section D, that you shouldn't use this for
25     purposes of coercion?

---

Page 40

1   A.  Not in the training, no.
2   Q.  Okay.  Putting up here -- oh, let's see.  What did I do?
3      Nope, I don't want that.  Nope.  I lost it.  Hold on.
4   A.  No problem.
5          THE REPORTER:  I am still not hearing her as
6      well for some reason.
7          THE WITNESS:  I'm going to put a mint in my
8      mouth, if it's okay.  I suffer from dry mouth.  It's
9      genetic.
10         VIDEO TECHNICIAN:  I have a suggestion, if we go
11     off record.
12         MS. AMTSBUECHLER:  You want to go off record?
13     VIDEO TECHNICIAN:  Just momentarily.
14     MS. AMTSBUECHLER:  Okay.
15     VIDEO TECHNICIAN:  Off the record, 10:03 a.m.
16     (Off the record at 10:03 a.m.)
17     (Back on the record at 10:05 a.m.)
18     VIDEO TECHNICIAN:  We are back on the record,
19     10:05 a.m.
20         MS. AMTSBUECHLER:  Now I lost -- let's see what
21     happened here.  Okay.  Now I'm -- something happened.  All
22     I have got is a mini, and I don't have this right.  Okay.
23         THE WITNESS:  And we ended up on the side, the
24     right-hand side, and before you girls were above, and so
25     was I.

---

10  (Pages 37 to 40)

LORI LYNN HEETHUIS, 9-25-2020

## Page 41

1    MS. AMTSBUECHLER:  I know, everything is changed
2    now, and I can't get her back.  I don't know what's going
3    on here.
4         MARKED FOR IDENTIFICATION:
5         DEPOSITION EXHIBIT 9
6         10:05 a.m.
7    BY MS. AMTSBUECHLER:
8    Q.  I have got -- on the screen share, can you see this, Rule
9    9, Disciplinary Actions, Exhibit Number 9?
10   A.  If I get close, yes.
11   Q.  Let me see if I can make it bigger.
12        MR. DREW:  So is this a new exhibit, Number 9
13   then?
14        MS. AMTSBUECHLER:  Yes.
15        MR. DREW:  Okay.
16   BY MS. AMTSBUECHLER:
17   Q.  Can you see that now?
18   A.  Yes, I can see it now.
19   Q.  It's county rule number 9, did you ever see that when you
20   were working there?
21   A.  I don't recall.
22        MARKED FOR IDENTIFICATION:
23        DEPOSITION EXHIBIT 10
24        10:06 a.m.
25   BY MS. AMTSBUECHLER:

## Page 42

1    Q.  All right.  I'm going to show you what I am marking as
2    Exhibit Number 10, if I can get that up there.  Let's see.
3    No.  I keep getting that.  That's not what I want.
4         Can you see that?  Is it sharing or not?
5    A.  No, it's not sharing.
6    Q.  Okay.  All right.
7    A.  It's just me.
8    Q.  Okay.  Well, we will get to it then.  Okay.  There we go.
9    Okay.  Exhibit Number 10, it's the Collective Bargaining
10   Agreement between the FOP, the sheriff, and the county.
11   Were you familiar that you were -- you were a member of
12   the union, correct?
13   A.  Yes.
14   Q.  And it was the FOP, correct?
15   A.  Yes.
16   Q.  And were you aware that you operated under this Collective
17   Bargaining Agreement, which I have marked as Exhibit
18   Number 10?
19   A.  I have never seen a copy of that, no.
20   Q.  Really.  You never saw -- let me ask you a question.  You
21   never saw a copy of the Collective Bargaining Agreement;
22   is that your testimony?
23   A.  From what I recall, yes.  I know that back years ago they
24   used to put them in our boxes, but I never really had a
25   lot in my box, and I never received one, and so I kept

## Page 43

1    asking, and mostly they would fill me in, like the union
2    reps would, on it.
3    Q.  Okay.  Who was your union rep?
4    A.  At what point?
5    Q.  Well, okay.  Fair clarification.  Let's say 2018.
6    A.  2018, I believe, to the best of my recall, it -- because
7    it kind of switched.  I believe it was still Nate
8    Stephenson and John Jenkins at that point.
9    Q.  How about 2019?
10   A.  2019 would have been -- I believe at some point in time in
11   2019 Deputy Chris Riddle took over because John Jenkins
12   had to -- due to a medical situation, had to quit being
13   the union rep, he could not be the union rep any longer,
14   and I believe that Nate relinquished his at that point,
15   and it ended up being Christopher Riddle and -- I can see
16   his face, but I'm not really -- Ed Fox was a business rep
17   who had always been, and then -- I'm drawing a blank on
18   the name.  I can see him.  I'm drawing a blank.
19   Q.  Ed Fox was a business representative; is that your
20   testimony?
21   A.  To my knowledge he was called the business agent.
22   Q.  Okay.  How long was he the business agent?
23   A.  Once we did the FOP, we got rid of teamsters, did the FOP,
24   I guess I would approximate he has been the business agent
25   for maybe six to seven years.

## Page 44

1    Q.  So as of 2019 you believe he had been the business agent
2    for six or seven years?
3    A.  Approximately.
4    Q.  How did you get along with him?
5    A.  Fair.
6    Q.  Did you believe he represented you adequately?
7    A.  No.
8    Q.  Why not?
9    A.  Because when I would be sitting in front of anyone for an
10   investigation, he really would never say anything.  He
11   also -- and he is also the business agent, I believe, that
12   is what he's called there, too, for the sheriff, the
13   undersheriff, the captains and lieutenants and the
14   sergeants as well.
15   Q.  So you believe he was the business agent for the command
16   and the FOP?
17   A.  And for the deputies, yes.
18   Q.  Okay.  Do you believe he ever discriminated against you
19   because you were a female?
20   A.  I believe he did, yes.
21   Q.  Okay.  Why do you believe that?
22   A.  Because of the way he would talk to me.  It was just very,
23   sometimes very degrading and demeaning, humiliating.
24   Q.  Did other deputies complain about him?
25   A.  I'm unaware.  I didn't really ever discuss that with

11 (Pages 41 to 44)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 45

1    anybody.
2    Q.  Were you aware your Collective Bargaining Agreement had a
3        provision, which I have up on the screen now, which
4        prohibited the union from discriminating against you?
5    A.  Yes.
6    Q.  So did you ever complain to anybody that you thought Ed
7        Fox was discriminating against you?
8    A.  Yes, I did.
9    Q.  Who?
10   A.  I believe Sergeant Wood and Lieutenant Mark Burns.
11   Q.  What did you say to them about Fox?
12   A.  I said that I didn't understand why he was our business
13       agent as well as the sheriff, undersheriff, and so forth,
14       the head command.  I said doesn't that kind of glaze over
15       and debunk?  How can he really represent us in these --
16       when he has got to represent the upper tier of command as
17       well, and I told them that I didn't believe he was doing
18       anything.  He wasn't verbally assisting in any kind of
19       defense or any kind of help while I was in there.  And I
20       told them that the times that I had spoken with him
21       afterwards, he had said that -- different like degrading
22       things like, well, you should have did this, you shouldn't
23       have did that.  You know, you just need to know, you know,
24       that we can only do so much basically.
25   Q.  What kind of degrading things did he say to you?

Page 46

1    A.  He said you talk too much.  You shouldn't say anything
2        about that.  Why -- why were you being evasive?  We
3        couldn't really say anything because Captain Poulin told
4        us not to, so, you know, it's not like you can be mad at
5        us because we were -- you know, we were told and ordered
6        by the captain, at that time he was the captain.  So just
7        things like that, of that nature, that just made me feel a
8        little humiliated and unwarranted, I felt, a lot of times.
9    Q.  Okay.  Anything else that he said that you thought was
10       degrading that you can recall?
11   A.  Well, there were things.  I just can't recall at this
12       time.  Those are the things I recall at this time.
13   Q.  All right.  So you referred to Captain Poulin.  This was
14       obviously when he was a captain; is that correct?
15   A.  Yes.
16   Q.  Was he captain of the jail for when you are talking about
17       or was it --
18   A.  Yes.
19   Q.  Okay.
20   A.  Well, I believe he was captain of both the road and the
21       jail, and --
22   Q.  When was this?
23   A.  When he became -- when he became captain.
24   Q.  When was the statement that you said that Ed Fox told you
25       that Captain Poulin --

Page 47

1    A.  That was probably in 2000 -- between 2013 to 2000 -- I
2        believe close to the end of 2018.
3    Q.  What did you ever -- let me rephrase this.  Were you aware
4        that Poulin became sheriff, he was elected in 2016,
5        November of 2016, correct?
6    A.  Yes, and he didn't take -- but he didn't take office, I
7        don't believe, until January of 2017.
8    Q.  All right.  And prior to that was he captain?
9    A.  Yes.
10   Q.  Do you know how long he was captain?
11   A.  Over years.  I can only estimate, maybe at least between
12       ten and eighteen years.
13   Q.  When he was captain, how much interaction did you have
14       with Poulin?
15   A.  Not very much at all.  I would see him in the hallway, say
16       hello, and then in 2014 I had interaction with him when --
17       in a couple of different allegations.
18   Q.  When he was captain, did he ever mistreat you?
19   A.  I believe so.  That's my belief.
20   Q.  How so?
21   A.  I would -- he would put out different things to help with
22       food banks and things like that, and if anybody was
23       interested, and every time I did, he said, well, let's
24       wait and see who else comes along, you know, maybe we can
25       use you next time, that type of thing.

Page 48

1        When he -- when he was put on two separate
2        allegations against me, he was very -- pounding his fist
3        on the table telling me, you know, that they were the
4        monkeys at the circus, and they were to sit there and be
5        quiet, which was very unsettling to me.
6    Q.  All right.  I'm going to come back to that in a minute,
7        but let's complete the list.  Anything else that Poulin
8        did to mistreat you when he was captain?
9    A.  I didn't see him a whole lot, but when I did see him, it
10       was for those allegations, and I felt that he mishandled
11       the second allegation, because his comment was there was
12       no -- no video at that time on that, but all I could see
13       was a picture, but he would have to assume that this is
14       what was happening.
15   Q.  What allegation are you talking about?
16   A.  A female that had been already released from our jail,
17       other than doing her fingerprints, and her -- she was
18       young.  She -- her phone was dead.  I had my charger with
19       me, so I was trying to get it charged because she was 21
20       and didn't know her mother or dad's phone number without
21       the phone.
22   Q.  All right.  So that's the incident you are talking about
23       there, and we will come back to that.
24   A.  Uh-huh.
25   Q.  So the time he was pounding his fist on the table and

12 (Pages 45 to 48)

LORI LYNN HEETHUIS, 9-25-2020

Page 49

1    talking about the monkeys in the circus, what was that
2    about?
3    A.  That was on the Taser, I believe, if I recall correctly,
4       it was on a Taser.  There were two right on top of each
5       other that we were doing, so...
6    Q.  All right.  How did the sheriff treat you -- how did
7       Poulin treat you when he became sheriff?
8    A.  I did not see Sheriff Poulin unless he had come down to
9       ask for me or if they had asked me to go upstairs.
10   Q.  Did he do anything in the times you did interact with him
11      as sheriff that you thought was inappropriate?
12   A.  Not sure I understand the inappropriate part.
13   Q.  Did he mistreat you in any way when he became sheriff, in
14      the one-on-one situation?  I know you have got allegations
15      that relate to the sheriff's office overall.  I'm talking
16      about one on one.
17   A.  Not that I recall, because I didn't see him very often.
18   Q.  I'm trying to find my documents.  Bear with me a minute
19      here.  Can you see the document I have up on the screen,
20      it's a written reprimand, January 24, 2019?
21   A.  Yes.
22      MARKED FOR IDENTIFICATION:
23      DEPOSITION EXHIBIT 11
24      10:22 a.m.
25   BY MS. AMTSBUECHLER:

Page 50

1    Q.  That's Bates stamped pages 12 to 13-D.  It's Exhibit
2       Number 11.  Do you recall receiving that written
3       reprimand?
4    A.  Yes.  That wasn't how it started, though.  It ended that
5       way, but --
6    Q.  What do you mean by that?
7    A.  They had taken me off for four days on administrative
8       leave and investigate -- some investigation.  They didn't
9       tell the union reps any particular information on it, nor
10      did they give me any information on it, and what the
11      original investigation apparently was, was that they
12      thought I was bringing drugs into the jail and giving them
13      to the female laundry ladies.
14   Q.  All right.  So when did you learn that somebody thought
15      you were bringing in drugs?
16   A.  That was the -- I believe the meeting was the 23rd, and
17      then I went back to work, I believe, the 24th.
18   Q.  So your Loudermill hearing was on the 23rd; is that
19      correct?
20   A.  For this incident, yeah, I believe so.  It was four days I
21      was off total.  They had Sergeant --
22   Q.  Okay.  You know what, I'm going to try to ask you to
23      answer my questions, if you can.
24   A.  Okay.
25   Q.  We have got a limited amount of time here today.

Page 51

1    A.  Sorry.
2    Q.  And so I'm just trying to -- the Loudermill hearing on the
3       23rd, who was present?
4    A.  It was the undersheriff, myself, Deputy Riddle, and I
5       believe that the sheriff was also there, if I recall
6       right, or in and out of the meeting.
7    Q.  Riddle was your union representative?
8    A.  Yes.
9    Q.  Was Ed Fox there?
10   A.  I don't recall.
11   Q.  What was said at this meeting on the 23rd of January,
12      2019?
13   A.  What I recall is they were -- I was told by Deputy Riddle
14      that they had thought that I was passing drugs into the
15      facility.  They had the dog go through, and then when they
16      couldn't find anything, they looked back on the tapes and
17      saw that I gave a cookie to each of the laundry trustees,
18      and I believe -- it seem likes Deputy Jenkins had either
19      talked to me prior to that or was there at that one also,
20      and he said:  Lori, if they try to write you up for giving
21      a cookie to an inmate, I'm going to have to out myself,
22      because all of us have given them cookies, we have given
23      them coffee.  The state of trustees had been into the
24      master control room when we had a luncheon for one of the
25      holidays, and they ate --

Page 52

1    Q.  Did Deputy Jenkins -- did Deputy Jenkins say this during
2       the hearing on the 23rd?
3    A.  No, just prior to it.
4    Q.  I'm asking what was said at the hearing on the 23rd.
5    A.  I'm sorry?
6    Q.  What was said at the hearing on the 23rd?
7    A.  On the 23rd, that they thought that I was bringing drugs
8       into the facility, however, they realized that I gave a
9       cookie to each trustee.  They asked me if I asked a
10      sergeant, and I said we have never had to ask a sergeant
11      from the time that I started.  It was just a given, people
12      give inmates -- or the trustees coffee all the time.
13      There is some that would go out and buy them pops at the
14      machine from the front, and I didn't realize that we had
15      to get an actual okay from a sergeant prior to giving a
16      cookie or anything such like that to a trustee.
17   Q.  Did you give the trustees cookies?
18   A.  I gave each of them a cookie, yes.
19   Q.  Okay.  What was said by the sheriff or the undersheriff
20      other than what you have just said during meeting on the
21      23rd related to the cookies, if you recall?
22   A.  He said, well, you handed to them -- handed it to them
23      strangely, that's why we thought at first it was possibly
24      drugs.  I am left handed.  I walked over to look at the
25      blanket, the loads of blankets there, and she -- I said --

13 (Pages 49 to 52)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 53

1　she said:  Do you have anything sweet, Ms. J?  And I said:
2　I have got a couple cookies that I was going to eat.  Oh,
3　do you think that we could have one?  And I said:  Sure.
4　And I handed it to them, because it was my left hand, so I
5　handed it this because she was on the other side, and
6　she -- I dropped it in her hand, and I said there is one
7　for each of you, and I walked out.
8　Q.  Who is he?  You said he said.
9　A.  Undersheriff Sanford.
10　Q.  Okay.  What was discussed on the 23rd related to your
11　cellphone?
12　A.  They said that I had it out in front of inmates.  I
13　had turned, and my daughter had text me, and I looked at
14　it, and then I put it in my pocket and walked out.
15　Q.  So they talked to you about this, and you told them that
16　that's what you had done, is that what you are testifying
17　to?
18　A.  That's correct.
19　Q.  Okay.  And what was the response by either the
20　undersheriff or the sheriff at this meeting on the 23rd?
21　A.  That we just have to be careful and out of view of the
22　inmates, even though they're turned around, they possibly
23　could see, and that they were never going to take the --
24　they would never take our phones away from us because that
25　could be the last resort, but just to be careful to not

Page 54

1　have trustees around or be moving inmates and have your
2　phone out.
3　Q.  So you received a written reprimand for these two items on
4　January 24, 2019 as reflected in Exhibit 11, correct?
5　A.  Yes, but Deputy Riddle did verbally say:  Now, can she
6　have it out like in a small hallway or in the offices or
7　places that there aren't inmates?  And he said:  Well,
8　sure, yeah, that's no problem at all.  And he goes:  Well,
9　I just wanted to clarify that.  But I don't believe that
10　it was ever added in the original write-up that I got.
11　Q.  Did you grieve the written reprimand?
12　A.  No.
13　Q.  It says here on the page 13-D that there was time
14　management, performance and time management issues which
15　were addressed at the hearing on the 23rd.  Do you see
16　that?
17　A.  Yes.
18　Q.  Do you recall that discussion?
19　A.  Yes.
20　Q.  What was said by who about that topic?
21　A.  The undersheriff brought it up.  I believe they were
22　saying that I had left the -- if I remember right, I had
23　left some stuff in the dryers, and I brought the girls up,
24　and they had a bunch of people they released, and Sergeant
25　Vanderlaan was upset that there was no trustees down there

Page 55

1　at that time when I left, but I had relayed to the people
2　in master control, as well as gave a note to the day
3　sergeant to give to the night sergeant, about what had
4　been done and what needed to be done.
5　Q.  So after that did you take extra care in how you filled
6　out your dailies regarding your time management?
7　A.  I was told by Sergeant -- well, I never had to do a daily
8　until then, and what he told me was it had to be specific,
9　the dates had to be right, the times had to be very, very
10　concise.  Like if I went to the bathroom at 8:32 and left
11　the bathroom at 8:36, I should note that.  I should note
12　everything pertinent in the day.
13　Q.  So did you start doing that?
14　A.  I did it to the best of my ability, yes.
15　Q.  In January of 2019 what shift were you working?
16　A.  I believe that, and the shift that I bid for, the
17　eight-hour shift for doing laundry, commissary, cell
18　checks, that type of thing.
19　Q.  What time of day, what hours were those eight hours, what
20　day times?  What times of day?
21　A.  It originally started at 10:00 a.m. until 6:00 p.m.
22　Q.  Did that change?
23　A.  Yes, it did.
24　Q.  When?
25　A.  My partner, who is deployed, he was a Marine reserves, and

Page 56

1　he was deployed, and so it was brought to the
2　undersheriff's attention at a meeting that we had all had
3　by another deputy that it would be nice if I could come in
4　at a little earlier in the day, like maybe 8:00, 8:30,
5　because when I would come in at 10:00 I was under the gun
6　to get so much finished before lunchtime, then I had to
7　break for lunchtime.  I couldn't go out and do my job
8　during the lunchtime, and then if it was a Sunday, I
9　couldn't do my lunchtime once we did the break, and then
10　had chapel at, I believe it started anywhere between
11　1:30 and 1:38 in at afternoon, and you would bring
12　different people to the chapel room and on the third
13　floor.
14　Q.  Okay.  But my question was when.
15　A.  When did it change?
16　Q.  Yes.
17　A.  After Deputy Rutt (Phonetic) was put on full duty as a
18　Marine.
19　Q.  Do you know when that was?
20　A.  It was probably late January, early February.  I don't
21　really recall.  I just know he was gone.
22　Q.  So from February until when were you on the shift coming
23　in at 8:00 or 8:30?
24　A.  To the best of my knowledge, it was approximately three to
25　four-and-a-half months after Rutt left.

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS,  9-25-2020

Page 57

1  Q.  Who were you working with during that time, who was your
2      partner if there was one?
3  A.  I had no partner.
4  Q.  Who was on your -- who did you work directly with during
5      that time?
6  A.  Directly with?  I had no partner, but I did work directly,
7      interacting with the deputies on each floor.
8  Q.  Okay.  And that was January, February, March?  You don't
9      remember, right?
10 A.  I know it was sometime in that area, but I don't really
11     remember if it was January, because he didn't leave until
12     January, I do know that, and it was sometime after that
13     that my hours changed.
14 Q.  After you got the written reprimand regarding the
15     cellphone usage in January of 2014, did you then try and
16     record video footage of other people using their
17     cellphones?
18 A.  When I was inside of an office, yes, I did, because I was
19     being -- that was retaliatory on the phones and such
20     because of my testimony in late 2016, that I was in a
21     deposition at.  So yes, I did, to show that there were
22     people that were actually on their phones out there with
23     people, buzzing around the inmates and trustees, and
24     nothing was done.
25 Q.  So you said that the written reprimand was in retaliation

Page 58

1      for your deposition testimony in 2016; did I hear you
2      correctly?
3  A.  Late 2016, I believe it was in October.  I believed it was
4      settled a year later or a little over a year later.
5  Q.  You are talking about your deposition testimony related to
6      the ACLU matter with the prisoners, correct?
7  A.  Yes.
8  Q.  Okay.  Why do you believe that the January 24, 2019
9      reprimand was in retaliation for your testimony in 2016?
10 A.  Well, it was late 2016.  They did not get a verdict until
11     sometime in 2017 --
12 Q.  Why?
13 A.  -- I believe.  Because of my testimony, I have been told
14     by Lieutenant Burns not to say anything other than I
15     didn't have any idea of the allegations, that I never saw
16     them, that I never heard them.  Basically he wanted me to
17     lie, and I told him at that time, Mark, we've worked
18     together for 21 years.  If they ask me direct questions
19     that I was there to hear or see or both, I'm going to tell
20     the truth.  I'm not going to lie for you, this department,
21     or anyone else.  If they ask me general questions that I
22     was not aware of, I will tell them I was not aware of.
23 Q.  We will get back to that in a minute, but why do you link
24     that up to your discipline in 2019, why do you believe
25     there is a connection?

Page 59

1  A.  Because there had been retaliation constantly since 2010
2      when I was sexually assaulted by a sergeant multiple
3      times, and nothing was done.
4  Q.  Okay.  The question is what -- what basis do you believe
5      that your January 2019 discipline was a retaliation for
6      your testimony in the deposition in October of 2016?
7  A.  I have to disagree with you, because it was the testimony,
8      but it was after they made a settlement that these things
9      started to occur of retaliation against me, because of my
10     testimony, because they did get a good sum of money from
11     that.
12 Q.  Why do you believe your discipline was because of that
13     2016 ACLU matter?
14 A.  Because I was told by Lieutenant Burns in 2017 that the
15     sheriff was not happy with me and my testimony in the
16     deposition, and he just thought I should know that.
17 Q.  Any other reason?
18 A.  I could see what was happening.  I could see the
19     retaliation.  I could see that they were -- they were
20     singling me out for certain things.  They weren't looking
21     at anybody else, after to find out that there was a
22     sergeant who was reviewing my tapes heard the command,
23     whether it was -- I don't know if it was undersheriff,
24     sheriff, who it was, and they were looking to try to
25     violate me on any of the policy they could.

Page 60

1  Q.  Who was that sergeant?
2  A.  Sergeant Vanderlaan, is what I understood.  That's what I
3      was told.
4  Q.  Who told you that?
5  A.  I was told that by different -- Chris Riddle, John
6      Jenkins, a couple people on the night team, so that's how
7      I was aware of it.
8  Q.  So your testimony is that Riddle, Jenkins, and others told
9      you that Sergeant Vanderlaan was reviewing your tapes to
10     try to get you in every way they could; is that your
11     testimony?
12 A.  That is what they made it -- it wasn't their exact
13     wording, but in so many words, yes, that's what they were
14     saying.
15 Q.  But what were their words, do you remember their words?
16 A.  Not -- not each one of them, no, but they basically all
17     said the same thing, you know, you need to watch out
18     because they got Vanderlaan reviewing your tapes to see if
19     they can get you on any policy violations.
20 Q.  When did they say this to you?
21 A.  After -- I have to think.  It was after they brought me
22     back from -- they took me off saying that I was mentally
23     unfit for duty, so it was after that point in time.
24 Q.  How many times did Jenkins and Riddle say this to you?
25 A.  I don't really have an answer for that.  I know it was at

15 (Pages 57 to 60)

LORI LYNN HEETHUIS, 9-25-2020

Page 61

1    least once.
2    Q.  Okay.  Since we started talking about this ACLU testimony,
3        let's close that loop.  You said that someone told you, I
4        think you said Lieutenant Burns told you the sheriff was
5        not happy with your testimony?
6    A.  Yes.
7    Q.  What sheriff was he talking about?
8    A.  He wasn't happy with my testimony?
9    Q.  What sheriff was he talking about?
10   A.  Sheriff Poulin.
11   Q.  Because when you testified, Poulin was not sheriff, was
12       he?
13   A.  When I testified, no, he was not sheriff, but when the
14       deposition was done and when -- or not the deposition,
15       sorry, but when it was brought to where -- the point where
16       they made a deal with the ACLU, that would be at that
17       point.
18   Q.  So is it your testimony that you believe that when the
19       case was settled with the ACLU, Poulin was sheriff?
20   A.  He was either sheriff or going to be, because when the
21       other sheriff lost, then he just quit coming to work,
22       so -- and neither did the undersheriff, came to work, very
23       rarely.
24   Q.  When did Burns tell you that -- you said -- let me
25       rephrase this.

Page 62

1        You testified, I believe, that it was in 2017
2    that Burns told you that the sheriff was not happy with
3    your testimony; is that correct?
4    A.  It was sometime in mid -- the middle of to the later of
5        2017.
6    Q.  In what context, where were you?
7    A.  We were in the master control, and we were standing
8        near -- more near the door, and he said, hey, I just want
9        to let you know that the under -- the sheriff and
10       undersheriff aren't very happy with you for -- they
11       settled that ACLU, and they are not real happy with your
12       testimony, what you testified to.
13   Q.  Anybody else present for this?
14   A.  There were people over, but they were busy doing things,
15       so there were people there.  There were a couple people
16       running the boards and stuff and letting inmates in and
17       out and so forth, but I had -- we weren't close enough to
18       them that -- I don't think they would have been able to
19       hear.
20   Q.  So it's your testimony that Lieutenant Burns just pulled
21       you aside and said, hey, the undersheriff and sheriff
22       aren't happy with your testimony; is that what you are
23       saying happened?
24   A.  Yes.
25   Q.  Okay.  Do you have any other reason to believe the sheriff

Page 63

1    even knew about your testimony?
2    A.  I just believed that because the sheriff was the sheriff
3        or going into being the sheriff or in the interim, or
4        whatever they wanted to call him, that he would have had
5        to have known.
6    Q.  Did anybody else testimony in that matter?
7    A.  I'm sure there were.  I know that Lieutenant Burns was
8        after my deposition, and I recall they had a -- I'm not
9        sure exactly what deputies, but they did have another, a
10       couple, three to my memory, that did testify in it at some
11       point after Lieutenant Burns.
12   Q.  Do you know who else testified?
13   A.  I can't recall, no.
14   Q.  Do you know if anybody else was retaliated against for
15       their testimony?
16   A.  Not to my knowledge.
17   Q.  Is it your testimony that Lieutenant Burns told you to
18       lie?
19   A.  Yes, it is.
20   Q.  Did anybody else hear that?
21   A.  No.
22   Q.  Do you -- did Lieutenant Burns tell you why he was telling
23       you to lie?
24   A.  Because that's what they always do.  He didn't tell me,
25       but that's what they always do.

Page 64

1    Q.  So you believed that he told you to lie because they
2        always lie?
3    A.  I don't -- I just think he told me to tell -- and in fact,
4        the fact of the matter is, it would have been a lie, but
5        they schmooze it over to just, well, you don't recall and
6        you didn't hear and you didn't see.  To me that's lying,
7        and that's what I called it as, so yes.
8    Q.  So your testimony is that he told you to say you didn't
9        really recall what went on?
10   A.  He said just say I have not heard that or I don't recall
11       hearing that or seeing that.  Just a vague, you know, type
12       of answer, that I really don't know what you are talking
13       about, but without saying that.
14   Q.  Did anybody talk to you about your testimony after you
15       gave the testimony other than what you have already said?
16   A.  Talk about my testimony as far as after it was done, no,
17       not that I recall.
18   Q.  So when I started down this path, when I asked you about
19       making a recording of other people on their cellphones,
20       and you said you did that because you thought you were
21       being retaliated against, and you -- through your attorney
22       we have been provided with four videos.  Are you familiar
23       with those, four videos that you made?
24   A.  Yes, I am, I'm aware.  I thought it was three, but it may
25       have been four.

16  (Pages 61 to 64)

LORI LYNN HEETHUIS, 9-25-2020

---

Page 65

1 Q. Okay. And one of those was a February 13, 2019 video of a
2 deputy in their office using an electronic device. Do you
3 recall making that?
4 A. Yes. It was a very quick one. It just shows his legs and
5 a little bit of his phone. He had his legs up.
6 Q. Who was that deputy that you were recording?
7 (Technical difficulties.)
8 MS. AMTSBUECHLER: We have some serious
9 feedback.
10 VIDEO TECHNICIAN: Off the record, 10:48 a.m.
11 (Recess taken at 10:48 a.m.)
12 (Back on the record at 11:04 a.m.)
13 VIDEO TECHNICIAN: We are back on the record,
14 11:04 a.m.
15 MS. AMTSBUECHLER: Okay. I think we can all
16 hear each other now.
17 Mr. Drew, did you change rooms? Are you in the
18 same room with her now?
19 MR. DREW: I'm in the same room. I'm in my same
20 separate room, yes.
21 MS. AMTSBUECHLER: Oh, okay. I didn't know if
22 that's what started the echo or if you had moved or not.
23 I was a little confused.
24 MR. DREW: No, I was there the whole time.
25 BY MS. AMTSBUECHLER:

---

Page 66

1 Q. Okay. Anyway, so I think we left off, we were talking
2 about the video that was made on February 13th of the
3 deputy who had his feet up, and you said his name was
4 what, please?
5 A. Deputy Greg Lynn, L-Y-N-N.
6 Q. Okay. And now I have got a little bit of a delay because
7 of the phone. I hope that doesn't result in us talking
8 over one another. We will do our best.
9 Did you report that to anyone?
10 A. I had said things several times, especially the male
11 deputies being on their phone.
12 Q. No, my question was did you report this incident?
13 A. I told my union rep.
14 Q. Did you report it to command?
15 A. I had said something, but it was kind of not really like a
16 sit down and report. I said: How come you let all these
17 guys sit around with their phones playing, you know, games
18 and stuff while they should be doing their stuff, you
19 know, they should be doing their duties?
20 Q. Did you report the incident on February 13, 2019 to
21 anyone?
22 A. Not formally, no. I did speak about it.
23 Q. How about informally?
24 A. Informally, yes.
25 Q. Okay. What about what you just said should have told

---

Page 67

1 anybody in command that Deputy Lynn had done this on
2 February 13?
3 A. I told them it was Deputy Lynn at that point, but that
4 there were several others.
5 Q. Who did you tell that Deputy Lynn had done this and when
6 did you tell that person?
7 A. I believe it was -- I believe it was Sergeant Griswold, if
8 I recall right.
9 Q. When did you have this conversation with Griswold about
10 Deputy Lynn being on his phone?
11 A. Probably within a week after that, a couple days. I don't
12 know if I had a couple days off in between or what, but it
13 wasn't right that exact day, no.
14 Q. And what did you say to Griswold about Lynn being on the
15 phone?
16 A. I said: Why is it that all these guys can be on their
17 phones, whether it be in the office or out while they are
18 with inmates doing different things, whether it be serving
19 dinner or what? And he said: I don't know, Lori, I don't
20 know.
21 Q. That is what you -- is there anything else that you told
22 him that you believe should have let him know that Lynn
23 had done this on February 13?
24 A. He knew that that was Deputy Lynn on the 13th, and then I
25 said, you know, he's not the only one.

---

Page 68

1 Q. How did he know it was Deputy Lynn on the 13th?
2 A. I told him it was Deputy Lynn.
3 Q. On the 13th?
4 A. Not on the --
5 Q. Did you specifically say to Griswold that on February 13th
6 Deputy Lynn was on his -- on his phone with his feet up,
7 and I have video of it?
8 A. I didn't probably say that it was the 13th or whatever. I
9 probably said on Tuesday or whatever it was, you know,
10 this is what I get. I got this guy that I'm with, and he
11 is sitting there with his feet kicked up talking on -- or
12 texting on the phone or whatever he was doing, I said, and
13 I just don't get it. I don't get why they watch me every
14 second of the day, but they don't let -- they let the
15 other guys, you know, deputies run around with their
16 phones in their hands constantly, and that's when he said
17 he didn't know.
18 Q. Was Sergeant Griswold -- Sergeant Griswold your sergeant?
19 A. He was there. He's not normally my sergeant. Well, they
20 all are, but sometimes they work dayshift. He was a
21 nightshift mainly, and then he went to day, and then while
22 people were away they would -- you know, we would get some
23 road sergeants that would come in and cover the jail, so
24 at that point that's who I was working with.
25 Q. He was not the sergeant on your shift at that time; is

---

17 (Pages 65 to 68)

LORI LYNN HEETHUIS, 9-25-2020

Page 69

1    that correct?
2    **A.  I don't recall, because they did move him to first shift**
3    **at some point, but I don't recall if it was at that point**
4    **or not.**
5    Q.  Okay.  You have also got a video of Jason Thielbar,
6    T-H-I-E-L-B-A-R, using an electronic device when he was
7    passing meals on March 23rd; is that correct?
8    **A.  I'm not sure if it was Jason or not.  It could have been,**
9    **but I haven't --**
10   Q.  Did you tell --
11   **A.  I haven't really looked at it again, and yeah, he was --**
12   Q.  Did you tell anybody -- did you tell anybody in command
13   about that?
14   **A.  Yes, I did.**
15   Q.  Who?
16   **A.  Lieutenant Burns.**
17   Q.  When?
18   **A.  The next time I saw him, which I don't recall.  It was --**
19   **it wasn't months or anything, but within probably, I would**
20   **guess, within a couple weeks.**
21   Q.  What did you say?
22   **A.  I just told him that, I said look it, here he is on his**
23   **phone, and nobody does a thing, but let me just slide it**
24   **out so I can see the time because my watch is broke or I**
25   **don't have my watch on that day, and I'm upstairs, and**

Page 70

1    they are trying to discipline me for it.  I said I don't
2    understand it.
3    Q.  What did Burns say in response?
4    **A.  He said, well, you know, they probably share -- I will**
5    **have a word with him, yeah, you know, you are right, and**
6    **you know, don't worry about it.  I will have a talk with**
7    **Thielbar and, you know, just we will see if we can't, you**
8    **know, all work together.**
9    Q.  Did you show Burns the video?
10   **A.  I couldn't get it to go at that time.  I got it up, but it**
11   **was frozen, so he knew there was a video, but he didn't**
12   **actually -- and he could see that the phone -- he was on**
13   **the phone, and it was frozen to that frame, but he didn't**
14   **get to see the whole thing, because at that time I**
15   **couldn't get it to unfreeze on my phone.**
16   Q.  So you had a conversation with Lieutenant Burns where you
17   showed him your phone, and you let him know you were
18   recording other deputies engaged in misconduct; is that
19   your testimony?
20   **A.  I --**
21          MR. DREW:  Wait a minute.  Wait, wait.
22   Objection, form of the question.  That's a compound
23   question.
24   BY MS. AMTSBUECHLER:
25   Q.  My question stands.  Can you answer it?

Page 71

1          MR. DREW:  Well, read it back.
2          MS. AMTSBUECHLER:  I'm not asking to have it
3    read back.
4          MR. DREW:  I am.
5          MS. AMTSBUECHLER:  It's my deposition.
6          MR. DREW:  Okay.  Do you remember the question?
7          THE WITNESS:  No.
8          MS. AMTSBUECHLER:  Let me rephrase the question
9    then, and I would appreciate not having interference.
10   BY MS. AMTSBUECHLER:
11   Q.  Is it your testimony that you showed Lieutenant Burns a
12   video of another deputy involved in misconduct?
13          MR. DREW:  Objection, form of the question.
14          Go ahead.
15   **A.  Yes, but it was frozen so he didn't see the video.  He saw**
16   **a photo of the start, a frozen frame, that's what he saw.**
17   BY MS. AMTSBUECHLER:
18   Q.  On your phone, correct?
19   **A.  Yes.**
20   Q.  So is it your testimony, that you believed anyway, that
21   Lieutenant Burns knew that you had taken a video recording
22   of Thielbar?
23   **A.  Yes.**
24   Q.  Okay.  And that you told Burns that you had this video,
25   correct?

Page 72

1    **A.  Yes, that it was a video.**
2    Q.  And that you just couldn't get it to play?
3    **A.  At that point, no, I couldn't.**
4    Q.  Okay.
5    **A.  I went in --**
6    Q.  Where were you -- okay.  Where were you when you showed
7    this to Burns?
8    **A.  In his office.**
9    Q.  In the jail?
10   **A.  His office was in the old jail, yes.**
11   Q.  So you went to him and you -- specifically to show him
12   this, is that your testimony?
13   **A.  Yes, because I felt I was being retaliated against once**
14   **again for --**
15   Q.  Okay.  All right.  I'm not asking you why.  I'm just
16   asking you if you did that.
17   **A.  Yes.**
18   Q.  Was there anybody else there?
19   **A.  No.**
20   Q.  Okay.  How long were you in his office having this
21   conversation?
22   **A.  I don't recall.**
23   Q.  Did you make an audio recording of the conversation?
24   **A.  No.**
25   Q.  Did you make audio recordings of any conversations with

18 (Pages 69 to 72)

LORI LYNN HEETHUIS, 9-25-2020

Page 73

1     anybody from the sheriff's office?
2   **A.**  **I really don't recall.  I mean you are talking the entire**
3     **span of my career, am I understanding that right?**
4   **Q.**  That's right.
5   **A.**  **I don't recall ever doing that until after the 2017, when**
6     **all the retaliation started, and then I may have done a**
7     **couple, but I'm not -- I don't recall at this time.  I'm**
8     **sorry.**
9         **I don't know whether to look at the phone or the**
10     **screen, so please correct me if I'm supposed to look**
11     **straight ahead or over there.**
12     THE VIDEOGRAPHER:  We just lost --
13     (Technical difficulties.)
14     MS. AMTSBUECHLER:  I'm back on computer audio.
15   Can you hear me?
16     VIDEO TECHNICIAN:  Yeah, I was just going to
17   stop the dep because we lost your audio.  That's fine.  We
18   can hear you well.
19     MS. AMTSBUECHLER:  I don't know what happened
20   here, so I'm just going to continue with the computer
21   audio.
22     THE WITNESS:  Okay.  I just asked if I should be
23   looking -- I'm tending to look at the phone over here.
24   Should I be looking straight ahead?
25     VIDEO TECHNICIAN:  Yes.  Thank you.

Page 74

1     MS. AMTSBUECHLER: Yes.
2     THE WITNESS:  Okay.  I'm sorry about that.
3   Thank you for clarifying.
4   BY MS. AMTSBUECHLER:
5   **Q.**  All right.  So did you audio record any conversations with
6     anybody that you worked with at the sheriff's office?  I
7     think your testimony was at least not before 2017.  Did
8     you do any audio recordings after 2017?
9   **A.**  **I don't really recall if I did.  There may have been a**
10     **couple that I did, and it would just be to show, again,**
11     **how I was being retaliated against and others weren't that**
12     **I worked with.**
13   **Q.**  Where are those audio recordings?
14   **A.**  **I don't know if I have them.  I have not looked on my**
15     **phone for that type of thing.  It would be on my phone if**
16     **I did have it.  I can look at it and get back through my**
17     **attorney with you on that, but at this time there may be**
18     **nothing.  I'm just -- I don't really recall.**
19   **Q.**  How long have you had the phone that you currently have?
20   **A.**  **Probably going on four years, if I'm right.  It's my**
21     **husband's account.  I get my phone through him, so I would**
22     **estimate it sometime around four years ago probably.**
23   **Q.**  So you have had the same actual device for approximately
24     four years?
25   **A.**  **Yes.**

Page 75

1   **Q.**  What kind of phone is it?
2   **A.**  **It's a Samsung.**
3   **Q.**  Is that the phone you used to make the video recordings
4     that you have produced to us?
5   **A.**  **Some of them maybe were on the chip that I did have on the**
6     **other phone, maybe one or two of them.  I'm not really**
7     **sure which phone it was, but I know that there was --**
8     **there were at least two of them made while I had this**
9     **phone.**
10   **Q.**  What other phone are you talking about?
11   **A.**  **The one I turned in to get $100 for the new phone because**
12     **our contract was up.**
13   **Q.**  What kind of phone was that?
14   **A.**  **That was also a Samsung, but a later model, or earlier**
15     **model.**
16   **Q.**  You said something about a chip.  Did you take that out of
17     the phone before you turned it in?
18   **A.**  **Yes, I did.  They make you take it out because they wipe**
19     **-- they wipe the phone clean at that point.**
20   **Q.**  Where is that chip now?
21   **A.**  **I have no idea, to tell you the truth.  I'm sure it's**
22     **somewhere, but I don't know exactly where.**
23   **Q.**  You said you thought some of the video may have come from
24     that chip.  Why did you think that?  Where would -- how
25     would you have gotten it off the chip?

Page 76

1   **A.**  **I'm not really sure.  I'm just saying that I don't really**
2     **recall on the specifics that you are asking me on, if they**
3     **were all on this phone or that, or if there were some on**
4     **another phone.  I'm just trying to -- trying to answer the**
5     **question the best that I can, and I guess the only thing**
6     **that I can say is I don't recall.**
7   **Q.**  You don't recall where the chip is?
8   **A.**  **It's somewhere, but we moved.  I moved twice.  We moved**
9     **once.  Well, I moved twice with him too, actually from**
10     **one --**
11   **Q.**  All right.  Whatever.  So if all your video was 2017 and
12     2018, that would be your new phone, right?
13   **A.**  **Yes.**
14   **Q.**  Okay.  But you don't recall, you may have done something
15     with the old phone?
16   **A.**  **No, I don't.  I don't recall doing anything with it.  I**
17     **didn't do any kind of like a recording or a video like I**
18     **did.**
19         **This all was done to try to protect myself from**
20     **being discriminated against, not only for what my**
21     **testimony was, but because I was female, because the other**
22     **males were allowed to do things, and they didn't get any**
23     **type of write-up.  They didn't get any write-up, talking**
24     **to, days off, or anything.  It was just directed**
25     **specifically to me.  You could tell it was specifically to**

19 (Pages 73 to 76)

LORI LYNN HEETHUIS, 9-25-2020

Page 77

1    me.
2          MS. AMTSBUECHLER: Okay. Mr. Drew, can we do
3    something so we can get answers to the questions? Because
4    otherwise we are not going to get through this in the
5    seven hours required by the court rules. You're muted.
6    You're muted.
7          MR. DREW: Listen to the question and just
8    answer the question, Lori.
9          THE WITNESS: Okay.
10   BY MS. AMTSBUECHLER:
11   Q. So I have four videos. Two are in 2017 -- one is in '18
12     and one is in '19. We just talked about two of them. The
13     other two are in October of 2017. One was a Deputy Herman
14     throwing -- allegedly you said something about throwing
15     Grizzly chew into a can, and I think the video was of a
16     trash can. Do you recall making that?
17   A. Yes.
18   Q. Why did you make that?
19   A. Because that's a violation of policy.
20   Q. Do you know if command knew about this?
21   A. Yes, they were aware of it. Several of them did it.
22   Q. Several of command did it?
23   A. Several of the deputies, one of the commands, they all
24     chewed, even though it was the policy that there was no
25     chew or tobacco in the facility.

Page 78

1   Q. Who in command do you believe was aware of the violation
2     by Herman?
3   A. Several sergeants.
4   Q. Who?
5   A. Sergeant Griswold, Sergeant Smith at the time he was the
6     sergeant, he knew about it, Sergeant Wood. Sergeant Wood
7     actually chewed as well in that policy. Herman. There
8     was a couple females, Brittany Miller chewed, and --
9   Q. Okay. That's not my question. My question was who do you
10     believe in command was aware of Herman?
11   A. Oh, I'm sorry. It would have been Lieutenant Burns,
12     Sergeant Burton-Jones, Sergeant Griswold. That's all I
13     recall off the top of my head. I'm sure there were other
14     ones.
15   Q. Did you report this violation that you found on October 7,
16     2017?
17   A. I said something about it to Lieutenant Burns. I did not
18     actually report it because he never actually said let me
19     do a report on this. This is what you need to do. He
20     just said, okay, Lori.
21   Q. What did you say?
22   A. I said: Isn't it funny how all these people can chew and
23     there is a policy that says there is no chew on the
24     premises, there is no tobacco, there is no smoking on the
25     premises. And he said: Yeah, well, you know, a lot of

Page 79

1     them do. And, you know, he was always just real
2     nonchalant, nah, like, you know, they do it, don't worry
3     about it.
4   Q. When was this conversation?
5   A. After I did the video.
6   Q. When?
7   A. I'm not sure of the date.
8   Q. Did you show him the video?
9   A. Yeah.
10   Q. So you showed Lieutenant Burns the video of the Grizzly
11     chew in the trash can?
12   A. I don't recall showing it to him. I know I had showed it
13     to my union rep, and he said let Lieutenant Burns know, so
14     that's what I did.
15   Q. Did you show Lieutenant Burns the video?
16   A. I don't recall.
17   Q. Did you tell Lieutenant Burns you had the video?
18   A. Yes.
19   Q. So you told Lieutenant Burns that you had video on your
20     phone of the chew in the trash can?
21   A. Yes, I did.
22   Q. Did you tell him that you took this video, and you thought
23     it was from Deputy Herman?
24   A. Yes, I did.
25   Q. Was this the same conversation that you had where you were

Page 80

1     trying to show him Thielbar's video and it froze?
2   A. No.
3   Q. This would have been before that, right, because this was
4     2017?
5   A. Right, yes.
6   Q. So is it your testimony -- how many conversations did you
7     have with Lieutenant Burns about the fact that you had
8     video of things that were going on in the jail?
9   A. Probably three times.
10   Q. When was the other time?
11   A. When Sergeant Smith made it the policy that all of the
12     garbage had to be out of the office and had it to be
13     cleaned before the other shift started, but that we would
14     come in and everything would be full of garbage, and I
15     didn't feel it was fair that he, you know, basically was
16     yelling at us for doing something that the night half was
17     not doing at all, so I -- and I told him that I was doing
18     this because I was being retaliated against with different
19     things, and that's why I was doing it. I wasn't just
20     videoing for the fun of it.
21   Q. And when you told Lieutenant Burns you thought you were
22     being retaliated against, what did he say?
23   A. He said: Well, Lori, you know, I don't know. I really
24     don't hear much anymore. You know, do what you have got
25     to do, and, you know, I hope -- I hope everything works

20 (Pages 77 to 80)

LORI LYNN HEETHUIS, 9-25-2020

---

Page 81

1    out basically.
2  Q. Where was this third conversation with Burns?  We have
3    talked about two.  Where was the third?
4  A. It was in his office.
5  Q. Okay.  Were you ever disciplined for not cleaning up the
6    trash, picking up things?
7  A. No.  We were given e-mails that we weren't doing our part
8    to keep the office clean, and that was to everybody, but
9    it wasn't just directly to me, no.
10  Q. And were you ever disciplined or talked to about smoking
11    or using tobacco?
12  A. I don't use either one, so I wouldn't be reprimanded for
13    that.
14  Q. And you said other women deputies also chewed and smoked?
15  A. Just -- just two.
16  Q. Female deputies chewed?
17  A. Yeah.
18  Q. Okay.  Were they disciplined, do you know?
19  A. I don't know.  I know the males weren't disciplined.
20  Q. Did you ever make any other videos that we don't have
21    besides the four that we have just talked about?
22  A. No.
23  Q. Did you ever see other people on their electronic devices
24    that you didn't record?
25  A. That they were videoing also?

---

Page 82

1  Q. No, other people -- no.  You said that these people,
2    Thielbar and the other one were violating policy by being
3    on their phones so you took videos of them.  Did you ever
4    see --
5  A. No --
6  Q. -- anybody else --
7  A. Oh, yes, I saw lots of people on theirs.
8  Q. Why didn't you record them?
9  A. Probably because I wasn't able to do that at that time.
10    Maybe I was busy moving somebody, but I saw them, or I was
11    doing something on my computer, glanced over, looked at
12    the screen and saw them.
13  Q. Did you tell these people you were recording them?
14  A. I didn't record them.
15  Q. You were video recording them.  Did you tell them you were
16    video recording them?
17  A. Deputy Lynn and -- is that what you are talking about?
18    And Deputy Thielbar, which I didn't video -- I videoed off
19    the video of the screen, so I didn't actually video like
20    him out there.  I videoed off the screen.
21       Scott Smith has videos on his device.  There is
22    several officers that have videos on their device that
23    they show.
24  Q. So your answer is no, you didn't tell Thielbar or Lynn
25    that you had video of them; is that correct?

---

Page 83

1  A. That is correct.
2  Q. Okay.  Now, you said Scott Smith has video of people on
3    his phone?
4  A. Yes.  He had Brittany Miller on his phone.
5  Q. How do you know that?
6  A. Because he showed me.
7  Q. What did he have of Brittany Miller on his phone?
8  A. How she told the trustees to bring the trays out.  They
9    missed a bunch of trays.  He explained that he had to pick
10    up 27 more and that she doesn't ever do her job, and she
11    is -- there is a big bag of garbage out by the -- when
12    they let them through the first door, the trustees, there
13    is a big bag of garbage there, and when she comes out of
14    the office and she grabs and --
15  Q. How do you know this, is my question.  Did he show it to
16    you?
17  A. Yes, he showed me it.
18  Q. Did he tell you -- did he tell you why he had it?
19  A. Yeah, he was -- he was upset because she didn't pick up 27
20    trays, and that how dare she, instead of go down, take
21    that garbage down and out like she should, because she was
22    a night officer, that she threw it back into a pile that
23    it didn't even come from.
24  Q. Okay.  All right.  Switching gears here a little bit, you
25    worked with Nate Stephenson in 2019, correct?

---

Page 84

1  A. Yes, for a while I did, yes.
2  Q. Were you working with him in January, February, March,
3    April?
4  A. Of 2019?
5  Q. Correct.
6  A. Well, I was on a special unit.  I just did certain things,
7    but I would have to ask them to open doors and so forth so
8    that I could do my job, so I did interact with him, but I
9    didn't like work side by side with him at that point.
10  Q. Did there come a time when you learned that he thought
11    that you had reported him that he was sleeping on the job?
12  A. Yes.
13  Q. And how did you learn that?
14  A. Because he wouldn't open the doors to allow me to bring in
15    commissary to the floor, and I had asked him a couple
16    times, I ran back, you know -- there is a little
17    pass-through window.  I went back, I believe, once and
18    said: Hey, Nate, can you open -- pop key up and open the
19    door so I can do commissary?  And he didn't respond, and
20    then the trustee went over there a couple times on his own
21    and says: Hey, Stephenson, can you open the door for
22    Deputy Johnson?  And he said:  Yeah, yeah, I will get to
23    it.  And then later on he called me an F'ing bitch and an
24    F'ing snitch for saying that he was sleeping.
25  Q. Okay.  So if I understand you correctly, you are saying

---

21 (Pages 81 to 84)

LORI LYNN HEETHUIS, 9-25-2020

Page 85

1    that you learned that he thought you reported him because
2    he wasn't opening doors fast enough, and you thought that
3    that was because he thought you reported him, and then he
4    called you a snitch and a bitch?
5    A. With the F word in front of it, yes.
6    Q. Okay.
7    A. He was told by Sergeant -- at the time he was a sergeant
8    and he was going for jail administrative class, but he was
9    called by Sergeant Smith at that time and told not to
10   trust me because I had written in my daily that I think
11   that he appeared to be sleeping while I was waiting for
12   those laundry trustees so that I could take them down the
13   stairs to do their job. And I learned that from actually
14   another female that was there that day, Marcie Neal, and
15   she is the one who told me that Matt Smith, who called
16   after I left and said: You need to watch yourself. You
17   know, if you were sleeping or you were dosed off,
18   whatever, watch yourself when she is around, because she
19   is putting it in her dailies.
20   Q. So these dailies, should they be at the department if we
21   were to go get them?
22   A. They should be, yes.
23   Q. Okay. And did you write that in your daily?
24   A. I wrote that it appeared as though he possibly was
25   sleeping or mediating, I believe I used the word, because

Page 86

1    he had called for them, and then when I came back and was
2    just kind of standing with my back waiting, and I kind of
3    took a couple steps away, came back, he had his chin down
4    and his eyes closed. So I actually waited about 30 more
5    seconds, and I said: Nate, could you make sure through
6    the pass door? And he goes: Oh, yeah, yeah. They aren't
7    out yet? And I said: No, they are not out yet. And so
8    that's what I put in there, because they told me to note
9    everything that I did.
10   Q. So you thought he was upset because he called you an F,
11   what was it again?
12   A. He called me an F'ing snitch and an F'ing bitch.
13   Q. Where did this conversation take place?
14   A. Well, when he called me an F'ing snitch, he was talking
15   through the hatch. It's like a bank teller hatch, and
16   when he called me that, I had four trustees left with me
17   because they assist in doing the commissary. On the days
18   that we do clothing, they assist on changing the clothing
19   out and the bedding, and so they were right there. And
20   they said: Wow, Ms. J, what is wrong with him? And I
21   said: I have no idea. Because after he --
22   Q. When was this?
23   A. It was during the afternoon when I was trying to pass
24   commissary into Pod P.
25   Q. Okay. Can you recall the date?

Page 87

1    A. It was approximately around the -- I know it was Sunday.
2    I want to say around the 20 -- somewhere in the 20s, late
3    20s of March, maybe the 24th, 23rd, somewhere in there.
4    Q. 2019?
5    A. Yes.
6    Q. And when he said F'ing snitch, did he say fucking or did
7    he say F'ing?
8    A. He said fucking.
9    Q. Okay. And did you tell anybody he had said this to you,
10   anybody in command?
11   A. Yes, I went down -- I had asked him to put the trustees
12   away and let me through the door so I could go on to the
13   elevator. I went downstairs. Sergeant Griswold had left
14   early, so it was Sergeant Stevens, and I told him I wanted
15   to make a complaint about the unbecoming conduct, and the
16   words he used to me in front of the trustees, that it's
17   not appropriate, and I was told that there was nothing he
18   could do about it, when he like this, there is
19   nothing I can do about it. You will just have to tell the
20   lieutenant tomorrow. And I said: What do you mean you
21   can't do anything about it? Do I have to sign --
22   handwrite something, do I need to go on the computer, are
23   there forms? Do I need to go through the union? What do
24   I need to do? And he said: I don't know. There is
25   nothing I can do about it. You will have to talk to the

Page 88

1    lieutenant tomorrow.
2    Q. Okay. And you said that he also called you a fucking
3    bitch. When was that in relation to the other comment?
4    A. That was when I came back up to the floor to start my job
5    again; however, they were starting to feed the lunch to
6    the inmates, so I had to stop. So I went into the office
7    to get my commissary paperwork that had been signed so
8    that I could put it in a box for Kathleen, because she did
9    -- or not Kathleen, I'm sorry, for Jeanie, because she did
10   all of the paperwork for that. So when I walked in, he
11   turned his head, and he goes: You fucking bitch. And I
12   went all righty, so I went over, got my stuff, and I said:
13   Could you let me out, please?
14   Q. And did you go home from there or did you continue
15   working?
16   A. No, I didn't go home, no. I went down and put the stuff
17   in the old jail where it needed to be under Jeanie's
18   stuff, and made sure it was all in alphabetical order and
19   so forth, because at that point in time I could not do
20   anything on the floor because of the mail being done.
21   Q. Okay. So let me make sure I understand this. I think it
22   was March 24th, you said it was sometime in the late 20s,
23   March 2019, he called you a fucking snitch. You went to
24   Stephens, you came back, and he called you a fucking
25   bitch; is that how it happened?

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 89

1  A.  Well, I came back, and I -- because I actually got to do J
2     and I believe K pod before the meal came up, and then I --
3  Q.  I'm just trying to understand the order of things.  Was
4     that the order of things?
5  A.  Yes, that is the order of things.  I came back, and when I
6     came into the office, because they were starting their
7     meals, I had to come in, and I thought, well, I will just
8     get the stuff and I will run it down.  I didn't realize he
9     was going to call me a fucking bitch when I walked in, and
10    so I just grabbed it and went downstairs.
11 Q.  Okay.  So let me ask you another question.  Again, we will
12    get through this a lot more quickly if we proceed with
13    questions and answers.  If you want to just talk, that's
14    fine.  I can let you do that, but --
15 A.  I don't want to just talk, ma'am.  I am not trying to do
16    that.  I apologize.
17 Q.  Okay.  All right.
18 A.  I just want you to be able to understand the answer,
19    because some of them aren't just a yes or no, so I
20    apologize.
21 Q.  Did you believe that Stephenson called you these names
22    because he thought you had reported or written in your
23    daily that he was sleeping?
24 A.  Yes, I do.
25 Q.  Did you meet with Lieutenant Burns the next day?

Page 90

1  A.  Yes.
2  Q.  What happened then?
3  A.  I told him I wanted to make a formal complaint.  He said:
4     Oh, Lori, you know, we are just like family, like brothers
5     and sisters.  There is going to be fights and
6     disagreements, and, you know, we see each other sometimes
7     more than we do our own families, and I will talk to Nate.
8     Don't worry about it.  I will talk to Nate.
9  Q.  And when you talked to Burns, I think you told him that
10    Nate had also made a comment, I have got you now.  Did
11    Nate make that comment?
12 A.  Yeah.
13 Q.  When did Nate --
14 A.  Yes, he did.
15 Q.  When did Nate make that comment in the order --
16 A.  Directly after he called me an F'ing snitch or a fucking
17    snitch, if you want me to say the word for the record.
18    I'm sorry, I don't like to really say that too much.  So
19    yeah, when he said that to me, he went, I got you, I got
20    you, I got you, like he was 12, and I'm like, okay.
21 Q.  Okay.
22 A.  I was just trying to do my job.
23 Q.  How long were you talking to Burns that day on the 25th?
24 A.  I could estimate it at maybe 10 to 20 minutes.
25 Q.  Was that around 2 o'clock that you went to talk to him?

Page 91

1  A.  I don't recall the time.  I knew it was when I had a
2     chance to be able to meet with him and that he was
3     actually in his office.
4  Q.  Was it the afternoon?
5  A.  Possibly early afternoon maybe when they were -- maybe
6     when we were doing chow, so it could have been, yeah.  It
7     could have been anytime between 12:15 and 2:00-ish
8     probably.
9  Q.  Had you gotten along with Nate prior to this incident
10    where he did this presumably because he thought you were
11    sleeping?  Or I'm sorry, could --
12 A.  Yeah, we got along fairly well, yes, I would say, you
13    know.  I mean we had a little bit of a discussion sometime
14    prior to that where I didn't agree with what he was
15    saying, and we got -- he wasn't understanding what the
16    deputy was trying to -- trying to give him as information
17    at shift change, so I was trying to clarify it, and so we
18    kind of talked over each other and got a little bit --
19 Q.  You got through that?
20 A.  Yeah, we got through that, yeah.
21 Q.  Okay.  And I misspoke in my last question, but apparently
22    you were tracking with me anyway.  I didn't mean to say
23    that he thought you were sleeping.  He thought you
24    reported that he was sleeping, but --
25 A.  I'm sorry.  I can't --

Page 92

1  Q.  I think I mis --
2  A.  The heat or the registers are on in here, so it's hard to
3     hear at this point.
4  Q.  All right.  I'm going to -- can you hear me better now?
5  A.  Yes, I can.
6  Q.  Okay.  I will make sure I'm clear.
7  A.  Okay.
8  Q.  So when in relation to your conversation with Lieutenant
9     Burns did you make the phone call that was recorded by
10    Deputy Boike?
11 A.  Well, I wasn't aware at that time that I was recorded by
12    Deputy Boike.
13 Q.  When did you make the, in relation to the conversation
14    with Lieutenant Burns did you make the recording -- I mean
15    make the phone call?
16 A.  I made the phone call prior -- after talking with Sergeant
17    Stephens and knowing that I had to go up and try to get my
18    job done on the floor.
19 Q.  Okay.  So you had the phone call that was recorded.  That
20    was after you talked to Stephens, and that was on the
21    24th, correct?
22 A.  I believe it was on the 24th, yes, the 23rd, 24th,
23    somewhere in there.
24 Q.  It was the same day you talked to Stephens?
25 A.  The same day that Stephens -- Sergeant Stephens said,

23 (Pages 89 to 92)

LORI LYNN HEETHUIS, 9-25-2020

Page 93

1  yeah, he couldn't do anything.  I would have to talk to
2  the lieutenant.  It was very frustrating.
3  Q.  Were you upset?
4  A.  Yes.  It was very frustrating.
5  Q.  You were frustrated and upset when you left your
6  conversation with Stephens; would that be accurate?
7  A.  Yes, it would be.
8  Q.  So did you go directly into the control area from the
9  conversation with Stephens, the area where Boike was?
10 A.  Boike was not in that area when he recorded me, he was on
11 the third floor, and that was during the time that they
12 were down for feeding.  He was at the command post where
13 the other officer was out doing the feeding of the
14 inmates, and I went up there because I had to use the
15 restroom, so I used the restroom, and then I made a call.
16 The door was shut.  It was 12 foot away from the where
17 Boike was.  There were buzzers going off.  There were
18 alarms going off.  He was asking people to lockdown.  I
19 had the door shut, went to the bathroom, and made a phone
20 call.
21 Q.  All right.  Let's try to go question and answer here if we
22 could.  So you left the conversation with Stephens.  Where
23 did you go?
24 A.  To the third floor office.
25 Q.  What room in the third floor did you go to?

Page 94

1  A.  I walked in the door of the office, and I directly turned
2  left and went into the bathroom shutting the door behind
3  me.
4  Q.  What room was that?
5  A.  A bathroom.
6  Q.  The room that the bathroom was in was what room?
7  A.  It would -- I think it would be called the bathroom.  It's
8  right to the left as you walk in, and then you go up two
9  steps, and there is -- it's quite a large room, and there
10 is the command with all the -- it's what we call the
11 command spot where you had all the computers in front of
12 you, and you were running, opening doors and closing doors
13 and so forth like that, and then there is another
14 probably, approximately, I would say six to eight feet to
15 the left there is another station for officers.
16 Q.  All right.  Stop for a second.  The bathroom was in the
17 room that was the command room; is that accurate?
18 A.  It was in the office.  I don't know.  I called them
19 offices.  There is a master control in the new jail, and
20 then there is a receiving, and then there is a first
21 floor -- or, I'm sorry, the second floor and the third
22 floor, and I went to the third floor at that time.  He
23 opened the door for me to enter.  I said:  Hi, Boike --
24 Q.  Please, let's go question and answer, okay?  I was just
25 trying to get a common term that we could use to describe

Page 95

1  the room.  So we can refer to it --
2  A.  So it's a bathroom from what I understand, it would be a
3  bathroom, but it is within the office.
4  Q.  Within the office where the command desks are located, is
5  that a good way to describe it?
6  A.  Yes.
7  Q.  Okay.  And Boike was at one of the command desks --
8  A.  Yes.
9  Q.  -- is that accurate?
10    And it's your testimony that you went right into the
11 bathroom; is that accurate?
12 A.  That is correct.
13 Q.  Did you see Boike before you went into the bathroom?
14 A.  Yes.  As I walk in, I can see him at the control.  He
15 looked at me, and I said:  Thanks, Boike.  I just have to
16 use the bathroom.
17 Q.  So you knew he was there, right?
18 A.  Correct, he was running the controls, yes.
19 Q.  And had you been in that bathroom before?
20 A.  Several times.
21 Q.  So you are familiar with the bathroom, you are familiar
22 with the door, and the layout and all that, right?
23 A.  Yes, I am.
24 Q.  Okay.  And you went into the bathroom and you shut the
25 door, right?

Page 96

1  A.  Correct, yes.
2  Q.  Did you have any other conversation with Boike before you
3  went into the bathroom other than to say I just have to
4  use the bathroom?
5  A.  No, because Deputy Boike normally works nightshift, so I
6  don't see him unless I happen to be there while the
7  officers on duty on that particular floor are briefing
8  him, but I was just being polite and saying:  Hey, Boike,
9  thank you.  I am just going to use your bathroom.
10 Q.  Did he respond?
11 A.  No, he was actually answering buzzers.  There were
12 intercom calls, and he was answering those and trying to
13 lock the upper tier down so the lower tier could eat, or
14 whichever tier was supposed to be out, so he was pretty
15 busy.
16 Q.  So he was busy working at that desk, right?
17 A.  Yes.
18 Q.  All right.  Did you have on a duty belt?
19 A.  No.  I don't wear a -- I never wore a duty belt.  I just
20 always wore my belt to my trousers, and that's where I put
21 my things.  Some of the deputies did have duty belts that
22 are clip-ons so that -- but it wasn't -- I don't think it
23 was necessary.  There were several of us, especially --
24 Q.  Okay.  I just was asking if you had it, that's all.
25 A.  Yeah, no, I didn't have one, no.

LORI LYNN HEETHUIS, 9-25-2020

Page 97

1  Q. So when you went into the bathroom, what did you do?
2  A. I went to the bathroom, flushed the toilet, turned on the
3     water. While I was washing my hands, I made a phone call.
4  Q. When did you start making the phone call, before you went
5     to the bathroom or after you went to the bathroom?
6  A. I believe it was while I was -- while I was using the
7     bathroom, and then through that point.
8  Q. So you started making the call before you started going to
9     the bathroom?
10 A. Yes.
11 Q. So you were holding onto the phone while you were going to
12    the bathroom?
13 A. Yes.
14 Q. And you were holding onto the phone while you were washing
15    your hands?
16 A. I had it crimped on my neck.
17 Q. How long did that all take?
18 A. I really don't know for sure.
19 Q. Were you -- would it be fair to say you were talking loud?
20 A. No, I was talking normal.
21 Q. Okay. Were you upset --
22 A. I mean I do -- I have a loud voice. I'm not soft spoken,
23    but I wasn't like yelling or anything.
24 Q. While you were in there, could you hear Deputy Boike
25    outside in the outside area doing the work that he was

Page 98

1     doing?
2  A. No, I couldn't hear what he was doing. I could hear
3     buzzers and things like that in the distance, but I had
4     the door shut, so I don't know really -- I couldn't tell
5     you what he was doing at what time.
6  Q. Could you hear him talking at all?
7  A. Not really. I think I heard him a couple times say, you
8     know, come on, lockdown, guys, what are you doing. That
9     was about it, otherwise it was we have an intercom call
10    and we have a door breach, a lot of noise like that.
11 Q. Did you give any thought to whether he could hear you in
12    the bathroom?
13 A. I felt an expectation of privacy while I was in the
14    bathroom with the door shut, and I was talking in my
15    regular voice, like I am with you right now, and I don't
16    believe that through everything else that -- unless he was
17    right up at the door of the bathroom, that he would be
18    able to hear me.
19 Q. My question was when you were in there, were you thinking
20    at all about whether or not he could hear you?
21 A. I wasn't specifically thinking of that, no. I had an
22    expectation of privacy, so I wasn't thinking, oh, I wonder
23    if Boike can hear this. I assumed he couldn't because the
24    door was shut. The water was running. The toilet was
25    flushed. You know, I'm -- so I guess --

Page 99

1  Q. When is the last time you have heard -- when is the last
2     time you listened to that video?
3  A. They only gave me a two-minute clip of it, and that was
4     after the Loudermill meeting by about a week, I think, or
5     a week-and-a-half, because first the sergeant said -- or
6     the captain said he didn't have any type of recording, it
7     was just a deputy that was concerned, and then at the end
8     he said: Well, I better tell you there is a recording.
9     And I said: Well, can I get a copy of that recording?
10    And he said: Well, I don't have it, but I will talk to
11    the sheriff about it.
12 Q. Did you listen to it?
13 A. The two-minute clip that he sent me?
14 Q. Have you listened to the audio, have you listened to it or
15    not?
16 A. Not the complete thing, no, just a two-minute clip of it.
17 Q. Why do you think there is more than what you have?
18 A. Because -- or when this all was going on, when they
19    decided to make an issue of this, and didn't do anything
20    about Nate Stephenson, I was told by Deputy Riddle that it
21    was probably almost a seven-and-a-half, eight-minute
22    recording, and that he could hear somebody in the
23    background, but he could not make out anything. The thing
24    that he heard was like it was close to the command video
25    or the main video where Boike would be working saying you

Page 100

1     have an intercom call, you have a door breach, and him
2     saying, you know, lockdown, and door is shutting and
3     locking, and there is a click when they lock them, and he
4     said I know that -- I didn't know it was you at the time,
5     but I knew somebody was talking, but I couldn't make
6     anything out, so there is nothing to this, Lori. This
7     is -- this video, it doesn't show anything.
8  Q. Where is that two-minute clip? Did you get to take one
9     with you or did you just listen to it at the sheriff's
10    office?
11 A. The two-minute clip -- the two-minute clip he sent to an
12    e-mail at work for me.
13 Q. Do you still have that?
14 A. Yeah, I have the actual clip because they let me transfer
15    it to my phone so that I could have it, I guess.
16 Q. When is the last time?
17 A. On that phone.
18 Q. When is the last time you listened to that?
19 A. Probably a year ago.
20 Q. Okay. Now, you said that you could hear on that that
21    Boike was at the command desk doing command?
22 A. No, no, I couldn't hear where he was. I had the door shut
23    with the water running. I assumed he was somewhere around
24    where he should be, but I have no idea where he was
25    because the door was shut.

25 (Pages 97 to 100)

LORI LYNN HEETHUIS, 9-25-2020

Page 101

1  Q.  All right.  So if he was right up next to the door with
2      his phone recording you, would he be able to be typing on
3      the keyboards at the control desk?
4  A.  He doesn't have to type at a keyboard on a control desk.
5  Q.  Were there keyboards right up next to the door that he
6      could be typing on at the same time he was --
7  A.  He didn't -- at that time -- you are misunderstanding.
8      I'm sorry.  He would just click the button, and then he
9      would click it to talk if he needed to, and I don't know
10     if there was a time where he let that just go and then
11     went somewhere else in the area or not, because again, the
12     door was shut.  I was near the running water.  I did not
13     go in like close to the door at that time or anything.
14 Q.  I'm asking you a different question.  I'm asking you a
15     different question.
16 A.  Okay.  I'm sorry.
17 Q.  Do you think it would be physically possible for him to be
18     standing near the door and also working the desk?
19 A.  The answer would be no, but he doesn't -- it doesn't -- he
20     doesn't type or anything, so he could have walked away
21     from the desk, yes, most definitely, and been at the door
22     possible.  I don't know.  He's not just stuck to that
23     area.  I mean I don't know how else to explain it.  I'm
24     sorry.
25 Q.  When you walked out of the bathroom, where was he?

Page 102

1  A.  When I walked out of the bathroom, he was at the smaller
2      desk.  He was walking -- he was getting up to walk, it
3      looked like to me, so there is the desk where he stands
4      up, and then right alongside of it there is a shorter
5      desk, where if he had time once lunch was over or dinner,
6      whatever it may be, where he had time, he types in some of
7      his activities or maybe looks at some parts for sale for
8      his car or number of things.
9  Q.  All that when you walked out of the -- all that -- you saw
10     all that when you walked out of the door?
11 A.  When I walked out of the door, he was -- he looked like he
12     was getting up from that smaller area, and I said:
13     Thanks, Boike.  And he got up the rest of the way.  He
14     ended up to the left so that he could open the door for
15     me, because that's the only way I could get out it.
16         MARKED FOR IDENTIFICATION:
17         DEPOSITION EXHIBIT 12
18         11:59 p.m.
19 BY MS. AMTSBUECHLER:
20 Q.  Okay.  So let's back up and go through this with this
21     drawing, which I have marked as Exhibit Number 12.  I will
22     represent to you that it was drawn for me by Boike.  Okay.
23     So at the bottom of this you see there is a main door.  Do
24     you see that?  It says main door.  It's kind of faint.
25 A.  Well, there is a thing that says from Jodie Chapa in the

Page 103

1      way.
2  Q.  Really?
3  A.  So yeah, I do see it now, main door.
4  Q.  Okay.  And that's where you walked in and you walked into
5      the bathroom; is that your testimony?
6  A.  Yes.
7  Q.  Okay.  And you shut the door, right?
8  A.  Yes.
9  Q.  What was the door made out of?
10 A.  Some type of metal.  I have no idea.
11 Q.  It's a metal door then, right?
12 A.  Yes.
13 Q.  Okay.  Heavy metal door?
14 A.  It wasn't light, no, but --
15 Q.  You shut it all the way, right, you shut it tight?
16 A.  Yes, I shut it and locked it.
17 Q.  And then you went over to the toilet, you took down your
18     pants, and you started to go to the bathroom?
19 A.  Yes.
20 Q.  And on the way in, by the way, I missed this, but you
21     acknowledged Boike, you said, hey, I'm here, I'm going to
22     the bathroom, right?
23 A.  Yes.
24 Q.  And which desk was Boike at, he was this big one over here
25     on the left or the one on the right with the three little

Page 104

1      screens?
2  A.  He was on the right with the screens.
3  Q.  So he was over here on the right-hand side?
4  A.  Yes.
5  Q.  Okay.  So you walked in, you went to the bathroom.  He was
6      there.  You, while you were in there --
7  A.  What's the square?
8  Q.  I'm sorry?
9  A.  I'm not sure what that square is right there.
10 Q.  I don't know.  Let's continue on.
11 A.  Maybe it's a pillar.  I think it's a pillar.  Thank you.
12     I was just trying to figure out --
13         MR. DREW:  Can we get some clarification,
14     because I see both desks on the right-hand side, one upper
15     right and one lower right.  Which right is she talking
16     about?
17         MS. AMTSBUECHLER:  I think she said the one with
18     the three, but we can clarify that.
19 BY MS. AMTSBUECHLER:
20 Q.  Are you talking about the one with the three, I think
21     those are three screens, is that what it was?
22 A.  Yeah, but I do have to say this drawing is
23     disproportionate, because that is over more to the left.
24     The computer to the left is over much more than what he
25     has it.  He has them almost like they are touching.  They

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 105

1    are along -- I don't know.  I don't know how he's trying
2    to depict that actually.
3    Q.  Well, I didn't ask him to do it to scale.  I'm just trying
4    to get an idea of where everything was in the room so we
5    had a point of reference.
6    A.  Okay.
7    Q.  All right.  So --
8    A.  Sure.
9    Q.  -- you walk in the main door.  On your way in, you say to
10   him, hey, I'm here, I'm going to the bathroom, right?
11   A.  No, I didn't say hey, I'm here.  I just said:  Hey,
12   thanks.  I'm going to use your bathroom.  I didn't say
13   hey, I'm here.
14   Q.  All right.  And then you go into the bathroom, right?
15   A.  Yes.
16   Q.  You shut the metal door, the heavy metal door?
17   A.  Yes.
18   Q.  Okay.  And you could not hear what he was doing out there
19   while you were inside the bathroom, right?
20   A.  Not really.  Sometimes you can hear -- it depends on their
21   voice and -- but I really couldn't make out what he was
22   saying.  I knew he was trying to talk to -- I knew he was
23   trying to do his dinner, and I know what happens during
24   dinner, that he has to talk to them to lock down so the
25   other one can, too --

Page 106

1    Q.  Could you hear him or could you not hear him?
2    A.  No, no, I really couldn't hear his voice, no.  I heard the
3    noises.
4    Q.  Okay.  So you heard noise out there, but you could not
5    hear what he was doing; is that accurate?
6    A.  That is accurate, yes.
7    Q.  All right.  So you went over to the toilet.  You took down
8    your pants to go to the bathroom, right?
9    A.  Yes.
10   Q.  Okay.  And at some point there you started making the call
11   or did you do it before you started taking down your pants
12   to go to the bathroom?
13   A.  Before I sat down, I started making the call that is in
14   question.
15   Q.  You sat down, you started making the call, right?
16   A.  Yes.
17   Q.  And you continued that call as you got up and did up your
18   pants and went to wash your hands, right?
19   A.  Yes.
20   Q.  And so you said -- I think you testified you tucked your
21   phone under your chin so you could do that; is that what
22   you did?
23   A.  Yeah, kind of the crook of your neck like this, and then
24   it's kind of right here, you know, a little bit towards
25   the mouth, so I have a long -- the phone is longer, so I

Page 107

1    can tuck this top part up and have the speaker to the
2    phone or what I am talking into, I guess, I call it a
3    speaker, pretty close to the edge of my mouth.
4    Q.  And you washed your hands, and then what did you do?
5    A.  I left the water running because I was not done with the
6    call yet.
7    Q.  Okay.
8    A.  So I just stood by the sink with the water running.
9    Q.  I'm sorry, you stood by the sink with the water running
10   while you were on the call?
11   A.  Yes, yes.
12   Q.  And so the water kept running after you washed your hands?
13   A.  Yes.
14   Q.  Why did you do that?
15   A.  Because I was actually trying to clean the sink out, I
16   guess, is what I -- you know, and I washed my hands, and
17   then I took a piece of paper toweling, and I was wiping
18   around the top and the handles, and it was pretty grody,
19   so I was kind of doing the bowl of it.
20   Q.  And the water was still running?
21   A.  Yeah, so that I could keep everything flowing because it
22   was pretty -- it had some stuff in it, and I didn't want
23   to just shut the water off, turn it back on and shut the
24   water off, turn it back on.  While I was doing it, I just
25   left it running so that I could kind of, you know, swish

Page 108

1    it down with the paper towel, and then rinse the paper
2    towel if I needed to and then swish some more.
3    Q.  And so you grabbed a couple paper towels while the water
4    was running so you could do that?
5    A.  Yes.
6    Q.  All right.  And then at some point you turned the water
7    off?
8    A.  Yeah, I --
9    Q.  At some point turned the --
10   A.  Yes, I did turn the water off.
11   Q.  Then what happened?
12   A.  I turned the water off.  I ended my conversation.  I
13   opened the door, and that's when Boike was like he was
14   getting up from the computer, the small computer, and he
15   said -- I think he said something like are you all set
16   then?  And I go, yep, you can let me out, and that was the
17   extent of it, and then I left the floor.
18   Q.  So he was getting up from, you say, the small computer.
19   Where was that, which one was it, the same one he was at
20   when he came in -- when you came in?
21   A.  No, he was at the larger, the three computers, and then
22   there is a computer over here on this little part, yeah,
23   right in there, not quite that far.  The computer is more
24   like around there.
25   Q.  All right.  So let me make sure I understand this.  When

27 (Pages 105 to 108)

LORI LYNN HEETHUIS, 9-25-2020

### Page 109

1  you came in, he was at the one we see on this drawing with
2  the three, and when you came out he was -- and again, I
3  understand it's not to scale, but you're saying he was
4  down in this area, which there is just one little one off
5  on the right-hand side?
6  A. Uh-huh.
7  Q. Okay.
8  A. He was getting up from that, and when I came out, he said,
9     you all set, and I said, yeah, from what I recall.
10 Q. You are saying the area that I marked in yellow is where
11    he was when you came out; is that right?
12 A. Yeah. That's not a correct drawing, but yeah, he was in
13    kind of that area just a little closer to the other way --
14 Q. Was there a computer there?
15 A. -- yes.
16 Q. Was there a computer there?
17 A. There was a computer there, yes. Yes, there is a small
18    computer -- well, it's a regular-sized computer. This one
19    is a large screen and then there is two smaller screens,
20    and it picks up the whole floor. It was schematics where
21    you can see into the security cells and so forth, so
22    that's where he started out when I first came in.
23 Q. Did you ever -- do you know whether or not he was ever up
24    next to the door? Did you ever observe him --
25 A. I have -- I have no idea whether he was up next to the

### Page 110

1  door. He could have been. I have no idea because the
2  door was shut, and obviously I wouldn't know that he was
3  out there.
4  Q. Who were you talking to on the phone?
5  A. I was talking to my husband at the time.
6  Q. What was -- what is your phone number now?
7  A. 231-457-3661.
8  Q. And that's the same cellphone you had then, correct?
9  A. Yes, I believe so. There is times that I take my
10    husband's. We have the same exact phone, same exact case,
11    but that day I believe I was on my phone, to the best of
12    my knowledge, yes, it wasn't his.
13 Q. What phone number did your husband have at the time?
14 A. 457, same area code, 3669.
15 Q. You said sometimes you would take your husband's phone by
16    accident?
17 A. Yeah. We have the same exact phones with the same exact
18    cases, and sometimes in the morning he would be up
19    throwing some stuff into my lunchbox for me, because he's
20    a great husband, and he would lay his close or on the
21    other side of my lunchbox, and I would think it was mine,
22    and I would grab it and I would throw it in my pocket, and
23    off I would go.
24 Q. Do you have any reason to believe you had his phone on
25    this day?

### Page 111

1  A. No, I didn't, I didn't have his phone on this day. I
2     don't have any reason to believe I did, no.
3  Q. If you called him, you would have had trouble calling? I
4     mean it wouldn't have made sense, right?
5  A. Right, it would wouldn't have went through.
6  Q. So are you sure you were talking to him?
7  A. Well, I had talked to -- I had talked to Chris Riddle. He
8     was up -- he was not in the office that day. He was up
9     north, and I had left him a voicemail, and then I had text
10    him, and he called me later on in the day. I did try to
11    call --
12 Q. My question was are you sure it was your husband you were
13    talking to --
14 A. Yeah, I'm sure it was.
15 Q. Let me finish the question.
16 A. Okay. I'm sorry.
17 Q. Are you sure it was your husband you were talking to while
18    you were in the bathroom?
19 A. Yes.
20 Q. Okay. Now, do you recall being asked about who you were
21    talking to at some point by command?
22 A. By Captain Brown, he asked me who I had talked to that
23    day, and I said I talked to a lot of people, you know. I
24    mean when, how, where?
25 Q. Let me be more specific, let me be more specific.

### Page 112

1  A. Okay.
2  Q. Do you recall being asked by anybody in the sheriff's
3     command who you were talking to during this phone call in
4     the bathroom?
5  A. Captain Brown.
6  Q. Okay. Did you tell Captain Brown that you did not recall
7     who you were talking to?
8  A. Yes, because I did not at that time.
9  Q. How is it that you now know that it was your husband that
10    you were talking to?
11 A. Because he was talking about the entire day, is how I
12    understood it, and so I just said several people, probably
13    maybe my mom. I said maybe -- I said I know I talked to
14    Chris Riddle. I know I tried to call my attorney, and I
15    talked to several -- you know, sometimes I talk to my --
16    my daughter would call. She lives up north.
17 Q. All right. So you never -- you never -- would it be
18    accurate to state that there was never a point in time
19    where you didn't recall who you were talking to when you
20    were in the bathroom on this day?
21 A. Okay. On the day that I was talking in the bathroom, I
22    had made a text to Riddle, so I did not call him, but yes,
23    I did call -- I knew I had called my husband, but in that
24    meeting he had asked me for my phone, and that's --
25 Q. Okay. Let's focus on the question. Was there ever a time

LORI LYNN HEETHUIS, 9-25-2020

Page 113

1 that you did not remember who it was when you were -- that
2 you were talking to when you were in the bathroom at the
3 time we just discussed?
4 **A. At first I did not recall because I didn't know where all**
5 **this questioning was coming from and why it was happening.**
6 Q. Why would that impact your not being able to recall? Is
7 it just that you didn't want to say?
8 **A. No, it's just -- there was so many -- first of all, it**
9 **started out me and the thing with Sergeant Vanderlaan that**
10 **the bathroom was in disarray, and then all of a sudden I**
11 **got this notice from the, I believe the undersheriff, and**
12 **he said, well, we have -- you know, you don't have to go**
13 **to that meeting with Sergeant Vanderlaan. You are now to**
14 **go to a meeting with Captain Brown, and that's what**
15 **happened. So it was just a -- everything was being**
16 **changed, so I'm trying to -- I was trying to stay focused**
17 **on what was happening. Why all of a sudden did it go from**
18 **a laundry thing to something that the captain needed to be**
19 **involved in?**
20 **At the time we had went back and forth.**
21 **Sergeant Vanderlaan had said, yeah, I would like to have**
22 **the opportunity to tell you, because they were overpassing**
23 **me. I told the lieutenant that I couldn't get --**
24 Q. Again, we have gone way beyond my question, so I'm going
25 to stop you.

Page 114

1 **A. Oh, okay.**
2 Q. We are going to get to the other stuff later.
3 So your testimony is that you always remembered
4 that it was your husband that you talked to; is that what
5 you are saying?
6 **A. At first I didn't, but then I did recall, yes.**
7 Q. Okay. What did you say on this phone call?
8 **A. I told him that Nathan had called me a fucking bitch and a**
9 **fucking snitch, and I went down and talked to Sergeant**
10 **Stephens, and he said there was nothing that I could do,**
11 **that I couldn't make a complaint, that I had to wait until**
12 **Mark came in, the lieutenant, the next day, and I was**
13 **discussing how it made me feel, how I was being treated**
14 **and constantly retaliated against, how it made me feel**
15 **going back to when I was sexually assaulted multiple times**
16 **by a sergeant, and nothing was done, and that maybe if**
17 **they understood through their families that something had**
18 **happened to that -- similar to maybe their wife, child,**
19 **whatever, and then child I meant not a four-year-old, I**
20 **meant a child that was old enough to work, and they had to**
21 **be put right back into that same situation every single**
22 **day to work with that person, maybe they'd understand how**
23 **I felt. So I was explaining that.**
24 Q. Did you say that you wished that Nate Stephenson's wife
25 and daughter would get raped?

Page 115

1 **A. No. I said: Maybe if Nate's wife or daughter almost got**
2 **raped multiple times by somebody they worked with, then**
3 **maybe he'd understand.**
4 Q. Well, I guess the recording speaks for itself, right?
5 **A. I would assume it does, yes, and not if you can clearly**
6 **hear me say --**
7 Q. Well, I wasn't going to play it, but maybe we ought to.
8 Let's see. Well, you know what, maybe we should --
9 MS. AMTSBUECHLER: It's 12:15. Let's see. Let
10 me see if I can get it here.
11 And while I play this, Sharon, I don't think you
12 need to record it. I know that it would be hard for you
13 to do, unless you think you can. I don't really expect
14 that you will try to do that, okay, unless Mr. Drew thinks
15 otherwise.
16 MR. DREW: I don't think it needs to be
17 recorded.
18 MS. AMTSBUECHLER: Okay. Thank you.
19 THE REPORTER: Thank you.
20 MS. AMTSBUECHLER: That didn't work. Okay. Let
21 me try another way. All right. I can't find it right
22 now, so --
23 MR. DREW: Are you planning on taking a lunch
24 break?
25 MS. AMTSBUECHLER: Yeah, but I would rather get

Page 116

1 this -- if I can find it, I would rather do that after, so
2 that we are done with the topic. I think what I might
3 have done is accidently deleted my quote, unquote,
4 "shortcut" to this, and now I'm totally -- I can't find
5 it. Oh, wait a minute. Here we go. I think I found it
6 now. Open. Can you hear it? No. I can hear it, but you
7 can't hear it, right?
8 MR. DREW: I'm not hearing anything.
9 MS. AMTSBUECHLER: Let me try something else. I
10 think if I put this on -- and I don't know, Jodie, as the
11 videographer, if there is something you can do to make
12 this easier, but I have a Dictaphone, and sometimes when I
13 put that on to the computer, the sound comes through that,
14 which is lot easier to hear.
15 VIDEO TECHNICIAN: Right. I wish there was
16 something I could do. There isn't actually anything I can
17 do actually, unfortunately.
18 MS. AMTSBUECHLER: Now it's coming from the
19 speaker on here, sometimes it will work better.
20 (Audio playing.)
21 **A. I have to believe that that's enhanced. I have never**
22 **heard this complete call of it, and I believe it is an**
23 **illegal tape, because I was in the bathroom with the door**
24 **shut with -- expecting to have my privacy.**
25 BY MS. AMTSBUECHLER:

29 (Pages 113 to 116)

LORI LYNN HEETHUIS, 9-25-2020

Page 117

1  Q.  Okay.
2  A.  So I have never heard that whole thing.
3  Q.  Do you not want to hear the rest of it now, or not?  It
4      was playing.  Could you hear it when I was playing it?
5  A.  Yeah, but I have never heard it, and it's got to be
6      enhanced, because at the time I'm talking there is nothing
7      until just now where it said you have an intercom --
8      whatever it just said.
9  Q.  All right.  I'm not going to bother trying to play it
10     then.  It's two minutes and 25 seconds long, the one that
11     I have.
12 A.  Okay.  I don't have that one.  I have a two-minute long
13     one.
14 Q.  Well, whatever.  So you heard -- you have heard one before
15     that was two minutes?
16 A.  Yes, and I clearly say almost.
17 Q.  So you --
18 A.  I said maybe they can get, and then I started to say
19     raped, and I said almost raped, and that goes to my state
20     of mind from going back to what I had happen to me being
21     sexually assaulted by a sergeant multiple times and
22     nothing being done.  I still had to work with him every
23     day.  The retaliation that was evident from my testimony
24     in late 2016 for the settlement in 2017, because they --
25     that was done in like, I want to say late August, possibly

Page 118

1      early September, and they took me off for over -- just
2      over two months saying I was mentally unfit for the job
3      with no circumstances evident except for one conversation
4      I had with the chaplain, and after that that was in --
5      they took me off in December of '18.  I came back in late
6      February.
7  Q.  Yeah, can you stop, please?  That's not really responding
8      to a question.
9  A.  Uh-huh.  I'm just saying that --
10 Q.  Stop, stop, stop.
11     MR. DREW:  Lori, just let her ask the question.
12     THE WITNESS:  Okay.
13 BY MS. AMTSBUECHLER:
14 Q.  I mean this is really going beyond all -- so did you say
15     that maybe Stephenson's daughter could get -- wife and
16     daughter could get almost raped at work?
17 A.  Yes.
18 Q.  Okay.  Why did you say that, other than how you felt, did
19     you have some -- you were upset with Stephenson, right?
20 A.  Yes, I was upset with Stephenson.
21 Q.  And that's why you said that?
22 A.  I said maybe he would understand, yes.  I was trying to
23     explain why maybe he would understand if his family had
24     gone through that, that the way he's treating me is
25     hostile, it's demeaning, it's humiliating, and maybe he

Page 119

1      would understand why I get upset when somebody says
2      something like that to me.
3  Q.  Did you call Boike an asshole to anybody?
4  A.  No.
5  Q.  Did you call Boike an asshole to his face?
6  A.  I don't recall ever even really speaking to Boike on
7      anything other than let me in and let me out.
8  Q.  Did you think Boike had any reason to want to retaliate
9      against you?
10 A.  From what I understood is he -- he was not comfortable
11     with being in a room with me because he had heard that I
12     made allegations in the past, and so I don't know whether
13     that's true or not.  That's just what I heard.
14 Q.  Okay.  Did you think that Nate had any reason to want to
15     retaliate against you other than because he thought that
16     you reported him sleeping?
17 A.  No.  Nate wanted to be a sergeant really bad, so I
18     wouldn't put it past the command to say, hey, mess with
19     her so that we can get her to -- you know, get her on
20     something so we can fire her.  I wouldn't put it past
21     command --
22 Q.  Do you have any evidence that that happened?
23 A.  Evidence that what happened?
24 Q.  That command told --
25 A.  No, no, but it wouldn't -- I wouldn't put it past the

Page 120

1      command to do that.
2  Q.  Who in command do you think would do that?
3  A.  I would think that possibly the sheriff, the undersheriff,
4      because they already were mad about my testimony, so they
5      were -- continued retaliation, and obviously they couldn't
6      charge me with a felony.  I was brought back to work.  I
7      have three letters from doctors stating that I was fine to
8      work, that I had always been fine to work, and then I get
9      back to work, and then they started slowing down different
10     things where I couldn't get my job done because I didn't
11     have the items to get the job done (inaudible).
12 Q.  Okay.  My question is --
13     (Speaking simultaneously.)
14 BY MS. AMTSBUECHLER:
15 Q.  My question was who, my question was who, and you said the
16     sheriff --
17 A.  I would imagine either the sheriff or the undersheriff or
18     both, or possibly Matt Smith.  He was in training at that
19     time, but he was back and forth every once in a while, so
20     it could have been any one of them.  I'm not saying for
21     sure it did, but it could have very well happened that
22     way.
23     MS. AMTSBUECHLER:  All right.  I think now is a
24     good time to take a lunch break.
25     THE WITNESS:  Sounds good.

30 (Pages 117 to 120)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 121

1    VIDEO TECHNICIAN: We are off the record, 12:27
2    p.m.
3        (Off the record at 12:27 p.m.)
4        (Back on the record at 1:10 p.m.)
5    VIDEO TECHNICIAN: Back on the record at 1:10
6    p.m. after a lunch break.
7        (Mr. Boike left the Zoom deposition.)
8    BY MS. AMTSBUECHLER:
9    Q.  Okay.  All right.  We are back, and as the videographer
10   mentioned to you, Ms. Heethuis, we don't want to talk at
11   the same time, and so there are two things.  One is you
12   need to stop, when I'm asking you a question, don't
13   interrupt, and sometimes I have been stopping you because
14   you have been going on and not really answering the
15   question, and I understand that there is a lot that you
16   might want to say, but, you know, the deposition is
17   question and answer, so please do your best to answer the
18   questions that I'm asking you.  It will help us get
19   through this today in a lot more efficient manner.  Okay?
20   A.  Okay.  I apologize.
21   Q.  And if you don't understand what I am asking you, then let
22   me know, and I will make sure that it's clear so you don't
23   feel you just have to talk.  Okay?
24   A.  Okay.  Thank you.
25   Q.  All right.  Before we broke you were talking about -- I

Page 122

1    asked you about whether you had audio recordings of
2    telephone -- I'm sorry, not telephone, audio recordings of
3    conversations with people at the sheriff's office, and you
4    said you didn't know, maybe you would have to look at your
5    phone.  You also testified that you had sometimes taken
6    your husband's phone to work by accident.  Do you know
7    whether or not there are any audio recordings or video
8    recordings on your husband's phone that pertain to
9    anything going on at the sheriff's office?
10   A.  No, there are none.
11   Q.  Now, what I want to switch to talk about now is the
12   discipline that you got in April of 2019.  So let's take
13   your brain into that time period, all right?
14   A.  Yes.
15       MARKED FOR IDENTIFICATION:
16       DEPOSITION EXHIBIT 14
17       1:12 p.m.
18   BY MS. AMTSBUECHLER:
19   Q.  Okay.  And just for your reference, let's pull up the
20   document to share.  Do I have screen sharing going on?
21   Can you see it?  No.  All right.  Let me do screen
22   sharing.
23       All right.  I'm showing you -- I'm a little out
24   of order here, this is Exhibit Number 14, which is a
25   notice of suspension on April 23, 2019.  I'm just showing

Page 123

1    that to you for reference at this point.  We will come
2    back and talk about it.  Do you recall getting that?
3    Yeah, I'm just skimming through it quickly.  Do you recall
4    receiving this discipline?
5    A.  I'm trying to recall exactly which one it was.
6    Q.  Okay.  We can go through it, April 23 -- I'm sorry, what?
7    A.  I'm sorry.  Yes, I do remember.
8        MARKED FOR IDENTIFICATION:
9        DEPOSITION EXHIBIT 13
10       1:13 p.m.
11   BY MS. AMTSBUECHLER:
12   Q.  Okay.  All right.  And at the same time you also received
13   this memo, which is Exhibit 13 from the sheriff.  Do you
14   recall that?
15   A.  That was after the -- I do, yes.
16   Q.  Okay.  And these were on April 23, 2019.  Did you receive
17   them both on the same day?
18   A.  Yes.
19   Q.  Okay.  Now, leading up to that is what I want to talk
20   about for a minute here, so let's stop -- we will go away
21   from the document for now, and we will come back to it.
22   A.  You are going kind of in and out.  I'm sorry.
23   Q.  All right.  Let's talk about what led up to the April 23rd
24   events.  Can you hear me now?
25   A.  Okay.  Yes, I can hear you good now.

Page 124

1    Q.  Okay.  As I understand it, there were three meetings
2    leading up to the April 23rd discipline.  Do you recall
3    the meetings leading up to the April 23rd discipline?
4    A.  Yes.
5    Q.  So you recall that there were three meetings?
6    A.  Yes, I do.
7    Q.  All right.  And the first one I show is occurring on April
8    11, which was a Loudermill hearing.  The next one was on
9    April 17, which was a second Loudermill hearing, and the
10   next one was on April 22nd with the undersheriff.  Do you
11   recall that those were the dates or do you have any reason
12   to dispute that those were the dates?
13   A.  No, I recall those were the dates.
14   Q.  Okay.  So let's talk about April 11th first.  When you
15   were asked about the phone call, do you recall saying at
16   that time that you were on the phone with Riddle when you
17   were in the bathroom?
18   A.  I said I may -- I may have been on the phone with Riddle.
19   I tried to text him and call him.
20   Q.  So did you tell them -- I'm sorry, go ahead.
21   A.  I'm sorry.  No, go ahead.
22   Q.  So did you tell the people at the Loudermill hearing on
23   April 11th that when you were in the bathroom on the phone
24   call, the one that Boike recorded, that you were talking
25   to Riddle?

31 (Pages 121 to 124)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 125

1  A.  At that time I said I was not sure, that I had called
2      three people, and I wasn't sure at that point what he was
3      going to with this, with this questioning, so I didn't
4      know for sure what times we were talking, and I did try to
5      get ahold of Riddle quickly on the phone while I was
6      there, and he didn't answer, so I left him a voicemail,
7      and then I made another call.
8  Q.  Did you tell them on -- when you talked to them on April
9      11th at the Loudermill hearing, did you tell them that you
10     were talking to your husband on the phone?
11 A.  No, I didn't.
12 Q.  Okay.  Did you understand that they were asking you about
13     the phone call that you made where you were talking about
14     Nate Stephenson's wife and daughter maybe getting raped?
15 A.  No, I didn't realize that at that time.  That was not
16     brought up.  At that time we didn't know there was any
17     kind of recording.
18 Q.  Well, what did you think you were called into a Loudermill
19     hearing for on April 11th?
20 A.  I didn't realize it was a Loudermill meeting, number one.
21     They just said I had to meet with the captain, and I
22     didn't know because it -- I thought it was to do with the
23     laundry situation.
24 Q.  You mean the situation with Nate?
25 A.  No, no, the laundry situation with the -- it started out

Page 126

1      with Sergeant Vanderlaan, and he was upset because there
2      was clothes that had got put in there because there was a
3      lot of releases and stuff, and so we were supposed to
4      meet, and then all of a sudden it said disregard the
5      meeting with Sergeant Vanderlaan.  You are going to meet
6      with Captain Brown.
7  Q.  So you went to this meeting with Captain Brown on April
8      11th.  You weren't sure what it was about?
9  A.  No, I wasn't sure what it was about.
10 Q.  Who else was there?
11 A.  Ed Fox.
12 Q.  So when you were asked about being on the phone, did you
13     have any idea what they were talking about or when?
14 A.  They gave me the date and said was I talking on the phone,
15     and at that point the captain had said that there was no
16     recording, but that somebody was concerned, so I was just
17     trying to get it all in perspective of what was happening
18     and why these questions were coming out.
19 Q.  So they specifically told you there was no recording?
20 A.  Yes.  Captain Brown -- I asked him, I said:  I understand
21     there may be a recording of this.  And Ed Fox said:
22     That's what I heard, too.  And he said:  I can assure you
23     there is absolutely no recording.  We had a concerned
24     fellow co-worker come in with some allegations that you
25     supposedly said, and I'm just trying to find out what was

Page 127

1      actually said.
2  Q.  Did they tell you what the allegations that you supposedly
3      said were?
4  A.  Later, yes.
5  Q.  No, I mean during this conversation, we are talking --
6  A.  Oh, during the meeting?
7  Q.  Yeah.
8  A.  During the meeting, yes.
9  Q.  Okay.  So during the meeting they told you that these were
10     the allegations about what you said about Nate, right, and
11     his wife and daughter?
12 A.  They said there were allegations about a co-worker, me
13     saying something about a coworker's wife and daughter.
14 Q.  Did you know that that's what they were talking about, the
15     comment you had made?
16 A.  When he explained to me that it was -- the date it was on
17     and so forth, then yes, I did realize.
18 Q.  So while you were there on April 11, you were talking
19     about it, you knew what they were talking about?
20 A.  Eventually, yes.
21 Q.  Okay.  And you -- at that point you had heard rumors that
22     there was an audio recording?
23 A.  Yes.
24 Q.  From where?
25 A.  Chris Riddle told me that there was -- that he had heard

Page 128

1      there was a recording and that he had listened to it.
2  Q.  So when they asked you who you were talking to when you
3      made that statement, you knew what they meant, didn't you?
4  A.  When I made that statement, yes, when they explained that
5      oh, this isn't about the laundry, this is about this.  We
6      talked about a few other things, too, prior to that, but
7      yes, I did realize when he said that.
8  Q.  Okay.  So at that point did you say you didn't know who
9      you were talking to when you made that statement or did
10     you say it was Riddle?  This is all on April 11th I'm
11     still asking you.
12 A.  I'm not sure for sure what I said, because I thought I
13     said something to the approximately -- like I talked to a
14     few people.  I know I talked to Riddle.  I said I know I
15     talked to my attorney.  I think I talked to my mom.  I
16     said I don't know, you know.  I really don't know who
17     else.  There were probably other people, too.  And he
18     said:  Well, let me -- you know, try to think, Lori, and,
19     you know, try to think of everything.  And then as we got
20     later into the meeting, he said:  Oh, and by the way, I
21     probably should tell you, we do have a recording of it.
22     And I thought, well, wow, why did you lie and say that?
23     But I just said:  Oh, okay.  Can I have a copy?  Ed said:
24     Can I have a copy?  He said:  I don't have it.  I will
25     have to talk to the sheriff, and I will get it to you when

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 129

1       I can.  So that was it.
2    Q.  This is all on April 11th, right?
3    A.  Yes.
4    Q.  Okay.  And then the next meeting was on April 17th.  Do
5        you recall that?
6    A.  Yes.
7    Q.  About six days later.  Who was there?
8    A.  I know Ed Fox was there and the captain.  I think it was
9        just us three again in that meeting.  I don't really
10       recall.  I know it was those, but I don't really recall
11       anybody else at this time.
12   Q.  Captain Brown and Ed Fox, you recall them?
13   A.  Yes, I do recall them.
14   Q.  And did they ask you again about who you were on the phone
15       with?
16   A.  Yes.
17   Q.  And did you tell them maybe your attorney?
18   A.  I said maybe it was Mr. Drew I was trying to reach at that
19       time.  I said I'm not really sure.
20   Q.  Did they ask you then to look at your phone?
21   A.  They did.
22   Q.  Did you tell them you didn't have the phone with you?
23   A.  I did not have my phone with me, yes.
24   Q.  Did you tell them you did not have your phone with you?
25   A.  Yes, I said I don't have my phone with me.

Page 130

1    Q.  Where was your phone?
2    A.  My phone was at home.
3    Q.  Did you have any phone with you?
4    A.  I had my husband's phone with me, yes.
5    Q.  So later on when they saw you in the elevator pull out a
6        phone, you are saying that was your husband's phone and
7        not yours?
8    A.  Yes, that was his phone.  I quickly looked at it and stuck
9        it in my pocket.  I was in the elevator by myself.
10   Q.  Did you make a phone call with that phone that day?
11   A.  I may have.  I don't recall.
12   Q.  Well, if you used your husband's phone to make a phone
13       call, you would notice it as soon as you opened it up,
14       right?
15   A.  Well, I noticed it when I took it out of my pocket because
16       it made a noise, and I looked at it, and it went on, and I
17       went, oh, this is Damon's phone.  So I stuck it back in my
18       pocket.
19   Q.  When you were in the meeting with Brown and Riddle on the
20       17th before you got in the elevator and they said do you
21       have your phone, and you said I don't have it with me, why
22       didn't you reach in and pull out the phone where you would
23       have said to them that it was your husband's phone?
24   A.  I didn't -- they were asking for my phone.  I knew at that
25       point that I didn't want to give them my phone because I

Page 131

1        didn't think it was appropriate for them to try to
2        re-track who might have been called when or whatever they
3        were going to do.  I had no idea what they were going to
4        do with the phone.  So that's why.  I knew -- thought I
5        had Damon's because I heard it do the little astro noise
6        that it did while it was in there, and it was very light,
7        because I would turn mine all the way down, and I probably
8        turned his almost all the way down.  And I thought, oh, I
9        probably don't even have my phone, so even if I do I'm not
10       going to say, well, listen, I'm running out of
11       can sit there and say, well, let me see your phone and see
12       if I can -- there is a place you can go back, and I tried
13       to explain to them, I said, listen, I'm running out of
14       space on my phone, so my husband just said to delete all
15       of the calls.  You keep way too many of them on there,
16       delete all of them.  So I deleted them, and so there
17       wouldn't have been anything on there except Mr. Drew's
18       calls, no matter what, whether it was mine or not, but I
19       just didn't feel like it was an appropriate thing for them
20       to ask to see my phone.
21   Q.  So are you saying that while you were in there you didn't
22       give them your phone, you told them you didn't have it
23       because you didn't think they had the right to look at it?
24   A.  Well, if it was mine, but I had a good sense that it was
25       my husband's because of that noise, so no, I didn't -- I

Page 132

1        didn't feel that they needed to look at my phone.  That
2        was something that I didn't feel that they had the right
3        to do, is get on my phone and try to look back, and -- you
4        know, I'm telling them I don't have any.  I just took a
5        bunch of stuff off it because it's almost up to the 64
6        gigs, and it's off.  The only things on there is Mr.
7        Drew's, so I have the dates of when I talked to him.
8    Q.  Well, why wouldn't it be in your best interest just to
9        tell them who you were talking to when you were having
10       that phone call?  Why did you care?
11   A.  Why did I care?  Because they tried to set me up for a
12       felony.  My husband and the sheriff and undersheriff had
13       spoken in the hallway, and Damon was pretty blunt with
14       them, and I felt that since they already had tried to set
15       me up for a felony for bringing drugs into the jail that
16       they may be trying to set me up and my husband up for
17       something.  So I didn't feel that they had any right to
18       even -- once I explained that I took everything off, why
19       they wanted it again.  That should be a warrant that they
20       want it.
21   Q.  Did you understand that they were trying to find out who
22       you were talking to when you were having that
23       conversation?
24   A.  Yes, and my fear was that they were trying to set us up
25       for a crime.

33 (Pages 129 to 132)

LORI LYNN HEETHUIS, 9-25-2020

Page 133

1  Q. All right. So when did you discover that -- during that
2     day when was it that you discovered that you had your
3     husband's phone and not yours?
4  **A. Well, in the meeting, as I said, it made a little noise, a**
5     **light noise, an astroid type sound, and I thought, hmm, is**
6     **that Damon's phone or is that mine, you know, because**
7     **people's phones were bleeping and stuff in there. And I**
8     **got in the elevator and it bleeped again, and I picked it**
9     **up and I looked at it, and I saw what it said, and I was**
10    **like I have got his phone. I can't believe I have got his**
11    **phone again. It was like the third time I have had his**
12    **phone.**
13 Q. So did you make any phone calls with his phone that day?
14 **A. Yes, I did.**
15 Q. Who did you call?
16 **A. I called my mom to let her know and see if she could call,**
17    **but I ended up sending a text to my phone so that Damon**
18    **had my password so that he could unlock the phone, and**
19    **then we did speak later that -- later after that.**
20 Q. And this was all on the 17th, the day of the second
21    meeting that you had?
22 **A. Yes.**
23 Q. So presumably if we got the phone records for that day,
24    the detailed records from your husband's phone, it would
25    show exactly what you are talking about, right?

Page 134

1  **A. I would have assumed so, yes.**
2  Q. Okay. So the next meeting you had was on April 22, 2019.
3     Do you recall that, with the undersheriff?
4  **A. Yes.**
5  Q. What happened then?
6  **A. He showed us a video, and he said: Do you know what you**
7     **are doing? And I said: Yeah. And he goes: Do you know**
8     **what day that is? And I go: Yeah, it was after a meeting**
9     **with Captain Brown on the 17th. And he said: Well, I**
10    **thought you said you didn't have your phone. I said: I**
11    **didn't. I had my -- and he goes how -- he slammed down on**
12    **the table. He said: How would you -- how would you do**
13    **that? And I explained it to him, and he said he didn't**
14    **believe it.**
15 Q. So you told him it was your husband's phone, and he said
16    he didn't believe it?
17 **A. Yes.**
18 Q. Did he say why he didn't believe it?
19 **A. For some reason he didn't listen to what I was saying, and**
20    **he thought I said that I had left -- I had got in the car**
21    **and I ran back in, and I took his phone like on purpose,**
22    **is what he was kind of putting together, that way, so that**
23    **it would make sense that he didn't believe me, I guess.**
24    **And I said: No, no, no. I grabbed it because I thought**
25    **it was mine. I said I grabbed it, and that's how I got**

Page 135

1     **his, but he stated that I said that I was out in the car**
2     **and I ran back and that I got my husband's phone on**
3     **purpose, so...**
4  Q. All right. So during this conversation on the 22nd, did
5     he ask you again to look at the phone, to see who you
6     called on the day that you were having the conversation?
7  **A. I don't recall. I don't recall at all actually on that.**
8     **I'm sorry.**
9  Q. Do you recall telling him that the day before, which would
10    have been April 21st, that you ran updates and lost
11    everything on your phone?
12 **A. No, because that's not what I had said. That's not true.**
13 Q. What did you say?
14 **A. I said my husband said delete some of these contacts in**
15    **here. You know you have got your mom a million times, me**
16    **a million times. That's eating up data, too, so get rid**
17    **of that, and maybe that will give you a little bit more**
18    **room.**
19 Q. So it's your testimony that the day before, on the 21st,
20    you went through and deleted the call records to give
21    yourself more room on your phone; is that what you are
22    saying?
23 **A. Yes.**
24 Q. Okay. And is it your testimony that that's what you told
25    the undersheriff?

Page 136

1  **A. To the best of my knowledge, yes, what I recall.**
2  Q. Did you talk to your attorney from the bathroom during the
3     day that we now know Boike has -- was audio recording?
4  **A. No.**
5  Q. So if it says that in the Complaint you filed, that's not
6     accurate?
7  **A. No. I said it could have been my attorney. He didn't**
8     **answer. It could have been Riddle. It could have been**
9     **anybody at that point.**
10 Q. Okay. Let's go back to -- all right, so the April 23,
11    where did that go? I seem to have lost another document.
12    Exhibit 14, what did I do with it? All right. Can you
13    see that? We talked about this earlier. It's Exhibit 14.
14 **A. Yes.**
15 Q. Right.
16 **A. That -- I was given a Last Chance Agreement, and then the**
17    **other one.**
18 Q. So everything was given to you -- let me rephrase that.
19    So on April 23rd, you were given this notice of suspension
20    which we marked as Exhibit 14, right?
21 **A. Yes.**
22 Q. And you were notified there of the violations that are
23    written in there and the suspensions, correct?
24 **A. Yes.**
25 Q. Okay. You also received the direction from the sheriff,

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 137

1    which is in the memo form we talked about earlier, right?
2    Right?
3    A.  The memo for the phone and the comments?
4    Q.  Yes.
5    A.  Yes.
6    Q.  And -- that's not what we want.  Technology is great when
7        it works.
8    A.  I know.
9            MARKED FOR IDENTIFICATION:
10           DEPOSITION EXHIBIT 15
11           1:33 p.m.
12   BY MS. AMTSBUECHLER:
13   Q.  Let's see.  I have got too many documents.  Okay.  Let's
14       go back to -- okay.  Exhibit 15, the Last Chance
15       Agreement, do you see that?
16   A.  Yes.
17   Q.  So your testimony -- I will just kind of quickly buzz
18       through here so you can see.  If you need to read any of
19       it, you can, but the pages 10 and 11-D Bates stamped, does
20       this look like what you got?
21   A.  Yes.
22   Q.  Okay.  Who was present at this meeting on the 23rd?
23   A.  Deputy Riddle and Deputy -- or I'm sorry, Deputy Riddle,
24       Deputy -- or I mean business agent, I'm sorry, Fox, Ed
25       Fox, and the sheriff and the undersheriff.

Page 138

1    Q.  Tell me the best you can what happened that day.
2    A.  Well, I went up there and I thought that it was going to
3        be nothing, because Deputy Riddle had told me a couple
4        days before that that he had heard the recording and it
5        was inaudible, and so it was basically just probably going
6        to be a close out, no warning, and I walked in -- well,
7        they were in together before that, and then I walked in
8        when they came out and got me, and they said:  Well, we
9        were going to terminate you, but the union talked us into
10       giving you a Last Chance Agreement, and then they put it
11       in front of me.
12   Q.  And then what happened?
13   A.  The sheriff and the undersheriff said we are going to give
14       you some time to talk -- read it and talk to your union
15       reps about it and what would be best, so we will be -- we
16       are going to be outside for a little bit, and then we will
17       come back in.
18   Q.  So how long were you in talking with your union rep about
19       it?
20   A.  Well, I really didn't get a chance to talk to them about
21       it for fifty-some minutes.  Ed Fox kept going on and on
22       about how I should sign it, and that it would be really
23       hard to prove that it was my husband's phone and not my
24       phone, and that it would be a battle and that, you know,
25       if I didn't sign it, that they could go and do a grievance

Page 139

1    about how hard it was going to be, and I needed to be sure
2    if I understood that, and I was trying to read it while he
3    was saying that, but it was kind of difficult to read
4    that, and he's saying:  Did you hear me?  And I'm saying:
5    Yes, I heard you.  I'm just trying to read this thing.
6    And so then Deputy Riddle said:  Well, maybe she wants to
7    call somebody.  Maybe she wants to call her attorney.  And
8    Ed Fox said:  Well, why would she want to call her
9    attorney?  And he says:  Well, I don't know, maybe she
10   wants to make a call to some people and ask or something.
11   And so he goes:  Well, you can go ahead and do that.
12       So I called and I tried to get ahold of Mr.
13   Drew to let him know what was going on, and then I tried
14   another attorney friend of mine and left a message for
15   him, and then I called my husband, and he said:  Well, try
16   to give Drew a phone call again.  So then I called a
17   couple more times for Drew.  I tried a couple more times
18   for the attorney, and then Ed Fox came in, and he said:
19   Listen, your time is up.  They want you to sign it or they
20   are terminating you.  And I said:  Ed, just let me finish
21   this.  This is when I was finishing up.  He walked in when
22   I was talking to my husband, and I really didn't get a
23   chance to talk to him that long, and I said:  Could you
24   just give me a minute to just say, okay, you know, that
25   they are making me go back in?  And he's like:  Yeah,

Page 140

1    yeah, but they know -- they know your minutes are up, and
2    then as I'm walking back, I'm saying:  You know, can I
3    have some extra time?  I haven't gotten all the way
4    through this.  I have only gotten up to 6.  And he said:
5    Well, I can ask.  And I said:  Can I just get until like
6    3?  Because the sheriff and undersheriff were not in the
7    room at that time when we went in and sat down, and he
8    said:  Well, I can go ask.  So I said:  Okay, well, thank
9    you.  And he went out, he asked for 24 hours, and the
10   sheriff said:  No, no.  Her five minutes are up.  So he
11   came back in, and he said:  I asked for 24 hours, and the
12   sheriff said no, we are not giving her any more time.  She
13   needs to sign it or she is terminated.
14       So then probably, I don't know, approximately
15   three minutes after that, they came in and said, you know,
16   have you made a decision?  And I said:  Well, I really
17   would like a little more time because I didn't get to read
18   all of these.  I'm up to number 8, and could I have a
19   little more time?  And he said:  No, we can't give you any
20   more time on it.  You know, we need an answer now.
21       So I went to Deputy Riddle, and I said:  Deputy
22   Riddle, you know what I have been through all these years
23   with different things.  I said:  If you were me, would you
24   sign it without reading the rest of it?  Because I know
25   you have read it, and he shook his head yes, and all I

35 (Pages 137 to 140)

LORI LYNN HEETHUIS, 9-25-2020

Page 141

```
 1    could think of was that my husband was going to lose the
 2    insurance he needed because he has cancer, that I wasn't
 3    going to have insurance, and I just kind of saw my life
 4    flash before me, and under duress, as tears rolled down my
 5    eyes, I signed it.
 6              And then they said, well, okay, that is great,
 7    but now we have this direct order, and he put that
 8    forward, and it said that I couldn't bring my phone in, I
 9    couldn't bring any electronic device in, and so forth, and
10    I could not bring up any past unbecoming conduct for what
11    had happened to me because people just didn't want to hear
12    it, and so that was verbally said to me.  And he said:  I
13    need you to sign this too.  And I looked at Riddle and I
14    said:  Do I have to sign this?  I said:  I can't bring my
15    phone in, and I have an 82-year-old mother who is ill and
16    not in good shape.  I have a daughter that lives three
17    hours away.  I have a husband who is ill, and I can't
18    bring my phone in but everybody else can?  And I said:
19    You know, this is like a gag order.  Oh, no, no, it's a
20    direct order, it's a direct order.  And Riddle said:  You
21    are going to have to, Lori, as part of that.  And so I
22    signed it under duress because I didn't know what else to
23    do.
24  Q.  Do you recall anything else happening during that meeting?
25  A.  They just read -- the undersheriff, Rodney [phonetic],
```

Page 142

```
 1    said that it was going to be three days for this and seven
 2    days for that, and that they were going to run it
 3    concurrent, which was just kind of -- you know, I thought
 4    what, concurrent?  It was like we were at court.  And he
 5    said:  So it will just be seven days, it will be from
 6    today, and then you will come back, and you can't bring
 7    your phone or any electronic devices other than what the
 8    sheriff's department gives you, and you cannot talk about
 9    anything that has happened to you with the sergeant that
10    you allege did things.  And I just said -- I was kind of
11    just overwhelmed, and I said:  Okay.  And I said:  Thank
12    you.  Because I'm always polite because no matter what,
13    they are my superiors, and I said thank you, I got up.  I
14    walked out.  Ed talked to me a minute, the sheriff and
15    undersheriff stayed in there, and he said:  You know, do
16    you want to grieve it, this and that?  I said:  I really
17    don't know.  I haven't -- I didn't even get to read all of
18    this.  I said:  Let me just let it sink in.  He said:
19    Well, if you do, we will have to subpoena the records, and
20    it will be a hard fight, but we could do it.  And I said:
21    Why don't you just let me get back with you, Ed.  I said:
22    I just -- I just want to go.  And so I thanked both of
23    them.  Riddle said take it easy.  Don't worry about
24    anything, Lori, we will see you, you know, soon.  They
25    walked me down and I walked out, and that's what started
```

Page 143

```
 1    my seven-day suspension.
 2  Q.  So who told you you would be terminated if you didn't sign
 3    it?
 4  A.  Ed Fox, and on the Last Chance --
 5  Q.  Because --
 6  A.  And on the Last Chance Agreement, like they pointed out
 7    that I was signing that -- I was signing it, the Last
 8    Chance Agreement and in lieu of being terminated, and that
 9    I would be on a two-year -- I think the sheriff was saying
10    at that time that it would be in my file for two years,
11    and that if I violated any of the things in this Last
12    Chance Agreement, and not barring any other policy
13    violations that I would be fired.
14  Q.  So when you left there after signing the Last Chance
15    Agreement, you were aware you were not fired, right?
16  A.  No, because I had signed it, but I signed it under duress
17    without reading the whole thing because they wouldn't let
18    me finish reading it.
19  Q.  And --
20  A.  I had asked.
21  Q.  -- you were aware that the union was available to file a
22    grievance if you wanted, correct?
23  A.  Yes.
24  Q.  Did you ever pursue a possible grievance with the union?
25  A.  No, I didn't.
```

Page 144

```
 1  Q.  Okay.  So as I understand from looking at your testimony
 2    at the unemployment hearing, it looks like you became
 3    concerned at some point about paragraph number 9, and I
 4    scrolling to that.  Do you see that?
 5  A.  Yes.
 6  Q.  When did you first read that?
 7  A.  I think it was the next day.  I just kind of threw it
 8    down.  I was very dishevelled.  My husband was trying to
 9    comfort me, and I just said I can't believe this is
10    happening.  And so the next day we started to read it, and
11    my husband actually said:  They are trying to take away
12    all of your rights, Lori, in number 9.  They are trying to
13    take that away.  They are trying to -- why do they have
14    the union and their agents in there?  That shouldn't
15    even -- they sure shouldn't even be concerned about that,
16    and it's saying that basically from the past to the
17    present to the future, touching upon my employment, that I
18    would not do any litigation.  I would not hold anybody
19    liable, and that they were taking away my civil rights.
20  Q.  Did you talk to anybody from the union about that
21    paragraph?
22  A.  I don't recall talking to anybody from the union.  What I
23    did was -- my husband -- he was in the union for a long
24    time.  He was the head of it, and he said:  You need to go
25    down and you need to -- you need to tell them you want to
```

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 145

1 revoke that and let them terminate you. He said: Tell
2 them you want to revoke the Last Chance --
3 Q. I'm going to stop you for a second, because my question
4 was whether you talked to anybody from the union.
5 A. No.
6 Q. All right. So do you know whether or not this paragraph
7 is something that the union always puts in the Last Chance
8 Agreements?
9 A. No.
10 Q. If sheriff's administration were to say that this is
11 something that the union puts in there when they draft
12 these with them, would you have any basis to disagree with
13 that?
14 A. No, because I have never seen a Last Chance Agreement --
15 Q. Okay.
16 A. -- in 21 years.
17 Q. Now, when you went through this Last Chance Agreement on
18 the 23rd, was there a paragraph taken out of it at your
19 request; do you recall that happening?
20 A. Yes. It had something to do with cellphone use. I think
21 it was out of number 8, if I recall correctly.
22 Q. What do you recall being removed at your request?
23 A. Something about the cellphone.
24 Q. Okay. Do you remember anything more specific?
25 A. Not really, no, just that it said something about the use

Page 146

1 of the phone, and I said: Riddle, you asked him verbally
2 about that. And right away, he goes: Oh, yeah, we will
3 take that out, no problem, we will take that out. And
4 they took it out, so -- and then reprinted it, and that
5 was one that was actually signed.
6 Q. During this meeting, how were you treated?
7 A. I don't believe fairly. I don't believe I was represented
8 by the union. I felt ambushed.
9 Q. Did anybody raise yell -- did anybody raise their voice at
10 you?
11 A. The undersheriff got a little bit loud at one point,
12 but -- and Ed, he got a little bit loud when he was trying
13 to tell me, because I was trying to read it, and I wasn't
14 answering enough, so he got a little loud.
15 Q. When the undersheriff got loud, what was he saying?
16 A. It was something about the direct order not being a gag
17 order, and it's a direct order, and that's how he was
18 getting kind of tense and snippy, like argumentative over
19 it, because I go: Well, that's more of a like gag order
20 for like the second part. And he said: No, it's not.
21 It's a direct order. That's when I left the room and I
22 said do I have to sign it.
23 Q. Did you understand they were telling you not to continue
24 to talk about that while you were at work?
25 A. Yes.

Page 147

1 Q. All right. Were you walking around talking about that a
2 lot while you were at work before this happened, before
3 this April 23rd --
4 A. Not a lot.
5         MARKED FOR IDENTIFICATION:
6         DEPOSITION EXHIBIT 16
7         1:48 p.m.
8 BY MS. AMTSBUECHLER:
9 Q. Okay. Okay. Let's go to Exhibit 16. You said you went
10 back and you revoked it. Is this what you turned in?
11 A. Yes, that's what I turned in, but the copy you have is not
12 correct, because -- unless you scroll down. Yeah, there
13 we go, but that's still not the one that she signed,
14 because she also put the date on 10:30 on it.
15 Q. Well, all right. It looks like it's signed by Kay. Who
16 is that?
17 A. Kathleen Julien. I called her the administrative
18 secretary to the sheriff.
19 Q. So you are saying your copy has a time of 10:30 written on
20 there?
21 A. Yes, the original does.
22 Q. Okay. Was that given back to you then, you took a copy
23 with you that was signed with a time on it?
24 A. She said: You take the original, Lori. I will take the
25 copy.

Page 148

1 Q. Okay.
2 A. Because the sheriff, undersheriff weren't there at that
3 time.
4 Q. So what was your conversation with Kathleen -- what did
5 you say her name was, Kathleen?
6 A. Julien, yes, Kathleen Julien.
7 Q. Okay. What was the conversation that day besides the
8 issue of the copy and the original?
9 A. She said: Oh, Lori, I'm so sorry. I don't know what's
10 going on anymore. They kind of cut me out of the loop
11 once he started being the sheriff, once Sergeant -- or I
12 mean Sheriff Poulin was put in office. I had no idea
13 about this. This is just horrible. Are you sure you want
14 to do this? And I said: I have no other choice because
15 they are trying to take away my civil rights in number 8
16 of the last chance agreement. And she said: Oh, I just
17 wish there was something else. I said: Well, I don't
18 know if there is anything else or not. She goes: Well,
19 let's call Ann James over at HR and see if maybe you can
20 retire or there is something that we can do, because I
21 just think it would look so bad if you are trying to find
22 another job, then you would have to put you were fired.
23 And I said: Well, that's what I am once I sign this, it
24 reverts back to the original signature saying I take my
25 signature off this, so I'm terminated. Well, let's just

LORI LYNN HEETHUIS, 9-25-2020

---

Page 149

1     see. So she made a call.
2   Q. Who did she call?
3   A. She called Ann James.
4   Q. Were you there when she called Ann?
5   A. Yes.
6   Q. And what did you hear her say to Ann?
7   A. She said: Hi, Ann, this is -- actually the first call she
8     made, they referred -- I think it was Sara Hough, and she
9     said: Well, I don't handle that. You would have to talk
10    to Ann James. And then she said: Hi, Ann. I'm here with
11    Lori Heethuis. I have you on speakerphone. We are trying
12    to figure out something. She had a Last Chance Agreement.
13    She got -- she is into a couple days of -- she got or so of
14    her seven-day suspension, and we are just looking to see
15    if she can retire at this time or what she can do, because
16    she is revoking her Last Chance Agreement signature, which
17    would make her terminated, so I'm just trying to figure
18    out if we can -- we can retire her out basically. And
19    that's what she said to her.
20  Q. Did you talk to anyone from the union on the 23rd at or
21    around the time you turned this revocation in to find out
22    whether or not it actually turned into a termination when
23    you turned in this letter?
24  A. No. I didn't feel I needed to because it was quite clear
25    in the last couple sentences that, you know, if I did not

---

Page 150

1     sign it, it was in lieu of termination. So therefore if I
2     revoked my signature, in my mind it meant that I was
3     terminated, so I didn't feel like I had to contact the
4     union for that.
5   Q. But the union would have grieved it for you, right?
6   A. I don't know whether they would have or not. Ed said they
7     would try. He said we would have to see. He said several
8     things. I assumed that they hadn't, they hadn't
9     grieved anything else for me, so I didn't --
10  Q. Did you ever try to talk to him about that, did you ever
11    go back to them and say I want to file a grievance on
12    this?
13  A. On this particular thing?
14  Q. Yes.
15  A. No.
16  Q. And at this point you had not talked to the sheriff to
17    find out whether or not this revocation actually meant you
18    were terminated, had you?
19  A. No. I just know that that's what it said. That's how
20    they explained it, but if I did not sign it, that it was
21    in lieu of termination, and that was it.
22          MARKED FOR IDENTIFICATION:
23          DEPOSITION EXHIBIT 17
24          1:53 p.m.
25  BY MS. AMTSBUECHLER:

---

Page 151

1   Q. Okay. On April 26th -- I marked as Exhibit 17 a document
2     that you wrote to the sheriff. Do you see that?
3   A. Yes.
4   Q. Okay. Did you write that on April 26th?
5   A. Yes. It was in the same day that I brought in the
6     revocation of my signature, because Ann James told me that
7     I could retire over the phone.
8   Q. The revocation of what signature?
9   A. Revocation of my signature of the Last Chance Agreement at
10    10:30 that day. This was a little bit later on.
11  Q. Okay. I thought that was on the 23rd. I have got to pull
12    the document back up. Are you saying you turned in the
13    revocation of the Last Chance Agreement and the retirement
14    all on the 26th?
15  A. I turned in the revocation on the 26th at 10:30, and then
16    later in the afternoon, probably about, I don't know,
17    12:30, 1:00, I'm guessing -- I'm not guessing, but I'm
18    assuming it was -- I can't really recall the exact time on
19    it. Then that's when we had talked to her, and she said:
20    Yeah, she can retire. And Kathleen Julien said: When?
21    And she said: Anytime she wants. And Kathleen looked at
22    me and goes: When do you want to retire? And go: I
23    don't know. And she goes: How about this Friday? And I
24    said: Okay. And she said: Ann, is that good? And she
25    goes: Yeah, I just need Lori to come over and get the

---

Page 152

1     paperwork for MERS and stuff, and we will go ahead and
2     put --
3          (Technical interruption).
4          MS. AMTSBUECHLER: I lost her. I lost her
5     audio. Stop.
6          MR. DREW: Yes. Let me go in there and see.
7          VIDEO TECHNICIAN: Off the record, 1:56 p.m.
8          (Off the record at 1:56 p.m.)
9          (Back on the record at 1:58 p.m.)
10         VIDEO TECHNICIAN: Back on the record, 1:58 p.m.
11  BY MS. AMTSBUECHLER:
12  Q. Okay. Honestly I don't know where we left off, so let's
13    make one thing clear. I was wrong about my understanding
14    of the dates. I see now that you went on the 26th. You
15    turned in the resignation, and you say that was 10:30, and
16    then on the 26th you took this note later in the day,
17    which we have marked as Exhibit 17.
18         What I would like to clarify is what happened in
19    between those times on that day? Will you please explain
20    what happened in between those visits to the sheriff's
21    office?
22  A. Sure.
23         THE WITNESS: Just so you know, there is like a
24    chat thing from Jodie Chapa like right in the middle of
25    that. There is an X. Can I hit that or no?

---

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

---

Page 153

1    THE VIDEOGRAPHER: Yes. I did not send you
2  anything, so that had to be from before.
3    MR. DREW: I hit the chat to get the number, so
4  yeah, hit the X to get rid of that.
5    THE WITNESS: Okay. There we go. Thank you.
6  BY MS. AMTSBUECHLER:
7  Q. All right. So you can see the document now, right?
8  A. Yes, I can see it.
9  Q. So what happened between the first note and returning with
10  this retirement note?
11  A. We left. I wrote that. We left to go get the paperwork.
12  I'm sorry. I left after she asked me all the questions
13  about what kind of party I wanted, so forth and so on,
14  when, and then I went down and I talked to my husband. We
15  had planned on going out of town that day. So he said:
16  Okay, so you are retiring then? And I go: Yes. And then
17  he said: Well, we better -- we better have you go back up
18  and see really what's going on, because can you retire?
19  And I said: I don't know if -- I don't think so, because
20  I don't turn 55 until January. And he said: Well, go up
21  and let Kathleen know that so she can let Ann James know
22  that and see if this is actually what's going to happen
23  before we go.
24    And so then I went back upstairs, and I was
25  talking to Kathleen, and James called and said: I'm

---

Page 154

1  sorry. I checked some things out. She goes: Well, I
2  have Lori here again. I have got you on speakerphone.
3  And she goes: Okay. I checked some things. And she
4  can't retire because she is short by eight months. And
5  Kathleen goes: Oh, I sent the e-mail out. I ordered the
6  cake. I got the room for the jury room. And she goes:
7  Okay. Well, what else can she do? And Ann James said:
8  What is she trying to do? And I said: I really would
9  just like to be able to know that I'm going to be able to
10  keep my insurance if I am terminated. And she said: You
11  can keep your insurance. What we do, and we do it for a
12  lot of people, Lori, we can freeze your insurance benefits
13  for you and your husband until you turn 55, and then when
14  you -- when we get your insurance back, the -- yours will
15  be sixty-six something and Damon's will be two twenty-two
16  something per month, however, you have to resign. And I
17  go: Resign? And Kathleen said: Resign? Well, what do
18  you mean? And she goes: We do it all the time. We just
19  have people resign, and then we will have Lori pick up the
20  MERS paperwork, and then just probably two weeks before
21  her 55th birthday, she needs to come down so we can start
22  getting things into motion to get her back on the county's
23  insurance and her husband back on. They called it the
24  Cadillac of Medicaid -- or Medicare, I mean. And, shoot,
25  I go: Are you sure, Ann, I go, that I have to resign?

---

Page 155

1  And she goes: Yeah, that's the only way you can do it.
2  We do it all the time, Lori. No big deal. And Kathleen
3  goes: Well, Ann would know, Lori. And I said: Okay.
4    And so then I went back down, talked to my
5  husband. He's like: Are you sure? I have never heard of
6  resigning. Went back up. She said: Well, you have got
7  to write a thing saying that you resigned. So then I did
8  that. To the best of my knowledge, it was the same day.
9  It was later in the day. I'm going to say it was anywhere
10  from around 2:30 to 3:30 at that point. We went over to
11  get the stuff for MERS.
12    I said: Damon, will you go in? I'm just beyond
13  myself at this point, you know, that this is happening.
14  So he went in, and he talked to Ann James, and he said:
15  Are you sure, Ann, that she has to resign? Are you
16  positive the word is resign in order to freeze her
17  benefits until she turns 55 in eight months? And she
18  said: Yes, I am sure. And I hope I don't -- I'm not
19  going to offhand any of you ladies, but my husband is from
20  a different era, like he's from Oak Ridge. And he says:
21  This is -- okay, I'm going to ask you one more time, Ann.
22  This is what Oak Ridge guys say. Are you cock sure she
23  has to use the word resign in order to get her benefits
24  when she turns 55? And she said: Yes, Damon, I am
25  absolutely sure. We do it all the time.

---

Page 156

1    So then he came, got in the car, had the MERS
2  stuff, and he said: She is cock sure, so I guess she
3  needs to resign. And I think that's actually when I went
4  back over and did the resignation at that point. So I
5  misspoke myself. It didn't happen before the resolution,
6  it happened before -- it happened after Damon talked with
7  her, and I went up and revoked the retiring. We changed
8  that and we changed it to resign. And Kathleen came out,
9  gave me a hug, said she is so sorry that this was
10  happening to me, and that, you know, at least you are
11  getting your insurance. We know you are getting your
12  insurance. And I said -- I got a little tear, and I said:
13  You have always been kind, Kathleen. I appreciate you
14  trying to help me out of this, I said, and make it a
15  little easier landing, I said, but the fact is that I
16  don't even know if this is going to go because I am
17  actually terminated at this point. So I'm going to go
18  with what Ann James says because she is the specialist,
19  and so here is this. So she had all three of them.
20  Q. So did you have any conversation with Ann James about your
21  years of service or was it only about whether you were
22  eligible by age?
23  A. She said: It has to be years of service, and if you don't
24  have years of service, it can be by your age, but it will
25  take a big hike -- you have to take a big cut, a big cut,

---

LORI LYNN HEETHUIS, 9-25-2020

Page 157

1    Lori, on your pension.  And then Kathleen said:  Isn't it
2    like two-and-a-half percent every month that she is short?
3    So they were kind of going back with numbers back and
4    forth, and I was listening, and I go:  Okay.  As long as I
5    can keep my insurance, then, you know, I said, I'm going
6    to run over and get the MERS stuff from you and stuff, and
7    then we will get this done, and so I went over there --
8    Q.  Okay, okay, okay.  You knew you had -- you did not have 25
9    years of service, right?
10   A.  Yeah, I knew I didn't, but I didn't know if there was
11   something -- because she said something about it being
12   a (inaudible) clause --
13   Q.  Okay.  The question was --
14   A.  -- so I don't know.
15   Q.  Did you talk to anyone besides Kathleen and your husband
16   and Ann James before making all these decisions?
17   A.  No.
18   Q.  At some point that day did you talk with the sheriff?
19   A.  Yes.  The guy that does the accounting called him and
20   said:  Hey, Lori is in here.  She is trying to do this,
21   that, and you might want to come on back.
22       So as I was leaving after all of the hugs and
23   talking to Kathleen and her telling me it was going to be
24   okay, I was opening the door while he was pulling the door
25   open on the other side, and he goes:  Hey, I'm glad I

Page 158

1    caught you Lori.  And he says:  Can I talk to you?  And I
2    said:  Sure.  I'm really not -- I'm not or -- I just don't
3    know what I want to say to you.  I don't know if there is
4    anything I can say to you.  I go, I would rather just not.
5    And he said:  Oh, come on.  I'm not going to bite.  He
6    said:  I will even leave the door open.  And there was a
7    lady that was in there that was trying to pay a bill, and
8    he said:  She can even come in if she wants to.  I just
9    want to talk to you for a minute.  And so against my
10   better judgement, I did go into the office with the door
11   open and speak with him.
12   Q.  The sheriff?
13   A.  Yes.
14   Q.  In his office?
15   A.  Yes.
16   Q.  Okay.  Was this after you had turned in the retirement
17   note but before you turned in the resignation note?
18   A.  I may have been going down to write it.  I don't recall
19   actually or if it was before or after.
20   Q.  All right.  But you talked about whether you were going to
21   retire?
22   A.  He said:  I saw that you were going to retire, and then I
23   saw that you weren't.  And he goes:  I just wanted to ask
24   you, do you have enough -- are you financially set enough,
25   is what I am trying to say, he said, to retire?  And I

Page 159

1    said:  Not really.  He said:  Well, you are a good worker.
2    You know, we just have to iron some things out, that's
3    all.  You have been here what, 21 years?  And then he
4    jumped from that to was I involved in that thing with
5    Gilchrist?  I remember hearing about it, and I don't know
6    if I came in while you were in talking to the undersheriff
7    or if I just heard it passing through, or do you remember
8    me being there at all?  And I go:  You came in and you
9    walked past, but you didn't -- you didn't come in.  And he
10   goes:  Yeah, that's right.  I don't think I did come in.
11   I thought for a minute I did come in, he says, but I do
12   know that after you left, I said, well, this needs to be
13   investigated.  She is making a complaint.  And the
14   undersheriff said:  Oh, no, no, it's not going to be
15   enough, and she doesn't want to pursue it, which was a
16   lie, and he said, so I -- that's about as much as I knew
17   at that point that something had happened, but he said we
18   weren't going to pursue it, and I said:  Well, yeah,
19   that's what happened when all of a sudden I was under all
20   of these investigations because they made Sergeant
21   Gilchrist the interim jail administrator while the new
22   jail was being built.
23   Q.  So is it your testimony that you had this conversation
24   with the -- oops.  I lost my picture of you -- with the
25   sheriff -- there you go -- with the sheriff on that day

Page 160

1    when you were in there talking about whether you were
2    going to retire or resign?
3    A.  Yes.
4    Q.  Okay.  Did he encourage you not to retire or resign during
5    this conversation?
6    A.  He just said:  I don't think you should retire.  You have
7    only got three years left, Lori.  You can do that with
8    standing on your head basically.  And he said:  I think it
9    would be better if you stay.  And I said:  I will stay if
10   you will take number 11 out of the Last Chance Agreement.
11   Even though I don't feel this is right, I will stay if you
12   take number 11 out of the -- and before I could get it out
13   the second time, he said:  I just can't do that, Lori.  I
14   said:  Then I can't stay.
15   Q.  Number 11 was what?
16   A.  It was taking away all my rights, all my civil rights for
17   any litigation from before, during or after.
18   Q.  All right.  So you are telling me that he told you no, and
19   you told him therefore you weren't going to stay, you were
20   still going to retire or resign?
21   A.  No, I told him I wasn't going to stay, and he says:  Oh,
22   come on, come on.  And I just felt like he was cornering
23   me, because he was coming at me, oh, come on you can
24   stay, you can stay, and all I can think of is I can't stay
25   if you leave that 11 in there because I'm not going to

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 161

1   have that in there. I'm not going to agree to it. And so
2   just to get out of there, I said: Fine, I will come back.
3   I will just do the stuff. I just wanted out. I felt like
4   I was just caught like a rabbit in a corner, so I just
5   said it so I could get out of his office.
6   Q. Okay. So you didn't really mean it; you were still not
7   planning on staying?
8   A. No, I knew I couldn't stay, but every time I said no, he
9   was, well, come on, you can -- you know, it's just seven
10  days, and you are a good worker, and, you know, we have
11  got Dan Stout on a Last Chance Agreement, too. We have
12  got other people, Lori. It's just -- you know, and he has
13  done really good with his. His whole attitude has
14  changed. And you just need to not be as friendly. You
15  are too familiar with the inmates. And you just need to
16  not talk about what happened, because people just don't
17  want to hear it. It's just -- you know, they don't like
18  hearing stuff like that. And I said: Well, you know, I
19  don't like things like that happening to me, and nobody
20  doing anything either.
21      So it was just a -- we were at an impasse, I
22  felt. He was just going to keep saying you need to stay.
23  In my mind I was saying I can't stay because you won't
24  take that out.
25  Q. What time of day was this?

Page 162

1   A. It was late afternoon, probably --
2   Q. So was this -- I'm trying to put this in order. Was this
3   before you talked to Ann James for the second time that
4   day or not?
5   A. It was -- after I talked the second time to Ann James, I
6   believe, because I was leaving to go get the MERS
7   paperwork and talk to her and then bring the -- bring it
8   back -- bring the -- excuse me, I'm sorry, my tongue is
9   getting tied -- to do the resignation at that point.
10  Q. All right. I'm still trying to understand the order of
11  these. I'm looking at some of the documents to see if it
12  helps, so let's --
13  A. Okay.
14  Q. We have got the retirement note on April 26th, right, that
15  was after you turned in the revocation of the last chance
16  at 10:30?
17  A. Yes, yes.
18  Q. In between the revocation of the last chance and this
19  retirement, you had not talked to anybody but your
20  husband?
21  A. No, I talked to Ann James -- I talked to Kathleen who
22  called Ann James.
23  Q. Okay. That was then. All right.
24      MARKED FOR IDENTIFICATION:
25      DEPOSITION EXHIBIT 18

Page 163

1       2:15 p.m.
2   BY MS. AMTSBUECHLER:
3   Q. And then, by the way, then Exhibit 18 there was a memo
4   from Kathleen putting out a retirement party notice at
5   2:15. Did you see that?
6   A. Yes.
7   Q. Okay. And then I have got notes here from Ann James that
8   show a phone -- or a conversation with you at 4:20 and a
9   conversation at 2:26. So the first one at 2:26 would have
10  been after the retirement party notice. Of course that
11  could have been when she made it, I don't know, but you
12  are saying that you talked to her before the retirement
13  party notice went out or not?
14  A. I talked to her, and that's when she said that I could
15  retire, and that's why Kathleen sent that notice out that
16  I was retiring, because she said I could, and she said:
17  Well, what date can she, Kathleen said, what date can Lori
18  retire? And she said: Any day she wants to. She could
19  retire tomorrow if she wants to. And Kathleen looked at
20  me and goes, when do you want to retire? And I said, I
21  really don't care because I really was stunned at what was
22  going on, and I was like --
23  Q. I'm still just trying to focus on the order. So then you
24  talked to her again at 4:20. Was this after you had
25  already talked to the sheriff or was this before you

Page 164

1   talked to the sheriff?
2       MR. DREW: Counsel, the 4:20, 164-D seems to
3   indicate that it that it was on April 29th.
4       MS. AMTSBUECHLER: Thank you. That may be why
5   I'm confused.
6       MR. DREW: Right.
7       MS. AMTSBUECHLER: Right.
8   BY MS. AMTSBUECHLER:
9   Q. Okay. So let me make sure I'm clear. I'm going to go
10  back to the beginning.
11      On April 26 you turned in the revocation, and
12  then you had --
13  A. Correct.
14  Q. -- a conversation with Kathleen, and you and Kathleen
15  talked to Ann James, and that was all on the 26th, and
16  then you turned in the retirement note, right, on the
17  26th?
18  A. Yes.
19  Q. And then she put out the notice of a party around 2:15.
20  You talked to the sheriff at some point on the 26th after
21  that?
22  A. After -- I talked to him when we thought it was still a
23  retirement, I believe, because he asked me: Are you
24  really -- financially can you retire at this point, Lori?
25  So I have to believe it was his response of that that the

LORI LYNN HEETHUIS, 9-25-2020

Page 165

1  only thing we had done at that point was the retirement,
2  and that I had talked to her about the resign part, but he
3  hadn't brought that up.
4  Q.  All right.  So then after that you talked to Ann James
5  again, and you decided to turn in a resignation; is that
6  what you are saying?
7  A.  Well, she had called back.  When she called back to tell
8  Kathleen that I could not retire because I was eight
9  months short, and that -- and then she said:  Well, what
10  do you -- what do you really want to do, Lori?  I said:
11  Well, you know, I was hoping that I could retire, but
12  obviously I can't.  And I said:  You know, I don't know.
13  I just wanted to somehow be able to freeze my insurance or
14  still have my insurance with the county.  I said:  You
15  know, at this point of the game without the retirement,
16  I'm back to being terminated, so I'm not really sure.  And
17  that's when it was talked about, about her being able to
18  freeze it if I did a resigning of the position.
19  Q.  So this conversation was on the 26th while you were still
20  over talking with Kathleen.  Was it over the phone again?
21  A.  Yes, it was over the phone, and she was made aware that I
22  was there, and she was on speakerphone.
23  Q.  So this was the second conversation with Ann James while
24  you were with Kathleen on the 26th; is that right?
25  A.  Yes.

Page 166

1  MARKED FOR IDENTIFICATION:
2  DEPOSITION EXHIBIT 19.
3  2:19 p.m.
4  MARKED FOR IDENTIFICATION:
5  DEPOSITION EXHIBIT 20.
6  2:19 p.m.
7  BY MS. AMTSBUECHLER:
8  Q.  Exhibit 20, the first page of that has a note that you
9  wrote again on the 26th saying that you are resigning.  Do
10  you see that?
11  A.  Yes.
12  Q.  Is that what you wrote after that second conversation with
13  Ann James?
14  A.  Yes, because I was told that I would be able to freeze my
15  insurance, so yes, that's correct.
16  Q.  And the reason you switched from retire to resign was
17  because you thought you could freeze your insurance?
18  A.  Exactly, yes.
19  Q.  What did that mean to you, did that mean that you would
20  get your insurance in January?
21  A.  Yes.  The way I understood it is we just had to hold on
22  until January, and it meant the world to me because my
23  husband was diagnosed with cancer, and I knew that he had
24  medical treatments and surgeries coming, and I knew that I
25  was having -- I had some medicine I had to be on for

Page 167

1  posttraumatic stress disorder and anxiety disorder and so
2  forth, and that I needed it, and that if we could just get
3  it -- if they could freeze it until my birthday, and I
4  come in two weeks before, that I was willing to forego
5  everything that they had done to me over the last almost
6  11 years if I could just have insurance for my husband who
7  needed these treatments.
8  Q.  Do you need a break?
9  A.  No, I'm fine.  I'm sorry.
10  Q.  Okay.  So when you turned in this resignation on the 26th,
11  you believed, your testimony is you believed that your
12  health insurance would pick back up in January?
13  A.  Yes.
14  Q.  When you turned 55?
15  A.  Yes, that's correct.
16  Q.  And this was based on what you are saying the telephone
17  conversation was with Ann James while you were in there
18  with Kathleen?
19  A.  Yes.
20  Q.  And Ann James was on the speaker?
21  A.  Yes.
22  Q.  But presumably Kathleen would have heard the same stuff?
23  A.  Yes.
24  Q.  Okay.  And when did you find out that you would not get
25  the health insurance when you turned 55?

Page 168

1  A.  I was left a voicemail, I believe the 26th, if I'm -- if
2  I've got my dates right.  I think that was a Thursday
3  possibly, and anyways, the very next day at like 4:46, I
4  had a call that I missed from the county, human resources,
5  and on it stated that -- that there had been an error,
6  that I would not be getting any insurance at any time when
7  I turned -- either now or when I turned 55 in January, and
8  neither would my husband, and that the date of my
9  insurance terminated as of midnight on the 26th, and that
10  to give them a call.  When I tried to call, it was too
11  late, because I had to listen to it, and then I got my
12  husband, and I said listen to what they are saying now.
13  So then I went down there, I believe it was on
14  Monday, and I said:  I have got to resign, Kathleen.  And
15  she goes:  Resign?  Why?  Or I have got to revoke it, and
16  I said:  They called me, and said I can't get my
17  insurance.  And she goes:  What?  What?  She goes she said
18  you could get your insurance.  And I said:  I know, but I
19  got this voicemail, and I played it for her, and she goes:
20  I can't believe this.  I go:  So I have to give you this
21  revocation of my resignation because I was led to believe
22  that if I did this, I would get my insurance for my
23  husband and myself, and it's not going to happen, so I'm
24  revoking this, which will revert me back to the
25  termination.  I said:  I appreciate everything you have

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 169

1  done. And she goes: Oh, this is terrible, this is
2  terrible. She said: I already sent your paperwork over
3  for resigning. She said: I will take a copy of this. I
4  want you to take a copy and bring it over to human
5  resources and tell them to put it in your file because
6  they have your file. And I said: Okay. So go over there
7  and tell them? And then she said: Well, don't tell them
8  I said to do it. She said: Just go over there and tell
9  them that you dropped one off here and you wanted to drop
10  one off to them because you were told that your packet,
11  your resignation and your whole packet of your information
12  was brought over there. So I thanked her again. She
13  hugged me. She said: I really hope it turns out, Lori.
14  I just don't know. And I went over, and they time stamped
15  it and initialed and said they would put it in my file,
16  and I said thank you.
17  Q. Exhibit -- again, we are looking at Exhibit 20, Bates
18  stamp page 153-D. Is that the document you are talking
19  about?
20  A. Yes.
21  Q. And that's 4:16 p.m. Is that around the time you dropped
22  it off on April 30th?
23  A. That was when I -- that's when they time stamped it at
24  human resources.
25  Q. Right.

Page 170

1  A. So I probably was at the sheriff's office at about, I
2  would say somewhere between probably 3:50 to 4:00 -- I
3  believe 4:10, 4:12, something like that, and then when I
4  left there I directly went over to human resources across
5  the street.
6    MR. DREW: Just one minutes, Laura. What
7  exhibit number was that last one? Because I think 20 was
8  the resignation.
9    MS. AMTSBUECHLER: 20 was a multi-page document
10  that had the resignation and that in it. It's Bates stamp
11  pages 3-D through 156-D. I sent you those yesterday.
12    MR. DREW: I didn't see the bottom part, that's
13  all. Okay.
14    MS. AMTSBUECHLER: Yeah, yeah. Okay.
15  BY MS. AMTSBUECHLER:
16  Q. All right. So that was on the 30th. This note from Ann
17  James says you talked to her on 4-29-19 at 4:20 p.m. Did
18  you actually talk to her at that date and time, which
19  would have been the day before you turned in that
20  revocation of your resignation?
21  A. I talked to -- I did have a conversation. I don't recall
22  it being Ann James. I thought it was Sara Hough, but I
23  could be wrong on that. I just know I did talk to
24  somebody, because I didn't get a chance prior.
25  Q. Was that conversation on the 29th, with whoever it was,

Page 171

1  after you had gotten the message about the fact that the
2  original information was wrong?
3  A. Yes, that is correct.
4  Q. Do you still have that voicemail message that you played
5  for Kathleen?
6  A. I'm not sure. I would have to check. I really am not
7  sure.
8  Q. It was on your cellphone?
9  A. It was on my cellphone, but my -- the messages, they only
10  stay for so long, and then they delete by their selves,
11  you know, automatically. The settings are set for so many
12  of them to be kept, and then they delete some of the older
13  ones, so I'm not sure if it has been deleted or if it's
14  still on there.
15  Q. Well, please check.
16    So as things stand now, when you turned 55 in
17  January, did you get -- start getting any retirement?
18  A. Yes, I did.
19  Q. What are you getting now?
20  A. I have a partial pension of approximately $1,668 and some
21  change a month.
22  Q. Have you done any calculations on what it would be if you
23  would have stayed for your 25 years?
24  A. I believe Ms. Hough did it at one time, because I had
25  checked earlier before all of this had happened, and she

Page 172

1  said it would be, if I stayed to 25 years, it would be
2  approximately thirty-six -- thirty-six hundred, and some
3  odd. I don't remember the -- I know it was thirty-six, so
4  it was basically cut like in half almost.
5  Q. When did you have that conversation with Sara Hough?
6  A. Oh, I went in I want to say -- I really can't recall. I
7  know it was prior to that, prior to everything happening,
8  so I want to say in the spring, because I wanted to see
9  when I could actually do it, and Sarah said she would have
10  to talk to Ann, but that to her calculation, it would be
11  approximately that if I stayed to 25, but it would be
12  reduced if I retired any earlier than that, if I retired
13  21, 22, 23, it would be lessened by so much of a
14  percentage.
15  Q. It was in the spring of what year?
16  A. It might have been the summer. I know it was before that,
17  so it would be maybe in '20 and maybe in '21. No, it
18  wouldn't have been '21. I'm sorry, I have got my dates
19  mixed up here. I want to say 2018, but I really, really
20  don't recall. I know it was before all of the other
21  things started happening.
22  Q. Before what, the fitness for duty?
23  A. Yeah, before all of that started happening, because with
24  my husband being sick, I wanted to see exactly what I
25  could do, when I could do it, because I wanted to

43 (Pages 169 to 172)

LORI LYNN HEETHUIS, 9-25-2020

## Page 173

1  hopefully be -- from my understanding, I would be able to
2  purchase at a reduced rate my insurances for both of us,
3  when I talked to Sara, because I just wanted to spend some
4  time with my husband because they had said he would die by
5  Thanksgiving that year.
6  Q.  So it was the year you thought he might die, and you
7  wanted to spend time with him, so you went in to see what
8  your options were about retirement and health care; is
9  that what you are saying?
10  A.  Yes, and my husband went with me as well.
11  Q.  All right.  And that's when you talked to Sara?
12  A.  Yes.
13  Q.  Okay.  What are you doing now for health insurance?
14  A.  I have no health insurance.
15  Q.  Well, how do you get your health bills paid, or your
16  husband's?  Are you on Medicaid?
17  A.  My husband has had to beg and plead and go into clinical
18  trials, and he did pick up a Part D on his Medicare, which
19  does help somewhat, that so far like the radiation, and
20  special testing at U of M, he was considered a case study.
21  He had to wait four months for that because he had
22  exhausted all of his medical treatments at that point.
23  There was nothing more they could do, and then they came
24  up with this case study, where it shows exactly where the
25  cancer is, and so that they can send it back to the

## Page 174

1  radiologist.
2  Q.  So how do you get your health bills paid, if you need
3  them?
4  A.  My health bills paid?  My one med that's very expensive, I
5  was able to make a call to the company that actually makes
6  the Vyvanse, and they put me on a hardship, and I have had
7  -- been able to get it for free.  That's coming up to
8  where I have to re-call them and see if I can reapply for
9  it.  My other meds are not really expensive, so we can
10  afford to do that between my 1,600 and my husband's 1,600
11  that he gets for his Medicare.
12  Q.  Do you get -- how do you pay your doctors bills?  Have you
13  gone to the doctor at all since you were (inaudible) --
14  (Speaking simultaneously.)
15  A.  I do, I do -- I'm sorry, I didn't mean to speak over you.
16  I apologize.  I do go to Dr. Powell every three months
17  because I have to because of the meds that I'm on, and I
18  just have to pay with cash.
19  BY MS. AMTSBUECHLER:
20  Q.  And what about the therapist, Dr. Strang or Strang?
21  A.  I can't afford to see her.  I haven't seen her since all
22  this happened.  Well, just prior to, because my shift
23  changed, and she only worked in the afternoons, and I had
24  to work in the afternoons at that point, so I couldn't see
25  her for a couple months.  Then I couldn't see her again

## Page 175

1  because I didn't have the money.
2  Q.  So is it your testimony then that the only doctors or
3  psychiatrists or therapists that you have seen since April
4  of 2019 would be actually Dr. Powell; is that right?
5  A.  Yes, Dr. Powell.
6  Q.  And you've paid cash to him?
7  A.  Yes.
8  Q.  And for any medications other than the Vyvanse you have
9  paid cash?
10  A.  Yes.
11  Q.  So you have not got any Medicaid for anything?
12  A.  I was eligible for one month.  I had to have a surgery, an
13  outpatient surgery, and I had been working with a Ms.
14  Davis on that, and she said you can't use your six months
15  prior because you made too much money at the department,
16  and after six months you can reapply, and I did, and I got
17  it for exactly 30 days.  I was able to have the outpatient
18  surgery, it was successful, and it ended.  It was 30 days
19  exactly that I had it.
20  Q.  Was that surgery by a Dr. T-O-M-A-S-C-Z-Y-K?
21  A.  Yes, Dr. Tomasczyk.
22  Q.  February 8th of 2020?
23  A.  Yes.
24  Q.  What surgery was that?
25  A.  I had exterior and interior hemorrhoids, and it was very

## Page 176

1  bad to the point where he said I needed to have the
2  surgery.
3  Q.  All right.  And the way I know that is you posted about
4  him online and said he was a great doctor?
5  A.  Yeah.
6  Q.  Okay.
7  A.  I gave him a review.
8  Q.  Any other -- so that was paid for by Medicaid?
9  A.  Yes.
10  Q.  Okay.  And that's the only other medical that you have
11  had, right?
12  A.  Yes.
13      MARKED FOR IDENTIFICATION:
14      DEPOSITION EXHIBIT 21
15      2:35 p.m.
16  BY MS. AMTSBUECHLER:
17  Q.  Okay.  I'm going to show you Exhibit Number 21, which is
18  the 2019 EEOC filing that you submitted.  Do you see that?
19  A.  Yes.
20  Q.  Okay.  Is that your signature there?
21  A.  Yes, it is.
22  Q.  Did you have any help writing this?
23  A.  No.  I mean --
24  Q.  Okay.  Did your lawyer write it for you or did you write
25  it?

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 177

1  A.  I had to write it, and then I believe it was -- I'm not
2  really sure, but I believe Carla typed it up and said read
3  this and make sure that I have it correct, and then you
4  will need to sign it.
5  Q.  Most of this we've talked about.  In the third paragraph
6  that says around April 5, 2019, it goes into your
7  discussion about a sergeant wrongfully telling co-workers
8  that you were mentally unfit.  Who were you talking about
9  there?
10  A.  The sergeant that said I was mentally unfit?  There was
11  several of them, but to my understanding, it was Sergeant
12  Smith at that time.
13  Q.  It's a very specific date, April 5.  How did you know that
14  date?
15  A.  I was told.
16  Q.  By who?
17  A.  By some of my co-workers and some of the inmates.
18  Q.  Who, who told you --
19  A.  I think it was Deputy Riddle.  It was, I want to say,
20  Deputy Arends possibly.  I can't recall.  There were just
21  a couple of people, and then most of the inmates were
22  saying we can't believe you are back.  They said that you
23  were mentally unfit, that you had a nervous breakdown, and
24  that you would never be back.  And I said, who is saying
25  that?  And they said the sergeant and the deputy.  And I

Page 178

1  said, okay, well, no, that wasn't the situation, but I'm
2  back.
3  Q.  So who told you that a statement was made specifically on
4  April 5?
5  A.  From the sergeant?  I really can't remember.  It was
6  either the sergeant -- or I mean, I'm sorry, Deputy Riddle
7  or -- I want to believe it was either Sergeant
8  Burton-Jones or Deputy Arends.  I really can't recall.
9  I'm sorry.  Those are the ones that come to mind, but I
10  don't know.
11  Q.  Is there an audio recording of anybody making the
12  statements about you being mentally unfit?
13  A.  Not that I'm aware of.
14  Q.  So you said that Sergeant Smith made this statement.
15  Somebody told you it was made on April 5, 2019.  Again, I
16  would like to know how you know that date specifically.
17  Did you make a note of it?  I mean where does that date
18  come from?
19  A.  Yes, I made a note of it, I made a note of it when I was
20  told that.
21  Q.  Where is that note?
22  A.  I wrote it with just a -- it was on -- we have these
23  datebooks that I keep in our pocket, and I just jotted it
24  on the date, and I don't any longer have any of the small
25  notebook things from year to year that we bought for a

Page 179

1  dollar.
2  Q.  Were those notebooks supplied by the sheriff's office or
3  you made that -- you kept that notebook?
4  A.  The sheriff's office, they sold them for a dollar, and --
5  for printing them, and they were just generic little books
6  that fit in our pocket so we could note things or we could
7  X out if we were doing vacations at a certain time or if
8  we changed shifts with somebody and we were going to work
9  for somebody, and they were going to pass back, just
10  things like that.
11  Q.  What did you do with that notebook?
12  A.  Well, every year I get rid of them, because I don't need
13  them.  It's just a little tiny datebook, is what it is.
14  Q.  What did you do with the one from 2019 after you left
15  work?
16  A.  I threw it away.  I didn't need it anymore.
17  Q.  Okay.  Did you -- do you have any more specifics about
18  what Sergeant Smith said about you being mentally unfit?
19  Do you know more specifically what he said?
20  A.  Not that I can recall.
21  Q.  I think now might be a good time to take a break.
22  VIDEO TECHNICIAN:  We are off the record, 2:40
23  p.m.
24  (Recess taken at 2:40 p.m.)
25  (Back on the record at 2:55 p.m.)

Page 180

1  VIDEO TECHNICIAN:  We are back on the record,
2  2:55 p.m.
3  MARKED FOR IDENTIFICATION:
4  DEPOSITION EXHIBIT 22
5  2:55 p.m.
6  BY MS. AMTSBUECHLER:
7  Q.  All right.  I've got up on the screen here a portion of
8  your answers to Defendants' first discovery request, which
9  I have marked as Exhibit Number 22.  Do you see this where
10  you have listed the jobs you have applied for?
11  A.  Yes, some of the jobs I've applied for, yes.
12  Q.  Okay.  And then it goes on to the second page, see all
13  that, it goes through Shoreline Vision?
14  A.  Yes.
15  Q.  Have you applied for any other jobs since then?
16  A.  Yes, I did.  If you can scroll back down for me just for a
17  moment, I want to make sure.  All right.  I worked for La
18  Fiesta.  It's a chip making manufacturer up in Whitehall.
19  Q.  I'm going to stop you for a second.  Hold on a minute,
20  because I have, in another answer, I have got the places
21  that you actually worked, so --
22  A.  Oh, okay.
23  Q.  -- I'm asking you about where you have applied, not gotten
24  work.
25  A.  Right, and I had more, but I just felt -- I had those

45 (Pages 177 to 180)

LORI LYNN HEETHUIS, 9-25-2020

Page 181

1  right at hand, so that's why I did those. I also used
2  Indeed in the unemployment office, even though I wasn't
3  getting unemployment, I could still go to Michigan Works,
4  so that's part of that and part of Indeed. I am sorry,
5  yes.
6  Q.  Did you keep a record of your applications for other
7  employment?
8  A.  Other than most of them had to be gone through Indeed, and
9  I didn't keep the e-mails, but I'm sure that I could
10  message them and ask for a history of all of the places
11  that I went through with them.
12      MR. DREW:  Counsel, she brought in some records
13  today that look like something she filled out for
14  unemployment. It's about fifteen pages, maybe more, of
15  all of the places I believe she applied or some of them or
16  more of them or something.
17      MS. AMTSBUECHLER:  All right.
18      MR. DREW:  We can copy those and send them to
19  you.
20      MS. AMTSBUECHLER:  All right.
21      MR. DREW:  And she can discuss what they are,
22  but I think they are different places for some forms she
23  filled out for unemployment.
24      MS. AMTSBUECHLER:  Okay.
25  BY MS. AMTSBUECHLER:

Page 182

1  Q.  What kinds of jobs have you been looking for? When you
2  look, what are your parameters?
3  A.  Well, I wanted to get into maybe a lateral position in
4  another county or possibly like in the Friend of the Court
5  or District Court, Circuit Court worker type thing, but I
6  found out quickly that that was not going to be an option,
7  so I just started applying everywhere. I applied from
8  attorney's offices to gas stations just trying to get a
9  job.
10  Q.  So let's break this down a little bit the jobs that you
11  say you applied everywhere, were you looking for a
12  particular type of job, like a secretary job, an office
13  job? Did you have some kind of way to narrow down what
14  you were looking for?
15  A.  Yes. I wanted to be in like an office job if I could not
16  continue with a lateral move, but eventually I just kind
17  of went anywhere to see if I could get any kind of job,
18  because I wasn't getting any responses from almost a
19  hundred percent.
20      I got a response from the Van Tubergen, Treutler
21  & Hayes, they interviewed me, and then they called me
22  about, I want to say three days later and said, I'm sorry,
23  you know, you did a great interview. We wish you luck,
24  but we have hired somebody with a little bit more
25  experience --

Page 183

1  Q.  Okay.
2  A.  -- that they wanted.
3  Q.  What kind of job was that?
4  A.  That would have been like a front desk person who handles
5  the clients' phone calls, took in information, did the
6  mail that came in the day and disburse that, make
7  appointments, and greet people that were there to see them
8  for appointments.
9  Q.  What other jobs did you apply for that you say were
10  lateral, court or county type jobs?
11  A.  I went through Indeed, but I don't know if they did them,
12  because Indeed said something about if you don't have your
13  words specifically, that it may not get through the
14  screening, I guess, but like New Era, Ottawa, there was
15  one other one. I'm trying to think. I have done so many,
16  it's hard to recall all of them. Central dispatch, they
17  had their own, and it linked me in, and I think it said
18  that they never sent me anything back because it took me
19  off Indeed and flipped me to their link, and I don't have
20  a laptop or a computer, I only had my phone, so I'm not
21  sure if they ever got that.
22  Q.  You tried to do all of this on your phone?
23  A.  Yes.
24  Q.  And you are trying to do the applications for other
25  counties or courts, you said you did those through Indeed?

Page 184

1  A.  I did -- I did some of them through Indeed, but I also
2  called and asked if they had any openings available or if
3  I could bring down a resume.
4  Q.  Who did you call?
5  A.  I called the Ottawa, just in their general -- I think she
6  was just a receptionist, and I asked if there was anything
7  at that time available, told her that I had worked for 21
8  years at Muskegon County, and she said there was nothing
9  at that time, but if I wanted to get on Indeed or if I
10  wanted to get on their site and do it, that I could do it
11  that way, and then if something became available, they
12  would have my resume on file.
13  Q.  What did you apply for with 911, in what county was that
14  or what 911 was that?
15  A.  Well, are you talking about the -- I tried to fill out the
16  application for central dispatch in Ottawa County.
17  Q.  And that was on the Indeed platform?
18  A.  Yes, Indeed, but then it flipped me over to their website.
19  From Indeed it said you are leaving Indeed and it put me
20  on their site.
21  Q.  You have stated somewhere, I have read, in something that
22  has been written, that you believe that someone from the
23  county or the sheriff's office has somehow interfered with
24  your ability to get another job. Is that your belief?
25  A.  That is my belief, yes.

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 185

1  Q. Why, on what basis?
2  A. Because I can't even get a job at a gas station.
3  Q. Who do you think is interfering and what do you think they
4     have done?
5  A. I think HR is telling them you don't want to hire her.
6     She has got a lawsuit against us, you know, any number of
7     things. She is a bad egg. I don't know, but it's just I
8     have applied for so many jobs and not even gotten a call,
9     not an e-mail, not anything from places that I'm -- you
10    know, I mean I would even be happy with a you are
11    overqualified, we would love to hire you, but you are
12    overqualified.
13 Q. Has anybody told you that anybody from the county or the
14    sheriff's office has said anything negative about you when
15    they have called?
16 A. No. I didn't ask anybody, and nobody called me, so I
17    think I'm understanding your question like you are saying
18    like Van Tubergen, Treutler & Hayes?
19 Q. Right.
20 A. Like they called me back, but on this list they are the
21    only ones who called me back, or even e-mailed me -- no
22    e-mails, no calls, no nothing.
23 Q. Okay. I know you have Facebook. Were you friends with
24    anybody from the sheriff's office on Facebook?
25 A. Yes.

Page 186

1  Q. Who?
2  A. Corey Meyer.
3  Q. Who? I'm sorry. Spell that.
4  A. I'm sorry, Corey Meyer. And Shawn Derrick, he's not there
5     anymore, but I was friends with him, and I believe Eric
6     Anderson.
7  Q. Did you message with them about what's -- anything that
8     was going on at the sheriff's office?
9  A. I don't really recall messaging them on anything, but I
10    just don't know at this point if I did or not.
11 Q. Do you use Facebook Messenger to exchange messages with
12    people?
13 A. Yes, I do.
14 Q. Okay. Did you exchange Facebook messages with people
15    about any of the ways you were being mistreated at the
16    office?
17 A. I don't understand why my Facebook is coming into play
18    here, because I -- that's my personal, private account,
19    and I -- I believe that I have the right to speak to
20    anybody on Messenger, because it's Messenger, about
21    anything, and that that should not be able to be put into
22    the realm of things because it is a private, personal
23    thing with personal pictures on there of different people
24    and of my grandchildren through my husband, and so I'm not
25    sure why I'm being questioned about this.

Page 187

1  Q. Well, I'm asking you the questions, and I am asking for an
2     answer. I'm not asking about your grandchildren. Did you
3     exchange Facebook messages with people about the goings-on
4     at the sheriff's office?
5  A. I may have. I don't recall. I don't recall when. I
6     don't recall the specifics of it if I did.
7  Q. Have you deleted anything from your Facebook Messenger
8     account?
9  A. Yeah. I deleted a lot of stuff when it gets too full
10    because I'm always on the high end of 64 gigabytes, so...
11 Q. Why do you believe that what's on your Facebook account
12    goes towards the gigabytes of what's on your phone?
13 A. Because it does.
14 Q. So when is the last time you deleted from your Facebook
15    account messages?
16 A. I really don't know. I'm sorry.
17 Q. Well, I'm asking you now not to delete anything else
18    pending our sorting this out in this lawsuit.
19       Are you claiming that you've got any physical
20    injuries as a result of anything that happened to you at
21    the sheriff's office, and I'm not talking about things
22    that you had work comp for, but anything as a result of
23    any of the stress or anything like that, are you claiming
24    you have been physically injured?
25 A. I have gained a lot of weight since then. I don't know if

Page 188

1     that would be a physical injury or not.
2  Q. Since when?
3  A. Probably -- I have struggled with it back and forth since
4     I left and with the pandemic obviously, so it has been
5     awhile. I go back and forth and up and down, and now I'm
6     pretty regularly going up, up, up, so...
7  Q. Anything else?
8  A. As a physical ailment, no.
9  Q. We talked about retirement. When were you planning to
10    retire if you hadn't had this stuff happen and you ended
11    up, you know, leaving?
12 A. I would have worked at the very minimum until I was 59. I
13    would have worked until I was 66 if I could. I was that
14    committed to my job.
15 Q. How is your husband's health right now?
16 A. He just got done twenty rounds of radiation about
17    five months ago after the PSMA special case study where
18    they found in his lymph nodes. It did knock the cancer
19    down, but the cancer is 11.9, and it's a very aggravated,
20    very fast moving cancer. So the doctors says that it has
21    knocked it back to a point I believe, a .061, if I
22    understood it right, which is excellent, because it was
23    going up by triple every time he had a PSA test, and so
24    it's knocked it back, but it's not gone. From my
25    understanding, that he will never survive cancer, that all

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 189

```
1     these things that they have done are to prolong his life.
2     He will never be a survivor of cancer.
3  Q. Are you working currently?
4  A. Yes, I am working currently at America's Best --
5  Q. What do you do?
6  A. -- Eyeglasses and Contacts.
7  Q. I'm sorry?
8  A. The whole name is Contacts and Eyeglasses, I'm sorry,
9     America's Best.
10 Q. What do you do there?
11 A. I'm an optician.
12 Q. Do you work full-time?
13 A. Yes, I do.
14 Q. So what hours?
15 A. Anywhere from 8:30 to -- it's nine-hour days, so if it's
16    10:15, it's 7:15 in the evening, because we close at 7:00,
17    a lot of 9:15s to 6:15s, usually between the two of those.
18    I don't really get anything -- they don't get -- give me
19    anything other than like that.  Like some of them come in
20    at 8:30, but it's usually like the upper staff.
21 Q. Okay.  What do you get paid?
22 A. $10 an hour.
23 Q. Any benefits?
24 A. No.
25 Q. Are you still looking for other employment?
```

Page 190

```
1  A. Yes.
2  Q. Do I understand if you find an employment with somewhere
3     that has MERS, you can continue under the MERS system?
4  A. I am not aware of that, no.
5  Q. Where do you get your scripts filled?
6  A. From Hometown Pharmacy in north Muskegon.
7  Q. Is that the same pharmacy you have used for several years?
8  A. Well, it was Keith's prior to that, and then Hometown
9     actually bought them out when they were still Keith's, and
10    then they moved down, so yes, I would say for several
11    years.
12 Q. So from say 2016 to the present it has been what was
13    Keith's and is now called Hometown?
14 A. Yes.
15 Q. Have you gotten prescriptions filled anywhere else?
16 A. I did one at Target because it was supposed to be a little
17    less expensive on that app that you can go on.  It's
18    supposed to give you better places where they can give you
19    the same meds for better deals, but I couldn't use it
20    because I have a high --
21       I'm sorry, my nail is bleeding a little bit.
22    Let me just get a Kleenex.
23       I am very highly sensitive to medication because
24    of the material that they put in with the medication, and
25    so I have to have certain brands, because otherwise they
```

Page 191

```
1     don't work at all.  So for the ones that could be generic,
2     I have to have a particular one.  It has to take few tries
3     of different stuff to make sure that I can use it.
4  Q. All right.  Let's see.  I'm going to try to find a
5     document now, so let's see.
6       While I'm looking, let me ask you another
7     question.  Do you feel like you were treated fairly on
8     your evaluations that were done, your annual evaluations?
9  A. Throughout the time at the first part of my career, I
10    don't feel I was by Lieutenant Mangioni (Phonetic), but
11    other than that, from what I can recall at this point, I
12    think it was fair, the evaluations were pretty fair.
13 Q. I totally cannot find a document that I have a copy of.
14    MS. AMTSBUECHLER:  Sharon, I know I sent you
15    some of these.  Do you have what I premarked as Exhibit
16    23?  I don't know why I can't find it now.
17    VIDEO TECHNICIAN:  I just saw a way that I can
18    actually give you permission to scroll, and I can pull
19    this up.  Let me get back to my screen share.  This might
20    be a good option.  Can you see it?  Laura, you are on mute
21    somehow.  I'm sorry.
22    MS. AMTSBUECHLER:  Oh, okay.  It's small.  Can
23    we make it any bigger?
24    VIDEO TECHNICIAN:  Let me see.  Yes.  Give me a
25    second here.  Oh, dear.  Now I am going backwards.  I
```

Page 192

```
1     guess my idea was worse.  I'm not doing this as eloquently
2     as I thought.
3       MS. AMTSBUECHLER:  All right.
4       VIDEO TECHNICIAN:  Let me just see.
5       MS. AMTSBUECHLER:  This really isn't actually
6     that important actually, but I have already marked it.
7       VIDEO TECHNICIAN:  I'm so sorry.
8       MS. AMTSBUECHLER:  It's all right.
9          MARKED FOR IDENTIFICATION:
10         DEPOSITION EXHIBIT 23
11         3:17 p.m.
12 BY MS. AMTSBUECHLER:
13 Q. Exhibit 23, let me just get it on screen sharing.  Okay.
14    There we go.  This is a series of an e-mail, a series of
15    e-mails, 2017, July, related to keeping the area clean.  I
16    think we talked about this earlier in the deposition.  Do
17    you recall -- and I will stroll it down as you want.  Just
18    tell me when you want me to move it down.  You weren't on
19    this first part.  Let me find where you were.
20 A. Wait.
21 Q. There we go.  Do you recall receiving this?
22 A. I do recall that, yes.  I don't know that I saw it at that
23    point in time, though.
24         MARKED FOR IDENTIFICATION:
25         DEPOSITION EXHIBIT 24
```

LORI LYNN HEETHUIS, 9-25-2020

Page 193

```
 1               3:18 p.m.
 2  BY MS. AMTSBUECHLER:
 3  Q.  All right.  Exhibit 24, which is up on the screen, Notice
 4      of Written Reprimand, 11-27-17, do you recall receiving
 5      that?
 6  A.  Yes, I believe I did receive that, yes.
 7  Q.  Okay.  I can scroll down so you can see the whole thing,
 8      page 19-D.  Do you need to see it any longer or do you
 9      recall receiving that?
10  A.  Yes, I do recall.
11  Q.  All right.  So it's a written reprimand.  One of the
12      things relates to November 17, 2017, an allegation that
13      you used obscene language in dealing with Chaplain
14      Peoples.  Let's start with that one.
15  A.  Okay.
16          MR. DREW:  Counsel, can we just get the Bates
17      stamp of that just for the record?
18          MS. AMTSBUECHLER:  Sure, 19-D.
19          MR. DREW:  Thank you.
20  BY MS. AMTSBUECHLER:
21  Q.  What do you recall happening with Chaplain Peoples that
22      led up to this?
23  A.  I don't believe it was on the 17th.  I thought it was on
24      the 14th, only because it was my mother's birthday, and I
25      was leaving early.
```

Page 194

```
 1  Q.  Okay.  What do you recall happening?
 2  A.  There was a fight on another floor.  The deputy I was
 3      working with left the floor to assist.  It was very busy
 4      at that time.  They had two classes in.  One was trying to
 5      go out.  I had two, I think they were probation officers
 6      seeing different people in their little rooms that they
 7      have on there, and I had to get the people from the
 8      visits, at the prior visits that were done with their
 9      visits back into their rooms and locked down if they were
10      down at that time for whatever reason, and had to get the
11      next set of visitors out for their visits.
12          And the chaplain hit the buzzer, the second
13      buzzer way down by the elevator of the floor, and he
14      says -- (inaudible) -- book cart.  You are going to have
15      to wait a minute, Chaplain (inaudible) -- there is a lot
16      of stuff going on.  I will get to you when I can.
17          THE REPORTER:  I'm sorry.  You have to -- could
18      you hear me?  Could you just please repeat?  You were
19      talking too fast.  I couldn't make it out.  I'm sorry.
20          THE WITNESS:  Oh, I'm sorry.
21          THE REPORTER:  It was right after the buzzer by
22      the elevator floor, and he says.
23  A.  Yes.  And he said I have the book cart here, and I said,
24      yes, I see Chaplain Peoples.  I said it's going to be a
25      minute.  I have a lot of things going on up here, and it's
```

Page 195

```
 1      going to be a few minutes, actually, I said, because I'm
 2      the only one up here, so I said I will get you as soon as
 3      we can.  And then I went off that, and I was trying to get
 4      the people out of the class, and you have to be careful
 5      because there may be people going into the other class
 6      that's trying to come in, the class that's trying to come
 7      out, or if you let them both at the same time, they could
 8      be on me, they could be involved in gangs that don't like
 9      each other.
10          I'm sorry, I was looking at the phone.
11          So it's very -- it's a very -- it was a very
12      high stress situation with that, and so I was trying to do
13      my best to clear everything and get everybody out and get
14      the probation agents out and the people that they were
15      seeing back to their pod without having any incidents
16      between inmates that may be commingling.
17          So then I did let him through.  I didn't say
18      anything.  I just clicked the door for him and got him
19      into the next door, and I said, okay, it's going to be a
20      minute.  I have almost got everything situated, just hang
21      on.  And he hit the button again, and I was still
22      trying to move people in and out.  People were trying to
23      go in somebody else's room, so I was trying to get them
24      situated and tell them to get in their own room and lock
25      down.  And he hit the buzzer again, and then he knocked on
```

Page 196

```
 1      the glass, and I was on the -- on the -- it's just a --
 2      it's a voice box, him to me, and I said, Chaplain, will
 3      you please stop?  I said you make me feel like a caged dog
 4      -- I'm sorry, a fucking caged dog that you keep kicking --
 5      similar to this, that you keep kicking because you want me
 6      to do something.  I can only go as fast as I can go.
 7  Q.  Okay.  And then after that you were called in, and you had
 8      a meeting with the undersheriff about this?
 9  A.  No.  After that happened I apologized because he said --
10      young lady, I don't talk that way, and I said I know you
11      don't.  I normally don't either.  I profusely apologize,
12      sir, it's just that you keep hitting, knocking, buzzing,
13      and I said I know you are there, and he said, well, I'm
14      sorry, too, he said, because I know that I get that way
15      because some of the other officers act like I'm not there,
16      so I apologize as well, and I said, well, apologize
17      profusely because that's not normally me.  I normally
18      don't say things like that, I said, so will you please
19      accept my apology?  And he said, yes, if you will accept
20      mine, and I said, I do, sir.  I said let me get you
21      through, just give me just a second.
22          And then my sergeant came up on the floor, which
23      is Sergeant Burton.  I told her of the situation.  I said,
24      look it, I apologized to him.  It just was a mess up here,
25      and I'm sorry, and I wanted you to know.  And she said:
```

49 (Pages 193 to 196)

Chapa & Giblin Court Reporters
(248) 626-2288

Page 197

1  Well, I'm going to talk to him when he comes down, because
2  you're not the first officer that says he beats on the
3  windows, he wraps with his keys, he hits the buzzer
4  multiple times.  And I said, well, we have agreed that we
5  had accepted apologies.
6  Q.  I'm going to stop you now, because again I think we are
7      going way beyond, so --
8  A.  I'm sorry.
9  Q.  Did you talk to anybody in command before you were issued
10     the written reprimand for this?  Did you have a Loudermill
11     hearing?
12 A.  I don't recall.
13 Q.  Did you feel like a written reprimand was not justified
14     for this?
15 A.  Yes, I didn't feel it was justified because we had
16     apologized to each other.
17 Q.  The other written reprimand was for an event on November
18     19, 2017, regarding you being distracted by your cellphone
19     relating to inattention to duty.  I believe this had to do
20     with a situation where you said your phone, you couldn't
21     turn it off, it was a new phone or something like that.
22     Do you recall that incident?
23 A.  Yes, it was my phone.  I don't know if it hit something in
24     my pocket, because I carry a couple of different things in
25     my pockets and stuff or what, but it had this like screen

Page 198

1  going, and it was muted.  I couldn't get it to shut off.
2  I couldn't get it to do anything.
3  Q.  You asked -- did you ask one of the inmates for assistance
4      in turning it off?
5  A.  No.  He tried to -- he said:  Let me see it, Ms. J, and
6      see if I can fix it.  And I said:  No, no, no, no.  Just
7      let me try and get this fixed.  And I was trying to have
8      it to where -- they obviously could hear it, but I was
9      trying to have it like out of view and hit buttons and
10     turn it off on each side, and it was a mess.  I ended up
11     having to go over and get it rebooted.
12 Q.  Was it playing music at that time?
13 A.  Yeah, it was really loud -- I don't even know what kind of
14     music it was, but it was really loud, very inappropriate,
15     I thought, and I couldn't figure out how to get it to
16     stop.
17 Q.  Did you feel that a written reprimand was not justified
18     for this?
19 A.  I do feel that it wasn't justified.
20 Q.  Why?
21 A.  It was something out of my control.  I had to address it.
22     I thought maybe I could get the phone to shut off, turn
23     off, or mute or something, and I said he could understand
24     that, but that he still felt that this was necessary.
25 Q.  Who is he?

Page 199

1  A.  The undersheriff.
2  Q.  Did you file a grievance over either of these?
3  A.  No.  I was told not to by Deputy Riddle.
4  Q.  Did Deputy Riddle say why you should not file a grievance?
5  A.  Not really.  He just said:  I don't feel it could go
6      anywhere, Lori.  You know, I said:  Well...
7  Q.  Do you recall an incident on -- on or around -- let me put
8      it this way, in early December of '17, where you and your
9      husband ran into the sheriff and the undersheriff in the
10     lobby?
11 A.  Yes.
12 Q.  What happened with that?
13 A.  I had been given an e-mail back and forth.  They kept
14     cancelling the time because of different things, their
15     meetings, John Jenkins, who was one of the union reps at
16     that time, had to take his daughter to therapy, so this
17     has been quite awhile of ongoing back and forth.  And I
18     got an e-mail, and it said we are going to do it 10:00 on
19     Monday, and apparently the undersheriff had sent that to
20     everybody, like he always had, but ten minutes after I
21     read that, he had sent an e-mail just to me stating that
22     the time was changed to 8:30, which I didn't view because
23     I didn't have time to go back to my e-mails.  Normally we
24     read them right away in the morning, and if we get a
25     chance to check, we can, but I just hadn't had a chance,

Page 200

1  and so I --
2  Q.  What meeting was this?
3  A.  It was supposed to be a meeting on the inattentive to
4      inmates and the situation with the chaplain.
5  Q.  All right.  So this related to that discipline we just
6      looked at, it was a meeting for that?
7  A.  It was.
8  Q.  So maybe my date in December was incorrect.  It may have
9      been November, but in any event, you had this happen, the
10     meeting got changed.  Then what happened?
11 A.  Well, John Jenkins, the union rep said -- I talked to Nate
12     the night before.  He said, yep, you are on for 10:00.  He
13     checked his thing.  He was the union rep also.  So John
14     said:  Just give me a text when you get here.  I will be
15     working, and I will come up.  So I got there about ten to
16     10:00, and waited until about seven minutes to, and I
17     talked to him, and I said:  John, I'm up here.  Where are
18     you?  And he goes:  Where are you?  And I said:  I'm on
19     the sixth floor.  So he said:  I will be up in just a
20     minute.  He came up, and he said:  You missed the meeting.
21     And I said:  No, I didn't.  It was for 10:00.  And he
22     goes:  They told me it was for 8:30.  And go:  I didn't
23     get anything that said that there was a change.  The last
24     thing I got was from the undersheriff at like 8:10 stating
25     that it was going to be at 10:00.  And I said:  And

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 201

1    everybody was involved.  And he goes:  I don't know.  I
2    don't know what's going on.  And I said:  Well -- I said:
3    This is crazy, John.  I said:  Am I going to get in
4    trouble for this now, too?  And he said:  Yeah, probably.
5    You will probably get a failed to comply with a direct
6    order.  And I said:  But it wasn't a direct order for that
7    time.  It was for 10:00.  And he said:  Well, we will have
8    to figure it out, Lori.  Don't worry about it.  I will be
9    in touch.
10        And we went down the elevator, and it opened up,
11   and I saying thank you to John and looking at him this
12   way, and I heard my husband say, hey, Mike, and I knew
13   that when he said, hey, Mike, he was talking to the
14   sheriff, so I turned around.  And John said:  I'm going to
15   get out of here.  And he went the other way.
16   Q.  And then what happened?
17   A.  My husband asked him why they were playing a game, that we
18   were there for the meeting, and then the sheriff said:
19   No, you weren't.  We changed it.  She should have read her
20   e-mail.  And he said:  No, no, no.  He said:  This isn't
21   right.  He said:  This isn't right, what you are doing to
22   her.  He basically told them that they have allowed a
23   predator to roam the halls of the Hall of Justice doing
24   what he did to me, to probably other women, and the
25   sheriff said that he didn't have anything to do with that.

Page 202

1    He didn't know about it.  And he said:  Well, now you know
2    about it.  And he went into a conversation, and they shook
3    hands, and said that it was just going to be considered a
4    miscommunication in times and that I would not be getting
5    a violation of a direct order, and then we left.
6    Q.  Was anybody -- were you and your husband, you and/or your
7    husband upset during this?
8    A.  Not really upset, but just not -- we couldn't figure out
9    what was going on, because they were saying that no, it
10   was for this time, and I'm like, no, I even checked with
11   Nate.
12   Q.  Okay.  But during the time you were down in the lobby
13   talking to the sheriff and the undersheriff, was your
14   husband raising his voice?  Was he yelling?
15   A.  No, he wasn't yelling.  He was using a stern voice, but he
16   wasn't yelling.
17   Q.  Were you yelling?
18   A.  No, I wasn't yelling at all.
19   Q.  Were you or your husband using vulgarities?
20   A.  I don't recall any.  I was -- when my husband said about
21   how he was trying to -- stuck his hand down my pants and
22   tried to stick his fingers up me, I don't know if that's
23   considered vulgar language, but he was just saying the
24   truth, and I said -- I made a motion, that I put my hand
25   in my crotch begging him not to do this, and the sheriff

Page 203

1    said -- the undersheriff said:  Lori, don't do -- don't do
2    those motions, don't do those motions.  So I stopped, you
3    know.
4    Q.  Isn't it true you were grabbing your crotch, and to show
5    that, while you were down there in the lobby?
6    A.  I wasn't grabbing it.  I said I put my hand between here,
7    and it wasn't like I was grabbing it.  I just put it in
8    between my thighs.  I said -- I actually put my hand in
9    between my thighs so I could block his fingers because he
10   was trying to dig them off me.
11   Q.  During that -- during that issue, that meeting, that
12   whatever, that event in the lobby, isn't it accurate to
13   state that you were talking loudly, if not yelling, and
14   that you had your hands down by your crotch?
15   A.  I can't hear.  I'm sorry, I can't hear you.  You are going
16   in and out.
17   Q.  Wouldn't it be accurate to state that you were -- had your
18   hand down by your crotch during this meeting in the lobby
19   and that you were rubbing around on your hand and moving
20   it around and saying things about it?
21   A.  No, that's not correct.
22   Q.  Were you upset during that part of the meeting, when you
23   were talking about that?
24   A.  Not really.  I was actually talking quite quietly to them
25   saying, you know, look, this is what he was trying to do.

Page 204

1    He was trying to dig his fingers up me, and thank God I
2    could get my hand up there to block it and squeeze my
3    thighs together so that he did not penetrate me.
4    Q.  Were there other people in the lobby -- were other people
5    in the lobby during this discussion?
6    A.  Yes, there were people going in and out and in and out of
7    courtrooms and paying bills and so forth, so it was a
8    regular day down there.
9    Q.  Why was this brought up then?
10   A.  My husband had brought it up.  He said:  You know, why
11   haven't you done anything about this?  You saw her in the
12   bank when they put you on third shift, and you said both
13   of you were going to be okay, and now you are allowing
14   this -- this guy to stay a sergeant, who did this to my
15   wife?  You know, why wasn't anything done?  Why weren't
16   charges sought?  Why was there no investigation?
17        And so that's how that got brought up, was
18   through that.  You know, why are you playing this game
19   with these little itty-bitty things over here where there
20   is big things that you really need to take care of.
21   Q.  Why was your husband there that day?
22   A.  He had asked if he could come along and just sit in the
23   lobby to make sure I was okay when I came out, and I said
24   I don't mind if you just sit there, you know, and come out
25   with me.  That would be fine.

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 205

1    Q. Okay. So do you recall then having a meeting on December
2       7, 2017 to discuss your mental state before they sent you
3       for a fitness for duty?
4    A. I don't know. I believe it was the 7th or 8th of
5       December, one of the two. They had reprimanded me for
6       the -- they called it an emotional outburst, and then I
7       was working Master Control that day, and I was coming out
8       of the bathroom of Master Control, and then I heard the
9       sheriff say: Lori, can I talk to you a minute out here?
10      And I kind of looked one way, and then I looked the other
11      way and I go: Oh, sure. Just a second. And I just
12      bunched up my shirt, and -- as I was walking to him, and I
13      go: Yeah, that's no problem. And then he got me outside
14      there, and then he said: Well, let's go into the
15      sergeants's office. So we went to the sergeants's office,
16      which is just a few feet away, and my sergeant, Teresa
17      Jones-Burton, she looked at me like a deer in the
18      headlights, and he's like: Is it okay if we move your
19      purse, Theresa, and shut the door? And she was: Like
20      yeah, whatever you want to do. And she is standing up and
21      looking to the left, and the undersheriff was in the
22      corner of the room, and that's not a very big room. And
23      he goes: We just want to talk to you because we had
24      another deputy come up concerned about you and your mental
25      health. You had another emotional outburst. And I said:

Page 206

1    I never had an emotional outburst, sir. I had a stern
2    talking to the chaplain, but it was not an outburst. I
3    said: There were things going on. It was busy, and
4    things were said, and we both agreed to accept the
5    apologies of each other. And I said: So who came up?
6    What did I supposedly say? Where did I supposedly have
7    this emotional outburst? Because I said: If I was going
8    to have an emotional outburst, probably the entire first
9    floor would know it. I said: So I don't understand this.
10   And they said -- Mike said: We would rather not say, just
11   like that. And I said: Okay.
12       So then the undersheriff unfolded this paper and
13   said: We would like you to go see Joe Auffrey for a
14   psychological evaluation. And I said: Well, I already
15   see a psychologist once a week, ever since I was sexually
16   assaulted, so why can't I just continue to go to her. If
17   you would like her records, I can sign a release. He
18   goes: No, no. We want you to go to our guy, and we want
19   you to leave now. And we were short staffed, so I said:
20   Can I just work through the day? No, no. We are going to
21   put you on administrative leave, and you are going to
22   leave, and then you are going to have this appointment
23   with Joe Auffrey, and then we will be back in touch with
24   you.
25   Q. So is it your testimony that they didn't tell you what the

Page 207

1    outburst was?
2    A. No, they didn't tell me.
3    Q. Do you recall discussing --
4    A. They would rather not say.
5    Q. Okay. Do you recall discussing an outburst where you were
6       frustrated trying to do some training, a training
7       certificate, and there was too much noise?
8    A. There wasn't too much noise. It kept freezing, and I
9       couldn't -- and it would time out, but I wasn't having an
10      emotional outburst about it. I just said: I'm so tired
11      of this. I have done this so many times. I know the
12      answers without even looking at them. It was not an
13      emotional outburst.
14   Q. Who was around when you were doing that training
15      certificate?
16   A. Scott Smith. I'm not really sure. It seems like somebody
17      else had come up for a few minutes, because at that point
18      we were doing the new -- they made it so that we could see
19      our overtime. Instead of posting it, they did it online,
20      and we had to hook it up to our phones through Google and
21      make an account for it, and I can't recall who was up
22      there, but they were helping Scott on this phone.
23   Q. Wasn't this discussed with the undersheriff that you were
24      talking to before you were sent for the fit for duty,
25      wasn't that incident discussed?

Page 208

1    A. No. That was when they gave me the outcome of what Dr.
2       Auffrey had said about me. It was in that meeting that
3       that was brought up. It was brought up by me. So, you
4       know, I still don't know why this is happening. What did
5       I say and what did I do, and who -- who said I said it?
6       And they never did tell me. They just said this is what
7       Dr. Auffrey finds, and so we are going to do this. We
8       have already done that.
9                MARKED FOR IDENTIFICATION:
10               DEPOSITION EXHIBIT 25
11               3:41 p.m.
12   BY MS. AMTSBUECHLER:
13   Q. All right. I'm putting on the screen the first report
14      from Dr. Auffrey, December 12, 2017. Exhibit 25, Bates
15      stamp 646-D through 648-D. Have you ever seen that
16      report?
17   A. They handed it to me at the meeting where they said that
18      they were taking me off for being mentally unfit, and that
19      I had to go see a psychiatrist because Dr. Auffrey had
20      stated in that letter that he thought I was having tirades
21      because I was on too much medication, too many
22      barbiturates, I believe he said.
23   Q. So you have seen it?
24   A. I have seen it, yeah. I didn't read it right at that
25      point because they were already saying what they had --

52 (Pages 205 to 208)

LORI LYNN HEETHUIS, 9-25-2020

Page 209

1 what they were going to do.
2 MARKED FOR IDENTIFICATION:
3 DEPOSITION EXHIBIT 26
4 3:42 p.m.
5 BY MS. AMTSBUECHLER:
6 Q. I'm putting up on the screen records from Dr. Beyer,
7 B-E-Y-E-R, which I'm marking as Exhibit 26. Do you recall
8 then going to Dr. Beyer after the fitness for duty?
9 A. Yes.
10 Q. And let's go to pages -- starting at page 14, and these
11 were Bates stamped by the doctor's office when they
12 produced them. There is a page mental health history. Is
13 that your writing on there?
14 A. Yes, that is.
15 Q. And you list Amy Bergman or Borgman?
16 A. Borgman, yes.
17 Q. You said -- this is the one you say that you started
18 seeing after you were sexually assaulted?
19 A. Yes, but she was an ex to the prosecutor, and she didn't
20 seem very interested in --
21 Q. Okay. Wait a minute, wait a minute. See, here you are
22 again, you are going way beyond my question.
23 A. Sorry.
24 Q. And I really want to get through this if we can today.
25 Okay. So you saw Borgman for five-and-a-half

Page 210

1 years?
2 A. From what I recall approximately, yes.
3 Q. Where was her office?
4 A. It was on Henry, the corner of Henry and Seminole --
5 Q. What city?
6 A. -- and it was upstairs. In Muskegon, it's located in
7 Norton Shores.
8 Q. How is it that you stopped going to see her, what happened
9 that you stopped going to see her?
10 A. She moved. She stopped doing what she was doing, and she
11 moved up, I want to say to Traverse City or Pentwater
12 somewhere.
13 MS. AMTSBUECHLER: Okay. We've asked -- we are
14 trying to order her records, so you should have an
15 authorization, Mr. Drew, to get signed by your client
16 perhaps while she is there so we can get those.
17 BY MS. AMTSBUECHLER:
18 Q. Okay. That's the first page, and then the second page of
19 this is a medical summary. Did you fill out that?
20 A. For who?
21 Q. Is this your handwriting? This is Dr. Beyer's --
22 A. It is my handwriting. I just don't know what -- why --
23 where I was writing this, for who.
24 Q. This is all part of the Dr. Beyer's records. Is this your
25 handwriting on the next page?

Page 211

1 A. Yes, it is, yes.
2 Q. And is this your handwriting on the next page?
3 A. Yes.
4 Q. Okay. Is this your -- did you check these boxes here
5 about symptoms?
6 A. Yes.
7 Q. Oops, I just lost it.
8 A. I can't see it.
9 Q. I lost it. I know. I lost it because I was trying to get
10 rid of some stuff on the screen.
11 A. Okay.
12 Q. So do you recall going to see Dr. Beyer?
13 A. Yes, I do. I had to. They were asking me to.
14 Q. All right. Good.
15 VIDEO TECHNICIAN: That answer, for the video,
16 it didn't make sense.
17 BY MS. AMTSBUECHLER:
18 Q. Okay. Go ahead. You recall going to see Dr. Beyer?
19 A. I was told at the meeting where I was taken off, I was
20 mentally unfit, that I had to seek out a psychiatrist to
21 check my medication to make sure that it was proper and
22 that I was not getting too much or too little of it.
23 Q. Okay. Again, my question was only if you recall this. Do
24 you recall going to see him?
25 A. Oh, yes, yes. I am sorry.

Page 212

1 Q. All right. So his notes are kind of difficult to read,
2 but what I have deciphered from them is it looks like you
3 told him, and I'm looking at the first line, about
4 two-thirds of the way over. Can you see my little arrow?
5 I will highlight this right here. It says dual officer
6 certified for road in correction unit. Did you tell him
7 that?
8 A. When I first hired in, that's what we were told when we
9 were sworn in, and then it changed some years after. So
10 originally, yes, that's what we were sworn in as.
11 Q. Did you tell him that you just wanted to work five more
12 years to get to 25 years?
13 A. I said if I had to do it, just how I could retire out,
14 that I would like to, because of the stress at that point
15 of what they had been putting me through.
16 Q. Did you tell him that you feel that they wanted to get rid
17 of you before you could retire?
18 A. I don't recall, but I -- I may have. It was a
19 conversation. It was a lengthy conversation.
20 Q. Do you recall him asking why, and you saying the
21 department has, it looks like there is a monetary number
22 here, 378,000 something, down at the next line? I'm
23 trying to highlight it, but I can't. Underneath it says
24 husband has cancer, and then it says why, and then it says
25 department, and there is $378,000, 400,000. Did you have

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 213

1    a discussion about the cost to the county of your
2    retirement?
3    A.  No.  I don't understand what he is saying there on the
4    300,000, 400,000, whatever.
5    Q.  Down below it talks about you said you had PTSD from 2009
6    through 2014.  Who diagnosed that?
7    A.  Dr. Pierce did.
8    Q.  And Dr. Pierce, I understand, you say is now deceased,
9    right?
10   A.  He is deceased, yes.
11   Q.  Where was his office?
12   A.  On Third Street in Fruitport, Michigan.
13   Q.  And was he in a practice with anybody else?
14   A.  I think towards the end he had a PA, but basically I had
15   never seen anybody but him or his nurse, Pat.
16   Q.  Is the practice still there?
17   A.  No.  I mean it has been -- it was sold, the lot was sold,
18   and it was sold to Dr. -- I can't think of her name, a
19   female doctor anyway.  The last time I knew, that's what's
20   there.  I don't know.
21   Q.  Did you ever go see the other doctor?
22   A.  Dr. -- I think it was Dr. Parrett or Parrier (Phonetic).
23   I think I saw her a couple times, because I was looking
24   for another doctor.
25   Q.  And can you spell her name?

Page 214

1    A.  I don't recall really what it was, because it's -- I know
2    it started with a P, Parrier or Parrett, something to that
3    effect.  I would have to look it up.
4    Q.  Can you look her up, please, and provide your attorney
5    with that information?
6    A.  Yes.
7    Q.  Okay.  When was it that Dr. Pierce died?
8    A.  I don't recall.  I'm sorry.
9    Q.  Okay.  It says in here that you said you had trouble
10   sleeping, and you were getting a sleep study.  Did you get
11   that done?
12   A.  Yes, I did.
13   Q.  Where did you get that done?
14   A.  It was at General Hospital at their sleep study.  They
15   wanted to see -- that was Dr. Powell that, I believe, did
16   that, my doctor, to see if I had apathy [sic], sleep
17   apathy.
18   Q.  Sleep apnea?
19   A.  Yes.
20   Q.  What did you find out?  Do you have it?
21   A.  No, I don't.
22   Q.  Okay.  General Hospital, is that in Muskegon?
23   A.  Yes, it is.  It's -- you can see it from the highway.  I
24   want to say it's Oak Street --
25   Q.  Okay.

Page 215

1    A.  -- possibly that runs --
2    Q.  All right.  So this also says, you talk about sexually
3    assaulted by a sergeant, went to authorities.  It says
4    state police.  Did you go to the state police?
5    A.  The state police came and took my statement, along with
6    some questions they were asking me about another deputy,
7    and just nothing ever happened.  I --
8    Q.  Okay.  Where were you when the state police came and took
9    your statement?
10   A.  In the old part of the jail in one of the conference rooms
11   right off of the command --
12   Q.  What did you think --
13   A.  I'm sorry.
14   Q.  What did you -- what were they investigating?
15   A.  Another deputy that they, I guess they suspected of
16   abusing the females, the inmates, I guess, and had I ever
17   noticed him being real touchy-feely and stuff like that,
18   and I said:  No, but I will tell you who has, and I would
19   like to make a statement.
20   Q.  Okay.  Did you make a statement to them then about what
21   you had experienced?
22   A.  Yes.
23   Q.  Did you have some belief that they were going to pursue
24   that as a criminal manner?
25   A.  I thought maybe somebody would.  It was --

Page 216

1    Q.  Did they ever follow up with you?
2    A.  -- you know, it was a criminal offense.
3    No.
4    Q.  Who was the sheriff at that time?
5    A.  Sheriff Roesler, I believe.
6    Q.  For the court reporter, I think that's R-O-E-S-S-L-E-R.
7    Is that right?
8    A.  I think it's just one S, R-O-E-S-L-E-R.
9    Q.  Did you talk to the state police more than once about your
10   situation?
11   A.  No.
12   Q.  Do you remember the name of the state police officer who
13   you talked to?
14   A.  No, I don't.
15   Q.  When were you diagnosed with ADHD?
16   A.  With Dr. Pierce, along with the PTSD, and then he said
17   that that's probably why I got the onset of adult ADHD,
18   and then he passed away, so then I needed to be
19   reevaluated.  Dr. Powell wanted a reevaluation, so that's
20   when I saw Diane Strang originally was to get her
21   professional opinion on if I did suffer from posttraumatic
22   stress disorder.
23   Q.  Okay.  Some of these other notes regarding Dr. Beyer's
24   notes regarding his meeting with you on January 29, 2018,
25   it looks like in here -- where did I see that?  It says

54 (Pages 213 to 216)

LORI LYNN HEETHUIS, 9-25-2020

Page 217

1  here not fought for her because she doesn't -- I can't
2  read what it says -- maybe not fit in, or the debauchery,
3  brought up something about other employees, something her
4  for being a Christian, quote, "God bless," end quote.
5        Did you talk with Beyer about you being a
6  Christian and not liking the debauchery of other
7  employees?
8  A.  I spoke with him about being a Christian and that they
9     would kind of make fun of me by going God bless, God
10    bless, and I felt as though --
11 Q.  Who made -- go ahead.
12 A.  I just felt as though that was very -- made me
13    uncomfortable, because I felt like I was being attacked
14    because of my religion.
15 Q.  Who did that?
16 A.  Several officers.
17 Q.  Names, please?
18 A.  Deputy Lynn, Deputy Herman, Deputy Stephenson, Deputy
19    Thielbar, that's all that come to mind.
20 Q.  Okay.  I have a note, kind of digressing here for a
21    minute, but do you recall an incident where you were at a
22    union meeting and you were talking to a deputy, I think
23    Carrie was her first name.  Ryan Boike was there with his
24    son in the hallway, and you were talking with the other
25    deputy accusing her to getting to her position by giving

Page 218

1  oral sex, making graphic statements about that; do you
2  recall that?
3  A.  No, I don't recall saying that at all.
4  Q.  What do you recall saying?
5  A.  I recall telling Deputy Longmire that we all know how she
6     got there, because she wasn't certified to be a deputy.
7     She worked in the courts, I believe district courts, and
8     they were going to fire her, so they allowed her to do a
9     lateral move, they did that, and sent her to school later.
10 Q.  Do you recall saying anything to her about oral sex?
11 A.  No.
12 Q.  Do you recall what I am talking about, that meeting?
13 A.  Yeah, I recall the meeting, yes.
14 Q.  You deny -- you would deny it if Ryan said that you had
15    made statements about oral sex accusing this deputy of
16    getting there by giving oral sex?
17 A.  Yeah, I don't recall saying that.  I don't recall it, so I
18    guess I can't speak on that, of saying anything like that.
19        I don't recall Deputy Boike being out there with
20    a child.  Normally -- normally children didn't go, but
21    there was several children there that day, and I'm not
22    sure why it was allowed.
23 Q.  Well, maybe I have the wrong person, but there was a
24    14-year-old child in the hallway who overheard this.  You
25    recall seeing children?

Page 219

1  A.  No.
2  Q.  You just said you did?
3  A.  I don't recall.
4  Q.  I thought you just said --
5  A.  I saw them in the meeting, because they had them in the
6     meeting, but I don't recall seeing anybody in the hallway
7     that was a child.  I don't recall.
8  Q.  Okay.  I put on the screen -- can you see that?  Can you
9     see the screen?  Can you see that?
10 A.  I don't see anything, no.
11        MARKED FOR IDENTIFICATION:
12        DEPOSITION EXHIBIT 27
13        3:59 p.m.
14 BY MS. AMTSBUECHLER:
15 Q.  Okay.  Sorry.  Then it must be off.  All right.  Exhibit
16    27, Bates stamp page 162-D, December 15, 2017, a note to
17    you about Dr. Auffrey's report.  Do you recall receiving
18    that?
19 A.  Yes.
20 Q.  And this probably was before you went to see Beyer, now
21    that I'm reading it, right?
22 A.  Yes, that's correct.
23 Q.  All right.  And did you go back to Auffrey a second time?
24 A.  Yes.  They made me go back after I had brought all my
25    stuff in from my doctors, from the psychiatrists, and so

Page 220

1  forth.  He said:  Well, I can't bring you back until we
2  get a clearance from Dr. Auffrey.
3        MARKED FOR IDENTIFICATION:
4        DEPOSITION EXHIBIT 28
5        4:00 p.m.
6  BY MS. AMTSBUECHLER:
7  Q.  And I put up on the screen Exhibit 28, February 13, 2018
8     report of Auffrey, Bates stamp 157, 158.  Do you recall
9     receiving a copy of this?
10 A.  It was a whole letter.  They kind of read it to me.  I did
11    get a copy of it, though.  I did give a copy of it to Dr.
12    Beyer.  I'm pretty sure I gave it to Dr. Beyer and Dr.
13    Powell, I believe, a copy.
14 Q.  So you were allowed to return to work after that, correct?
15 A.  Yes.
16 Q.  And during the time you were off during this fitness for
17    duty examination time period, you were paid, right?
18 A.  I was put on the 480 hours of the --
19        I hear sirens in the background.  It's just
20    distracting me.
21 Q.  Were you on paid administrative leave?
22 A.  No, I wasn't.  I was until they got this, and then they
23    used my time, which ran concurrently together with the
24    Family Leave Act, so there was 480 hours of Leave Act, but
25    it also took off every sick day that I had, and then once

55 (Pages 217 to 220)

LORI LYNN HEETHUIS, 9-25-2020

Page 221

1   it got through all my sick days, then it started with my
2   vacation time.  And so I was being paid, but it -- I was
3   being paid because I had the time that they -- that they
4   hadn't paid me because I had the time to use.
5   Q.  Do you know how much of that sick and vacation time was
6   used?
7   A.  All of my sick time, I believe, and part of my -- part of
8   my vacation time.  I can't recall how much of the
9   vacation.  I know that they ran through my sick time, and
10  the FMLA ran concurrently with it --
11  Q.  I'm just asking if you know how much this time was.
12  A.  Pardon me?
13  Q.  Do you know how much time it was, how many days?
14  A.  How many days of vacation I had?
15  Q.  Okay.  Never mind.
16         So are you claiming that this fitness for duty,
17  being sent for the fitness for duty was harassment or
18  retaliation or discrimination by anybody?
19  A.  Yes.
20  Q.  All right.  Who do you believe was harassing or
21  discriminating or retaliating against you by doing this?
22  A.  The sheriff and the undersheriff.
23  Q.  Why do you believe the sheriff would want to harass or
24  discriminate or retaliate?
25  A.  Because I had testified in the ACLU case, and it didn't

Page 222

1   come out favorably for them, and so there were things that
2   happened, one after another, that I believe that they
3   were -- they were going to punish me for telling the truth
4   and costing the county money.
5   Q.  For the reasons we talked about this morning?
6   A.  Pardon me?
7   Q.  For the reasons we talked about this morning?  I don't
8   want to rehash all that.
9   A.  Yes, yes, ma'am.
10  Q.  Okay.  Do you believe anybody else was harassing or
11  retaliating against you by sending you for the fitness for
12  duty exam?
13  A.  I don't really know.  They could have been -- the captain
14  could have been in on it, I'm not sure, but to my
15  knowledge, it was just those two that were bringing this
16  whole situation about.  There wasn't other people in the
17  room those times.
18  Q.  What captain are you talking about?
19  A.  Well, there was Captain Christianson for a while, and then
20  he retired out, and then there was Captain Brown.  They
21  elevated him to a -- Captain Brown.
22  Q.  Were you aware of the relationship between Sheriff Poulin
23  and the previous sheriff who he ran against, Roesler?
24  A.  I don't understand what you mean by relationship.
25  Q.  Do you know if they got along, if they were --

Page 223

1   A.  I don't -- I don't think they got along too well, no.
2   Q.  Bear with me.
3          MR. DREW:  If this is a good time, I need a
4   restroom break.
5          MS. AMTSBUECHLER:  That's fine.  Yeah, that's
6   fine.  Let's do that.
7          MR. DREW:  Okay.
8          VIDEO TECHNICIAN:  Off the record, 4:06 p.m.
9   (Recess taken at 4:06 p.m.)
10  (Back on the record at 4:15 p.m.)
11         VIDEO TECHNICIAN:  We are back on the record,
12  4:15 p.m.
13         MARKED FOR IDENTIFICATION:
14         DEPOSITION EXHIBIT 29
15         4:15 p.m.
16  BY MS. AMTSBUECHLER:
17  Q.  I have put up on the screen a June 19, 2009 document that
18  I have marked as Exhibit 29.  It's from, I think the Bates
19  stamp documents provided through plaintiff's counsel,
20  starting at page 266 through -- it's a long one -- 277.
21  Okay?  So this is back from 2009, so put your brain back
22  there, if you can go back that far.  It looks like there
23  was a meeting that you had with Lieutenant Burns on June
24  19, 2009.  Do you recall that?
25  A.  I don't recall it specifically at this point, but...

Page 224

1   Q.  Okay.  Do you recall talking to Lieutenant Burns in 2009
2   about an issue related to you and Heidi?
3   A.  I believe she was one of the workers for Canteen or the
4   service that does the food.  I faintly remember talking to
5   him about it.  I --
6   Q.  Do you recall that there was an investigation into
7   statements that you made about Heidi?
8   A.  No, I was not aware if there was an investigation.  I
9   think we had a talk, but I didn't feel like it was an
10  investigation.
11  Q.  We meaning you and who?
12  A.  I think Mark and I had a -- I'm not sure.  I can't recall.
13  This is all...
14  Q.  All what?
15  A.  Unfamiliar.  I'm trying to really kind of get a grasp on
16  it as you are scrolling.
17  Q.  I'm just asking you what you remember right now.  I am not
18  asking you to read this.  I'm trying to find sections.
19  A.  Oh.
20  Q.  What do you remember about the situation with you and
21  Heidi in 2009?
22  A.  I don't really recall.  I know there was some type of
23  situation, but I don't recall what it was.
24  Q.  Do you recall Heidi reporting that she had been advised by
25  trustees that you and Jessica, and possibly Deputy Lewis,

56 (Pages 221 to 224)

LORI LYNN HEETHUIS, 9-25-2020

---

Page 225

1     were talking bad about her in front of them?
2  A.  I recall something about a problem where she thought that
3     some of us were talking about her. I don't really recall
4     it that well, though.
5  Q.  Do you recall that Sergeant Gilchrist was assigned to
6     investigate this?
7  A.  Yeah. I know at that time that that were some of the
8     investigations he was trying to bring up on me, yes.
9  Q.  My question is do you recall him being assigned to
10     investigate this?
11  A.  I know he ended up being the one that handled it, yes, I
12     do.
13  Q.  Do you recall Lieutenant Burns telling you -- see, he is
14     noted here, I have got it right here, this section I'm
15     pointing to right here. Do you see that?
16  A.  Uh-huh.
17  Q.  He notes he told Deputy Johnson that the complaint was
18     founded based on witness statements, and that he asked you
19     to help by making sure that hurtful statements stop. Do
20     you recall that discussion with him?
21  A.  With Lieutenant Burns?
22  Q.  Yes.
23  A.  I don't recall exactly, no.
24  Q.  And then he says he had a frank discussion including
25     examples of Lori, quote "going off" on other staff in the

---

Page 226

1     past, Lori said that she has a history of it, when the
2     "real her" gets cornered she starts to fight. Do you
3     recall having that discussion with Lieutenant Burns?
4  A.  I may have had it with him. I see it, but I don't really
5     recall what -- what this is.
6  Q.  Do you recall going off on other staff?
7  A.  No.
8  Q.  Is there a real you that gets -- you know, that goes off
9     when you get cornered when you feel like you have to
10     fight?
11  A.  I would say that in any -- anything, if a person gets
12     pushed in a corner too far, their instinct is to come out
13     fighting, yes.
14  Q.  I'm asking about you, not other people. Can you answer my
15     question?
16  A.  I would imagine that if I got pushed and pushed and
17     pushed, because I'm a pretty calm person, that I may come
18     out fighting if I feel like they are attacking me to the
19     point where I can't get any type of resolution talking to
20     them, others.
21  Q.  Are you saying that you believe that Gilchrist started
22     this investigation on you or somebody else? Do you know
23     who started it?
24  A.  I have no idea who started it. I know he was involved
25     with it.

---

Page 227

1  Q.  Okay. It says here that Jessica Fordham, F-O-R-D-H-A-M,
2     had a complaint on you that you referred to Heidi as a
3     bitch. Does that help jar your memory?
4  A.  I never said that she was a bitch that I recall. I don't
5     recall this, so -- I have never seen this.
6  Q.  You do not recall being --
7  A.  So far I don't recall seeing it, no.
8  Q.  You may not, but do you recall being investigated for
9     calling Heidi a bitch?
10  A.  I don't recall being investigated for calling somebody
11     something, but I know that he was trying to drum up
12     many investigations as he could so that it could go in my
13     file.
14  Q.  So you are saying that you believe this was all started by
15     Gilchrist?
16     MR. DREW: Objection, that mischaracterizes her
17     testimony.
18     MS. AMTSBUECHLER: Well, she says he is trying
19     to drum up stuff to go in her file.
20     BY MS. AMTSBUECHLER:
21  Q.  Is it your testimony that this 2009 matter that we are
22     talking about was something that Gilchrist drummed up?
23  A.  I don't recall. I just know that he was involved in it,
24     and I know that Eric Anderson was the union rep at that
25     time and said this is ridiculous.

---

Page 228

1  Q.  I'm sorry, what did you say? A union rep said it's
2     ridiculous, who, what union rep?
3  A.  Yes. Eric Anderson was the union rep at that time, I
4     believe, if I'm recalling correctly. I just really don't
5     recall what these 17 pages of things -- I don't know if I
6     have ever seen it at this point.
7  Q.  So you do recall something, because you recall a union rep
8     being there?
9  A.  Well, yeah, at the end of -- of it, if I'm remembering
10     right. There was multiple investigations upon that time,
11     so there were a lot of things that were going on.
12     Sometimes I was under investigation at three at a time or
13     close to three at a time two, sometimes one.
14  Q.  But did you complain about Gilchrist in 2009 being part of
15     an investigation into your alleged misconduct?
16  A.  I probably talked to the lieutenant about it, yes.
17  Q.  And what was your --
18  A.  I don't recall it being misconduct or anything of that
19     sort, but I probably -- usually I did talk to Mark about
20     anything.
21  Q.  What was your complaint about Gilchrist at that point?
22  A.  Probably was that he was making up these investigations on
23     me that were senseless, that I felt were retaliations
24     because that I tried to stand up and tell him and make him
25     account -- tell people and make him accountable for what

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 229

1    he had done to me, yes.  I had talked to Mark quite a bit.
2    I don't know that I was under investigation when I spoke
3    with him on that type of stuff or whether it was just in
4    common speaking.
5          I had been over it and over it with the
6    lieutenant.  In fact, he apologized a couple years prior
7    to me leaving saying that he should have handled it
8    differently.
9    Q.  So is it your -- when are you claiming that Gilchrist
10   first assaulted you?
11   A.  I believe it was back in 2009.
12   Q.  When in 2009?
13   A.  I really can't recall the actual month or time.  I just
14   know it was -- it had started at that time.
15   Q.  How did it start?  What was the first thing he did?
16   A.  He grabbed my butt as I was walking down, because he
17   always -- he was a new sergeant.  He wanted to be able to
18   brief us in the basement of where we had our lunches and
19   stuff, or the fridge was there and microwave, and that's
20   how it started, was him grabbing my butt, and he would
21   hold his -- his clipboard kind of out.  There were no
22   cameras there at that time, but receiving was to the back
23   of us, when I was trying to go down the hallway to the
24   front, and go down the stairs and take the elevator down
25   to do the briefing, so that's how it started.

Page 230

1    Q.  Did anybody witness that?
2    A.  Not that I'm aware of, no.
3    Q.  You said this was when he first became your sergeant?
4    A.  I'm remembering at that --at that point of him being
5    sergeant starting to initiate that, from what I recall.
6    Q.  Did it start when he first became your sergeant?
7    A.  I truly can't recall at this moment.  I'm sorry.  It has
8    been a long day.  I just -- I'm sorry, I don't recall.
9    Q.  Was he your sergeant when he did this, grabbing your butt,
10   for the first time?
11   A.  I just am not -- I'm not sure.  I'm not sure if it started
12   just before he got the position and then he got the
13   position, I'm not sure.
14   Q.  Did you work with him before this started to happen?
15   A.  I had worked with him at -- on some level when he was
16   deputy yet, and we were assigned together on different
17   things and different floors and that type of thing, but --
18   so I did have interaction with him because he was a
19   deputy.
20   Q.  During that time did he ever do anything that you
21   considered to be inappropriate?
22   A.  Yeah, he had done stuff, what I thought was inappropriate.
23   Q.  Like what?
24   A.  He would say things about my butt.  He would say things
25   about me, just very -- made me very uncomfortable with

Page 231

1    verbal stuff.  He would brush up --
2    Q.  Did he --
3    A.  He would brush up against you and say, oh, I'm sorry, I
4    was just trying to get through here, because he's quite
5    large man, and so...
6    Q.  Did anybody ever hear or see any of that?
7    A.  I don't -- to my knowledge, no, but I don't know.
8    Q.  Did you know if he ever did anything like this to anybody
9    else?
10   A.  Yes, he had done -- he had done, and it was ongoing, and
11   then stopped and ongoing, with one of the deputies there,
12   a female deputy.
13   Q.  Who?
14   A.  Sherry Ogren.
15   Q.  How do you spell her name, please?
16   A.  O-G-R-E-N.  She quit after 19 years.  She said she
17   couldn't take it anymore.
18   Q.  Did she tell you that?
19   A.  After she was gone, yeah.
20   Q.  Do you know where she is now?
21   A.  No, I don't.  I don't believe she is doing really a whole
22   lot of anything, and I think they moved.  She was married,
23   so they moved to a different location from where I knew
24   she was at.
25   Q.  Did you see any of this happen to her or do you know it

Page 232

1    because she told you about it?
2         MR. DREW:  Counsel, let me --
3    A.  She --
4         MR. DREW:  Wait a minute, wait a minute.
5    Let me say something on the record.  You are
6    getting a bit far afield, and I'm not sure why, but let me
7    say this.  I did not object about you asking what this
8    man -- I'm not going to say what I think -- did to her
9    while she was there, because part of her comment about the
10   rape and what had happened to her is relevant, but now
11   when you are asking questions about him doing it to others
12   and how many and things of that nature.
13        So I want to be clear about one thing.  We are
14   not going to go up, and then you are going to stop to go
15   to your dinner, and I'm not going to be able to ask
16   questions, and then come back.  I --
17        MS. AMTSBUECHLER:  No, no.  I'm sorry, but no.
18   Look, this is totally relevant.  Your client's credibility
19   is very relevant.  What she says about what other people,
20   I was going to corroborate it, is extremely relevant.  I
21   am going as fast as I can, and I'm already sacrificing my
22   dinner.  I have got friends in from out of state who I
23   will never get to see unless I get there, and I am
24   prepared to go through this tonight if I have to.  I will
25   text my husband to go ahead without me.  I'm not going to

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 233

1  quit.  Okay.  We are going to go through this as long as
2  we need to, but you are not going to stop me from asking
3  questions that I believe are spot on.
4        MR. DREW:  I didn't say I was going to stop you.
5  What I said was we are not going to up to a point and then
6  you stop it, and then I don't get to ask my questions.
7        MS. AMTSBUECHLER:  I don't think we have time to
8  get done today.  It's 4:30, and I can tell we are not
9  going to get done with my questioning in an hour given the
10  way we are going.  So you decide what you want to do.  I
11  am here for the duration.
12        MR. DREW:  I will talk to my client, but if she
13  wants to end this today so she doesn't have to come back,
14  then we will finish it today, no matter how long it takes.
15        MS. AMTSBUECHLER:  Because she just said she is
16  tired and doesn't remember, and I don't want that to be an
17  issue.
18        MR. DREW:  Well, you have seven hours, and I
19  understand the entire of the questions she hasn't answered, but
20  you have thirty different things to go through.  Part of
21  that gets beyond the reasonableness of seven hours --
22        MS. AMTSBUECHLER:  No, it's not, no, it's not.
23        MR. DREW:  -- with that question as well.
24        MS. AMTSBUECHLER:  You tell me what is
25  unreasonable about asking who can corroborate what she has

Page 234

1  got to say, which is directly relevant to her whole story
2  here.  I mean that's nuts that you are telling me it's not
3  relevant, and that's not even a reason for an objection.
4  We are wasting time with this.
5        MR. DREW:  Go ahead.  We will be here awhile.
6        MS. AMTSBUECHLER:  Fine.
7  BY MS. AMTSBUECHLER:
8  Q.  Did Sherry tell you that she was assaulted or harassed or
9     did you witness it?
10  A.  I did not witness it.
11  Q.  Do you know of anyone else who was assaulted or sexually
12     harassed by Gilchrist?
13  A.  There were two road officers, and one of them had made the
14     comment to me that she knew exactly where I was coming
15     from because it was happening to her, and then I believe
16     she got scared because she was young and just starting her
17     career and did not want to be blacklisted as an officer.
18  Q.  Did you see -- I'm sorry, go ahead.
19  A.  No, that's fine.
20  Q.  Did you see Gilchrist sexually harass or assault anybody
21     else?
22  A.  No, I did not witness him sexually assaulting anybody.  I
23     think he was quite keen on how he did it.
24        I do know that Deputy Grillo did say that she
25     was aware, and he knew that he was touching Sherry Ogren,

Page 235

1  and he kept telling her to say no, and that is another
2  reason I know what was happening to Sherry, because he
3  corroborated that.
4  Q.  Who is he?
5  A.  It would be Deputy Grillo.  He is no longer there.  He was
6     there when Roesler was there.
7  Q.  How do you spell that name?
8  A.  G-R-I-L-L-O.
9  Q.  Okay.  All right.  So when I started this questioning --
10  A.  I believe.
11  Q.  -- I asked you about 2009, and -- well, actually I asked
12     you when this started with Gilchrist.  You said in 2009
13     grabbed your butt when he was a new sergeant.  I think we
14     clarified you didn't really know if he was a sergeant yet
15     or not; is that right?
16  A.  I know that he -- I know that he was a sergeant when it
17     started getting more aggressive, so...
18  Q.  What happened -- what happened when he started getting
19     more aggressive?
20  A.  He followed me.  He put his foot in the elevator door.  He
21     forcibly tried to kiss me and stick his tongue in my
22     mouth.  He reached in my top grabbing my breasts and
23     fondling them while I was trying to pull his hands out
24     begging him not to.  Multiple times that happened.
25     Multiple times he shoved his hand down the front of my

Page 236

1  pants trying to dig his finger up me.
2  Q.  Okay.  Did this get witnessed by anybody?
3  A.  Not that I am aware of.  Back in the old jail, there were
4     just cameras in certain areas of the jail, and of course
5     he was aware of that, so not to my knowledge.
6  Q.  Where did it happen that he grabbed -- reached his hand in
7     your shirt and grabbed your breast, where were you when
8     that happened?
9  A.  There were multiple times he did it.  I was in the
10     elevator once.  I was in the -- on the second floor in the
11     west end dayroom, downstairs.  He did it again going down
12     from the floor to the main floor, so a lot of places where
13     there weren't cameras, is where he chose to do those
14     things.
15  Q.  Same thing would be true for putting his hand in your
16     pants?
17  A.  Yes.
18  Q.  This is all in the old jail?
19  A.  Yes.
20  Q.  When did you change to the new jail?
21  A.  Well, it was being built -- I don't recall the dedication
22     to it.  I'm sorry.
23  Q.  I'm sorry, what?
24  A.  I said I'm sorry, I don't recall the dedication of the new
25     jail, which would have meant we would have been in the new

LORI LYNN HEETHUIS, 9-25-2020

Page 237

1  jail.
2  Q.  Do you recall what year you changed?
3  A.  I believe it was 2016, and that is -- for some reason that
4  comes to mind, but I can't plausibly identify that time.
5  Q.  How many times did Deputy Gilchrist touch you, your
6  breasts, or put his hands down your pants?
7  MR. DREW:  What is the relevance of this?
8  Objection, relevance.
9  MS. AMTSBUECHLER:  That's not a basis to object
10  in a deposition.  My question stands.  I will take an
11  answer.
12  BY MS. AMTSBUECHLER:
13  Q.  How many times did this happen?
14  A.  What I recall is at least three times of going down my
15  pants, and approximately four, four times down the front
16  of my shirt, and then just multiple times with the
17  grabbing of the butt and probably -- I'm trying to --
18  approximately two to three times with him trying to
19  forcibly kiss me.
20  Q.  When did you first complain about this?
21  A.  I first complained about it I believe in -- early 2010, or
22  possibly 2010.  I'm not sure of the timeframe.  I told two
23  sergeants, I told the lieutenant, I told the undersheriff
24  and the sheriff contacted the lieutenant and said I want
25  Lori to see the EEO, so I saw the EEO.

Page 238

1  Q.  Who was the sheriff then?
2  A.  Sheriff Roesler.
3  Q.  And who was the EEO then?
4  A.  Mr. Nash.
5  Q.  What did you talk about with Mr. Nash?
6  A.  I told him what had happened to me with Sergeant
7  Gilchrist.  He said it wasn't the first time that he had
8  had his name come up over the years, and that he was
9  definitely going to do a full investigation, and he would
10  be in contact with me, and he asked me if I wanted to do a
11  complaint.  I said yes.  I signed for the complaint, and
12  he said that he was going to get a list of the employees
13  and would speak with them, and he would be in touch with
14  me.
15  Q.  This was in 2010?
16  A.  Approximately.  I don't know.
17  Q.  Did you ever hear from Nash again?
18  A.  No.  He retired abruptly.
19  Q.  Do you know why?
20  A.  I have no idea why.
21  Q.  Did you hear anything else about the investigation after
22  that?
23  A.  I called almost every single day to his female assistant
24  who had taken over in the interim, and she said that they
25  had lost the paperwork, she could not find it, and

Page 239

1  therefore there would be nothing that she could do about
2  it.  And so I kept checking back to see if she found the
3  paperwork, and when I did get to speak with her on the
4  times about leaving a message for her, she just kept
5  saying that it had to be lost, that she could not find it.
6  Q.  What was her name?
7  A.  I don't recall her name.
8  Q.  So did you try to talking to somebody else at the EEO
9  office to say that you wanted to pursue it and refile your
10  complaint?
11  A.  From what I understand, it was this lady that was interim.
12  When they got Mr. Bracey, I did go to him, and he said I
13  can't find it either, so we will open a new one.
14  Q.  That was in 2014, right?
15  A.  Yes.
16  Q.  Okay.  So still back in 2010 timeframe, were you talking
17  to anybody from the sheriff's office about your complaint
18  at that time when you were also talking with Mr. Nash?
19  A.  John Jenkins, who was the union rep at that time.  He came
20  up with me initially, I believe, and then I kept asking
21  him what I should do.
22  Q.  Okay.  Who else besides your union rep were you talking to
23  about this complaint in 2010 from the sheriff's office?
24  A.  It would have been Sergeant Pabek, Sergeant Wood,
25  Lieutenant Burns.

Page 240

1  Q.  It looks like you are thinking.  I don't want to interrupt
2  you.  Let me know when you are finished.
3  A.  No, that's fine.  I'm just trying to -- those are the ones
4  that I recall.
5  Q.  Okay.  Did you give them specifics at that time, that he
6  was sticking his hands down your pants and touching your
7  breasts and grabbing your butt and trying to kiss you?
8  A.  Yes, I did.
9  Q.  So if Lieutenant Burns is called on to testify, he will
10  say that you told him those things in 2010?
11  A.  I don't know if he will say it.  That's what I said to
12  him, though --
13  Q.  All right.
14  A.  -- explained to him.
15  Q.  So what happened after that in 2010, did this -- did it
16  just get dropped or did you hear any more about it?
17  A.  Apparently it was dropped.  I didn't hear any more from
18  the EEO.  Mark told me that basically these things happen.
19  You have just got to pull your big girl pants up and go
20  on.  So I didn't really get any support from any of the
21  command that I had went to.
22  Sergeant Pabek said, okay, make sure you are
23  documenting and let him do it a few more times, and we
24  will be able to fire him, and that was about as much help
25  as I got from anyone.

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 241

1    Q.  So this conversation in 2010, Sergeants Pa, what?
2        Sergeant Pabek it sounds like you are saying, but I don't
3        know who that is.
4    A.  Yes, Pabek.
5    Q.  Spell that name, please.
6    A.  P-A-B-E-K, I believe.
7    Q.  Okay.  And the undersheriff, who was Stout at the time?
8    A.  The undersheriff would have been, yes, Stout, and because
9        Roesler was the sheriff at that time, and that was his
10       undersheriff, yes.
11   Q.  And Burns, you keep referring to somebody by the name of
12       Mark.  Is that Burns?
13   A.  Oh, I'm sorry, yes, Lieutenant Mark Burns.
14   Q.  All right.  And was there anybody else that was part of
15       the discussion at that time that was from the sheriff's
16       office, besides your union rep?
17   A.  Not that I recall other than those that I named, Sergeant
18       Wood, Sergeant Pabek, Lieutenant Burns.
19   Q.  Okay.  And then so the next thing I see in this,
20       about this in 2014.  What happened between 2010 and
21       2014?  Did this just continue?
22   A.  I was put under several investigations that were just, I
23       called them witch hunts, because I had tried to stand up
24       and let them know what he was doing to me.  And
25       unbeknownst to me he was putting things in my file

Page 242

1        upstairs trying to set the stage to have all these
2        different paperworks in there so they could fire me.
3    Q.  All right.  So what happened with Gilchrist, was he
4        continuing to do these things between 2010 and 2014 or did
5        he stop at all?
6    A.  Oh, he quit, because I told a deputy about it, a male
7        deputy, so he would wait for me to come in, and he would
8        walk me down to there and get me to the floor
9        that I was working on if he could.
10   Q.  So are you saying the Gilchrist touching you and the
11       things you talked about stopped after you complained
12       in 2010?
13   A.  No.  I'm saying that I talked to a male officer, and he
14       said: I will look out for you, Lori.  I will wait until
15       you get here.  We will walk down together.  I will try to
16       get you to the floor.  Then he went on vacation, and
17       unbeknownst to me, he asked another male deputy to watch
18       out for me, who went to the sergeant and said:  I heard
19       you are touching Lori.  You are going to lose your job if
20       you don't stop, so you might want to stop because she will
21       take your job from you.
22   Q.  Who are these two male deputies?  Who is the first one
23       that was walking with you?
24   A.  The first one was Deputy Steve Farkas.
25   Q.  How do you spell that last name, F-A-R-K-A-S?

Page 243

1    A.  Yes.
2    Q.  Okay.  And then who was the other one that went to
3        Gilchrist and told him you better cut it out?
4    A.  Dr. Ivan Morris.
5    Q.  When was it that Morris told Gilchrist that he needed to
6        stop it?
7    A.  I don't really recall the dates that it was or anything, I
8        just know that Steve went on vacation, and unbeknownst to
9        me, he had told -- he was the only one I had told at that
10       point that was a deputy, that was a co-worker type thing,
11       that I explained everything to, and he went on vacation,
12       and unbeknownst to me he talked to Deputy Morris, and
13       Deputy Morris felt that he should probably warn --
14   Q.  My question was when, when.  What year was this?
15   A.  I don't recall when, when it was.  I'm sorry.
16   Q.  So was it -- can you say that it was before -- we have got
17       a big timeframe between 2010 and 2014.  You can't give
18       me --
19   A.  I realize that, and that's what's a little confusing
20       because you are going back and forth and back and forth,
21       and it's -- it's just causing some anxiety, I guess I
22       would say, to answer these, because we are going back and
23       forth between years, and it seems like you are asking me
24       some of the same, similar questions over again.  I don't
25       know if you are.  It just seems that way.

Page 244

1    Q.  I'm trying to understand what happened between 2010 and
2        2014.  In 2010 you said you had this conversation with the
3        command and with Vern Nash, and then you are telling me
4        that at some point you had this officer who walked you,
5        and the other officer, Ivan Morris, who told Gilchrist
6        that it needed to stop.
7            Maybe a better way to ask this would be how long
8        after you had the discussion with command and EEO in 2010
9        was it that Ivan Morris told Gilchrist to stop?
10   A.  It was -- I had talked to the command staff prior to that
11       and got nowhere, and so I believe that is when that
12       happened.
13   Q.  Let me ask you a different question then.  Did Gilchrist
14       stop after 2010?
15   A.  It was sometime between 2010, 2000 -- early 2012 maybe.
16       I'm not sure.
17   Q.  And what happened that caused him to stop in 2012, if you
18       know?  Was this when the Ivan person told him to stop or
19       was something else -- did something else --
20   A.  It was sometime in between there.  I'm not exactly sure
21       when, but I believe that's why he stopped.  I don't know
22       for a fact that's why he stopped, but that's what Steve
23       Farkas had told me, and Ivan Morris had told me, that he
24       had done that because he didn't think it was right, and he
25       was giving him the opportunity to stop.

61 (Pages 241 to 244)

LORI LYNN HEETHUIS, 9-25-2020

Page 245

1  Q.  Okay.  When you talked to the command staff about this in
2      2010, the people we have talked about earlier, did any of
3      them indicate to you that they were upset with you for
4      bringing forward this complaint?
5  A.  I wouldn't say they said they were upset with it.  I just
6      didn't think they -- I just think they didn't want to deal
7      with it actually.
8  Q.  So when you -- when it was brought up again in 2014, we
9      will talk about that in a minute, we are bringing up the
10     stuff that had happened before 2012; is that right?
11 A.  Yes.
12 Q.  All right.  So that's where I did not understand that from
13     what I read before.  Now I do.
14         So when you brought it up in 2014, do you recall
15     going to the undersheriff and having a discussion with him
16     in his office?
17 A.  I first went to Sergeant Wood because I was being sexually
18     harassed by Deputy Geoghan, physically touching me and
19     making noises, sexual noises, and I had had enough, so I
20     went to Sergeant Wood, and he said you are going to have
21     to go see the undersheriff, so that's how that ended up
22     happening.
23 Q.  How do you spell Geoghan for the court reporter?  Can you
24     spell that?
25 A.  Oh, I think it's G-E-O-G-H-E-N [sic].  I'm not really

Page 246

1      sure.
2  Q.  All right.  And when you went to the undersheriff, do you
3      recall what you said?
4  A.  I told him of the whole entire situation from back, and
5      what had happened, the retaliation with the different
6      things being put into my file and that I just didn't
7      feel -- I felt like something needed to be done.  I said
8      this has happened.  It's -- I feel like I'm being treated
9      differently.  I said because I brought it out, I said I
10     have been under a few investigations that I don't think
11     were warranted.
12         I just need this to stop.  I can't have people
13     that are sexually assaulting me walk around still being my
14     sergeant, still being my training officer, and I can't
15     have co-workers being emboldened because I got divorced
16     and was a single woman again at that time, for quite
17     awhile actually, that they get emboldened and want to grab
18     my waist and pull me back into them making grunt noises
19     and calling me, you like it, She Nay Nay, also grabbing my
20     head and trying to shove it into his crotch and making
21     ogling noises such as I was doing something sexual.
22 Q.  Was this Geoghan that was doing this, Geoghan?
23 A.  Geoghan, it's like Geoghan, that's the pronunciation.
24 Q.  Is he the one?
25 A.  Yes.

Page 247

1  Q.  When you went to tell the undersheriff about this, was
2      that when then Captain Poulin was also in the room?
3  A.  Captain Poulin was never in the room with me.
4  Q.  Not when you were talking to the undersheriff about it?
5  A.  No.  He thought he was in the discussion that we had later
6      after the last chance letter and stuff, but then I told
7      him, no, you weren't in the room, and he says, that's
8      right, I think I was coming back from lunch, and I just
9      happened to be walking by and hearing part of it, and
10     after you got there I spoke with the undersheriff about
11     it.
12 Q.  Okay.  So what happened after you talked to the
13     undersheriff about Geoghan?
14 A.  He asked me if I wanted to do a complaint, and I said,
15     yes, I did, but I wanted to get my facts around, and could
16     I come back on -- this was, I believe, a Friday.  Could I
17     come back and give him everything that I may
18     have or any recounts that I could recall besides what I
19     talked to him about, and he told me that he was opening a
20     contract on Tuesday.  Monday wasn't going to be a good day
21     because he had some meetings of some sort, that I could
22     get back with him Thursday on it, and I never got the
23     opportunity to because I was immediately put under an
24     investigation and a second investigation and a third
25     investigation, I think, almost all at once.

Page 248

1  Q.  Did you document the first day you went in to see the
2      undersheriff?
3  A.  The first time I saw the undersheriff?
4  Q.  Yeah, did you talk about Geoghan, when you first went to
5      complain about it, did you make a record of that?
6  A.  I may have written it down on something, but I didn't -- I
7      didn't formally like write something down and give it as a
8      complaint at that time because I wasn't able to due to the
9      investigations I was under.  I was instructed not to speak
10     to any other command officer about the investigation,
11     other than Sergeant Ridout and Sergeant Gilchrist.
12 Q.  Did you -- do you have a way of pinpointing the date that
13     you first went to the undersheriff in 2014?
14 A.  I may have.  Not at this time, that I'm aware of.
15 Q.  What would you look at to find that out?
16         MS. AMTSBUECHLER:  We lost her audio.
17         VIDEO TECHNICIAN:  We lost her audio.  Let's go
18     off the record, 4:56 p.m.
19         (Recess taken at 4:57 p.m.)
20         (Back on the record at 5:09 p.m.)
21         VIDEO TECHNICIAN:  And we are back on the
22     record, 5:09 p.m.
23         MS. AMTSBUECHLER:  All right.  Can you tell us
24     where we left off, Sharon?
25         THE REPORTER:  Sure.  One second.

62 (Pages 245 to 248)

LORI LYNN HEETHUIS, 9-25-2020

Page 249

1    (The following record was read by the reporter
2  at 5:09 p.m.
3    "QUESTION: Do you have a way of pinpointing the
4  date that you first went to the undersheriff in 2014?
5    ANSWER: I may have. Not at this time, that I'm
6  aware of.
7    QUESTION: What would you look at to find that
8  out?")
9  BY MS. AMTSBUECHLER:
10  Q. All right. Can you answer that question?
11  A. No. I really don't know.
12  Q. When you went to the undersheriff to complain about
13    Geoghan, and you may have covered this, but I need to go
14    back because we've kind of -- I'm a little confused. What
15    did you -- what was Geoghan doing that you were
16    complaining about, what specifically was he doing?
17  A. He would grab my waist and pull me back and forth into his
18    groin area making sexual noises and saying you know you
19    like it, She Nay Nay.
20  Q. How many times did he do that?
21  A. Multiple times. Every time he had a chance to.
22  Q. Can you give me some idea of what that means?
23  A. Probably, my estimate would be at least two a week.
24  Q. For how long?
25    THE REPORTER: Did you say two a week? I

Page 250

1    couldn't hear you, Witness.
2    THE WITNESS: Yes, I said approximately twice a
3  week.
4  BY MS. AMTSBUECHLER:
5  Q. For how long?
6  A. Probably almost a year, I am estimating at this point,
7    somewhere approximately between eight months and a year.
8  Q. Was this all off areas where there would be no cameras?
9  A. Yes, that would be in the receiving area actually, the
10    receiving.
11  Q. How long had it been going on before you complained to the
12    undersheriff?
13  A. I had complained to Sergeant Wood several times, with it
14    falling on deaf ears with him. I would say roughly
15    anywhere from six months to ten months.
16  Q. After you complained to the undersheriff, did it stop?
17  A. No. They retired him out quickly.
18  Q. So he was no longer there to do it to you?
19  A. Correct, yes.
20  Q. When you talked to Sergeant Wood about it, what did he
21    say?
22  A. He just basically shrugged his shoulders and said: Well,
23    there is not really much I can do about it. You know how
24    it is around here.
25  Q. Did either the undersheriff or Sergeant Wood -- is it

Page 251

1    Woods or Wood? I don't know.
2  A. Wood, W-O-O-D.
3  Q. Did either of them indicate that they were upset with you
4    for bringing this forward?
5  A. They didn't say, wow, we are really upset with you, no, if
6    that's what you are asking.
7  Q. Well, did they give some indication that they were unhappy
8    with you for bringing it forward?
9  A. Well, I believe the undersheriff wasn't really happy to
10    hear it, just by his body language and, you know, well, I
11    can't get with you Monday, and Tuesday we are opening the
12    contract, so by Thursday or Friday, and then he never came
13    to me and said, hey, how come you didn't come back to me
14    or what's going on? He had to know that they had me under
15    three investigations, and one of them said that I could
16    not speak to any other command, other than Sergeant Ridout
17    and Sergeant Gilchrist, so therefore it meant any command,
18    sheriff, undersheriff, sergeant, lieutenant.
19  Q. What were the three investigations you were under at that
20    time?
21  A. I think -- I really -- there were like nine of them within
22    ten months, so I know one was about -- I think one was
23    about a Taser incident. The other one was something very,
24    very silly, the one that they said I couldn't speak to
25    anybody except those two individuals about the

Page 252

1    circumstance, and --
2  Q. What was it?
3  A. I don't really recall. I would have to look at my notes
4    to see, you know, if I have notes on it. I think I -- I
5    think I gave dates possibly to Mr. Drew. I am not sure.
6    I'm not sure. I would have to really sit down and be able
7    think about which one came first, second, third, fourth,
8    fifth. So I'm sorry, I don't know.
9  Q. You told me about a Taser, and I really am trying to
10    understand what you are talking about. Do you remember
11    any of the other things that you were being investigated
12    for in 2014?
13  A. They were things that were basically just made up, so I
14    don't -- at this time I don't recall exactly. I would
15    have to be able to sit down and think of each individual
16    lie.
17  Q. You received a notice of suspension for the Taser
18    incident, right? Do you remember?
19  A. I think that was a write-up. I don't think it was a
20    suspension. I could be wrong, though, because they were
21    both kind of one right after the other, the one where I
22    was under investigation for allowing an inmate to use
23    their phone in the confines of the jail.
24    VIDEO TECHNICIAN: I don't see Mr. Drew, and I
25  sent him a personal message, and he hasn't replied.

63 (Pages 249 to 252)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

## Page 253

1       MR. DREW:  I'm here.
2       VIDEO TECHNICIAN:  Okay.  Thank you.  Fantastic.
3   I apologize.
4       MR. DREW:  No problem.
5       MARKED FOR IDENTIFICATION:
6       DEPOSITION EXHIBIT 30
7       5:17 p.m.
8   BY MS. AMTSBUECHLER:
9   Q.  I put up on the screen Exhibit 30, which is a group of
10      pages starting at 36-D through 47-D, okay?  Do you
11      recognize that Notice of Suspension Without Pay on the
12      front page as relating to the group of offenses that you
13      received?
14  A.  That was the one with the cellular phone, yes.
15  Q.  Is this the one that you said you allowed her to use the
16      charging cord?
17  A.  I allowed -- her phone was dead, yes, and I allowed her
18      to -- the prints didn't come over for some reason, so I
19      was reentering them.  Sergeant Wood was aware of it.  He
20      came through and asked what I was doing.  I said:  She has
21      no charge at all, and she doesn't know her mom or dad's
22      phone number.  21 years old, and I didn't want her have to
23      try to walk all the way from where we are located to clear
24      out in north Muskegon.
25  Q.  So it's your position -- are you testifying that these --

## Page 254

1   that charge was not valid?
2   A.  Well, when it was investigated, I told him what had
3       happened, and he said:  Well, I don't have any sound, but
4       I believe that you were on a group talk.  And I said:
5       There was no bars on there.  He said:  Well, I really
6       can't see that, so I'm just going to make the judgement
7       call that I believe that you were -- she had it on
8       speakerphone, and you were talking to her as well as
9       whoever was on the speakerphone.  And I said:  That is not
10      what happened.
11  Q.  Page 38-D from Exhibit 30, a July 30, 2014 written
12      reprimand for the Taser incident.  Do you recall receiving
13      that?
14  A.  Yes.
15  Q.  Okay.  And this relates to an incident that occurred on
16      April 19, 2014.  Do you have any reason to dispute that
17      that was the date of the Taser incident?
18  A.  Not at this time, I don't have any way of knowing, unless
19      I were to actually go and get my written reprimands and
20      look at them.
21  Q.  Did you taze that inmate?
22  A.  I did taze a inmate, yes, I did, and Sergeant Wood said
23      it was a good taze, and we went to court.  She waived up
24      to circuit, and she pled guilty, so --
25  Q.  My question was did you taze her?  That was my question.

## Page 255

1   A.  Yes, I did, yes, I did.
2   Q.  Okay.  Let's stick with my questions.
3       Do you dispute the validity of this written
4   reprimand?  Do you believe that you should not have been
5   reprimanded for tazing her?
6   A.  I do dispute it.
7   Q.  Did you taze her to try to get her to move?
8   A.  She would not move, but I tazed her because of a prior
9       incident with her, and she -- when I walked up to her,
10      stay calm, just go in your room, she asked me if she
11      wanted -- if she wanted to do that a second time.
12  Q.  Why did you taze her?
13  A.  Because at that point I felt that she may engage me.  She
14      had bit me through the skin till it bled.  She broke
15      another officer's hand trying to get her under control,
16      and -- a couple months prior to that, and I finished out
17      the -- I called out the taze to Sergeant Wood, and he said
18      go ahead.
19  Q.  Well, did you taze her to get her to move?  That was the
20      reason you tazed her, isn't it?
21  A.  Not exactly, no.  It was the threat that she had stated to
22      me when I was near her, and she was quite a quick young
23      lady, wiry, and I just -- between what she said, I didn't
24      feel comfortable, and she would not budge, and she would
25      not follow direction after multiple times of asking her.

## Page 256

1   So I called out, and I said:  She will not obey and lock
2   down.  I'm going to taze her.  And Sergeant Wood said:  Go
3   ahead.
4   Q.  I think he said okay, right?
5   A.  Okay, go ahead, it was something to the -- to that effect,
6       that, yes, you may.
7   Q.  That's how you interpreted what he said.  Do you know if
8       he said he thought you had already done it when he said
9       okay?
10  A.  No.
11  Q.  All right.
12  A.  I hadn't done it.  I explicitly said that I was going to
13      taze her.
14  Q.  Do you recall who investigated the Taser incident?
15  A.  I believe it was Captain Poulin.
16  Q.  Did you believe that he treated you unfairly during that
17      investigation?
18  A.  Yes, I did.
19  Q.  In what way?
20  A.  In twisting things and saying that there was a policy.
21      There was not a policy at that time on Tasers.  We had had
22      shotty training on the Tasers.  Most of the guys were just
23      ha-ha and talking and cackling downstairs when we were
24      supposed to be learning about it, and just come up and
25      let's see how to shoot, and that was the extent of it.

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 257

1      And he said there was a policy.  My sergeant,
2  Sergeant Burton-Jones had wrote her team an e-mail stating
3  that there was not a policy at that time, so to be careful
4  and make sure that it was absolutely necessary.  I was not
5  on her team at that time, however.
6  Q.  Did Captain Poulin at that time say or do anything to
7  cause you to believe that he was discriminating against
8  you or retaliating against you as part of this
9  investigation?
10  A.  I believe just the way he spoke, that he was coming after
11  me, even though the sergeant who was on duty said it was a
12  good shoot, and what they did was they gave him a coaching
13  session, and then went after me.
14  Q.  Okay.  My question -- my question was -- my question was
15  did Captain Poulin say or do anything to you during the
16  course of this investigation that would cause you to think
17  he was discriminating or retaliating?
18      MR. DREW:  She was answering your question,
19  Counsel.
20      MS. AMTSBUECHLER:  About -- she was talking
21  about -- no, she wasn't.
22  BY MS. AMTSBUECHLER:
23  Q.  Did she say or do anything, did Poulin?
24  A.  Yes.
25  Q.  What did Poulin say?

Page 258

1  A.  Yes, Sheriff Poulin.
2  Q.  What did Poulin say that caused you to think --
3  A.  When he talked to me -- when he talked to me, he insisted
4  that this was this and that was that, and that was the way
5  it was going to be, and he just very, very agitated
6  while he was speaking to me about it, and that's what I
7  took offense to, and that's why I feel that he was coming
8  after me.
9  Q.  Did he mention anything about your sexual harassment
10  complaints when you were doing this?
11  A.  No.
12  Q.  Did he seem to be genuinely upset with the whole -- the
13  fact that you tazed this inmate?
14  A.  No.
15  Q.  What did he seem to be agitated about, if you know?
16  A.  I don't know.  I think that he was just on autopilot on --
17  that he was told to do these things, and that he was just
18  going to do them.  I -- just the way he talked about it
19  and the way he talked to the union reps, it just was like
20  a hostile thing.
21  Q.  How did he talk to the union reps?
22  A.  He told them not to advise me on anything and that they
23  weren't to talk to me.  They weren't to counsel with me.
24  They were just to sit there.
25  Q.  When was that, during what phase of this?

Page 259

1  A.  I'm going to say the very last time that we met before he
2  did the reprimand.
3  Q.  Okay.
4  A.  I don't really recall.
5      MARKED FOR IDENTIFICATION:
6      DEPOSITION EXHIBIT 31
7      5:27 p.m.
8  BY MS. AMTSBUECHLER:
9  Q.  I put up on the screen, I have got two documents that look
10  similar, 31, this is Exhibit 31.  It's Plaintiff's Bates
11  stamp 253, 254, 255.  Okay?  Is this your complaint form
12  that you filled out?
13  A.  If it says that that was the complaint form that I filled
14  out, I would have to agree.  That's my handwriting on it.
15  Q.  Was it on July 11, 2014 that you filled this out?
16  A.  That's what it says.
17  Q.  And it's also -- down toward the bottom of this document,
18  again, did you submit it on that date, submit it to the
19  county EEO office on that date?
20  A.  If I sent it on that date, then that was the date, yes.
21  Q.  Okay.  And there is list of witnesses.  It says continued,
22  but I don't have another page.  Did you submit witnesses?
23  A.  Yes, I did submit witnesses.
24  Q.  Maybe it's because it's continued from up on this page,
25  page 254, right?

Page 260

1  A.  I think so.
2  Q.  Are these all the witnesses that you provided to the
3  county EEO?
4  A.  Let me just look here.  I don't remember what was the top
5  list.  I see these.
6  Q.  Let me see.
7  A.  Yes.
8  Q.  So you gave them all the witnesses you knew about at the
9  time; is that right?
10  A.  Yes, that I knew about at that time.
11      MARKED FOR IDENTIFICATION:
12      DEPOSITION EXHIBIT 32
13      5:29 p.m.
14      MARKED FOR IDENTIFICATION:
15      DEPOSITION EXHIBIT 33
16      5:29 p.m.
17  BY MS. AMTSBUECHLER:
18  Q.  Then I'm going to show you what I have marked as Exhibit
19  Number 33 [sic], which starts out the same, it starts out
20  at Defendants' Bates stamp page 171-D, and it goes through
21  page 180-D, this is Exhibit 32.  And I'm just going to
22  kind of quickly go through and ask you, as I am scrolling
23  through, do you recognize that this is your handwriting?
24  A.  It is my handwriting.
25  Q.  Do you have a recollection without going through and

65 (Pages 257 to 260)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 261

1    reading all of these that you wrote down statements on
2    this at different times?  I mean tell me how this happened
3    that all these different statements are here, if you
4    remember.
5    A.  I guess just remembering them, and then in 2014, he told
6    me not to put certain things that he couldn't find the
7    first one to the EEO, so he said -- Mr. Bracey guided me
8    on what should be in there, what shouldn't.  I was just
9    trying to do the best that I could at recalling the
10   things.
11   Q.  You said Bracey told you not to put things in there.  What
12   did he tell you not to --
13   A.  He told me to streamline it.  He said streamline it so
14   that it's not -- you know, just get to the meat of the
15   matter of things.
16   Q.  Okay.  So we are back at the top where it starts out.
17   There is one July 18, 2014.  There is Addendum to Original
18   Complaint.  So do you recall writing this out and
19   providing it to Bracey as an addendum?
20   A.  Yes.
21   Q.  Okay.  And then we go to, let's see, Bates stamp page
22   178-D.  There is a July 17, 2014 note.  Do you recall if
23   you were writing about something that happened that day or
24   is this something that you remembered and you were giving
25   him another note about what happened?

Page 262

1    A.  You are moving it too fast.  I can't tell what it is.
2    Q.  Okay.
3    A.  I don't recall, but apparently that's my writing, so I
4    don't recall.
5    Q.  Another one, July 21, 2014, is this something that you --
6    that happened on the 21st or that you are writing about on
7    the 21st that you recalled happening earlier?
8    A.  I don't recall it, but if I wrote it, this must be what
9    happened on that day.
10   Q.  During the time that Bracey was doing this investigation,
11   how many times did you talk to him?
12   A.  To who?
13   Q.  Bracey, from the EEO office.
14   A.  I don't know the exact amount of times.  I know it was
15   more than just a few.  It was several times, but I don't
16   remember the exact amount of days that I talked to him
17   about it at times.
18   Q.  Were you interviewed by anyone else during that
19   investigation?
20   A.  During the EEO investigation?
21   Q.  Yes.
22   A.  Not that I recall, not with Mr. Bracey.  I don't recall.
23   Q.  Did anybody from the sheriff's department, to your
24   knowledge, were they involved in the EEO investigation,
25   other than being asked to be witnesses?

Page 263

1    A.  I have no idea.
2    Q.  So you don't know whether they were involved in making the
3    decision that Bracey eventually told you about?
4    A.  No, I don't.  I do know that some people were not talked
5    to, they told me, that they were never talked to, and then
6    he came back and said he brought it to the (inaudible) --
7           THE REPORTER:  Brought it to the what?  I'm
8    sorry.  I couldn't hear you.
9    A.  I think he said he brought it to the commission, the
10   county commission, and he said that there wasn't -- they
11   said there wasn't enough to act on it.
12   BY MS. AMTSBUECHLER:
13   Q.  The county Board of Commissioners, do you know?
14   A.  That's what I recall.
15   Q.  All right.  Do you know if Captain Poulin was involved at
16   all in this 2014 investigation?
17   A.  I have no idea.
18   Q.  Do you know if he knew about it?
19   A.  I would have to believe he knew about it, because it was
20   with the EEO, so I would assume that he was aware about
21   it.
22   Q.  The EEO was a separate county department, correct?
23   A.  I don't know.  I didn't even know there was an EEO when
24   they told me to go see the EEO, so --
25   Q.  The first time you learned about it --

Page 264

1    A.  -- I didn't know.
2    Q.  The first time you learned about the county EEO was in
3    2010, right?
4    A.  When I talked to the EEO, that was in two thousand -- I
5    don't recall the date, but anyways, it was the first time
6    with Mr. Nash --
7    Q.  Rights.
8    A.  -- and I was told that there was an EEO at that time, and
9    then he left, and then I didn't even know Bracey was there
10   for quite awhile, I mean a couple months at least, and
11   then I realized, so then I went back and said:  Listen,
12   they have a file.  And he said:  Well, let me look.  There
13   is a lot of things in boxes and so on.  And he said that
14   it must have been lost, just like the lady said that it
15   was lost, because he could not find it.  So that I needed
16   to come in and do a new complaint with him.
17   Q.  Putting up the screen sharing, the October 7, 2014 memo to
18   you from Tim Bracey, plaintiff -- starting plaintiff's
19   Bates stamp page 256 through 263.  Did you get this memo
20   from Tim Bracey?
21   A.  I don't recall, but if it says it was to me, I would have
22   to assume I did get it.
23   Q.  Did you have an attorney at that time?
24   A.  The October of 2014?  Yes, I did have an attorney at that
25   time.

66 (Pages 261 to 264)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 265

1  Q. Was that Mr. Drew's office?
2  A. Yes, it was.
3          MARKED FOR IDENTIFICATION:
4          DEPOSITION EXHIBIT 34
5          5:38 p.m.
6  BY MS. AMTSBUECHLER:
7  Q. Putting up Exhibit 34, which is the 2014 EEOC filing that
8     you did, there are two pages. One was in October on
9     October 8th, one was on November 10th. Do you recall
10    submitting two separate statements?
11 A. I don't recall --
12 Q. Go to the --
13 A. -- without being able to sit here and read it.
14 Q. Okay. There is an October 8 one. Is that your signature
15    on there?
16 A. Yes, it is.
17 Q. That's plaintiff's Bates stamp 291. And looking at --
18    looking at the second paragraph, because I think we have
19    covered the first paragraph, it says: The verbally
20    offensive environment by employees continued and in
21    2013-2014 I was again subjected to physical inappropriate
22    grabbing, touching and other physically sexually offensive
23    conduct by the aforementioned Sergeant and a co-worker
24    Deputy, the last physical incidents occurring in February
25    2014 and/or May 2014. Do you see that?

Page 266

1  A. Yes, I see it.
2  Q. Okay. So are you saying here that the physical conduct by
3     Gilchrist continued through February and/or May of 2014?
4     Because that's not really what you said to me earlier
5     today.
6  A. I don't really recall the dates of it. That's when we
7     were going back and forth, so I don't really -- I don't
8     really have an answer.
9  Q. The co-worker deputy that we are talking about, is that
10    Geoghan that we just talked about?
11 A. Yeah, Deputy Geoghan, yeah.
12 Q. And then you say here that in retaliation for making
13    complaints about this, you have been subjected to written
14    disciplinary actions, unpaid suspension in September of
15    '14. You say one of the management employees that is a
16    decision-maker on the disciplinary actions is the
17    aforementioned Sergeant that physically harassed me.
18        Are we talking about Gilchrist?
19 A. Yes.
20 Q. What decision did he make?
21 A. They said that they had talked to him on the amount of
22    time I should get off for this three-day suspension that
23    ended up being like six days, because something -- he said
24    something to the fact, well, she's on vacation, and then
25    that's her off weekend, so we will do this, and then we

Page 267

1     will do that.
2          And so I know he was involved with it because I
3     was told that he was involved with it, that they had
4     talked to him and that's how they came about with the date
5     of the suspension.
6  Q. Who told you that?
7  A. Sergeant Wood.
8  Q. Sergeant Wood told you that Gilchrist had input on what
9     dates you would serve your suspension?
10 A. Yeah, that they had spoke about it and came up with the
11    number of days that they said they wanted me to do.
12 Q. What other decision-making role do you believe that
13    Gilchrist had in any of the 2014 discipline?
14 A. I think he had decisions in a lot of it or input in a lot
15    of it. He was the interim jail administrator, I believe,
16    at that time.
17        THE REPORTER: I couldn't hear what you said.
18    Sorry. He was the what?
19 A. I believe that was at the point where he was the interim
20    jail administrator, I believe.
21 BY MS. AMTSBUECHLER:
22 Q. Other than the fact that you believe he was interim jail
23    administrator, do you have any reason to believe that he
24    was a decision-maker in the -- let me rephrase that. Do
25    you have any factual basis for the belief that he was a

Page 268

1     decision-maker on whether you were disciplined or not in
2     2014?
3  A. I felt he was, yes.
4  Q. Do you have any facts to support that feeling?
5  A. The fact that he was putting things in my file that I
6     wasn't aware of and setting the stage for a dismissal,
7     with these constant investigations because I was given --
8     I was sent a letter by the county because two major
9     incidents had happened within six months, that if I even
10    got a minor incident after that I would be terminated. I
11    would be separated is what it said, I believe, separated
12    from the county as an employee.
13 Q. Do you still have that letter?
14 A. I probably do.
15 Q. Who sent it?
16 A. I believe Mr. Drew may have it as well. I don't know for
17    a fact that he does, but...
18 Q. Who sent it?
19 A. Somebody in HR.
20        MR. DREW: What letter is that that she is
21    talking about?
22        THE WITNESS: After the two -- when Poulin found
23    me guilty of the Taser, found me guilty of the phone, the
24    county HR sent me a letter stating that because I had two
25    major incidents within six months, that if I had any

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

---

Page 269

1  other, even minor incidents, that I could be separated or
2  would be separated from the county as an employee, and
3  that was when I -- it was when my husband said --
4          MR. DREW:  I just wanted to know -- I just
5  wanted to know what letter that you said I might have.  I
6  would have to look for it.
7          THE WITNESS:  Yeah, it was a letter from the HR
8  department, and it said that because I had gotten two
9  major incidents within six months, that if I got any other
10 incidents, that I would be separated, something along -- I
11 would be separated as an employee of Muskegon County.
12         MR. DREW:  All right.
13 BY MS. AMTSBUECHLER:
14 Q.  What did -- what did Gilchrist -- you keep mentioning that
15     he put stuff in your file.  What did he put in your file?
16 A.  I have the original file.  Dan Stout shredded most of it
17     after the fact of that, so I believe Mr. Drew has a copy
18     of it.  We were able to go up and get that, and they
19     allowed us to copy it, so we copied everything in it, and
20     then I think it was approximately two days later that Dan
21     Stout called me and asked me if I could meet him up on the
22     floor.  They wanted to talk about my file.  I got up
23     there, and he was already shredding a few things, and he
24     said, you know, we should really go through you guys'
25     files.  Yours is this thick, and the -- some of the stuff

---

Page 270

1  is outdated, so we should really just get rid of some of
2  it.  What do you want to keep?  So I kept some things that
3  were -- from what I recall, they were like reviews and,
4  I'm trying to think, a couple letters from outside sources
5  that had been inside the jail that wrote the command on
6  our performance.
7  Q.  Okay.  My question was what did -- my question was what
8      did Gilchrist --
9  A.  He took several things from there.  I don't recall at this
10     time because I haven't seen the file in quite -- several
11     weeks.  I can't tell you when I have actually looked at
12     that again, but I do know that he was putting things in
13     it, because when we copied it, that's when I realized that
14     he was putting things in there that were derogatory, that
15     were not true to make it look like I was a bad employee
16     and set the stage for termination.
17 Q.  This copy of the file, you said you and your attorney made
18     a copy of file with the sheriff's permission?
19         MR. DREW:  I'm going to object.
20 A.  Not my attorney.
21         MS. AMTSBUECHLER:  I'm trying to understand
22     where this file is and what it is.  If you could help me,
23     Steve, that would be great, because it would save us some
24     time.  What are we talking about here?
25         MR. DREW:  I think she is talking about she was

---

Page 271

1  allowed to copy part of her file --
2          THE WITNESS:  The entire file.
3          MR. DREW:  -- at the time, and so I don't know
4  if we have that or not, but I will look, but I think she
5  is saying she was entitled -- or they let her copy her
6  file.
7          MS. AMTSBUECHLER:  I just want to know where it
8  is so I can get a copy of it.  If you are going to look
9  for it, that would be great, because I don't have that.
10         MR. DREW:  I will look for it.  All right.
11         THE REPORTER:  And I missed the person's name
12 that was doing the shredding.
13         MS. AMTSBUECHLER:  Undersheriff Stout,
14 S-T-O-U-T.
15         THE REPORTER:  Thank you.
16 BY MS. AMTSBUECHLER:
17 Q.  Right?
18 A.  Yeah, correct.
19 Q.  It also says here:  In retaliation from making complaints,
20     some officers have also failed to respond to my calls for
21     assistance, further creating a hostile environment -- work
22     environment.
23         Who failed to respond to calls for assistance
24     and when?
25 A.  There were several deputies that were involved in that,

---

Page 272

1  and what actually happened was Sergeant Wood had
2  Lieutenant Burns come in, and they called me in, and they
3  said we believe that the team has turned against you, and
4  they are not taking your calls as -- that that's what they
5  base it on, because they could hear.  There were times
6  that Sergeant Wood would say:  Would you answer Deputy
7  Johnson?  And so then they would answer, but that's how I
8  actually found out that they both felt that I was in a
9  hostile situation and that my team had turned against me,
10 and they were going to move me to Sergeant Jones -- or
11 Burton-Jones, I'm sorry, it's hyphenated, anyways, her
12 married name is Burton, her maiden name is Jones.  So I
13 was changed to that team after several years of being with
14 that team because they felt that it was in their best
15 interest to do that because the team had turned against
16 me.
17 Q.  Who in particular had turned against you?
18 A.  They said the team.  I know that Geoghan had several times
19     called me a stupid bitch, and other things of that nature,
20     demeaning nature.  Lori Lewis had said some demeaning
21     things to me, not answering calls.
22         There were several of them on that team that
23     were doing that, and it was actually brought to my
24     attention by Sergeant Wood and Lieutenant Burns, saying we
25     believe your team, you know, had turned against you.

68 (Pages 269 to 272)

LORI LYNN HEETHUIS, 9-25-2020

Page 273

These things happened sometimes, and we care about --
1   Q. I just asked you who.
2   A. Yeah.
3   Q. When was this?
4   A. Those are the ones that I recall them doing.
5   Q. When, when, when, when was it?
6   A. I would have to look at the paperwork on it. I don't
7   recall at this time. I know it was when Robert Johnson
8   was being tried for the murder of a Nexus Realtor.
9   Q. And this stopped after you got changed to Burton's shift?
10  A. Sergeant Theresa Burton-Jones or Jones-Burton. I'm sorry.
11  I think the Burton comes at the end. It's a hyphenated
12  name.
13  Q. Did it stop when you went to her shift?
14  A. Yes. People did answer my calls, and they did answer me
15  and they did call me, and I answered them, and so, yeah.
16  It was much better at that point in time.
17  Q. You said earlier that Amy Borgman was not receptive to you
18  in some way because she used to be involved with the
19  prosecutor. What were you talking about there?
20  A. She was married to Tony Tague, and she felt that
21  discussing these things with me would be not beneficial to
22  her as a person. I believed that she may -- she made it
23  sound like that he -- there would be retaliation against
24  her, I don't know in what form, but she really didn't --

Page 274

1   wasn't interested in following what I was saying about
2   what was happening. She was more interested in that I was
3   a single mother raising a daughter on my own, working
4   full-time, and her father not being involved with her
5   life. So that's what she, I think, felt was important. I
6   just kind of went along with it just so that maybe at some
7   point in time she would realize that it was her duty to
8   listen to me as a psychologist and to counsel me on what
9   had happened to me.
10  Q. If you thought she wasn't really receptive, why didn't you
11  go to somebody else?
12  A. I don't really know why I didn't do -- I just kept
13  thinking maybe she will handle this. I had a good --
14      MR. DREW: All right. You have answered it.
15  Let's try to move on. Just listen to the question and
16  answer without adding things so we can get done.
17  A. I don't know why. I don't know why. I don't know why.
18  BY MS. AMTSBUECHLER:
19  Q. Do you have any other reason -- let me ask you -- well,
20  let me ask a different question. Is there anything else
21  that you believe that now Sheriff Poulin has done to you
22  that was retaliatory or discriminatory or harassment that
23  you haven't talked about today?
24  A. Do I think at any point after I was -- after I was
25  terminated that he has done anything, is that the

Page 275

1   question?
2   Q. No. Is there anything else that he has done wrong to you
3   that we haven't talked about today? Let me make it very
4   basic.
5   A. I don't recall at this time.
6   Q. Do you have any other reason to believe that he -- let me
7   ask you a better question. Why do you think Sheriff
8   Poulin would want to retaliate against you?
9   A. Because of my testimony at the ACLU.
10  Q. Any other reason?
11  A. Well, he was probably even more upset when my husband
12  spoke with him.
13  Q. You mean the incident in the lobby?
14  A. Yes.
15  Q. I'm sorry, did you say yes? I couldn't hear you.
16  A. Yes.
17  Q. Any other reason that you think he would want to retaliate
18  against you?
19  A. I don't think he liked how I did my job, because it was
20  always about being too familiar. They are animals. You
21  shouldn't be that close to that trustee. It was just a
22  constant, you are too familiar, you are too familiar, and
23  I -- all I could think was I have never been attacked by
24  any of the trustees. I have never had them do anything
25  that was considered not right, I guess I would say, or

Page 276

1   handled myself in any way, so I just really couldn't
2   understand why they were coming after me like that about
3   the familiarity.
4       I was told by other deputies, other people that
5   they thought it was good how I could handle things and
6   keep things calm. They would call me up on a floor
7   because they were having a problem so that I could assist
8   with getting it under control, because they said I had a
9   good way of speaking with the inmates and calming them. I
10  don't believe Sheriff Poulin liked that. I don't believe
11  that he liked that it was made aware that I was a
12  Christian and that I would pray for an individual if they
13  asked me to. I just don't -- I think he wanted a
14  different type of -- I call it the God syndrome, where
15  they because they wear that uniform, they are God. I
16  never felt that way.
17  Q. Did you ever go to Sheriff Poulin and complain about sex
18  harassment?
19  A. Did I ever go to him when he was a sheriff and complain
20  about it?
21  Q. Yes, right.
22  A. Well, I told him about it when we were having that
23  discussion.
24  Q. The last day when you were talking about retirement, you
25  are talking about that, right?

69 (Pages 273 to 276)

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 277

```
 1    A.  No, no, no, no, no.  The last -- when -- my thought just
 2        went out the window here.
 3    Q.  Let me -- let me back up.  I asked you if you ever
 4        complained to Sheriff Poulin about sexual harassment.  You
 5        said you had a conversation with him about the Gilchrist
 6        stuff.
 7    A.  Yeah, after -- yes.
 8    Q.  And then I asked you --
 9    A.  I'm talking about when -- when the meeting was supposed to
10        be and it wasn't, and then he had told my husband, well, I
11        wasn't in charge then, and my husband said:  Well, now you
12        in charge now.  Are you going to do something about it?
13        So at that point he knew about it.  I don't know that the
14        undersheriff had knew about it until that point because he
15        was new.  He was from a different -- he was a captain in
16        the township, and so --
17    Q.  Other than --
18    A.  -- he hadn't been there.
19    Q.  Other than the discussion, which it is what it is, did you
20        go to the sheriff, Sheriff Poulin, and complain about
21        sexual harassment?
22    A.  He was made aware of it, yes, that complaint that day,
23        yes.
24    Q.  You are talking about it being the incident in 2014?
25    A.  No, I didn't speak with him in 2014.  He wasn't in the
```

Page 278

```
 1        office with the undersheriff then.
 2    Q.  When you said --
 3    A.  I'm talking about --
 4    Q.  Let me ask a question.
 5    A.  Go ahead.
 6    Q.  When you said he was made aware of it that day, that day
 7        meaning the day after the elevator incident where you had
 8        the discussion in the lobby, is that the day you are
 9        talking about?
10    A.  That is the day I'm talking about.
11    Q.  And when you say he was made aware of it, what are you
12        talking about?
13    A.  The sexual assault.
14    Q.  Back in -- from Gilchrist?
15    A.  From Gilchrist, yeah.
16    Q.  Did you complain to Sheriff Poulin during the time he was
17        sheriff about any sexual harassment that occurred while he
18        was sheriff?
19    A.  Not that I recall, no.
20    Q.  Did you complain to anybody about sexual harassment that
21        occurred while Sheriff Poulin was sheriff?
22    A.  Not that I -- not that I can recall.  I don't recall.  I'm
23        sorry.
24              THE REPORTER:  Laura, can you stop screen
25        sharing if you are done?
```

Page 279

```
 1              MS. AMTSBUECHLER:  Yes.  Thank you.
 2              THE REPORTER:  Thank you.
 3              MS. AMTSBUECHLER:  Sure.  Sorry.
 4    BY MS. AMTSBUECHLER:
 5    Q.  Did you -- did Sheriff Poulin ever say anything to you
 6        that made you to believe that he didn't think that women
 7        should be corrections officers?
 8    A.  He never said anything directly to me about women should
 9        be correction officers, no.
10    Q.  Did he ever say --
11    A.  Not that I recall.
12    Q.  Did he ever say anything that made you think he didn't
13        think women should be corrections officers?
14    A.  Just the way that I was scrutinized under the scope, and
15        there were deputies that were male officers doing very
16        wrong things at the time, and they were never scrutinized
17        the way that I was.
18              I was put under a microscope.  I was watched.  I
19        was harassed almost every other day by having to go up
20        there and listen to them about how I was too familiar with
21        people, how that wasn't good.  They were animals.  They
22        could kill me.
23    Q.  What male officers were as familiar as you and were not
24        talked to, if you know?
25    A.  There were several of them.  They were ranging from the
```

Page 280

```
 1        two incidents to on the phone, while they were --
 2    Q.  No, no, my question -- that's not my question.  What other
 3        male officers were as familiar with the inmates?  You said
 4        that the sheriff criticized you for being too familiar.
 5        What male officers were also as familiar and were not
 6        criticized for it?
 7    A.  Several of the officers that were in the upper, upper
 8        tier.  There were about six of us, Deputy Riddle at the
 9        time; it was Deputy Herman, while he was there; Deputy
10        Lynn; Deputy Thielbar, who is there now.  Those are the
11        ones that I recall on different things that really should
12        have been addressed with them that were never addressed,
13        and they were aware of.
14    Q.  What were they aware of that should have been addressed
15        and wasn't addressed?  Can you give me anything specific?
16    A.  The chew, the way they spoke to inmates, the way they
17        neglected inmates, the way they put the mute button on
18        when they would hit -- you have an intercom call in
19        receiving.
20    Q.  Can you give me any specific example of anything that
21        anybody did that they knew about, anything specific?
22    A.  They knew about them putting the mute button on.  They
23        knew about them on how they reacted towards inmates that
24        were asking for things or asking questions, and the
25        derogatory things that were said back to them.  They knew
```

70 (Pages 277 to 280)

LORI LYNN HEETHUIS, 9-25-2020

Page 281

1  about the chew.  They knew about the phones.  They chose
2  to ignore everything but focus on me, and everything that
3  I did was scrutinized.
4  Q.  They told people to focus on you?  Who was told to focus
5     on you?
6  A.  I don't -- I don't know that they told them, ma'am.  I
7     didn't say that they actually said look at her.  I was
8     told that they had a sergeant at night watching me and
9     going over tapes to see if he could find any policy
10    violations, that's what I was told.
11 Q.  Who told you that?
12 A.  I was told that by the union rep, John Jenkins.  I was
13    told that by a couple of the -- I want to say Sergeant --
14    Corey Meyers, he is a sergeant now.  I was told by
15    probably, I mean I would estimate it at three to four
16    people told me that, that knew that that was happening.
17 Q.  So the mute button, who put the mute button on and when?
18    What are you talking about?
19 A.  The deputies, the male deputies would a lot of times put
20    mute buttons on so that they didn't have to listen to that
21    when they were trying to book or do paperwork so that they
22    didn't have to hear you have an intercom call, you have an
23    intercom call, you have an intercom call, so it would mute
24    that.  It would put a line across it, and it would just
25    blink yellow, I believe, and they would mute all of them

Page 282

1  out.
2            They put black, thin magnetic type material,
3     they would cut it, and they would put it over the windows
4     so that they didn't have to be looked at because they
5     said --
6  Q.  Let's stick with the -- let's stick with the mute button
7     for a minute.
8  A.  Okay.
9  Q.  What policy did that violate?
10 A.  I don't know if there was a policy, but it was a duty as
11    an officer to respond to those call buttons in case there
12    was an emergency.  It would come under doing the job.
13 Q.  The chew, you said women did the chew as well as men?
14 A.  There was one girl that did chew, yes.
15 Q.  Okay.  And the cellphones, you have got some video, we
16    have talked about earlier.  Can you give me an example of
17    somebody else who used their cellphone and was not
18    disciplined, something specific?
19 A.  Jason -- Jason Thielbar muted his phone out there.  I saw
20    Deputy Lynn out there using his phone, he was not
21    disciplined --
22 Q.  Those are the two -- hold on a minute.
23 A.  -- to my knowledge.
24 Q.  Those are the two videos we've already talked about?
25 A.  Deputy Lynn also talked outside on his phone while he was

Page 283

1  with trustees and out in the mix of inmates.
2  Q.  Do you know if command knew --
3  A.  So it wasn't the exact particular time of sitting in the
4     office.
5  Q.  Do you know if command knew about Lynn doing that?
6  A.  They were aware.
7  Q.  How do you know?
8  A.  Because the lieutenant, at least to the lieutenant area,
9     they knew.
10 Q.  How do you know?
11 A.  Because Lieutenant Burns and I had talked about it several
12    times.
13 Q.  So you and Burns talked about the fact that he knew that
14    other people used their cellphones?
15 A.  He said he knew.  I told him.  I said:  Why am I being
16    scrutinized like this, and every other officer is just
17    looking at the time, because I didn't have a watch at the
18    time?  And he said:  I know there is other people that do
19    that, Lori.
20 Q.  When was this conversation?
21 A.  It was sometime in between the thing that happened with
22    Nate Stephenson calling me those names and prior to that
23    several times, because I was being scrutinized at that
24    time for every breath I took.  So I had went to him
25    because I had worked with him for so long and asked him

Page 284

1  why is it that I am being called up constantly by them
2  when Lynn and Herman and Thielbar and Smith and several
3  other male officers were on their phones literally, not
4  just trying to look at the times.  So I was just trying to
5  get -- I guess trying to talk to him about it so that
6  maybe he could get an answer from the upper "enchalant,"
7  which would be the sheriff and the undersheriff, on why
8  this was happening.
9  Q.  You said you were constantly scrutinized, constantly
10    called up there.  Were there any other times you were
11    called up or talked to that we haven't talked about today?
12 A.  There were times that I was called up there just to talk
13    about being too familiar.
14          There was a time that I was called up at 6:00,
15    and a complaint had been made by Deputy Pete Nelson.  He
16    was working over, and he witnessed a female deputy having
17    sexual favors with a trustee, and I was called up because,
18    as it was, one of my friends was the grandmother of the
19    two boys of the trustee that this was happening with, and
20    she had given me the name and the incident, and I know
21    that Keith was -- Keith did a formal complaint with the
22    Sergeant Burton, and then Sergeant Burton took it to the
23    captain, which was Captain Christianson at the time, and
24    from what I understand from Deputy Nelson, they said she
25    was a cutter, that they had put her into counseling, that

71 (Pages 281 to 284)

LORI LYNN HEETHUIS, 9-25-2020

Page 285

1  she had to go to counselling, and that she had issues
2  because she was a single mother of an autistic son.
3  Q. Okay. Just a few more questions. Have you had any
4     psychological treatment or psychiatric treatment prior to
5     Amy Borgman?
6  A. Psychological treatment prior to what? I'm sorry. The
7     heater came on.
8  Q. Have you seen a counselor or a psychologist, a
9     psychiatrist, anybody like that before Amy Borgman?
10 A. Yes.
11 Q. Who?
12 A. I want to say Dr. Haight. It was when I was in my
13    twenties.
14 Q. How do you spell that name?
15 A. I really don't know. I know it's like H-E-I or I-E-G-H-T.
16    I'm not sure. I know on totally unrelated things.
17    I wasn't even at the sheriff's department at that time. I
18    had a boyfriend that was cheating on me, and I went to him
19    to seek counsel on how to handle it and how to be able to
20    walk away from that particular thing. So had it nothing
21    to do with the sheriff's department. It had nothing to do
22    with really anything other than some guidance on how to
23    handle something like that.
24 Q. Any other time you have sought treatment like that?
25 A. That was the only time that I do recall at this point, is

Page 286

1     that one.
2  Q. Have you ever been sexually assaulted or sexually abused,
3     other than what you have testified to today that you
4     believe that Gilchrist and Geoghan did?
5  A. Sexually assaulted or sexually abused by --
6  Q. Anyone.
7  A. Are we talking about work or what are we -- are we talking
8     about when I was 21, when I was 30? I'm not sure what you
9     are trying to say.
10 Q. I'm talking --
11        MR. DREW: Objection. Wait a minute.
12    Objection, relevance.
13        Go ahead.
14 BY MS. AMTSBUECHLER:
15 Q. I'm talking about at any time in your life.
16 A. At any time in my life was I sexually assaulted or
17    sexually abused by somebody, is that the question?
18 Q. Yes.
19 A. No, not -- not in those terms, not in the two terms that
20    you used.
21 Q. Were you sexually mistreated by anybody? And I don't want
22    to -- I don't want to put too fine a point on this.
23 A. I was not treated very well by my first husband. He was a
24    Muskegon police officer.
25 Q. City of Muskegon?

Page 287

1  A. City of Muskegon, yeah.
2  Q. When did you get divorced from him?
3  A. 2006.
4  Q. Did you seek treatment at all during that time,
5     psychological treatment?
6  A. No. I didn't feel I needed to get psychological treatment
7     at that point.
8  Q. Was he physically abusive?
9  A. Not physically abusive in the ways that I believe that you
10    are saying, no.
11        I don't -- I don't understand the relevance of
12    what my relationship was with my husband, my ex-husband
13    now for years.
14        MR. DREW: I have objected to the relevance, but
15    in a discovery dep sometimes you can go into that.
16        THE WITNESS: So then I have to answer, correct?
17        MR. DREW: I'm not instructing you not to
18    answer, put it that way.
19        THE WITNESS: Okay.
20 A. He wanted to do certain things that were quite odd in our
21    sexual part of the marriage, yes.
22        MS. AMTSBUECHLER: All right. That's all I
23    have.
24        MR. DREW: I had some questions, but I'm going
25    to use the restroom. You can stay there, Lori. I will be

Page 288

1     back in just a second.
2        VIDEO TECHNICIAN: Off the record 6:16 p.m.
3     (Recess taken at 6:16 p.m.)
4     (Back on the record at 6:19 p.m.)
5        VIDEO TECHNICIAN: We are back on the record,
6     6:19 p.m.
7           EXAMINATION
8  BY MR. DREW:
9  Q. Lori, the ACLU deposition that you talked about, you gave
10    testimony in that deposition; is that right?
11 A. Yes.
12 Q. And you said that before that deposition Lieutenant Burns
13    had some conversations with you, and I think you said
14    no one else was present at that time; is that right?
15 A. That is correct.
16 Q. Had you received the notice of the deposition at that
17    time, that he talked to you?
18 A. No, I hadn't received it yet. I think I received it late
19    after he had stated that.
20 Q. Do you have any idea as to how he knew that your
21    deposition was going to be taken?
22 A. Apparently he had got a list from the ACLU attorney
23    stating that the girls had asked for me to be subpoenaed
24    to the deposition to answer questions on how they were
25    treated.

LORI LYNN HEETHUIS, 9-25-2020

Page 289

1  Q. Did he mention anything -- and I guess quickly summarize
2     again what he told you or what you told him.
3  A. He told me that he -- wanted me to say that I hadn't
4     seen anything, that I hadn't heard anything of that, I
5     hadn't secondhand heard anything about the things that
6     they had made the complaint about. And I said: I'm not
7     going to lie for you, Mark. You have known me for 21
8     years. I'm not going to lie to you. I'm not going to lie
9     to them. If it's something that I heard or saw or both, I
10    am going to tell the truth if it's a direct question. If
11    it's a general question, I will answer it accordingly.
12 Q. Did you meet with an attorney prior to the deposition?
13 A. Yes, I did.
14 Q. And then you gave the deposition; is that right?
15 A. Yes, I did.
16 Q. Did you answer the questions truthfully?
17 A. Yes, I did.
18 Q. Were there questions asked that you feel your answers were
19    not in favor, were the truth, but not in favor of the
20    sheriff's department?
21 A. Yes, I did.
22 Q. You mentioned that there was a settlement later that next
23    year; is that right?
24 A. Yes, to the best of my knowledge, there was a settlement
25    sometime in maybe mid to late 2017, like I would say

Page 290

1     somewhere between maybe -- this would be an approximate --
2     I would think by July, between July and the end of August
3     or the first of September, I believe.
4  Q. And at that time that the settlement was made, and I think
5     -- was it made public, do you know?
6  A. I don't believe it was made public. It may have been, you
7     know, because I don't know how the -- I had never been in
8     a deposition with the ACLU, so I don't know what --
9  Q. How did you find out that the case had been settled?
10 A. Lieutenant Burns came to me.
11 Q. And was that the conversation you talked about earlier?
12 A. The conversation that he had -- yeah, that he said that
13    the sheriff was not very happy with you.
14 Q. And at that time the sheriff was who, at that time?
15 A. Sheriff Poulin.
16 Q. Did -- and so Lieutenant Burns said to you that the
17    sheriff was not happy with you?
18 A. Yes.
19 Q. Did you have an understanding about which sheriff he was
20    referring to?
21 A. Yes. That was right during the time where Roesler had
22    lost the election, and then at some point he quit coming
23    to work, so they just kind of -- they didn't do the formal
24    swearing in until, I believe, January 11th of 2017, I
25    believe. So he was like an acting sheriff coming in, but

Page 291

1     he wasn't -- he hadn't been, you know, inducted into that
2     position formally.
3  Q. And if the settlement was in, as you said, mid to late
4     2017, I'm forgetting when it was, was Poulin, Sheriff
5     Poulin already the sheriff at that time?
6  A. Oh, I'm sorry. I think I misspoke myself. It was 2017.
7     I do know that it was at that time, and then he -- when it
8     was settled, he would have been sworn in as the sheriff.
9  Q. Lieutenant Burns said that to you. Did Sheriff Poulin
10    ever say directly to you he was unhappy with you with your
11    testimony?
12 A. No, he did not speak with me directly on it.
13 Q. You were then -- and you have indicated that after that
14    you feel things started happening or more things started
15    happening in retaliation for that because you had
16    testified; is that right?
17 A. Yes.
18 Q. And was one of those things the -- being cited and being
19    taken off for the mental, emotional outburst regarding the
20    chaplain?
21 A. Yes, and the other person, whoever it was.
22 Q. I'm not going to take you through it, but you have
23    described what happened with the chaplain and how you
24    apologized to him and he had apologized to you, and the
25    two of you had buried the hatchet; is that right?

Page 292

1  A. Yes, that is correct.
2  Q. And had that occurred before you were disciplined for
3     that? Had you buried the hatchet before the county
4     disciplined you for this emotional outburst?
5  A. Yes. We did it within minutes of the exchange of what I
6     said to him and he said to me, and I told him that I was
7     very sorry and that I would like to apologize to him for
8     the words that I used, because it was not something that I
9     was proud of saying to a chaplain. And he said: Yes, if
10    you will accept my apology, because I know I get -- I feel
11    like you guys don't see me, other deputies, and so I tend
12    to hit the buzzer a lot, and I shouldn't. I should just
13    be patient, and I shouldn't knock on windows and stuff
14    with keys and stuff, he said, so I apologize for that.
15    And he said: Would you accept my apology? And I said:
16    Yes, I would, sir.
17 Q. And who made -- who made the decision that you should see,
18    if you know, that you should see their psychologist, Dr.
19    Auffrey, regarding your -- these emotional outbursts? Was
20    it somebody from the county or somebody from the sheriff's
21    department?
22 A. I believe it was the undersheriff and the sheriff made
23    that decision.
24 Q. You did not make that decision to go seek -- go see Dr. --
25    or if he's a doctor -- Psychologist Auffrey; is that

LORI LYNN HEETHUIS, 9-25-2020

Page 293

1  correct?
2  A.  No, I did not make that decision.  I told them I have my
3  own psychologist, and if you would like a release of the
4  records, you could.  They said they would like you to see
5  their psychologist.
6  Q.  And was that psychologist or person, one of them, Dr.
7  Beyer or Beyer?
8  A.  No.  They told me that I had to go see Joseph Auffrey, and
9  then he sent the letter, and then they told me at the time
10  of the meetings, stating they were taking me off mentally
11  unfit because of the letter from Dr. Auffrey, that in
12  that, in order to get back and be able to work again, that
13  I had to continue to see my psychologist and that I had to
14  seek out a psychologist due to the fact that Dr. Auffrey
15  had stated in his letter that he felt that I was possibly
16  having tirades because I was on a large amount of
17  barbiturates.
18  Q.  And Auffrey is a psychologist that they sent you to, not a
19  medical doctor, correct?
20  A.  No, he's just a psychologist.
21  Q.  And who was the psychologist that you were seeing?
22  A.  I was seeing Diane Strang.  It's S-T-R-A-N-G.
23  Q.  Dr. Beyer, the medical doctor, felt in no uncertain terms
24  that you were able to work; is that correct?
25  A.  Yes.  He was a psychiatrist.  I'm sorry.

Page 294

1  Q.  From your understanding, did Dr. Beyer feel in no
2  uncertain terms that you were able to work during this
3  entire course of time?
4  A.  That is what he told me when I met with him.
5  Q.  Were you aware of male officers that would have what they
6  are determining you as a female, emotional outbursts, that
7  were bad or worse of the kind of thing they were accusing
8  you of?
9  A.  Yes.
10  Q.  Can you give us some examples?  And I'm going to ask you
11  did management know about any of these, and if you know,
12  then you can indicate that just to save some time.  So
13  what men had emotional outbursts that management knew
14  about?
15  A.  Nate Stephenson had, Deputy Jared Herman.  I should put
16  deputy in front of all of them, they were deputies.
17  Deputy Thielbar.
18  Q.  And that's three -- go ahead.
19  A.  Yes.  That's the ones I recall right off the top of my
20  head.
21  Q.  And all three of these were deputies in the corrections
22  just like you were?
23  A.  Yes.
24  Q.  But these are men?
25  A.  They are men, yeah.

Page 295

1  Q.  So what kind of things, outbursts did Deputy Nate
2  Stephenson have and do that you are aware of?
3  A.  He would call -- if they kept hitting the buzzer, he would
4  tell them -- he would say stop hitting the fucking button,
5  you idiot.  He called the girls bitches and told them they
6  weren't getting anything, they weren't getting anything
7  more from him, and that -- he yelled at them on other
8  occasions for asking the same question over and over
9  again.  What are you, F'ing stupid, which he said fucking
10  stupid.  You need to just fucking stop right now.  I'm
11  done hearing it.  I'm going to put you in the rubber room
12  if you don't, different things like that, and he would --
13  he would be yelling.  It was in receiving where these
14  things happened.
15  Q.  So he would be yelling it emotionally?
16  A.  Yes, very emotionally, like loud yelling.
17  Q.  Louder -- if you compare how he was yelling loudly, how
18  would it compare to how you talked to the chaplain that
19  time?
20  A.  Like a hundred times more, but he was yelling it,
21  obviously because there is noise in the receiving area,
22  and he is yelling at them through the door in holding
23  where they were, so he was yelling at them loud enough so
24  that they can hear through the door what he is saying.
25  Q.  Was he yelling -- I think you answered.  Was he yelling

Page 296

1  it, in your judgement, was he yelling it in a way that
2  this was an outburst as well?
3  A.  I believed so, because I think that he was just stressed
4  out with all the -- everything that goes on in receiving
5  and all the noise on top of the intercom button.  There
6  would be people who were maybe not mentally all there, and
7  then they would yell to another person, and they would go
8  back and forth, and there was just a lot of noise levels
9  there, so I could see the stress when he was screaming and
10  yelling at them about it.
11  Q.  So this type of stress was similar to your stress reacting
12  to the chaplain?
13  A.  Yes.
14  Q.  Did management know about Stephenson's yelling and
15  outbursts?
16  A.  Yes.
17  Q.  What --
18  A.  Sergeant Wood had witnessed it, Sergeant Wood had
19  witnessed it, and Sergeant Matt Smith had witnessed it.
20  Those are the --
21  Q.  Sergeant who?
22  A.  Sergeant Matt Smith.  He's the jail administrator now, and
23  Sergeant Wood.
24  Q.  Sergeant Wood and Sergeant Matt Smith witnessed it?
25  A.  Yes.

74 (Pages 293 to 296)

LORI LYNN HEETHUIS, 9-25-2020

Page 297

1   Q.  And staying with Stephenson, had Lieutenant Burns ever
2       witnessed -- well, let me ask you something first.  When
3       you say they witnessed it, did you directly witness what
4       you talked about with --
5   A.  Yes, I directly witnessed them, yes.
6   Q.  And the profanity that Stephenson was using?
7   A.  Yes.
8   Q.  Did you witness that?  And are you saying --
9   A.  Yes, I did witness that.
10  Q.  Are you saying that Sergeant Wood and Sergeant Matt Smith
11      were there to hear it when you did it, the times you
12      witnessed it?
13  A.  They were in the receiving area.  I would have to believe
14      they heard it, as loud as he was speaking and yelling.
15  Q.  Why do you say that?
16  A.  I would have to believe that.
17  Q.  How far away were you, how far away were they?
18  A.  Well, I was sitting probably only four feet from him, and
19      they were walking through different areas of the bookings
20      quite large, the booking area where we book is quite
21      confined.  There is nothing around us except that open
22      desk and two swing doors, so they were in the area of the
23      receiving where I would have to believe that at the level
24      he was yelling at these people, with the outbursts that he
25      was having, calling them different things, that they had

Page 298

1       to have heard it.  I didn't ask them, hey, did you hear
2       that, but I would have to believe they heard it.
3   Q.  Have you been in the area you saw them in the area, and as
4       loud as Stephenson was talking, would you have been able
5       to hear it from the area they were in?
6   A.  Yes.
7   Q.  What about Lieutenant Burns, was he ever in the area that
8       you directly recall when Stephenson was using profanity
9       and having the outbursts?
10  A.  Yes, Lieutenant Burns had been through the area different
11      times when these outbursts would arise, and it was just
12      like, I don't know, he just went on his -- went about his
13      stuff, didn't really say anything.  Nobody ever really
14      said anything to them for the way that they screamed and
15      yelled at people.
16  Q.  So as far as you know, Deputy Stephenson was never
17      suspended, reprimanded or written reprimand for emotional
18      outbursts?
19  A.  Not that I'm aware of.
20  Q.  Anything else -- and this -- give me a timeframe for this.
21      Is this all what you identified with Stephenson, was this
22      all after you testified in the ACLU case?
23  A.  Yes.
24  Q.  You mentioned Deputy Jason Thielbar.  What -- would he
25      have emotional outbursts?  And if so, describe those.

Page 299

1   A.  He -- they would be yelling back on forth, the inmates
2       would, from one pod to the other cell.  There were single
3       cells, there were -- I think the men had twenty-four,
4       twenty-eight.  There were nine people in certain cells, so
5       they had different size cells, and they would get yelling
6       back and forth, whether they were drunk or whether they
7       were just not quite there, or coming off of drugs, and he
8       would go:  (Indiscernible noise) Will you dumb fuckers
9       just shut up?  I'm so sick of hearing your ignorant asses.
10      Just shut up.  And that would be one of the things that he
11      would do when there was a commotion like that.
12  Q.  You mentioned -- anything else that you would hear that
13      Thielbar would say or do?
14  A.  He would say like you stupid bitches quit hitting that --
15      that buzzer or I'm just going to just shut it off and
16      nobody is getting out tonight.  So if you are waiting for
17      a release, you're not getting out.  You need to fucking
18      stop.  He would say things like that as well, calling
19      the females inmates bitches and that they needed to F'ing
20      stop or he was going to make sure that they didn't get out
21      because the paperwork got lost.
22  Q.  Were these things yelled emotionally?
23  A.  Yeah, he would yell.  He would just -- all of a sudden it
24      was just -- all of a sudden it was just -- all of a sudden
25      he would go (indiscernible noise), and then he would just

Page 300

1       start yelling at them, and then when he got done, he was
2       done, and sometimes the girls would still ring the buzzer.
3   Q.  Were these done with just the females or males as well?
4   A.  He did males as well.  It wasn't just females, but it was
5       more the females that he called bitches.  The other ones
6       he would just tell them to stop.  He was going to cut
7       the -- cut them off, and he just yelled profanities toward
8       them, to -- you know, fucking, you need to stop, you need
9       to stop.  I have other people to deal with.  You need to
10      F'ing stop, and this was kind of a --
11  Q.  Were these those that you viewed yourself as well,
12      firsthand, would Deputy --
13  A.  Did management view it?
14  Q.  No, I'm asking -- were these incidents that you talked
15      about things you have viewed firsthand?
16  A.  Yes.  I was working in the receiving with them.
17  Q.  Did management, which is sergeants on up, were they
18      present during any of these that you viewed?
19  A.  There were sergeants that would walk through and hear at
20      different points in times of these individuals screaming
21      obscenities and shut up and everything else under the sun,
22      bitches, everything.  And it just was like it fell upon
23      deaf ears, I felt, because it was like there was no
24      reaction, like what are you doing?  Why are you screaming
25      like that?  You know, that's not appropriate.

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 301

1  Q.  And who in management, sergeant on up, did you see be in a
2      position to hear and see these outbursts by Thielbar?
3  A.  Who would be in fear?
4  Q.  No, who would have seen it --
5  A.  Oh, again, there were several sergeants that would walk
6      through.  Sometimes it was sergeant -- it would be
7      Sergeant Griswold.  It would be Sergeant Smith.  It would
8      be the lieutenant at times.
9  Q.  What lieutenant?
10 A.  Lieutenant -- Lieutenant Burns.
11 Q.  And these sergeants and lieutenants would be there and
12     physically see and hear these profanity and outbursts --
13 A.  They would be.
14 Q.  Let me finish -- outbursts by Thielbar?
15 A.  Yeah.
16 Q.  What did you say?
17 A.  Yes, yes.
18 Q.  Are you aware of them ever reprimanding, suspending
19     these -- or Deputy Thielbar for any of these outbursts?
20 A.  No, I'm not aware of any actions to curve his behavior.
21 Q.  You mentioned Sergeant Matt Smith.  Have you seen him or
22     been there when he made any emotional outbursts?
23 A.  In Master Control at one point --
24 Q.  I'm sorry, let me ask you one question before I move
25     there.

Page 302

1  A.  Yes.
2  Q.  The incidents with Deputy Thielbar, were these also after
3      you testified in the case?
4  A.  Yes.
5  Q.  Now, Matthew Smith, did you see him do any emotional
6      outbursts?
7  A.  Yes.  He was talking to one of the deputies, and the
8      deputy was razzing him.  He was -- I could tell that he
9      was kidding, and so could one other person that spoke
10     about it, and he got very belligerent.  There is a railing
11     that's made out of pipe in the Master Control, and he was
12     beating on it, and he was telling the deputy that if he
13     didn't like the way things were run that he could just
14     quit, he could walk out, or he could get his papers ready,
15     and that he was tired of hearing him cry about not being
16     promoted as a sergeant, and that if he didn't like how the
17     things were handled and how the command staff was awarded
18     things, then he had the choice to leave or he could make
19     sure he left.  And that deputy kept trying to say I was
20     just joking, you know.  I was just ripping you.  I don't
21     know why you are getting like this, and he got louder and
22     said more things to him that were not appropriate, I don't
23     think, for a sergeant to act like.
24 Q.  Were you there?
25 A.  I was there, yes.

Page 303

1  Q.  What inappropriate things -- first of all, was he saying
2      it in a loud, yelling emotional voice, Sergeant Smith?
3  A.  He just said:  You can -- he said:  You can fucking leave
4      anytime.  If you don't like how we do shit around here,
5      you can just fucking leave and quit being a crying bitch
6      about it.  He said:  Why don't you just leave if you are
7      going to act like this?  You are always -- you are always
8      crying like a girl.  You are crying and whining and
9      bitching because you didn't get picked as a sergeant.
10     There is a reason why you didn't get picked for a
11     sergeant.
12 Q.  Was that said emotionally?
13 A.  It was said emotionally, yes, I mean it was emotionally
14     charged by both.  I mean it got emotionally charged first
15     by the sergeant, and then I could feel the tension in the
16     emotional charge from the officer trying to explain and
17     say, hey, you don't got to go this far, Man.  You don't
18     got to be calling me names and stuff, you know.  I'm
19     just --
20 Q.  Was this -- go ahead.  Was this done in front of people?
21     Where was this again?
22 A.  This was in Master Control.
23 Q.  And was this after your testimony?
24 A.  Yes.
25 Q.  When do you think this was, time wise?  We have got -- you

Page 304

1      know, you went off work in late 2017, I think, and came
2      back in 2018, February, I think --
3  A.  Right.
4  Q.  -- for the emotional outburst.  So when was that?  Was it
5      before or after that?
6  A.  It was after I came back.
7  Q.  Okay.  And were there -- other than you, were there other
8      people around?
9  A.  There were other people in the Master Control at that
10     time.  I don't recall exactly who.  For some reason a
11     deputy's name comes to mind, but it would be --
12 Q.  But this was done not just --
13 A.  -- an opinion.
14 Q.  There were more than -- I mean you were there, and who was
15     the deputy?
16 A.  The deputy was Deputy Lane.  We were switching shifts, so
17     there were people in there because they were being
18     assigned there, and we were trying to brief, and then this
19     occurs.
20 Q.  Did you say Lane, L-A-N-E or Lang, L-A-N-G?
21 A.  Yes, L-A-N-E.  Jamal is his first name.  I believe that's
22     J-A-M-A-L.
23 Q.  So this was an outburst to another employee, not an
24     inmate?
25 A.  Right.

76 (Pages 301 to 304)

LORI LYNN HEETHUIS, 9-25-2020

Page 305

1 Q. Do you know if Sergeant Smith was ever suspended,
2   reprimanded in writing, or otherwise for this emotional
3   outburst?
4 A. Not that I'm aware of, no.
5 Q. You mentioned that he used profanity. How -- was it just
6   one time or how many times during this outburst did he use
7   profanity?
8 A. Several times, about every couple words there would be the
9   F or the -- you know, why are you being a bitch. You are
10   just a whiny ass bitch. Just if you don't like how we do
11   things, you can leave or I can make sure you leave, which
12   to me was threatening. Like, you know, I mean that was
13   like, well, is he physically going to make him leave, or
14   was he going to charge him with something to get him
15   fired? I didn't know what that meant, but to me it was
16   hostile and uncalled for.
17 Q. You mentioned pounding -- or you mentioned a railing.
18   What was his physical, his being Sergeant Smith's physical
19   actions during this time that he was yelling?
20 A. He pounded on it. He pounded on it, and it makes a hollow
21   noise because it's just -- it is hollow. It is just a
22   handrail made out of metal, and when you pound on it, it
23   just has this -- just this sound of really just going
24   through something, you know, like a pound that wasn't
25   muffled or anything. It was just -- it kind of radiated

Page 306

1   through, it guess is the best way to explain it, is the
2   pipe kind of radiated through that.
3 Q. Did you -- anything else about this outburst that you
4   remember that you think is important that we haven't
5   talked about?
6 A. Not that I can recall. It was quite a -- it was a good --
7   it seemed like it was a good three to five minutes
8   approximately, and it just was a lot of -- he was very
9   loud, very yelling, never stopped yelling really, and then
10   Jamal, he started to try to explain --
11 Q. When you say he, who do you mean?
12 A. Pardon me?
13 Q. When you say he, who do you mean?
14 A. Sergeant Smith was yelling throughout the entire thing,
15   and he was getting louder and louder because Deputy Lane
16   was trying to explain his situation, that look, Man, I was
17   just kidding. You don't got to get all like that. Come
18   on, Man. What's wrong with you, Matt? And he called him
19   by his first name instead of Sergeant Smith, because they
20   had worked together prior for some time prior to that, so
21   they were familiar with each other, and --
22 Q. Did you report that --
23 A. -- he called him Matt.
24 Q. Did you report that incident to anybody higher up or
25   anything like that?

Page 307

1 A. No. No one did because they were afraid because he was a
2   sergeant, that it was just kind of like a good old boy
3   hookup, so whatever they did was okay, and then you would
4   be on what we call the wheel of misfortune, they used to
5   call it, you will be on the wheel of misfortune if you did
6   that, which meant you will be under scrutiny.
7 Q. Did you report the outburst of Nate Stephenson or Deputy
8   Thielbar, and if not, why not?
9 A. No, because I had already been retaliated against multiple
10   times, and I just felt like the command was there, they
11   heard it. No one else tried to report it either because
12   they were scared for their jobs.
13 Q. Have you -- strike that.
14      You were also, I guess, criticized for the
15   comments you made about the tape, the rape comment and
16   that type of thing, almost rape. Are you aware of any
17   situations where male officers have said things against
18   other officers and nothing has happened?
19 A. Yes.
20 Q. Can you give some -- and are these things that you are
21   aware of after you came back from the -- in 2018, up until
22   when you were discharged?
23 A. Yes.
24 Q. What type of examples do you have about that?
25 A. Well, one -- one comment was made that they hoped that the

Page 308

1   deputy died. One was made about how drunk the one gets
2   and maybe he could get in an accident and kill somebody or
3   kill himself.
4 Q. I'm sorry. Okay. You said that there was one about a
5   deputy dying?
6 A. They said why don't you just do us all a favor and die,
7   something very similar to that. And then the other one
8   was --
9 Q. Let's stay on that. Yeah, go ahead, what was the other
10   one?
11 A. The other one was where they said that they hoped that --
12   they were so drunk all the time, they hoped that they got
13   in an accident and either killed their selves or killed
14   somebody else and went away to prison.
15 Q. Okay. Let's start with the first one. This is one
16   officer of the Muskegon County Sheriff's Department
17   talking about do us a favor and die and talking about
18   another officer of the department?
19 A. Yes.
20 Q. Give me more detail. What are you talking about? Give me
21   the context, give me the names, if you remember.
22 A. The names that I remember were Deputy Thielbar and
23   Sergeant Smith.
24 Q. This is just about the one about do us a favor and die,
25   who are you talking about?

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 309

1 A. The do us a favor and die?
2 Q. Yes.
3 A. That was directed at, I believe, Deputy Harrison.
4 Q. By who?
5 A. By another deputy, a co-worker.
6 Q. Okay. Who was that co-worker?
7 A. Nate Stephenson.
8 Q. So did you hear this comment or did you hear that it was
9 made?
10 A. I heard that it was made on that particular one, because
11 the deputy spoke about it.
12 Q. What deputy spoke about it?
13 A. Deputy Harrison spoke about it.
14 Q. Deputy Harrison?
15 A. Yes.
16 Q. Okay. And did he speak about it either to you or where
17 you were so you could hear him speaking about it?
18 A. He was directing the conversation to me. There were -- I
19 believe there was another person there at the time, and I
20 just said, you know, Darrell, I don't know what to say.
21 Q. What was he saying? What was Deputy Harrison saying?
22 A. He said that -- you know, they were in a disagreement,
23 and the guy popped off and said, which was Nate, and said
24 why don't you just do us a favor and die? And he said it
25 just kind of threw him aback, you know, that another

Page 310

1 co-worker would say something that horrid, you know. I
2 mean that probably wasn't his word, but that was the word
3 that came to my mind as I was hearing that.
4 Q. Okay. Just so we know, both Nate Stephenson and Harrison
5 are males; is that right?
6 A. Yes, they are.
7 Q. Are you aware of Stephenson being disciplined at all,
8 written reprimanded, suspended, any type of discipline,
9 termination or anything for saying that about a fellow
10 officer?
11 A. No, not that I'm aware of.
12 Q. You mentioned -- and when in the context of that did you
13 hear about that or talk -- did Harrison mention it, if you
14 can give me a general time reference?
15 A. I would estimate, from my just estimate of time, it was
16 within a day of it happening. It could have been the same
17 day, but I know it was within just -- if it wasn't that
18 same day, it was just within like a day.
19 Q. And do you remember what year or how long had you been
20 back to work when this happened or a reference that way?
21 A. I had -- I had been back to work at that point in time,
22 and I was -- excuse me, I have a frog in my throat. I was
23 back from being taken off for mentally unfit, and I was
24 back from the investigation, where they thought I was
25 bringing drugs into the facility and tried to get the

Page 311

1 laundry girls to lie.
2 Q. You mentioned somebody talking about I hope he gets drunk
3 and ends up getting killed or something like that. Can
4 you give us some detail about that, what you are referring
5 to?
6 A. Yes. It was about Corey Meyers, and Corey had went on to
7 be a sergeant, so it was about him, because Deputy Herman,
8 I believe it was, was mad at him for something, and that's
9 when he stated as drunk as he gets, maybe he can get drunk
10 enough to where he drives and either kills himself or
11 kills somebody else or both. He said: I'm so sick of
12 him, and I just -- it would just be a world of favor,
13 something to that extent, if that's what happened to him.
14 Q. And that was one Muskegon County deputy talking about
15 another Muskegon County deputy?
16 A. Yes.
17 Q. And was it -- are you indicating you believe it was Herman
18 talking about Meyers or who, or vice versa, or what?
19 A. I believe it was Corey. Corey does drink, and I believe
20 Herman and him had some type of disagreement, and that was
21 said, not in front of Corey, but behind his back.
22 Q. Okay. How did you learn of that? Did you hear it
23 directly, did somebody tell you, or what?
24 A. I heard that one.
25 Q. From who?

Page 312

1 A. I was in the area that it was being said, so I could
2 actually hear what was being said.
3 Q. Oh, you heard it. Okay. You were in the area and you
4 heard it being said?
5 A. Yes.
6 Q. And you heard it being said by Deputy Herman?
7 A. Yes.
8 Q. Were you able to see him or did you know his voice or
9 what?
10 A. I knew his voice.
11 Q. Do you know one way or the other, and if you don't, fine,
12 whether Deputy Meyers ended up hearing of those
13 statements?
14 A. I don't know if he heard of those things or not.
15 Q. Do you know who Deputy Herman was talking to when he made
16 those statements?
17 A. I don't -- I don't recall. I am sorry, I don't recall.
18 Q. But he was talking to somebody --
19 A. (Inaudible).
20 Q. -- he wasn't just saying it nobody --
21 A. Yeah.
22 Q. -- to a wall?
23 A. No. He wasn't talking to a wall. He was talking to a
24 deputy that he was working with.
25 THE VIDEOGRAPHER: Lori, please make sure you

78 (Pages 309 to 312)

LORI LYNN HEETHUIS, 9-25-2020

| Page 313 | Page 314 |
|---|---|
| 1   wait until he finishes the question.  Thank you.<br>2       THE WITNESS:  I'm sorry.<br>3   BY MR. DREW:<br>4   Q.  Do you know one way or the other whether that came to<br>5       management's attention, sergeant or above, those<br>6       statements?<br>7   **A.  I don't know of any, no.**<br>8   Q.  Any other comments like that where one deputy is talking<br>9       about -- or one employee is talking about, you know,<br>10      harming another employee or things of that nature that you<br>11      can recall at this time?<br>12  **A.  Not at this time.  I'm sure there were other times.  I**<br>13  **just -- I don't recall at this time.**<br>14      MR. DREW:  Could you -- Reporter, I'm forgetting<br>15      what exhibit it was, Dr. Beyer's handwritten notes that<br>16      was an exhibit.  I would like to pull that exhibit up.<br>17      THE VIDEOGRAPHER:  I would need to know the<br>18      number.<br>19      MR. DREW:  Laura, do you remember the number?  I<br>20      think it was Exhibit, was 20 or 21?<br>21      THE WITNESS:  It was in the early 20s.  I<br>22      thought it was 21 or 23 maybe.<br>23      MR. DREW:  I think it was 21.  Is that the<br>24      handwritten notes that's about twenty-something pages?  It<br>25      has numbers, Bates numbers in the lower right-hand corner. | 1       THE WITNESS:  What's on the screen?  Is it that?<br>2   I don't know what number it is.<br>3       MR. DREW:  I'm sorry?<br>4       MS. AMTSBUECHLER:  Wait.  How much longer are<br>5   you planning on going?<br>6       MR. DREW:  About 15 minutes.<br>7       MS. AMTSBUECHLER:  Okay.  I mean I'm just<br>8   feeling bad for the court reporter.  I mean I am here for<br>9   the duration, but I don't -- it's really not fair to have<br>10  her keep going.  Are you doing okay, Sharon?<br>11      THE REPORTER:  Oh, you can hear me.  I'm not<br>12  muted.  You know, I am getting very fatigued.  It's been a<br>13  long day.  If it's 15 minutes, I think that's fine.<br>14      MS. AMTSBUECHLER:  All right.  Let me try to<br>15  find the exhibit.  Let me see.<br>16      THE REPORTER:  Yeah, I am trying to search for<br>17  it too.<br>18      THE VIDEOGRAPHER:  I put it on.  Can you see it?<br>19  Is this the one?<br>20      THE WITNESS:  Sheriff Poulin is what I see.<br>21  Just a minute.<br>22      MS. AMTSBUECHLER:  Exhibit 26.<br>23      MR. DREW:  Right.  I just found it.<br>24  BY MR. DREW:<br>25  Q.  Okay.  I'm going to refer to the pages at the -- the Bates |

| Page 315 | Page 316 |
|---|---|
| 1       stamp numbers at the bottom, which will make it easier for<br>2       me to go to it.  So you saw this doctor while you were<br>3       off, while you were taken off by Auffrey for the emotional<br>4       outburst; is that right, Lori?<br>5       MS. AMTSBUECHLER:  Objection to the form of the<br>6       question.<br>7   **A.  Yeah, they told me I had to see a psychiatrist before I**<br>8   **could come back.**<br>9   BY MR. DREW:<br>10  Q.  Go to Bates stamp page 7 at the bottom.  Is that up?  It's<br>11      a lot of handwritten notes.<br>12      THE VIDEOGRAPHER:  Can you see it?<br>13  BY MR. DREW:<br>14  Q.  Can you see that?  Anyway, I have a bigger copy, and the<br>15      notes seem to say -- there was a quote, "You are a piece<br>16      of shit and won't ever be anything else, that you told<br>17      him, why don't you just end it."  Do you recall telling<br>18      the doctor about that comment?  Assume I read it right.<br>19  **A.  Now that -- now that that is said, I do recall saying it.**<br>20  Q.  Who did that, was that somebody that said something or was<br>21      that something that was said to you?<br>22  **A.  I'm trying to recall.  From what I recall, it was said to**<br>23  **me.**<br>24  Q.  Do you remember who it was said to you by?<br>25  **A.  I believe it was Deputy Herman that stated that, I** | 1   **believe.  It has been some time since that, but I -- that**<br>2   **comes to mind.**<br>3       MS. AMTSBUECHLER:  What are you reading there?<br>4   I don't see this.<br>5       MR. DREW:  I'm reading -- it's up a little<br>6   higher, right there.  The paragraph that says ACLU to<br>7   testify on behalf, verbal abuse, et cetera, then quote,<br>8   "you are a piece of shit," right there.<br>9   **A.  Okay.  So --**<br>10  BY MR. DREW:<br>11  Q.  All right.  Moving on, you saw Dr. Beyer, and he<br>12      absolutely felt that you had been able to return to work;<br>13      is that right, and work?<br>14  **A.  Yes, that's what I was told by him.  He also stated that**<br>15  **my mental was fine, that he didn't see anything wrong with**<br>16  **it, and that I had not exhibited any type of tirades or**<br>17  **anything that Dr. Auffrey had stated, and that it was**<br>18  **improper for Dr. Auffrey to talk about meds because only**<br>19  **psychiatrists can talk about it, a person's meds or**<br>20  **prescribe them, psychologists cannot.**<br>21  Q.  You were mentioning about inmates they would not answer or<br>22      put the call buttons on mute.  Is that a violation of<br>23      policy?<br>24  **A.  I believe it would be because of conduct, because of the**<br>25  **fact that some of those people may have needed life or** |

LORI LYNN HEETHUIS, 9-25-2020

## Page 317

1    death help, such as the gentleman who died on April 4th.
2  Q.  What was that, what do you mean?
3  A.  There was an inmate that was going through withdrawals,
4    and they were not giving him his Klonopin, and they put
5    the sheet of black -- like magnetic stuff over it, and
6    they muted his button, and it came out with TV 8, I
7    believe, they came out with a full version of the tape,
8    because the sheriff had said that they were having
9    trouble, the IT department was having trouble.  So I'm not
10    exactly sure how it happened, but you could see him, and
11    the reporter said that he had seized multiple times, I
12    can't exactly remember how many throughout the night, and
13    there was only one officer that lifted it just enough --
14    the black thing just enough you could see it on the video
15    to kind of say that he peeked in there, but not really,
16    and so...
17  Q.  So he muted the call buttons and put something over the
18    window?
19  A.  Yeah, they would mute the call button, and then they would
20    put this -- it's a thin like magnetic strip, and it
21    couldn't just stick to the window, it had to stick to the
22    metal of the door, so that there was no way really to
23    visually see in.  I mean they could have moved the camera
24    to that spot to watch, but they wouldn't be able to
25    visually be able to see him, and they had him, I believe

## Page 318

1    at that time in a suicide gown.  So it's very imperative
2    that we be able to see the people who are down there for
3    being potentially suicidal, to be able to physically view
4    them so that they cannot hurt their selves during that
5    time.
6  Q.  Were these males -- were these male officers that had done
7    that?
8  A.  Yes.
9  Q.  Would this be a violation of policy, and do you know if
10    they were reprimanded?  Someone died.  Were they
11    reprimanded for it, do you know?
12  A.  I know that they are being sued, so but to my knowledge,
13    nobody has been reprimanded for that at all.
14          MS. AMTSBUECHLER:  Foundation.
15  BY MR. DREW:
16  Q.  You were advised when they had the last chance that if you
17    did not sign that, you would be terminated; is that right?
18  A.  Yes.
19  Q.  And who advised you of that?
20          MS. AMTSBUECHLER:  Asked and answered.
21  A.  It was Ed Fox, Ed Fox, the undersheriff, and I believe the
22    sheriff stated it too.
23  BY MR. DREW:
24  Q.  And the paragraph that you had a problem with, you called
25    at 9, and then at other times you called at 11.

## Page 319

1  A.  I misspoke myself.
2  Q.  All right.  The paragraph was in consideration of this
3    agreement you hereby release the employer, and the Union,
4    their agents and employees, from all claims, damages,
5    liability, related to, arising from, toughing upon, or
6    concerning your employment or the negotiation or execution
7    of this agreement.  Did I read that paragraph right as you
8    remember it?
9  A.  Yes, that's correct.
10  Q.  And I won't pull it up to save some time.
11  A.  Yes.
12  Q.  And --
13  A.  That's it.
14  Q.  And when you -- I'm sorry, go ahead.
15  A.  That was number 11.  I just wanted to clarify that I had
16    misspoke myself earlier for just a moment.  I said, I'm
17    sorry, it wasn't 9.  It was 11.
18  Q.  Well, I read what was in paragraph 9.
19  A.  I believe you read number 11.
20  Q.  Well --
21  A.  I'm not -- I'm tired right now, Mr. Drew.  I'm sorry.
22  Q.  I'm looking at Exhibit 15, okay?
23  A.  Okay.
24  Q.  That's paragraph 9 in that exhibit that I read.
25  A.  Okay.  Then it was 9.  I'm sorry.  There were 11 total.

## Page 320

1    It was 9.
2  Q.  At that time did you feel that you were still being
3    retaliated against because you had testified in the
4    inmate -- female inmates' case?
5  A.  Yes, I did feel that.  I felt that they were just trying
6    to take all of my rights away, my civil rights from
7    before, during, or to the end of my career, that I could
8    not discuss or bring up any misconduct by any officer,
9    unbecoming conduct in the officer, whether it be past,
10    present, or future is the way I understood it when I read
11    it, signed when I read it.
12  Q.  As you understood it then, you would be giving up any
13    claim you may have had about how they were retaliating
14    against you if you signed this --
15          MS. AMTSBUECHLER:  Objection to foundation.
16  Q.  -- if that continued; is that right?
17          MS. AMTSBUECHLER:  Objection to foundation.
18  BY MR. DREW:
19  Q.  Well, let me -- you felt that you would be giving up any
20    claim you had to the retaliation for having testified in
21    all of the things that they had been doing to you up to
22    that point; is that right?
23  A.  Yes, that is correct.
24  Q.  And do you still feel that way reading that language, of
25    you are releasing them from all claims, touching upon, or

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 321

1    any liability related to, arising from, touching upon, or
2    concerning your employment?
3    **A. Yes, I still believe that today.**
4         MR. DREW: That's all I have.
5         MS. AMTSBUECHLER: Did you say you are finished?
6         MR. DREW: I said I'm finished with questioning
7    her at this point, yes.
8         MS. AMTSBUECHLER: Okay.
9              RE-EXAMINATION
10   BY MS. AMTSBUECHLER:
11   Q. Just a question on this doctor's note about the quote,
12   about quote, "you are a piece of shit and you won't ever
13   be anything else, why don't you just end it," it looks
14   like it is -- they are talking about your ACLU testimony.
15   Is that something that you were telling -- saying that you
16   testified that other people said to the inmates?
17   **A. No. I'm not really sure. I -- it could have been -- I**
18   **didn't really -- I wasn't able to do it real thoroughly,**
19   **and it's really hard to read some of his notes that you**
20   **had pulled up, so I'm not really sure if it was something**
21   **they had said to me or something they had said to one of**
22   **the females. I'm just not -- I'm not sure.**
23   Q. Who said it?
24   **A. At this point I don't recall. I'm sorry.**
25   Q. So you were asked a lot of questions about things that

Page 322

1    have happened after your testimony in the ACLU hearing.
2    Would you agree that Sheriff Roesler was the sheriff from
3    October of '16 through at least November of '17 when the
4    new sheriff was elected, although he had not officially
5    taken office yet?
6    **A. The -- Sheriff Roesler had taken off prior to actually**
7    **losing, and so I'm not quite sure --**
8         MS. AMTSBUECHLER: All right. Okay. I don't
9    have anything else.
10   **A. -- what you are asking? Sorry.**
11        MR. DREW: We are done.
12        VIDEO TECHNICIAN: Thank you. That concludes
13   the deposition of Lori Heethuis. We are off the record,
14   7:23 p.m.
15        (The deposition was concluded at 7:23 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 323

1    STATE OF MICHIGAN )
2                     ) SS
3    COUNTY OF WAYNE  )
4
5         I certify that this transcript, consisting of 323
6    pages, is a complete, true, and correct record of the
7    testimony of, LORI LYNN HEETHUIS was remotely sworn to tell
8    the truth.
9         I also certify that prior to taking this
10   deposition, LORI LYNN HEETHUIS was remotely sworn to tell
11   the truth.
12        I also certify that I am not a relative or
13   employee of or an attorney for a party, nor a
14   relative or employee of an attorney for a party, nor
15   financially interested in the aforementioned action.
16
17
18
19
20
21   *Sharon Bayerl*
22   Sharon Bayerl, CSR 3406
23   Notary Public,
24   Wayne County, Michigan.
25   My Commission expires: June 9, 2025

Chapa & Giblin Court Reporters
(248) 626-2288

LORI LYNN HEETHUIS, 9-25-2020

Page 324

**A**

**a.m** 1:22 6:3,6
17:15 20:5
21:12 23:14
25:16 29:22
33:17 34:17
38:6 40:15,16
40:17,19 41:6
41:24 49:24
55:21 65:10,11
65:12,14
**aback** 309:25
**abide** 26:7,9
**ability** 10:10
32:22 55:14
184:24
**able** 8:22,25
62:18 82:9
89:18 91:2
98:18 101:2
113:6 154:9,9
165:13,17
166:14 173:1
174:5,7 175:17
186:21 229:17
232:15 240:24
248:8 252:6,15
265:13 269:18
285:19 293:12
293:24 294:2
298:4 312:8
316:12 317:24
317:25 318:2,3
321:18
**above-entitled**
1:18
**Abraham** 13:2,3
13:6,9,15,18
**abruptly** 238:18
**absolutely** 30:25
31:10 37:9
126:23 155:25
257:4 316:12
**abuse** 316:7
**abused** 286:2,5

286:17
**abusing** 215:16
**abusive** 287:8,9
**Academy** 15:25
**accept** 196:19
196:19 206:4
292:10,15
**accepted** 197:5
**accident** 110:16
122:6 308:2,13
**accidently** 116:3
**account** 74:21
186:18 187:8
187:11,15
207:21 228:25
**accountable**
228:25
**accounting**
157:19
**accurate** 16:17
17:2 93:6
94:17 95:9,11
106:5,6 112:18
136:6 203:12
203:17
**accurately** 8:25
**accusing** 217:25
218:15 294:7
**acknowledged**
103:21
**ACLU** 10:16
58:6 59:13
61:2,16,19
62:11 221:25
275:9 288:9,22
290:8 298:22
316:6 321:14
322:1
**act** 27:2 196:15
220:24,24
263:11 302:23
303:7
**acting** 1:20
290:25
**action** 323:15
**actions** 41:9

266:14,16
301:20 305:19
**active** 39:21
**activities** 102:7
**actual** 30:15
52:15 74:23
100:14 229:13
**added** 54:10
**addendum**
261:17,19
**adding** 274:16
**address** 198:21
**addressed** 54:15
280:12,12,14
280:15
**adequately** 44:6
**ADHD** 9:23
216:15,17
**adhered** 37:5
**administer** 7:20
**administration**
145:10
**administrative**
50:7 85:8
147:17 206:21
220:21
**administrator**
19:25 159:21
267:15,20,23
296:22
**adult** 216:17
**advise** 258:22
**advised** 224:24
318:16,19
**afford** 174:10,21
**afield** 232:6
**aforementioned**
265:23 266:17
323:15
**afraid** 307:1
**afternoon** 56:11
86:23 91:4,5
151:16 162:1
**afternoons**
174:23,24
**age** 156:22,24

**agent** 43:21,22
43:24 44:1,11
44:15 45:13
137:24
**agents** 144:14
195:14 319:4
**aggravated**
188:19
**aggressive**
235:17,19
**agitated** 258:5
258:15
**ago** 12:6 42:23
74:22 100:19
188:17
**agree** 7:2 17:7
91:14 161:1
259:14 322:2
**agreed** 13:10
197:4 206:4
**agreement** 6:23
6:24 42:10,17
42:21 45:2
136:16 137:15
138:10 143:6,8
143:12,15
145:14,17
148:16 149:12
149:16 151:9
151:13 160:10
161:11 319:3,7
**Agreements**
145:8
**ahead** 71:14
73:11,24
124:20,21
139:11 152:1
211:18 217:11
232:25 234:5
234:18 255:18
256:3,5 278:5
286:13 294:18
303:20 308:9
319:14
**ahold** 125:5
139:12

**ailment** 188:8
**alarms** 93:18
**allegation** 48:11
48:15 193:12
**allegations**
47:17 48:2,10
49:14 58:15
119:12 126:24
127:2,10,12
**allege** 142:10
**alleged** 228:15
**allegedly** 77:14
**allergies** 9:12
**allow** 37:2 84:14
**allowed** 36:8
76:22 201:22
218:8,22
220:14 253:15
253:17,17
269:19 271:1
**allowing** 204:13
252:22
**alongside** 102:4
**alphabetical**
88:18
**altitude** 161:13
**ambushed** 146:8
**amended** 23:19
**America's** 189:4
189:9
**amitriptyline**
10:3
**amount** 33:11
50:25 262:14
262:16 266:21
293:16
**Amtsbuechler**
2:12,13 3:7,11
7:6,6,12,16,18
8:10,14,15
17:16 20:6
21:13 23:15
25:17 29:23
32:6,7,12,19
33:1,4,7,10,14
33:20,25 34:18

38:7 39:7,16
40:12,14,20
41:1,7,14,16
41:25 49:25
65:8,15,21,25
70:24 71:2,5,8
71:10,17 73:14
73:19 74:1,4
77:2,10 102:19
104:17,19
115:9,18,20,25
116:9,18,25
118:13 120:14
120:23 121:8
122:18 123:11
137:12 147:8
150:25 152:4
152:11 153:6
163:2 164:4,7
164:8 166:7
170:9,14,15
174:19 176:16
180:6 181:17
181:20,24,25
191:14,22
192:3,5,8,12
193:2,18,20
208:12 209:5
210:13,17
211:17 219:14
220:6 223:5,16
227:18,20
232:17 233:7
233:15,22,24
234:6,7 237:9
237:12 248:16
248:23 249:9
250:4 253:8
257:20,22
259:8 260:17
263:12 265:6
267:21 269:13
270:21 271:7
271:13,16
274:18 279:1,3
279:4 286:14

287:22 314:4,7
314:14,22
315:5 316:3
318:14,20
320:15,17
321:5,8,10
322:8
**Amy** 209:15
273:18 285:5,9
**and/or** 202:6
265:25 266:3
**Anderson** 186:6
227:24 228:3
**Anding** 2:5
**animals** 275:20
279:21
**Ann** 148:19
149:3,4,6,7,10
149:10 151:6
151:24 153:21
154:7,25 155:3
155:14,15,21
156:18,20
157:16 162:3,5
162:21,22
163:7 164:15
165:4,23
166:13 167:17
167:20 170:16
170:22 172:10
**announce** 6:25
**annual** 191:8
**answer** 8:25
14:19,22 15:10
15:12 32:13
33:6 36:18
50:23 60:25
64:12 70:25
76:4 77:8
82:24 89:18
93:21 94:24
101:19 121:17
121:17 125:6
136:8 140:20
180:20 187:2
211:15 226:14

237:11 243:22
249:5,10 266:8
272:6,7 273:15
273:15 274:16
284:6 287:16
287:18 288:24
289:11,16
316:21
**answered** 33:9
233:19 273:16
274:14 295:25
318:20
**answering** 14:16
33:3,5 96:11
96:12 121:14
146:14 257:18
272:21
**answers** 77:3
89:13 180:8
207:12 289:18
**Anti-Harassm...**
20:8 23:21
**Anti-Retaliati...**
21:16 23:21
**anxiety** 9:23
167:1 243:21
**anybody** 22:18
25:7 31:25
32:8,14 45:1,6
47:22 59:21
62:13 63:6,14
63:20 64:14
67:1 69:12,12
72:18 73:1
74:6 82:6 87:9
87:10 112:2
119:3 129:11
136:9 144:18
144:20,22
145:4 146:9,9
162:19 178:11
185:13,13,16
185:24 186:20
197:9 202:6
213:13,15
219:6 221:18

222:10 230:1
231:6,8 234:20
234:22 236:2
239:17 241:14
251:25 262:23
278:20 280:21
285:9 286:21
306:24
**anymore** 80:24
148:10 179:16
186:5 231:17
**anytime** 91:7
151:21 303:4
**anyway** 66:1
71:20 91:22
213:19 315:14
**anyways** 168:3
264:5 272:11
**apartment**
11:17,21
**apathy** 214:16
214:17
**apnea** 214:18
**apologies** 197:5
206:5
**apologize** 89:16
89:20 121:20
174:16 196:11
196:16,16
253:3 292:7,14
**apologized**
196:9,24
197:16 229:6
291:24,24
**apology** 196:19
292:10,15
**app** 190:17
**apparently**
50:11 91:21
199:19 240:17
262:3 288:22
**APPEARAN...**
2:1
**appeared** 85:11
85:24
**appearing** 2:10

2:18 7:8
**application**
184:16
**applications**
181:6 183:24
**applied** 180:10
180:11,15,23
181:15 182:7
182:11 185:8
**apply** 183:9
184:13
**applying** 182:7
**appointment**
206:22
**appointments**
183:7,8
**appreciate** 71:9
156:13 168:25
**appropriate**
87:17 131:1,19
300:25 302:22
**approximate**
43:24 290:1
**approximately**
10:8 12:6
22:21 39:18
44:3 56:24
74:23 87:1
94:14 128:13
140:14 171:20
172:2,11 210:2
237:15,18
238:16 250:2,7
269:20 306:8
**April** 84:3
122:12,25
123:6,16,23
124:2,3,7,9,10
124:14,23
125:8,19 126:7
127:18 128:10
129:2,4 134:2
135:10 136:10
136:19 147:3
151:1,4 162:14
164:3,11

169:22 175:3
177:6,13 178:4
178:15 254:16
317:1
**area** 57:10 93:8
93:9,10 97:25
101:11,23
102:12 109:4
109:10,13
110:14 192:15
249:18 250:9
283:8 295:21
297:13,20,22
298:3,3,5,7,10
312:1,3
**areas** 236:4
250:8 297:19
**Arends** 177:20
178:8
**argumentative**
146:18
**arising** 319:5
321:1
**arrangement**
6:22
**arrow** 212:4
**aside** 62:21
**asked** 11:20
13:9 26:20
28:16 49:9
52:9,9 64:18
73:22 84:15
87:11 111:20
111:22 112:2
112:24 122:1
124:15 126:12
126:20 128:2
140:9,11
143:20 146:1
153:12 164:23
184:2,6 198:3
201:17 204:22
210:13 225:18
235:11,11
238:10 242:17
247:14 253:20

255:10 262:25
269:21 273:2
276:13 277:3,8
283:25 288:23
289:18 318:20
321:25
**asking** 14:16
15:4 25:4 43:1
52:4 71:2
72:15,16 76:2
93:18 96:24
101:14,14
121:12,18,21
125:12 128:11
130:24 180:23
187:1,1,2,17
211:13 212:20
215:6 221:11
224:17,18
226:14 232:7
232:11 233:2
233:25 239:20
243:23 251:6
255:25 280:24
280:24 295:8
300:14 322:10
**ass** 305:10
**assault** 234:20
278:13
**assaulted** 59:2
114:15 117:21
206:16 209:18
215:3 229:10
234:8,11 286:2
286:5,16
**assaulting**
234:22 246:13
**asses** 299:9
**asshole** 119:3,5
**assigned** 225:5,9
230:16 304:18
**assist** 86:17,18
194:3 276:7
**assistance** 198:3
271:21,23
**assistant** 238:23

**assisting** 45:18
**associates** 15:23
**assume** 15:12
48:13 115:5
263:20 264:22
315:18
**assumed** 98:23
100:23 134:1
150:8
**assuming** 13:25
151:18
**assumption**
13:11
**assure** 126:22
**astro** 131:5
**astroid** 133:5
**ate** 51:25
**Ativan** 10:4,5
**attached** 3:16
**attacked** 217:13
275:23
**attacking**
226:18
**attended** 24:7
25:9
**attending** 24:23
**attention** 28:7
56:2 272:24
313:5
**attentive** 29:14
**attesting** 24:6
**attorney** 7:1,7
8:16 14:1,3,8
64:21 74:17
112:14 128:15
129:17 136:2,7
139:7,9,14,18
214:4 264:23
264:24 270:17
270:20 288:22
289:12 323:13
323:14
**attorney's** 182:8
**audio** 72:23,25
73:14,17,21
74:5,8,13

99:14 116:20
122:1,2,7
127:22 136:3
152:5 178:11
248:16,17
**Auffrey** 206:13
206:23 208:2,7
208:14,19
219:23 220:2,8
292:19,25
293:8,11,14,18
315:3 316:17
316:18
**Auffrey's**
219:17
**August** 117:25
290:2
**authorities**
215:3
**authorization**
210:15
**autistic** 285:2
**automatically**
171:11
**autopilot** 258:16
**available** 143:21
184:2,7,11
**Avenue** 2:6 6:12
**avoid** 27:7
**awarded** 302:17
**aware** 9:2 18:15
18:17,21 19:1
19:7,15 20:23
21:24 23:20
24:22 26:4,7,9
26:17,21,23
27:15 28:7
30:1,4,8,13,15
30:18 35:21
36:10,17 37:24
38:15 42:16
45:2 47:3
58:22,22 60:7
64:24 77:21
78:1,10 92:11
143:15,21

165:21 178:13
190:4 222:22
224:8 230:2
234:25 236:3,5
248:14 249:6
253:19 263:20
268:6 276:11
277:22 278:6
278:11 280:13
280:14 283:6
294:5 295:2
298:19 301:18
301:20 305:4
307:16,21
310:7,11
**awhile** 188:5
199:17 234:5
246:17 264:10

---

**B**
**B-E-Y-E-R**
209:7
**back** 13:10 23:6
31:10,16 33:15
35:15 37:12
39:9 40:17,18
41:2 42:23
48:6,23 50:17
51:16 58:23
60:22 65:12,13
71:1,3 73:14
74:16 83:22
84:16,17 86:1
86:2,3 88:4,24
89:1,5 102:20
107:23,24
113:20 114:15
114:21 117:20
118:5 120:6,9
120:19 121:4,5
121:9 123:2,21
130:17 131:12
132:3 134:21
135:2 136:10
137:14 138:17
139:25 140:2

140:11 142:6
142:21 147:10
147:22 148:24
150:11 151:12
152:9,10
153:17,24
154:14,22,23
155:4,6 156:4
157:3,3,21
161:2 162:8
164:10 165:7,7
165:16 167:12
168:24 173:25
177:22,24
178:2 179:9,25
180:1,16
183:18 185:20
185:21 188:3,5
188:21,24
191:19 194:9
195:15 199:13
199:17,23
206:23 219:23
219:24 220:1
223:10,11,21
223:21,22
229:11,22
232:16 233:13
236:3 239:2,16
243:20,20,22
246:4,18 247:8
247:16,17,22
248:20,21
249:14,17
251:13 261:16
263:6 264:11
266:7 277:3
278:14 280:25
288:1,4,5
293:12 296:8
299:1,6 304:2
304:6 307:21
310:20,21,23
310:24 311:21
315:8
**background**

13:25 99:23
220:19
**backwards**
191:25
**bad** 119:17
148:21 176:1
185:7 225:1
270:15 294:7
314:8
**bag** 83:11,13
**bank** 86:15
204:12
**banks** 47:22
**barbiturates**
208:22 293:17
**Bargaining** 42:9
42:17,21 45:2
**barring** 143:12
**bars** 254:5
**base** 272:5
**based** 167:16
225:18
**basement**
229:18
**basic** 275:4
**basically** 45:24
58:16 60:16
80:15 81:1
138:5 144:16
149:18 160:8
172:4 201:22
213:14 240:18
250:22 252:13
**basis** 59:4
145:12 185:1
237:9 267:25
**Bates** 18:1 20:9
21:16 23:17
25:19 30:1
38:10 50:1
137:19 169:17
170:10 193:16
208:14 209:11
219:16 220:8
223:18 259:10
260:20 261:21

264:19 265:17
313:25 314:25
315:10
**bathroom** 9:16
55:10,11 93:19
94:2,5,6,7,16
95:2,3,11,13
95:16,19,21,24
96:3,4,9 97:1,2
97:5,5,7,9,12
98:12,14,17
101:25 102:1
103:5,18,22
104:5 105:10
105:12,14,19
106:8,12
111:18 112:4
112:20,21
113:2,10
116:23 124:17
124:23 136:2
205:8
**battle** 138:24
**Bayerl** 1:19 6:15
6:17 323:22
**Bear** 17:22
49:18 223:2
**beating** 302:12
**beats** 197:2
**bedding** 86:19
**beg** 173:17
**begging** 202:25
235:24
**beginning**
164:10
**behalf** 2:10,18
316:7
**behavior** 301:20
**beings** 27:24
**belief** 47:19
184:24,25
215:23 267:25
**believe** 9:8 10:9
11:3 13:19
14:15 18:9,22
22:6,15,21

28:21 32:17
35:3 43:6,7,10
43:14 44:1,6
44:11,15,18,20
44:21 45:10,17
46:20 47:2,7
47:19 49:3
50:16,17,20
51:5,18 54:9
54:21 55:16
56:10 58:3,8
58:13,24 59:4
59:12 61:18
62:1,25 67:7,7
67:22 78:1,10
84:17 85:25
89:2,21 92:22
97:6 98:16
110:9,11,24
111:2 113:11
116:21,22
133:10 134:14
134:16,18,23
144:9 146:7,7
162:6 164:23
164:25 168:1
168:13,20,21
170:3 171:24
177:1,2,22
178:7 181:15
184:22 186:5
186:19 187:11
188:21 193:6
193:23 197:19
205:4 208:22
214:15 216:5
218:7 220:13
221:7,20,23
222:2,10 224:3
226:21 227:14
228:4 229:11
231:21 233:3
234:15 235:10
237:3,21
239:20 241:6
244:11,21

247:16 251:9
254:4,7 255:4
256:15,16
257:7,10
263:19 267:12
267:15,19,20
267:22,23
268:11,16
269:17 272:3
272:25 274:21
275:6 276:10
276:10 279:6
281:25 286:4
287:9 290:3,6
290:24,25
292:22 297:13
297:16,23
298:2 304:21
309:3,19 311:8
311:17,19,19
315:25 316:1
316:24 317:7
317:25 318:21
319:19 321:3
**believed** 19:8
21:25 58:3
63:2 64:1
71:20 167:11
167:11 273:25
296:3
**belligerent**
302:10
**belt** 96:18,19,20
**belts** 96:21
**beneficial**
273:22
**benefits** 154:12
155:17,23
189:23
**Bennett** 12:3
**Bergman**
209:15
**best** 13:19 27:3
27:13,14 32:21
34:14 35:3
43:6 55:14

LORI LYNN HEETHUIS, 9-25-2020

Page 328

56:24 66:8 76:5 110:11 121:17 132:8 136:1 138:1,15 155:8 189:4,9 195:13 261:9 272:14 289:24 306:1

**better** 12:17 39:17 92:4 99:8 116:19 153:17,17 158:10 160:9 190:18,19 243:3 244:7 273:17 275:7

**Beyer** 209:6,8 211:12,18 217:5 219:20 220:12,12 293:7,7,23 294:1 316:11

**Beyer's** 210:21 210:24 216:23 313:15

**beyond** 113:24 118:14 155:12 197:7 209:22 233:21

**bid** 55:16

**big** 83:11,13 103:24 155:2 156:25,25,25 204:20 205:22 240:19 243:17

**bigger** 41:11 191:23 315:14

**bill** 158:7

**bills** 173:15 174:2,4,12 204:7

**birthday** 154:21 167:3 193:24

**bit** 13:24 20:14 20:15,15 21:19 21:20 25:21

38:17 39:2,3 65:5 66:6 83:24 91:13,18 106:24 135:17 138:16 146:11 146:12 151:10 182:10,24 190:21 229:1 232:6 255:14

**bitch** 84:23 85:4 86:12 88:3,11 88:25 89:9 114:8 227:3,4 227:9 272:19 303:5 305:9,10

**bitches** 295:5 299:14,19 300:5,22

**bitching** 303:9

**bite** 158:5

**black** 282:2 317:5,14

**blacklisted** 234:17

**blank** 43:17,18

**blanket** 52:25

**blankets** 52:25

**bled** 255:14

**bleeding** 190:21

**bleeped** 133:8

**bleeping** 133:7

**bless** 217:4,9,10

**blink** 281:25

**block** 203:9 204:2

**blunt** 132:13

**Board** 263:13

**boards** 62:16

**body** 251:10

**Boike** 1:10 2:22 6:9 7:8,15 8:16 92:10,12 93:9 93:10,17 94:23 95:7,13,15 96:2,5,8 97:24 98:23 99:25

100:21 102:13 102:22 103:21 103:24 108:13 119:3,5,6,8 121:7 124:24 136:3 217:23 218:19

**book** 194:14,23 281:21 297:20

**booking** 36:1 297:20

**bookings** 297:19

**books** 36:5,25 179:5

**Borgman** 209:15,16,25 273:18 285:5,9

**bother** 117:9

**bottles** 36:6

**bottom** 102:23 170:12 259:17 315:1,10

**bought** 178:25 190:9

**bowl** 107:19

**box** 42:25 88:8 196:2

**boxes** 42:24 211:4 264:13

**boy** 307:2

**boyfriend** 285:18

**boys** 284:19

**Bracey** 239:12 261:7,11,19 262:10,13,22 263:3 264:9,18 264:20

**brain** 122:13 223:21

**brands** 190:25

**breach** 98:10 100:1

**break** 15:1 56:7 56:9 115:24 120:24 121:6

167:8 179:21 182:10 223:4

**breakdown** 177:23

**breaks** 14:25

**breast** 236:7

**breasts** 235:22 237:6 240:7

**breath** 283:24

**brief** 229:18 304:18

**briefing** 96:7 229:25

**bring** 56:11 83:8 84:14 141:8,9 141:10,14,18 142:6 162:7,7 162:8 169:4 184:3 220:1 225:8 320:8

**bringing** 50:12 50:15 52:7 132:15 222:15 245:4,9 251:4 251:8 310:25

**Brittany** 78:8 83:4,7

**broke** 69:24 121:25 255:14

**brothers** 90:4

**brought** 54:21 54:23 56:1 60:21 61:15 120:6 125:16 151:5 165:3 169:12 181:12 204:9,10,17 208:3,3 217:3 219:24 245:8 245:14 246:9 263:6,7,9 272:23

**Brown** 111:22 112:5,6 113:14 126:6,7,20 129:12 130:19

134:9 222:20 222:21

**brush** 231:1,3

**budge** 255:24

**built** 159:22 236:21

**bunch** 54:24 83:9 132:5

**bunched** 205:12

**buried** 291:25 292:3

**Burns** 22:17,22 23:9 45:10 58:14 59:14 61:4,24 62:2 62:20 63:7,11 63:17,22 69:16 70:3,9,16 71:11,21,24 72:7 78:11,17 79:10,13,15,17 79:19 80:7,21 81:2 89:25 90:9,23 92:9 92:14 223:23 224:1 225:13 225:21 226:3 239:25 240:9 241:11,12,13 241:18 272:2 272:24 283:11 283:13 288:12 290:10,16 291:9 297:1 298:7,10 301:10

**Burton** 196:23 272:12 273:12 284:22,22

**Burton's** 273:10

**Burton-Jones** 78:12 178:8 257:2 272:11 273:11

**business** 43:16 43:19,21,22,24

LORI LYNN HEETHUIS, 9-25-2020

44:1,11,15
45:12 137:24
**busy** 31:8 62:14
82:10 96:15,16
194:3 206:3
**butt** 229:16,20
230:9,24
235:13 237:17
240:7
**button** 101:8
195:21 280:17
280:22 281:17
281:17 282:6
295:4 296:5
317:6,19
**buttons** 198:9
281:20 282:11
316:22 317:17
**buy** 52:13
**buzz** 137:17
**buzzer** 194:12
194:13,21
195:25 197:3
292:12 295:3
299:15 300:2
**buzzers** 93:17
96:11 98:3
**buzzing** 57:23
196:12

**C**

**C** 2:21 6:14
**cackling** 256:23
**Cadillac** 154:24
**caged** 196:3,4
**cake** 154:6
**calculation**
172:10
**calculations**
171:22
**calibrating** 12:4
**call** 63:4 89:9
92:9,15,16,19
93:15,20 94:10
97:3,4,8 98:9
100:1 106:10

106:13,15,17
107:2,6,10
111:11 112:3
112:14,16,22
112:23 114:7
116:22 119:3,5
124:15,19,24
125:7,13
130:10,13
132:10 133:15
133:16 135:20
139:7,7,8,10
139:16 148:19
149:1,2,7
168:4,10,10
174:5 184:4
185:8 254:7
273:16 276:6
276:14 280:18
281:22,23,23
282:11 295:3
307:4,5 316:22
317:17,19
**called** 8:6 30:21
43:21 44:12
64:7 84:23
85:4,9,15 86:1
86:10,12,14,16
88:2,23,24
89:21 90:16
94:7,18 111:3
111:10 112:23
114:8 125:1,18
131:2 133:16
135:6 139:12
139:15,16
147:17 149:3,4
153:25 154:23
157:19 162:22
165:7,7 168:16
182:21 184:2,5
185:15,16,20
185:21 190:13
196:7 205:6
238:23 240:9
241:23 255:17

256:1 269:21
272:2,19 284:1
284:10,11,12
284:14,17
295:5 300:5
306:18,23
318:24,25
**calling** 111:3
227:9,10
246:19 283:22
297:25 299:18
303:18
**calls** 96:12
131:15,18
133:13 183:5
185:22 271:20
271:23 272:4
272:21 273:15
**calm** 226:17
255:10 276:6
**calming** 276:9
**camera** 317:23
**cameras** 229:22
236:4,13 250:8
**cancelling**
199:14
**cancer** 141:2
166:23 173:25
188:18,19,20
188:25 189:2
212:24
**Canteen** 224:3
**captain** 16:20
19:25 22:3
26:19 28:19,21
46:3,6,6,13,14
46:16,20,23,25
47:8,10,13,18
48:8 99:6
111:22 112:5,6
113:14,18
125:21 126:6,7
126:15,20
129:8,12 134:9
222:13,18,19
222:20,21

247:2,3 256:15
257:6,15
263:15 277:15
284:23,23
**captains** 44:13
**car** 102:8 134:20
135:1 156:1
**care** 55:5 132:10
132:11 163:21
173:8 204:20
273:1
**career** 18:15,17
18:21 19:1
73:3 191:9
234:17 320:7
**careful** 53:21,25
195:4 257:3
**Carla** 177:2
**Carrie** 217:23
**carry** 197:24
**cart** 194:14,23
**case** 1:7 6:7,11
10:16 11:2,3
61:19 110:10
173:20,24
188:17 221:25
282:11 290:9
298:22 302:3
320:4
**cases** 110:18
**cash** 174:18
175:6,9
**caught** 158:1
161:4
**cause** 1:18 7:25
31:23 257:7,16
**caused** 244:17
258:2
**causing** 12:9
243:21
**cell** 55:17 299:2
**cellphone** 53:11
57:15 110:8
145:20,23
171:8,9 197:18
282:17

**cellphones**
57:17 64:19
282:15 283:14
**cells** 109:21
299:3,4,5
**cellular** 253:14
**central** 183:16
184:16
**certain** 59:20
84:6 179:7
190:25 236:4
261:6 287:20
299:4
**certificate** 207:7
207:15
**certified** 6:18
15:18 212:6
218:6
**certify** 323:5,9
323:12
**cetera** 316:7
**chain** 19:14
20:25 22:2,6
22:11 23:1,8
23:10
**chair** 39:9
**chance** 91:2
136:16 137:14
138:10,20
139:23 143:4,6
143:8,12,14
145:2,7,14,17
148:16 149:12
149:16 151:9
151:13 160:10
161:11 162:15
162:18 170:24
199:25,25
247:6 249:21
318:16
**change** 13:6
16:14 55:22
56:15 65:17
91:17 171:21
200:23 236:20
**changed** 10:3

12:20,20 16:20
39:8 41:1
57:13 113:16
156:7,8 161:14
174:23 179:8
199:22 200:10
201:19 212:9
237:2 272:13
273:10
**changes** 16:22
29:8
**changing** 86:18
**Chapa** 2:21 6:14
102:25 152:24
**chapel** 56:10,12
**chaplain** 118:4
193:13,21
194:12,15,24
196:2 200:4
206:2 291:20
291:23 292:9
295:18 296:12
**charge** 120:6
253:21 254:1
277:11,12
303:16 305:14
**charged** 48:19
303:14,14
**charger** 48:18
**charges** 204:16
**charging** 253:16
**chat** 152:24
153:3
**cheating** 285:18
**check** 171:6,15
199:25 211:4
211:21
**checked** 154:1,3
171:25 200:13
202:10
**checking** 239:2
**checks** 55:18
**chew** 77:15,25
78:22,23 79:11
79:20 280:16
281:1 282:13

282:13,14
**chewed** 77:24
78:7,8 81:14
81:16
**child** 114:18,19
114:20 127:13
218:20,24
219:7
**children** 13:8
218:20,21,25
**chin** 86:3 106:21
**chip** 75:5,16,20
75:24,25 76:7
180:18
**choice** 148:14
302:18
**chose** 236:13
281:1
**chow** 91:6
**Chris** 43:11 60:5
111:7 112:14
127:25
**Christian** 217:4
217:6,8 276:12
**Christianson**
222:19 284:23
**Christopher**
43:15
**circuit** 182:5
254:24
**circumstance**
252:1
**circumstances**
8:19 118:3
**circus** 48:4 49:1
**cited** 291:18
**citizens** 28:4
**city** 24:9 210:5
210:11 286:25
287:1
**civil** 144:19
148:15 160:16
320:6
**civilian** 36:6
**civilians** 36:22
**claim** 320:13,20

**claiming** 187:19
187:23 221:16
229:9
**claims** 319:4
320:25
**clarification**
43:5 104:13
**clarified** 235:14
**clarify** 14:23
16:6 54:9
91:17 104:18
152:18 319:15
**clarifying** 74:3
**class** 85:8 195:4
195:5,6
**classes** 24:21
194:4
**clause** 157:12
**clean** 75:19 81:8
107:15 192:15
**cleaned** 80:13
**cleaning** 81:5
**clear** 12:15 15:7
92:6 121:22
149:24 152:13
164:9 195:13
232:13 253:23
**clearance** 220:2
**clearly** 115:5
117:16
**click** 100:3
101:8,9
**clicked** 195:18
**client** 210:15
233:12
**client's** 232:18
**clients'** 183:5
**clinical** 173:17
**clip** 99:3,13,16
100:8,11,11,14
**clip-ons** 96:22
**clipboard**
229:21
**close** 41:10 47:2
61:3 62:17
99:24 101:13

107:3 110:20
138:6 189:16
228:13 275:21
**closed** 86:4
**closer** 39:13
109:13
**closing** 94:12
**clothes** 126:2
**clothing** 36:6
86:18,18
**CLVS** 2:21 6:14
**co-worker**
126:24 127:12
243:10 265:23
266:9 309:5,6
310:1
**co-workers**
177:7,17
246:15
**coaching** 257:12
**cock** 155:22
156:2
**code** 110:14
**coercion** 39:25
**coffee** 51:23
52:12
**Colace** 9:11,13
9:14,15
**Collective** 42:9
42:16,21 45:2
**come** 11:18
12:12 48:6,23
49:8 56:3,5
66:16 68:23
75:23 80:14
83:23 84:10
89:7 98:8
123:1,21
126:24 138:17
142:6 151:25
154:21 157:21
158:5,8 159:9
159:10,11
160:22,22,23
161:2,9 167:4
178:9,18

189:19 195:6,6
200:15 204:22
204:24 205:24
207:17 217:19
222:1 226:12
226:17 232:16
233:13 238:8
242:7 247:16
247:17 251:13
251:13 253:18
256:24 264:16
272:2 282:12
306:17 315:8
**comes** 47:24
83:13 116:13
197:1 237:4
273:12 304:11
316:2
**comfort** 144:9
**comfortable**
119:10 255:24
**coming** 17:20
56:22 61:21
113:5 116:18
126:18 160:23
166:24 174:7
186:17 205:7
234:14 247:8
257:10 258:7
276:2 290:22
290:25 299:7
**command** 16:24
18:24 19:12,14
21:1 22:2,7,10
22:12,13 23:1
23:4,8,10 34:5
35:6,17 36:14
44:15 45:14,16
59:22 66:14
67:1 69:12
77:20,22 78:1
78:10 87:10
93:12 94:10,11
94:17 95:4,7
99:24 100:21
100:21 111:21

LORI LYNN HEETHUIS, 9-25-2020

112:3 119:18
119:21,24
120:1,2 197:9
215:11 240:21
244:3,8,10
245:1 248:10
251:16,17
270:5 283:2,5
302:17 307:10
**Commanding**
19:25
**commands**
77:23
**commencing**
1:22
**comment** 48:11
88:3 90:10,11
90:15 127:15
232:9 234:14
307:15,25
309:8 315:18
**comments** 137:3
307:15 313:8
**commingling**
195:16
**commissary**
55:17 84:15,19
86:17,24 88:7
**commission**
263:9,10
323:25
**Commissioners**
263:13
**committed**
188:14
**common** 13:8
94:25 229:4
**commotion**
299:11
**comp** 187:22
**company** 12:3
174:5
**compare** 295:17
295:18
**complain** 44:24
45:6 228:14

237:20 248:5
249:12 276:17
276:19 277:20
278:16,20
**complained**
237:21 242:11
250:11,13,16
277:4
**complaining**
249:16
**complaint** 20:22
20:24 87:15
90:3 114:11
136:5 159:13
225:17 227:2
228:21 238:11
238:11 239:10
239:17,23
245:4 247:14
248:8 259:11
259:13 261:18
264:16 277:22
284:15,21
289:6
**complaints**
258:10 266:13
271:19
**complete** 48:7
99:16 116:22
323:6
**completely** 8:25
**complex** 11:22
**comply** 201:5
**compound**
70:22
**computer** 30:24
31:7,7 73:14
73:20 82:11
87:22 104:24
108:14,14,18
108:22,23
109:14,16,17
109:18,18
116:13 183:20
**computers**
94:11 108:21

**concerned** 99:7
126:16,23
144:3,15
205:24
**concerning**
319:6 321:2
**concise** 55:10
**concluded**
322:15
**concludes**
322:12
**concurrent**
142:3,4
**concurrently**
220:23 221:10
**conduct** 25:24
26:5,13,17,24
27:5,7 29:5
30:12 87:15
141:10 265:23
266:2 316:24
320:9
**conference** 6:6
215:10
**confined** 297:21
**confines** 252:23
**confused** 65:23
164:5 249:14
**confusing**
243:19
**connection**
58:25
**consent** 6:22
**consideration**
319:2
**considered**
173:20 202:3
202:23 230:21
275:25
**consisting** 323:5
**constant** 268:7
275:22
**constantly** 59:1
68:16 114:14
284:1,9,9
**contact** 28:5

150:3 238:10
**contacted**
237:24
**contacts** 135:14
189:6,8
**CONTENTS**
3:1
**context** 62:6
308:21 310:12
**continue** 73:20
88:14 104:10
146:23 182:16
190:3 206:16
241:21 293:13
**continued**
106:17 120:5
259:21,24
265:20 266:3
320:16
**continuing**
242:4
**contract** 75:12
247:20 251:12
**control** 9:22
35:24 36:2
51:24 55:2
62:7 93:8
94:19 95:14
101:3,4 198:21
205:7,8 255:15
276:8 301:23
302:11 303:22
304:9
**controls** 95:18
**conversation**
67:9 70:16
72:21,23 79:4
79:25 81:2
86:13 92:8,13
93:6,9,22 96:2
108:12 118:3
127:5 132:23
135:4,6 148:4
148:7 156:20
159:23 160:5
163:8,9 164:14

165:19,23
166:12 167:17
170:21,25
172:5 202:2
212:19,19
241:1 244:2
277:5 283:20
290:11,12
309:18
**conversations**
72:25 74:5
80:6 122:3
288:13
**cookie** 51:17,21
52:9,16,18
**cookies** 51:22
52:17,21 53:2
**Cooper** 2:5
**copied** 269:19
270:13
**copies** 16:2,7
**copy** 18:3 31:21
42:19,21 99:9
128:23,24
147:11,19,22
147:25 148:8
169:3,4 181:18
191:13 220:9
220:11,11,13
269:17,19
270:17,18
271:1,5,8
315:14
**cord** 253:16
**Corey** 186:2,4
281:14 311:6,6
311:19,19,21
**corner** 161:4
205:22 210:4
226:12 313:25
**cornered** 226:2
226:9
**cornering**
160:22
**correct** 12:25
18:10 21:8

Chapa & Giblin Court Reporters
(248) 626-2288

23:10 24:10
42:12,14 46:14
47:5 50:19
53:18 54:4
58:6 62:3 69:1
69:7 71:18,25
73:10 82:25
83:1,25 84:5
92:21 95:12,18
96:1 109:12
110:8 136:23
143:22 147:12
164:13 166:15
167:15 171:3
177:3 203:21
219:22 220:14
250:19 263:22
271:18 287:16
288:15 292:1
293:1,19,24
319:9 320:23
323:6
**correction** 212:6
279:9
**corrections**
10:23 15:15,22
15:25 17:7,8
27:25 29:13
34:20 35:16
279:7,13
294:21
**correctly** 49:3
58:2 84:25
145:21 228:4
**corroborate**
232:20 233:25
**corroborated**
235:3
**cost** 213:1
**costing** 222:4
**counsel** 6:21
32:25 164:2
181:12 193:16
223:19 232:2
257:19 258:23
274:8 285:19

**counseling**
284:25
**counselling**
285:1
**counselor** 285:8
**counties** 183:25
**county** 1:9,20,21
6:8 7:9 8:16
16:1 19:15
20:8,10 21:16
35:25 41:19
42:10 165:14
168:4 182:4
183:10 184:8
184:13,16,23
185:13 213:1
222:4 259:19
260:3 263:10
263:13,22
264:2 268:8,12
268:24 269:2
269:11 292:3
292:20 308:16
311:14,15
323:3,24
**county's** 21:5
154:22
**couple** 18:24
32:17 47:17
53:2 60:6
62:15 63:10
67:11,12 69:20
73:7 74:10
78:8 84:15,20
86:3 98:7
108:3 138:3
139:17,17
149:13,25
174:25 177:21
197:24 213:23
229:6 255:16
264:10 270:4
281:13 305:8
**course** 16:14
163:10 236:4
257:16 294:3

**court** 1:1 6:10
6:15 8:12
10:21 77:5
142:4 182:4,5
182:5 183:10
216:6 245:23
254:23 314:8
**courteous** 27:21
28:1,4
**courtesy** 27:15
27:21 30:8,11
**courtrooms**
204:7
**courts** 183:25
218:7,7
**cover** 68:23
**covered** 249:13
265:19
**coworker's**
127:13
**coworkers**
17:11 22:10
34:8
**crazy** 201:3
**creating** 271:21
**credibility**
232:18
**crime** 132:25
**criminal** 15:24
215:24 216:2
**criminals** 29:13
**crimped** 97:16
**criticized** 280:4
280:6 307:14
**critiqued** 38:24
**crook** 106:23
**cross-trained**
37:16
**crotch** 202:25
203:4,14,18
246:20
**cry** 302:15
**crying** 303:5,8,8
**CSR** 6:15
323:22
**CSR-3406** 1:19

**currently** 74:19
189:3,4
**curve** 301:20
**cut** 36:15 148:10
156:25,25
172:4 243:3
282:3 300:6,7
**cutter** 284:25

**D**

**D** 39:24 173:18
**dad's** 48:20
253:21
**dailies** 55:6
85:19,20
**daily** 34:13 55:7
85:10,23 89:23
**damages** 319:4
**Damon** 11:14,15
12:20 132:13
133:17 155:12
155:24 156:6
**Damon's** 130:17
131:5 133:6
154:15
**Dan** 161:11
269:16,20
**dare** 83:20
**Darrell** 309:20
**data** 135:16
**date** 6:13 18:3
29:6 30:4,5
34:21,23 35:9
35:11 79:7
86:25 126:14
127:16 147:14
163:17,17
168:8 170:18
177:13,14
178:16,17,24
200:8 248:12
249:4 254:17
259:18,19,20
259:20 264:5
267:4
**datebook**

179:13
**datebooks**
178:23
**dated** 23:19 29:3
**dates** 11:1 13:17
24:14 55:9
124:11,12,13
132:7 152:14
168:2 172:18
243:7 252:5
266:6 267:9
**daughter** 53:13
112:16 114:25
115:1 118:15
118:16 125:14
127:11 141:16
199:16 274:3
**Davis** 175:14
**day** 14:15 31:1
55:2,12,19,20
55:20 56:4
67:13 68:14,21
69:25 85:14
89:25 90:23
92:24,25
110:11,25
111:1,8,10,23
112:11,20,21
114:12,22
117:23 123:17
130:10 133:2
133:13,20,23
134:8 135:6,9
135:19 136:3
138:1 144:7,10
148:7 149:13
151:5,10
152:16,19
153:15 155:8,9
157:18 159:25
161:25 162:4
163:18 168:3
170:19 183:6
204:8,21 205:7
206:20 218:21
220:25 230:8

238:23 247:20
248:1 261:23
262:9 276:24
277:22 278:6,6
278:7,8,10
279:19 310:16
310:17,18,18
314:13
**dayroom** 236:11
**days** 9:25 50:7
50:20 67:11,12
76:24 86:17
129:7 138:4
142:1,2,5
149:13 161:10
175:17,18
182:22 189:15
221:1,13,14
262:16 266:23
267:11 269:20
**dayshift** 68:20
**dead** 48:18
253:17
**deaf** 250:14
300:23
**deal** 61:16 155:2
245:6 300:9
**dealing** 17:8
29:13 193:13
**deals** 190:19
**dear** 191:25
**death** 317:1
**debauchery**
217:2,6
**debunk** 45:15
**deceased** 213:8
213:10
**December** 118:5
199:8 200:8
205:1,5 208:14
219:16
**decide** 233:10
**decided** 99:19
165:5
**deciphered**
212:2

**decision** 140:16
263:3 266:20
292:17,23,24
293:2
**decision-maker**
266:16 267:24
268:1
**decision-maki...**
267:12
**decisions** 157:16
267:14
**dedication**
236:21,24
**deer** 205:17
**defendant** 7:8
**defendants** 1:11
2:18 6:9 7:7
**Defendants'**
180:8 260:20
**defense** 45:19
**defined** 35:12
**definitely** 18:16
101:21 238:9
**degrading** 44:23
45:21,25 46:10
**degree** 15:23
**delay** 66:6
**delete** 131:14,16
135:14 171:10
171:12 187:17
**deleted** 116:3
131:16 135:20
171:13 187:7,9
187:14
**demeaning**
44:23 118:25
272:20,20
**deny** 218:14,14
**dep** 73:17
287:15
**department**
16:7,15 18:7
19:18 26:3,22
27:2,6,8 58:20
85:20 142:8
175:15 212:21

212:25 262:23
263:22 269:8
285:17,21
289:20 292:21
308:16,18
317:9
**Departmental**
26:17,25
**depends** 105:20
**depict** 105:2
**deployed** 55:25
56:1
**deposition** 1:13
1:16 3:18,19
3:20,21,22,23
3:24,25 4:1,2,3
4:4,5,6,7,8,9
4:10,11,12,13
4:14,15,16,17
4:18,19,20,21
4:22,23,24,25
5:1 6:7,19 8:10
8:17 10:12,19
13:25 14:4
17:14 20:4,7
21:11 23:13
25:15,18 29:21
33:11 34:16
38:5 41:5,23
49:23 57:21
58:1,5 59:6,16
61:14,14 63:8
71:5 102:17
121:7,16
122:16 123:9
137:10 147:6
150:23 162:25
166:2,5 176:14
180:4 192:10
192:16,25
208:10 209:3
219:12 220:4
223:14 237:10
253:6 259:6
260:12,15
265:4 288:9,10

288:12,16,21
288:24 289:12
289:14 290:8
322:13,15
323:10
**deputies** 15:25
35:17 36:13
44:17,24 57:7
63:9 66:11
68:15 70:18
77:23 81:14,16
96:21 231:11
242:22 271:25
276:4 279:15
281:19,19
292:11 294:16
294:21 302:7
**deputy** 8:16
36:2 43:11
51:4,13,18
52:1,1 54:5
56:3,17 65:2,6
66:3,5 67:1,3,5
67:10,24 68:1
68:2,6 71:12
77:13 79:23
82:17,18 84:22
91:16 92:10,12
96:5 97:24
99:7,20 137:23
137:23,23,24
138:3 139:6
140:21,21
177:19,20,25
178:6,8 194:2
199:3,4 205:24
215:6,15
217:18,18,18
217:18,22,25
218:5,6,15,19
224:25 225:17
230:16,19
231:12 234:24
235:5 237:5
242:6,7,17,24
243:10,12,13

245:18 265:24
266:9,11 272:6
280:8,9,9,10
282:20,25
284:15,16,24
294:15,16,17
295:1 298:16
298:24 300:12
301:19 302:2,8
302:12,19
304:15,16,16
306:15 307:7
308:1,5,22
309:3,5,11,12
309:13,14,21
311:7,14,15
312:6,12,15,24
313:8 315:25
**deputy's** 304:11
**derogatory**
270:14 280:25
**Derrick** 186:4
**describe** 94:25
95:5 298:25
**described**
291:23
**desk** 96:16
100:21 101:3,4
101:18,21
102:2,3,5
103:24 183:4
297:22
**desks** 95:4,7
104:14
**detail** 36:19
308:20 311:4
**detailed** 133:24
**determining**
294:6
**device** 65:2 69:6
74:23 82:21,22
141:9
**devices** 36:5,25
81:23 142:7
**diagnosed**
166:23 213:6

216:15
**Diane** 216:20
293:22
**Dictaphone**
116:12
**die** 173:4,6
308:6,17,24
309:1,24
**died** 214:7 308:1
317:1 318:10
**difference** 39:20
**different** 21:20
26:2 29:8,9
37:15 45:21
47:17,21 56:12
60:5 67:18
80:18 101:14
101:15 120:9
140:23 155:20
181:22 186:23
191:3 194:6
197:24 199:14
230:16,17
231:23 233:20
242:2 244:13
246:5 261:2,3
274:20 276:14
277:15 280:11
295:12 297:19
297:25 298:10
299:5 300:20
**differently**
229:8 246:9
**difficult** 31:5,12
139:3 212:1
**difficulties** 65:7
73:13
**dig** 203:10 204:1
236:1
**digressed** 23:7
**digressing**
217:20
**dinner** 11:19,19
67:19 102:5
105:23,24
232:15,22

**direct** 18:14
19:12 37:9
58:18 141:7,20
141:20 146:16
146:17,21
201:5,6 202:5
289:10
**directed** 23:3
76:24 309:3
**directing** 309:18
**direction** 136:25
255:25
**directly** 57:4,6,6
81:9 90:16
93:8 94:1
170:4 234:1
279:8 291:10
291:12 297:3,5
298:8 311:23
**disagree** 27:10
27:11 59:7
145:12
**disagreement**
309:22 311:20
**disagreements**
90:6
**disarray** 113:10
**disburse** 183:6
**disbursed** 18:23
**discharged**
307:22
**disciplinary**
41:9 266:14,16
**discipline** 26:10
58:24 59:5,12
70:1 122:12
123:4 124:2,3
200:5 267:13
310:8
**disciplined** 81:5
81:10,18,19
268:1 282:18
282:21 292:2,4
310:7
**disconnect** 13:7
**discover** 133:1

**discovered**
133:2
**discovery** 1:18
18:2 180:8
287:15
**discredit** 27:7
**discriminate**
221:24
**discriminated**
44:18 76:20
**discriminating**
45:4,7 221:21
257:7,17
**discrimination**
18:3,8,12,18
19:2,8 221:18
**discriminatory**
274:22
**discuss** 44:25
181:21 205:2
320:8
**discussed** 22:9
22:10 39:22
53:10 113:3
207:23,25
**discussing**
114:13 207:3,5
273:22
**discussion** 54:18
91:13 177:7
204:5 213:1
225:20,24
226:3 241:15
244:8 245:15
247:5 276:23
277:19 278:8
**dishevelled**
144:8
**dismissal** 268:6
**disorder** 167:1,1
216:22
**dispatch** 183:16
184:16
**disproportion...**
104:23
**dispute** 124:12

254:16 255:3,6
**disregard** 126:4
**distance** 98:3
**distracted**
197:18
**distracting**
220:20
**district** 1:1,2
6:10,10 182:5
218:7
**Division** 1:3
6:11
**divorced** 13:9
13:13,18
246:15 287:2
**doctor** 174:13
176:4 213:19
213:21,24
214:16 292:25
293:19,23
315:2,18
**doctor's** 209:11
321:11
**doctors** 120:7
174:12 175:2
188:20 219:25
**document** 24:4
49:19 122:20
123:21 136:11
151:1,12 153:7
169:18 170:9
191:5,13
223:17 248:1
259:17
**documenting**
240:23
**documents** 14:7
49:18 137:13
162:11 223:19
259:9
**dog** 51:15 196:3
196:4
**doing** 14:19
30:25 45:17
48:17 49:5
55:13,17 62:14

66:18,19 67:18
68:12 73:5
76:16 80:16,17
80:17,19 81:7
82:11 86:17
91:6 93:13
97:25 98:1,2,5
98:8 100:21
105:18 106:5
107:19,24
134:7 161:20
173:13 179:7
188:16 192:1
201:21,23
207:14,18
210:10,10
221:21 231:21
232:11 241:24
246:21,22
249:15,16
253:20 258:10
262:10 271:12
272:23 273:5
279:15 282:12
283:5 300:24
314:10 320:21
**dollar** 179:1,4
**door** 62:8 83:12
84:19,21 86:6
87:12 93:16,19
94:1,2,3
95:22,25 98:4
98:10,14,17,24
100:1,2,22,25
101:1,5,12,13
101:18,21
102:10,11,14
102:23,24
103:3,7,9,11
103:13 105:9
105:16,16
108:13 109:24
110:1,2 116:23
157:24,24
158:6,10
195:18,19

205:19 235:20
295:22,24
317:22
**doors** 84:7,14
85:2 94:12,12
297:22
**dosed** 85:17
**downstairs**
38:20 87:13
89:10 236:11
256:23
**downtime** 31:9
**Dr** 174:16,20
175:4,5,20,21
208:1,7,14,19
209:6,8 210:21
210:24 211:12
211:18 213:7,8
213:18,22,22
214:7,15
216:16,19,23
219:17 220:2
220:11,12,12
243:4 285:12
292:18,24
293:6,11,14,23
294:1 313:15
316:11,17,18
**draft** 145:11
**drawing** 43:17
43:18 102:21
104:22 109:1
109:12
**drawn** 102:22
**Drew** 2:4,5 3:9
7:1,1,11 32:3,9
32:16,24 33:3
33:5,8,13,23
39:13 41:12,15
65:17,19,24
70:21 71:1,4,6
71:13 77:2,7
104:13 115:14
115:16,23
116:8 118:11
129:18 139:13

139:16,17
152:6 153:3
164:2,6 170:6
170:12 181:12
181:18,21
193:16,19
210:15 223:3,7
227:16 232:2,4
233:4,12,18,23
234:5 237:7
252:5,24 253:1
253:4 257:18
268:16,20
269:4,12,17
270:19,25
271:3,10
274:14 286:11
287:14,17,24
288:8 313:3,14
313:19,23
314:3,6,23,24
315:9,13 316:5
316:10 318:15
318:23 319:21
320:18 321:4,6
322:11
**Drew's** 131:17
132:7 265:1
**drink** 311:19
**Drive** 2:14
**drives** 311:10
**drop** 169:9
**dropped** 53:6
169:9,21
240:16,17
**drugs** 50:12,15
51:14 52:7,24
132:15 299:7
310:25
**drum** 227:11,19
**drummed**
227:22
**drunk** 299:6
308:1,12 311:2
311:9,9
**dry** 36:15 40:8

**dryers** 54:23
**dual** 212:5
**due** 7:4 43:12
248:8 293:14
**duly** 8:7
**dumb** 299:8
**dummy** 38:23
**dumpster** 11:21
**duration** 233:11
314:9
**duress** 141:4,22
143:16
**duties** 29:14
31:1 34:20
35:12,21 37:13
66:19
**duty** 27:5 28:7
30:13,15,20,22
56:17 60:23
96:7,18,19,21
172:22 197:19
205:3 207:24
209:8 220:17
221:16,17
222:12 257:11
274:7 282:10
**dying** 308:5

_____
**E**
_____
**e-mail** 17:1 35:4
100:12 154:5
185:9 192:14
199:13,18,21
201:20 257:2
**e-mailed** 185:21
**e-mails** 81:7
181:9 185:22
192:15 199:23
**earlier** 18:15,17
18:21 19:1
32:4 56:4
75:14 136:13
137:1 171:25
172:12 192:16
245:2 262:7
266:4 273:18

282:16 290:11
319:16
**early** 11:3 39:12
56:20 87:14
91:5 118:1
193:25 199:8
237:21 244:15
313:21
**ears** 250:14
300:23
**easier** 116:12,14
156:15 315:1
**easy** 142:23
**eat** 53:2 96:13
**eating** 135:16
**echo** 9:17 12:9
65:22
**echoing** 7:4
**Ed** 43:16,19
45:6 46:24
51:9 126:11,21
128:23 129:8
129:12 137:24
138:21 139:8
139:18,20
142:14,21
143:4 146:12
150:6 318:21
318:21
**edge** 107:3
**EEO** 21:2,3,4,5
21:5,6 23:3,20
25:7 237:25,25
238:3 239:8
240:18 244:8
259:19 260:3
261:7 262:13
262:20,24
263:20,22,23
263:24 264:2,4
264:8
**EEOC** 21:7
176:18 265:7
**effect** 214:3
256:5
**effective** 18:3

30:4 34:21,24
38:15
**efficient** 121:19
**egg** 185:7
**eight** 55:19
94:14 154:4
155:17 165:8
250:7
**eight-hour**
55:17
**eight-minute**
99:21
**eighteen** 47:12
**either** 19:24
22:15 25:4
39:14 51:18
53:19 61:20
81:12 120:17
161:20 168:7
178:6,7 196:11
199:2 239:13
250:25 251:3
307:11 308:13
309:16 311:10
**elected** 47:4
322:4
**election** 290:22
**electronic** 36:5
36:25 38:9
65:2 69:6
81:23 141:9
142:7
**elevated** 222:21
**elevator** 87:13
130:5,9,20
133:8 194:13
194:22 201:10
229:24 235:20
236:10 278:7
**eligible** 156:22
175:12
**eloquently**
192:1
**else's** 195:23
**emboldened**
246:15,17

emergency
282:12
emotional 205:6
205:25 206:1,7
206:8 207:10
207:13 291:19
292:4,19 294:6
294:13 298:17
298:25 301:22
302:5 303:2,16
304:4 305:2
315:3
emotionally
295:15,16
299:22 303:12
303:13,13,14
employee 27:5
268:12 269:2
269:11 270:15
304:23 313:9
313:10 323:13
323:14
employees 27:6
217:3,7 238:12
265:20 266:15
319:4
employer 319:3
employment
21:21 144:17
181:7 189:25
190:2 319:6
321:2
enchalant 284:6
encourage 160:4
ended 40:23
43:15 50:4
102:14 108:12
133:17 175:18
188:10 198:10
225:11 245:21
266:23 312:12
ends 311:3
engage 255:13
engaged 70:18
enhanced
116:21 117:6

enter 94:23
entire 73:2
112:11 206:8
246:4 271:2
294:3 306:14
entitled 271:5
entries 34:13
environment
265:20 271:21
271:22
equipment 6:20
era 155:20
183:14
Eric 186:5
227:24 228:3
error 168:5
especially 66:10
96:23
estimate 47:11
74:22 90:24
249:23 281:15
310:15,15
estimating
250:6
et 316:7
evaluation
206:14
evaluations
191:8,8,12
evasive 46:2
evening 189:16
event 197:17
200:9 203:12
events 123:24
eventually
127:20 182:16
263:3
everybody 81:8
141:18 195:13
199:20 201:1
evidence 119:22
119:23
evident 117:23
118:3
ex 209:19
ex-husband

287:12
exact 60:12
67:13 110:10
110:10,17,17
151:18 262:14
262:16 283:3
exactly 16:4
63:9 75:22
123:5 133:25
166:18 172:24
173:24 175:17
175:19 225:23
234:14 244:20
252:14 255:21
304:10 317:10
317:12
exam 222:12
examination 3:6
3:8 8:13
220:17 288:7
examined 8:9
example 280:20
282:16
examples
225:25 294:10
307:24
excellent 188:22
exception 36:1
exchange
186:11,14
187:3 292:5
excuse 162:8
310:22
execution 319:6
Executive 2:14
exhausted
173:22
exhibit 3:15,18
3:19,20,21,22
3:23,24,25 4:1
4:2,3,4,5,6,7,8
4:9,10,11,12
4:13,14,15,16
4:17,18,19,20
4:21,22,23,24
4:25 5:1 14:9

14:12 17:14,17
17:24 19:17
20:4,7 21:11
21:15 23:13,16
25:15,18 26:12
29:17,18,21,25
34:16,19 38:5
38:8 41:5,9,12
41:23 42:2,9
42:17 49:23
50:1 54:4
102:17,21
122:16,24
123:9,13
136:12,13,20
137:10,14
147:6,9 150:23
151:1 152:17
162:25 163:3
166:2,5,8
169:17,17
170:7 176:14
176:17 180:4,9
191:15 192:10
192:13,25
193:3 208:10
208:14 209:3,7
219:12,15
220:4,7 223:14
223:18 253:6,9
254:11 259:6
259:10 260:12
260:15,18,21
265:4,7 313:15
313:16,16,20
314:15,22
319:22,24
exhibited
316:16
exhibits 3:13,16
14:8
existed 16:8
27:16 28:7
29:6 34:23
35:11 36:18
38:15

existence 18:12
existing 36:10
expect 115:13
expectation
98:13,22
expected 15:2
expecting
116:24
expensive 174:4
174:9 190:17
experience
182:25
experienced
215:21
expires 323:25
explain 101:23
118:23 131:13
152:19 303:16
306:1,10,16
explained 8:11
83:9 127:16
128:4 132:18
134:13 150:20
240:14 243:11
explaining
114:23
explicitly 256:12
extent 108:17
256:25 311:13
exterior 175:25
extra 55:5 140:3
extremely
232:20
Eyeglasses
189:6,8
eyes 86:4 141:5

F

F 19:21,23 85:5
86:10 305:9
F'ing 84:23,24
86:12,12,14
87:6,7 90:16
295:9 299:19
300:10
F-A-R-K-A-S

242:25
F-O-R-D-H-A...
227:1
face 43:16 119:5
Facebook
185:23,24
186:11,14,17
187:3,7,11,14
facility 35:19
51:15 52:8
77:25 310:25
fact 24:7,17 64:3
64:4 80:7
156:15 171:1
229:6 244:22
258:13 266:24
267:22 268:5
268:17 269:17
283:13 293:14
316:25
facts 8:19
247:15 268:4
factual 267:25
failed 201:5
271:20,23
failure 26:9
faint 102:24
faintly 224:4
fair 21:14 43:5
44:5 80:15
97:19 191:12
191:12 314:9
fairly 91:12
146:7 191:7
falling 250:14
familiar 25:19
25:23 38:12
42:11 64:22
95:21,21
161:15 275:20
275:22,22
279:20,23
280:3,4,5
284:13 306:21
familiarity
276:3

families 90:7
114:17
family 90:4
118:23 220:24
Fantastic 253:2
far 64:16 108:23
173:19 223:22
226:12 227:7
232:6 297:17
297:17 298:16
303:17
Farkas 242:24
244:23
Farmington
2:15
fast 85:2 188:20
194:19 196:6
232:21 262:1
father 274:4
fatigued 314:12
favor 289:19,19
308:6,17,24
309:1,24
311:12
favorably 222:1
favors 284:17
fear 132:24
301:3
February 11:15
13:19 56:20,22
57:8 65:1 66:2
66:20 67:2,23
68:5 84:2
118:6 175:22
220:7 265:24
266:3 304:2
Federal 21:8
feed 88:5
feedback 65:9
feeding 93:12,13
feel 46:7 80:15
114:13,14
121:23 131:19
132:1,2,17
149:24 150:3
160:11 191:7

191:10 196:3
197:13,15
198:17,19
199:5 212:16
224:9 226:9,18
246:7,8 255:24
258:7 287:6
289:18 291:14
292:10 294:1
303:15 320:2,5
320:24
feeling 268:4
314:8
feet 66:3 68:6,11
94:14 205:16
297:18
fell 300:22
fellow 126:24
310:9
felony 120:6
132:12,15
felt 46:8 48:10
72:13 98:13
114:23 118:18
132:14 146:8
160:22 161:3
161:22 180:25
198:24 217:10
217:12,13
228:23 243:13
246:7 255:13
268:3 272:8,14
273:21 274:5
276:16 293:15
293:23 300:23
307:10 316:12
320:5,19
female 38:20
44:19 48:16
50:13 76:21
81:16 85:14
213:19 231:12
238:23 284:16
294:6 320:4
females 78:8
215:16 299:19

300:3,4,5
321:22
Fiesta 180:18
fifteen 181:14
fifth 252:8
fifty-some
138:21
fight 142:20
194:2 226:2,10
fighting 226:13
226:18
fights 90:5
figure 104:12
149:12,17
198:15 201:8
202:8
file 143:10,21
150:11 169:5,6
169:15 184:12
199:2,4 227:13
227:19 241:25
246:6 264:12
268:5 269:15
269:15,16,22
270:10,17,18
270:22 271:1,2
271:6
filed 136:5
files 269:25
filing 176:18
265:7
fill 43:1 184:15
210:19
filled 55:5
181:13,23
190:5,15
259:12,13,15
finally 31:13
financially
158:24 164:24
323:15
find 28:10 49:18
51:16 59:21
115:21 116:1,4
126:25 132:21
148:21 149:21

150:17 167:24
190:2 191:4,13
191:16 192:19
214:20 224:18
238:25 239:5
239:13 248:15
249:7 261:6
264:15 281:9
290:9 314:15
finds 208:7
fine 7:12 32:6
73:17 89:14
120:7,8 161:2
167:9 204:25
223:5,6 234:6
234:19 240:3
286:22 312:11
314:13 316:15
finger 236:1
fingerprints
48:17
fingers 202:22
203:9 204:1
finish 33:6
111:15 139:20
143:18 233:14
301:14
finished 56:6
240:2 255:16
321:5,6
finishes 313:1
finishing 139:21
fire 119:20
218:8 240:24
242:2
fired 143:13,15
148:22 305:15
first 8:7 18:6
19:6,6 22:3,25
34:24 35:25
52:23 69:2
83:12 94:20
99:5 109:22
113:4,8 114:6
124:7,14 144:6
149:7 153:9

LORI LYNN HEETHUIS, 9-25-2020

Page 338

180:8 191:9
192:19 197:2
206:8 208:13
210:18 212:3,8
217:23 229:10
229:15 230:3,6
230:10 237:20
237:21 238:7
242:22,24
245:17 248:1,3
248:4,13 249:4
252:7 261:7
263:25 264:2,5
265:19 286:23
290:3 297:2
303:1,14
304:21 306:19
308:15
**firsthand**
300:12,15
**fist** 48:2,25
**fit** 179:6 207:24
217:2
**fitness** 172:22
205:3 209:8
220:16 221:16
221:17 222:11
**five** 140:10
188:17 212:11
306:7
**five-and-a-half**
209:25
**fix** 198:6
**fixed** 198:7
**flash** 141:4
**flipped** 183:19
184:18
**floor** 14:9 31:9
35:25 37:12,13
56:13 57:7
84:15 88:4,20
92:18 93:11,24
93:25 94:21,21
94:22,22 96:7
108:17 109:20
194:2,3,13,22

196:22 200:19
206:9 236:10
236:12,12
242:8,16
269:22 276:6
**floors** 230:17
**flowing** 107:21
**flushed** 97:2
98:25
**FMLA** 221:10
**focus** 112:25
163:23 281:2,4
281:4
**focused** 113:16
**follow** 17:4 37:8
37:21 216:1
255:25
**followed** 37:6,6
37:19 235:20
**following** 33:16
249:1 274:1
**follows** 8:9
**fondling** 235:23
**food** 47:22 224:4
**foot** 93:16
235:20
**footage** 57:16
**FOP** 42:10,14
43:23,23 44:16
**force** 38:10
**forcibly** 235:21
237:19
**Fordham** 227:1
**forego** 167:4
**forgetting** 291:4
313:14
**form** 31:6 32:4
70:22 71:13
137:1 259:11
259:13 273:25
315:5
**formal** 90:3
284:21 290:23
**formally** 66:22
248:7 291:2
**forms** 21:20

87:23 181:22
**forth** 29:9 30:12
31:16 37:1
45:13 62:17
84:7 88:19
94:13 109:21
113:20 120:19
127:17 141:9
153:13 157:4
167:2 188:3,5
199:13,17
204:7 220:1
243:20,20,23
249:17 266:7
292:13 296:8
299:1,6
**forward** 141:8
245:4 251:4,8
**fought** 217:1
**found** 78:15
116:5 182:6
188:18 239:2
268:22,23
272:8 314:23
**foundation**
318:14 320:15
320:17
**founded** 225:18
**four** 50:7,20
64:22,23,25
74:20,22,24
77:11 81:21
86:16 173:21
237:15,15
281:15 297:18
**four-and-a-half**
56:25
**four-year-old**
114:19
**fourth** 252:7
**Fox** 43:16,19
45:7,11 46:24
51:9 126:11,21
129:8,12
137:24,25
138:21 139:8

139:18 143:4
318:21,21
**frame** 70:13
71:16
**frank** 225:24
**free** 174:7
**freeze** 154:12
155:16 165:13
165:18 166:14
166:17 167:3
**freezing** 207:8
**frequently** 19:5
**Friday** 1:21 6:2
151:23 247:16
251:12
**fridge** 229:19
**friend** 139:14
182:4
**friendly** 161:14
**friends** 185:23
186:5 232:22
284:18
**frog** 310:22
**front** 18:20 44:9
52:14 53:12
85:5 87:16
94:11 138:11
183:4 225:1
229:24 235:25
237:15 253:12
294:16 303:20
311:21
**froze** 80:1
**frozen** 70:11,13
71:15,16
**Fruitport**
213:12
**frustrated** 93:5
207:6
**frustrating** 93:2
93:4
**fuckers** 299:8
**fucking** 87:6,8
88:2,11,23,24
89:9 90:16
114:8,9 196:4

295:4,9,10
299:17 300:8
303:3,5
**full** 56:17 80:14
187:9 238:9
317:7
**full-time** 189:12
274:4
**fully** 8:25
**fun** 80:20 217:9
**funny** 78:22
**further** 271:21
**future** 144:17
320:10
**fuzzy** 24:14

---

**G**

**G-E-O-G-H-E-...**
245:25
**G-R-I-L-L-O**
235:8
**gag** 141:19
146:16,19
**gained** 187:25
**game** 165:15
201:17 204:18
**games** 66:17
**gangs** 195:8
**garbage** 11:21
80:12,14 83:11
83:13,21
**gas** 182:8 185:2
**gears** 83:24
**gee** 15:9
**general** 16:3,4,7
16:12,19,23
17:4,9 18:1,6,9
18:11,14 25:11
25:20,22,23
26:4,12 29:24
34:19 36:8
37:23 38:9
58:21 184:5
214:14,22
289:11 310:14
**generalized**

18:19
**generic** 179:5
  191:1
**genetic** 40:9
**gentleman**
  317:1
**genuinely**
  258:12
**Geoghan** 245:18
  245:23 246:22
  246:22,23,23
  247:13 248:4
  249:13,15
  266:10,11
  272:18 286:4
**getting** 39:3
  42:3 102:2,12
  108:14,18
  109:8 123:2
  125:14 146:18
  154:22 156:11
  156:11 162:9
  168:6 171:17
  171:19 181:3
  182:18 202:4
  211:22 214:10
  217:25 218:16
  232:6 235:17
  235:18 276:8
  295:6,6 299:16
  299:17 302:21
  306:15 311:3
  314:12
**gigabytes**
  187:10,12
**gigs** 132:6
**Gilchrist** 159:5
  159:21 225:5
  226:21 227:15
  227:22 228:14
  228:21 229:9
  234:12,20
  235:12 237:5
  238:7 242:3,10
  243:3,5 244:5
  244:9,13

248:11 251:17
266:3,18 267:8
267:13 269:14
270:8 277:5
278:14,15
286:4
**girl** 240:19
282:14 303:8
**girls** 40:24 54:23
288:23 295:5
300:2 311:1
**give** 7:25 50:10
52:12,17 55:3
91:16 98:11
130:25 131:22
135:17,20
138:13 139:16
139:24 140:19
168:10,20
189:18 190:18
190:18 191:18
191:24 196:21
200:14 220:11
240:5 243:17
247:17 248:7
249:22 251:7
280:15,20
282:16 294:10
298:20 307:20
308:20,20,21
310:14 311:4
**given** 10:19
18:22 51:22,22
52:11 81:7
136:16,18,19
147:22 199:13
233:9 268:7
284:20
**gives** 142:8
**giving** 50:12
51:20 52:15
138:10 140:12
217:25 218:16
244:25 261:24
317:4 320:12
320:19

**glad** 157:25
**glanced** 82:11
**glass** 196:1
**glaze** 45:14
**go** 9:16 14:14
17:22 19:12,13
19:13,15 20:25
21:1,2,3,4,14
22:1,2,5,6,11
23:1,3,9 26:16
31:6,10,16
34:19 39:17
40:10,12 42:8
49:9 51:15
52:13 56:7
70:10 71:14
83:20 85:21
87:12,22,23
88:14,16 92:17
93:8,21,23,25
94:8,24 101:10
101:13 102:20
103:18 105:14
106:8,12
108:16 110:23
113:12,14,17
116:5 123:6,20
124:20,21
131:12 134:8
136:10,11
137:14 138:25
139:11,25
140:8 142:22
144:24 146:19
147:9,13
150:11 151:22
152:1,6 153:5
153:11,16,17
153:20,23
154:17,25,25
155:12 156:16
156:17 157:4
158:4,10 159:8
159:25 162:6
164:9 168:20
169:6,8 173:17

174:16 181:3
188:5 190:17
192:14,21
194:5 195:23
196:6,6 198:11
199:5,23
200:22 205:11
205:13,14
206:13,16,18
208:19 209:10
211:18 213:21
215:4 217:11
218:20 219:23
219:24 223:22
227:12,19
229:23,24
232:14,14,24
232:25 233:1
233:20 234:5
234:18 239:12
240:19 245:21
248:17 249:13
254:19 255:10
255:18 256:2,5
260:22 261:21
263:24 265:12
269:18,24
274:11 276:17
276:19 277:20
278:5 279:19
285:1 286:13
287:15 292:24
292:24 293:8
294:18 296:7
299:8,25
303:17,20
308:9 315:2,10
319:14
**God** 8:2 204:1
217:4,9,9
276:14,15
**goes** 54:8 86:6
88:11 117:19
134:7,11
139:11 146:2
148:18 151:22

151:23,25
154:1,3,5,6,18
155:1,3 157:25
158:23 159:10
163:20 168:15
168:17,17,19
169:1 177:6
180:12,13
187:12 200:18
200:22 201:1
205:23 206:18
226:8 260:20
296:4
**going** 14:2,15
15:12 17:17
25:1,4 28:14
33:1 34:19
35:15 38:22
40:7 41:2 42:1
48:6 50:22
51:21 53:2,23
58:19,20 61:20
63:3 73:16,20
74:20 77:4
80:8 85:8 89:9
90:5 92:4
93:17,18 96:9
97:8,11 99:18
103:21 105:10
105:12 113:24
114:2,15 115:7
117:9,20
118:14 121:14
122:9,20
123:22 125:3
126:5 131:3,3
131:10 138:2,5
138:9,13,16,21
139:1,13 141:1
141:3,21 142:1
142:2 145:3
148:10 153:15
153:18,22
154:9 155:9,19
155:21 156:16
156:17 157:3,5

158:18,20,22
159:14,18
160:2,19,20,21
160:25 161:1
161:22 163:22
164:9 168:23
176:17 179:8,9
180:19 182:6
186:8 188:6,23
191:4,25
194:14,16,24
194:25 195:1,5
195:19 197:1,6
197:7 198:1
199:18 200:25
201:2,3,14
202:3,9 203:15
204:6,13 206:3
206:7,20,21,22
208:7 209:1,8
209:22 210:8,9
211:12,18,24
215:23 217:9
218:8 222:3
225:25 226:6
228:11 232:8
232:14,14,15
232:20,21,25
233:1,2,4,5,9
233:10 236:11
237:14 238:9
238:12 242:19
243:20,22
245:15,20
247:20 250:11
251:14 254:6
256:2,12 258:5
258:18 259:1
260:18,21,25
266:7 270:19
271:8 272:10
277:12 281:9
287:24 288:21
289:7,8,8,10
291:22 294:10
295:11 299:15

299:20 300:6
303:7 305:13
305:14,23
314:5,10,25
317:3
**goings-on** 187:3
**good** 12:16 27:8
59:10 95:5
120:24,25
123:25 131:24
141:16 151:24
159:1 161:10
161:13 179:21
191:20 211:14
223:3 247:20
254:23 257:12
274:13 276:5,9
279:21 306:6,7
307:2
**Google** 207:20
**gotten** 18:24
31:15 75:25
91:9 140:3,4
171:1 180:23
185:8 190:15
269:8
**Government**
21:8
**gown** 318:1
**grab** 110:22
246:17 249:17
**grabbed** 89:10
108:3 134:24
134:25 229:16
235:13 236:6,7
**grabbing** 203:4
203:6,7 229:20
230:9 235:22
237:17 240:7
246:19 265:22
**grabs** 83:14
**Grand** 1:17 2:7
6:1,13
**grandchildren**
186:24 187:2
**grandmother**

284:18
**graphic** 218:1
**grasp** 224:15
**great** 110:20
137:6 141:6
176:4 182:23
270:23 271:9
**greet** 183:7
**Greg** 66:5
**grievance**
138:25 143:22
143:24 150:11
199:2,4
**grieve** 54:11
142:16
**grieved** 150:5,9
**Grillo** 234:24
235:5
**Griswold** 67:7,9
67:14 68:5,18
68:18 78:5,12
87:13 301:7
**Grizzly** 77:15
79:10
**grody** 107:18
**groin** 249:18
**group** 253:9,12
254:4
**grunt** 246:18
**guess** 36:16
43:24 69:20
76:5 98:25
100:15 107:2
107:16 115:4
134:23 156:2
183:14 192:1
215:15,16
218:18 243:21
261:5 275:25
284:5 289:1
306:1 307:14
**guessing** 151:17
151:17
**guidance** 285:22
**guided** 261:7
**guilty** 254:24

268:23,23
**gun** 56:5
**guy** 68:10
157:19 204:14
206:18 309:23
**guys** 38:21
66:17 67:16
68:15 98:8
155:22 256:22
292:11
**guys'** 269:24

**H**

**H-E-I** 285:15
**ha-ha** 256:23
**Haight** 285:12
**half** 80:16 172:4
**Hall** 201:23
**halls** 201:23
**hallway** 47:15
54:6 132:13
217:24 218:24
219:6 229:23
**hand** 7:23 53:4
53:6 181:1
202:21,24
203:6,8,18,19
204:2 235:25
236:6,15
255:15
**handed** 52:22,22
52:24 53:4,5
208:17
**handle** 149:9
274:13 276:5
285:19,23
**handled** 225:11
229:7 276:1
302:17
**handles** 107:18
183:4
**handrail** 305:22
**hands** 68:16
97:3,15 106:18
107:4,12,16
202:3 203:14

235:23 237:6
240:6
**handwrite** 87:22
**handwriting**
210:21,22,25
211:2 259:14
260:23,24
**handwritten**
313:15,24
315:11
**hang** 195:20
**happen** 14:17
15:8 96:6
117:20 153:22
156:5 168:23
188:10 200:9
230:14 231:25
236:6 237:13
240:18
**happened** 40:21
40:21 62:23
73:19 88:25
90:2 108:11
113:15 114:18
119:22,23
120:21 134:5
138:1,12
141:11 142:9
147:2 152:18
152:20 153:9
156:6,6 159:17
159:19 161:16
171:25 174:22
187:20 196:9
199:12 200:10
201:16 210:8
215:7 222:2
232:10 235:18
235:18,24
236:8 238:6
240:15 241:20
242:3 244:1,12
244:17 245:10
246:5,8 247:9
247:12 254:3
254:10 261:2

LORI LYNN HEETHUIS, 9-25-2020

Page 341

261:23,25
262:6,9 268:9
272:1 273:1
274:9 283:21
291:23 295:14
307:18 310:20
311:13 317:10
322:1
**happening**
48:14 59:18
113:5,17
126:17 141:24
144:10 145:19
155:13 156:10
161:19 172:7
172:21,23
193:21 194:1
208:4 234:15
235:2 245:22
262:7 274:2
281:16 284:8
284:19 291:14
291:15 310:16
**happens** 105:23
**happy** 59:15
61:5,8 62:2,10
62:11,22
185:10 251:9
290:13,17
**harass** 221:23
234:20
**harassed** 234:8
234:12 245:18
266:17 279:19
**harassing**
221:20 222:10
**harassment**
18:18 19:2,9
22:7 24:10,20
221:17 258:9
274:22 276:18
277:4,21
278:17,20
**hard** 30:24 92:2
115:12 138:23
139:1 142:20

183:16 321:19
**hardship** 174:6
**harming** 313:10
**Harrison** 309:3
309:13,14,21
310:4,13
**hatch** 86:15,15
**hatchet** 291:25
292:3
**Hayes** 182:21
185:18
**head** 45:14
78:13 88:11
140:25 144:24
160:8 246:20
294:20
**headlights**
205:18
**health** 167:12,25
173:8,13,14,15
174:2,4 188:15
205:25 209:12
**hear** 7:14 12:14
39:14 58:1,19
62:19 63:20
64:6 65:16
73:15,18 80:24
92:3,4 97:24
98:2,2,6,11,18
98:20,23 99:22
100:20,22
105:18,20
106:1,1,2,5
115:6 116:6,6
116:7,14 117:3
117:4 123:24
123:25 139:4
141:11 149:6
161:17 194:18
198:8 203:15
203:15 220:19
231:6 238:17
238:21 240:16
240:17 250:1
251:10 263:8
267:17 272:5

275:15 281:22
295:24 297:11
298:1,5 299:12
300:19 301:2
301:12 309:8,8
309:17 310:13
311:22 312:2
314:11
**heard** 8:17 23:8
28:20 30:21
58:16 59:22
64:10 98:7
99:1,24 106:2
106:4 116:22
117:2,5,14,14
119:11,13
126:22 127:21
127:25 131:5
138:4 139:5
155:5 159:7
167:22 201:12
205:8 242:18
289:4,5,9
297:14 298:1,2
307:11 309:10
311:24 312:3,4
312:6,14
**hearing** 40:5
50:18 51:2
52:2,4,6 54:15
64:11 116:8
124:8,9,22
125:9,19 144:2
159:5 161:18
197:11 247:9
295:11 299:9
302:15 310:3
312:12 322:1
**heat** 92:2
**heater** 285:7
**heavy** 103:13
105:16
**Heethuis** 1:5,14
1:17 3:4 6:7,8
7:2 8:5,11,15
12:21,22

121:10 149:11
322:13 323:7
323:10
**Heidi** 224:2,7,21
224:24 227:2,9
**held** 6:12,19
**hello** 47:16
**help** 8:1 9:16,22
9:23 45:19
47:21 121:18
156:14 173:19
176:22 225:19
227:3 240:24
270:22 317:1
**helping** 207:22
**helps** 162:12
**hemorrhoids**
175:25
**Henry** 210:4,4
**Herman** 77:13
78:2,7,10
79:23 217:18
280:9 284:2
294:15 311:7
311:17,20
312:6,15
315:25
**hey** 62:8,21
84:18,21 96:8
103:21 105:10
105:11,11,13
119:18 157:20
157:25 201:12
201:13 251:13
298:1 303:17
**Hi** 94:23 149:7
149:10
**high** 187:10
190:20 195:12
**higher** 306:24
316:6
**highlight** 212:5
212:23
**highlighted**
39:23
**highly** 190:23

**highway** 214:23
**hike** 156:25
**Hills** 2:15
**hire** 185:5,11
**hired** 15:15,24
19:4 182:24
212:8
**history** 181:10
209:12 226:1
**hit** 38:22 152:25
153:3,4 194:12
195:21,25
197:23 198:9
280:18 292:12
**hits** 197:3
**hitting** 196:12
295:3,4 299:14
**hmm** 133:5
**hold** 29:18 40:3
144:18 166:21
180:19 229:21
282:22
**holding** 97:11
97:14 295:22
**holidays** 51:25
**hollow** 305:20
305:21
**home** 88:14,16
130:2
**Hometown**
190:6,8,13
**Hon** 1:8
**Honestly** 152:12
**hook** 207:20
**hookup** 307:3
**hope** 66:7 80:25
80:25 155:18
169:13 311:2
**hoped** 307:25
308:11,12
**hopefully** 9:18
14:17 173:1
**hoping** 165:11
**horrible** 148:13
**horrid** 310:1
**Hospital** 214:14

214:22
**hostile** 118:25
258:20 271:21
272:9 305:16
**Hough** 149:8
170:22 171:24
172:5
**hour** 31:9
189:22 233:9
**hours** 15:23
55:19,19 57:13
77:5 140:9,11
141:17 189:14
220:18,24
233:18,21
**HR** 148:19
185:5 268:19
268:24 269:7
**hug** 156:9
**hugged** 169:13
**hugs** 157:22
**human** 25:8
27:24 168:4
169:4,24 170:4
**humiliated** 46:8
**humiliating**
44:23 118:25
**hundred** 172:2
182:19 295:20
**hunts** 241:23
**hurt** 318:4
**hurtful** 225:19
**husband** 110:5
110:13,20
111:12,17
112:9,23 114:4
125:10 131:14
132:12,16
135:14 139:15
139:22 141:1
141:17 144:8
144:11,23
153:14 154:13
154:23 155:5
155:19 157:15
162:20 166:23

167:6 168:8,12
168:23 172:24
173:4,10,17
186:24 199:9
201:12,17
202:6,7,14,19
202:20 204:10
204:21 212:24
232:25 269:3
275:11 277:10
277:11 286:23
287:12
**husband's** 74:21
110:10,15
122:6,8 130:4
130:6,12,23
131:25 133:3
133:24 134:15
135:2 138:23
173:16 174:10
188:15
**hyphenated**
272:11 273:12

---

**I**

**I-E-G-H-T**
285:15
**idea** 22:11 58:15
75:21 86:21
100:24 103:10
105:4 109:25
110:1 126:13
131:3 148:12
192:1 226:24
238:20 249:22
263:1,17
288:20
**IDENTIFICA...**
17:13 20:3
21:10 23:12
25:14 29:20
34:15 38:4
41:4,22 49:22
102:16 122:15
123:8 137:9
147:5 150:22

162:24 166:1,4
176:13 180:3
192:9,24 208:9
209:2 219:11
220:3 223:13
253:5 259:5
260:11,14
265:3
**identified**
298:21
**identify** 237:4
**idiot** 295:5
**ignorant** 299:9
**ignore** 281:2
**ill** 141:15,17
**illegal** 116:23
**imagine** 120:17
226:16
**immediately**
247:23
**impact** 10:10
113:6
**impasse** 161:21
**imperative**
318:1
**important** 28:3
29:14 192:6
274:5 306:4
**improper**
316:18
**inappropriate**
49:11,12
198:14 230:21
230:22 265:21
303:1
**inattention**
30:13,15,19,21
197:19
**inattentive**
200:3
**inaudible** 32:9
120:11 138:5
157:12 174:13
194:14,15
263:6 312:19
**incident** 48:22

50:20 66:12,20
91:9 197:22
199:7 207:25
217:21 251:23
252:18 254:12
254:15,17
255:9 256:14
268:10 275:13
277:24 278:7
284:20 306:24
**incidents** 195:15
265:24 268:9
268:25 269:1,9
269:10 280:1
300:14 302:2
**include** 35:17,24
**including**
225:24
**incorrect** 31:4
200:8
**indicate** 6:23
164:3 245:3
251:3 294:12
**indicated** 14:8
291:13
**indicating**
311:17
**indication** 251:7
**indiscernible**
299:8,25
**individual**
252:15 276:12
**Individually**
1:10 6:9
**individuals**
251:25 300:20
**inducted** 291:1
**informally**
66:23,24
**information**
18:24 50:9,10
91:16 169:11
171:2 183:5
214:5
**initialed** 169:15
**initially** 239:20

**initiate** 230:5
**injured** 187:24
**injuries** 187:20
**injury** 188:1
**inmate** 36:1
51:21 252:22
254:21,22
258:13 304:24
317:3 320:4
**inmates** 17:8
52:12 53:12,22
54:1,7 57:23
62:16 67:18
88:6 93:14
161:15 177:17
177:21 195:16
198:3 200:4
215:16 276:9
280:3,16,17,23
283:1 299:1,19
316:21 321:16
**inmates'** 320:4
**input** 267:8,14
**inside** 57:18
105:19 270:5
**insisted** 258:3
**instinct** 226:12
**instructed** 21:4
248:9
**instructing**
287:17
**insurance** 141:2
141:3 154:10
154:11,12,14
154:23 156:11
156:12 157:5
165:13,14
166:15,17,20
167:6,12,25
168:6,9,17,18
168:22 173:13
173:14
**insurances**
173:2
**interact** 49:10
84:8

LORI LYNN HEETHUIS, 9-25-2020

Page 343

interacting 57:7
interaction
  47:13,16
  230:18
intercom 96:12
  98:9 100:1
  117:7 280:18
  281:22,23,23
  296:5
interest 27:3
  132:8 272:15
interested 47:23
  209:20 274:1,2
  323:15
interfere 37:3
interfered
  184:23
interference
  71:9
interferes 36:7
interfering
  185:3
interim 63:3
  159:21 238:24
  239:11 267:15
  267:19,22
interior 175:25
interpreted
  256:7
interrogatory
  14:5
interrupt 14:17
  14:21 28:13
  32:24 33:1
  121:13 240:1
interruption
  152:3
interview
  182:23
interviewed
  182:21 262:18
intranet 24:8
investigate 50:8
  225:6,10
investigated
  159:13 227:8

227:10 252:11
254:2 256:14
investigating
  215:14
investigation
  44:10 50:8,11
  204:16 224:6,8
  224:10 226:22
  228:12,15
  229:2 238:9,21
  247:24,24,25
  248:10 252:22
  256:17 257:9
  257:16 262:10
  262:19,20,24
  263:16 310:24
investigations
  159:20 225:8
  227:12 228:10
  228:22 241:22
  246:10 248:9
  251:15,19
  268:7
involved 71:12
  113:19 159:4
  195:8 201:1
  226:24 227:23
  262:24 263:2
  263:15 267:2,3
  271:25 273:19
  274:4
iron 159:2
issue 23:7 99:19
  148:8 203:11
  224:2 233:17
issued 197:9
issues 54:14
  285:1
items 54:3
  120:11
itty-bitty 204:19
Ivan 243:4
  244:5,9,18,23

―――――――
         J
―――――――
J 53:1 86:20

89:1 198:5
J-A-M-A-L
  304:22
jail 14:10 16:1
  17:9 19:25
  29:13 35:19,25
  37:15 46:16,21
  48:16 50:12
  68:23 72:9,10
  80:8 85:8
  88:17 94:19
  132:15 159:21
  159:22 215:10
  236:3,4,18,20
  236:25 237:1
  252:23 267:15
  267:20,22
  270:5 296:22
Jamal 304:21
  306:10
James 148:19
  149:3,10 151:6
  153:21,25
  154:7 155:14
  156:18,20
  157:16 162:3,5
  162:21,22
  163:7 164:15
  165:4,23
  166:13 167:17
  167:20 170:17
  170:22
January 34:21
  34:25 35:9,11
  35:22 47:7
  49:20 51:11
  54:4 55:15
  56:20 57:8,11
  57:12,15 58:8
  59:5 84:2
  153:20 166:20
  166:22 167:12
  168:7 171:17
  216:24 290:24
jar 227:3
Jared 294:15

Jason 69:5,8
  282:19,19
  298:24
Jeanie 88:9
Jeanie's 88:17
Jenkins 43:8,11
  51:18 52:1,1
  60:6,8,24
  199:15 200:11
  239:19 281:12
Jessica 224:25
  227:1
job 10:23 11:12
  32:21 36:7
  37:3 56:7
  83:10 84:8,11
  85:13 88:4
  90:22 92:18
  118:2 120:10
  120:11 148:22
  182:9,12,12,13
  182:15,17
  183:3 184:24
  185:2 188:14
  242:19,21
  275:19 282:12
jobs 12:4 180:10
  180:11,15
  182:1,10 183:9
  183:10 185:8
  307:12
Jodie 2:21 6:14
  7:13 102:25
  116:10 152:24
Jody 7:18
Joe 206:13,23
John 43:8,11
  60:5 199:15
  200:11,13,17
  201:3,11,14
  239:19 281:12
Johnson 11:2,10
  12:23 13:4,6
  13:10,13,13
  84:22 225:17
  272:7 273:8

joking 38:21
  302:20
Jones 272:10,12
Jones-Burton
  205:17 273:11
Joppich 2:13
Joseph 293:8
jotted 178:23
judge 13:9
judgement
  158:10 254:6
  296:1
Julien 147:17
  148:6,6 151:20
July 38:15
  192:15 254:11
  259:15 261:17
  261:22 262:5
  290:2,2
jumped 159:4
June 223:17,23
  323:25
jury 154:6
justice 15:24
  201:23
justified 197:13
  197:15 198:17
  198:19

―――――――
         K
―――――――
K 89:2
Kathleen 88:8,9
  147:17 148:4,5
  148:6 151:20
  151:21 153:21
  153:25 154:5
  154:17 155:2
  156:8,13 157:1
  157:15,23
  162:21 163:4
  163:15,17,19
  164:14,14
  165:8,20,24
  167:18,22
  168:14 171:5
Kay 147:15

keen 234:23
keep 16:11
  32:22,22 36:22
  36:25 42:3
  81:8 107:21
  131:15 154:10
  154:11 157:5
  161:22 178:23
  181:6,9 196:4
  196:5,12
  241:11 269:14
  270:2 276:6
  314:10
keeping 192:15
Keith 284:21,21
Keith's 190:8,9
  190:13
kept 42:25
  107:12 138:21
  171:12 179:3
  199:13 207:8
  235:1 239:2,4
  239:20 270:2
  274:12 295:3
  302:19
key 84:18
keyboard 101:4
keyboards
  101:3,5
keys 197:3
  292:14
kicked 68:11
kicking 196:4,5
kidding 302:9
  306:17
kill 279:22 308:2
  308:3
killed 308:13,13
  311:3
kills 311:10,11
kind 43:7 45:14
  45:18,19,25
  66:15 75:1,13
  76:17 86:2,2
  91:18 102:24
  106:23,24

107:19,25
109:13 123:22
125:17 134:22
137:17 139:3
141:3 142:3,10
144:7 146:18
148:10 153:13
156:13 157:3
182:13,16,17
183:3 198:13
205:10 212:1
217:9,20
220:10 224:15
229:21 249:14
252:21 260:22
274:6 290:23
294:7 295:1
300:10 305:25
306:2 307:2
309:25 317:15
kinds 182:1
kiss 235:21
  237:19 240:7
Kleenex 190:22
Klonopin 317:4
knew 36:19,21
  63:1 67:24
  70:11 71:21
  77:20 78:6
  91:1 95:17
  100:5 105:22
  105:22 112:23
  127:19 128:3
  130:24 131:4
  157:8,10
  159:16 161:8
  166:23,24
  201:12 213:19
  231:23 234:14
  234:25 260:8
  260:10 263:18
  263:19 277:13
  277:14 280:21
  280:22,23,25
  281:1,16 283:2
  283:5,9,13,15

288:20 294:13
312:10
knock 188:18
  292:13
knocked 188:21
  188:24 195:25
knocking
  196:12
know 9:17 12:14
  12:15 14:18
  15:1,5,8 17:21
  18:23 20:11
  22:16,23 24:16
  24:17 25:22
  28:8,9,11,16
  28:17 29:8
  31:25 32:2,14
  32:20 33:19,21
  34:22 35:10,10
  36:20,21,22
  37:1,16 38:16
  38:23,23 39:8
  41:1,2 42:23
  45:23,23,23
  46:4,5 47:10
  47:24 48:3,20
  49:14 50:22
  56:19,21 57:10
  57:12 59:16,23
  60:17,25 62:9
  63:7,12,14
  64:11,12 65:21
  66:17,19 67:12
  67:19,20,22,25
  68:1,9,15,17
  68:22 70:4,5,6
  70:7,8,17 73:9
  73:19 74:14
  75:7,22 77:20
  78:25 79:1,2
  79:12,13 80:15
  80:23,23,24,25
  81:18,19,19
  83:5,15 84:16
  85:17 87:1,24
  90:4,6 91:13

94:18 97:18
98:4,8,25
100:2,4,4
101:9,22,23
104:10 105:1,1
105:23 106:24
107:16,25
109:23 110:2
111:23 112:9
112:13,14,15
113:4,12 115:8
115:12 116:10
119:12,19
121:16,22
122:4,6 125:4
125:16,22
127:14 128:8
128:14,14,16
128:16,16,18
128:19 129:8
129:10 132:4
133:6,16 134:6
134:7 135:15
136:3 137:8
138:24 139:9
139:13,24
140:1,1,2,14
140:15,20,22
140:24 141:19
141:22 142:3
142:15,17,24
145:6 148:9,18
149:25 150:6
150:19 151:16
151:23 152:12
152:23 153:19
153:21,21
154:9 155:3,13
156:10,11,16
157:5,10,14
158:3,3 159:2
159:5,12 161:9
161:10,12,17
161:18 163:11
165:11,12,12
165:15 168:18

169:14 170:23
171:11 172:3,7
172:16,20
176:3 177:13
178:10,16,16
179:19 182:23
183:11 185:6,7
185:10,23
186:10 187:16
187:25 188:11
191:14,16
192:22 196:10
196:13,14,25
197:23 198:13
199:6 201:1,2
202:1,1,22
203:3,25
204:10,15,18
204:24 205:4
206:9 207:11
208:4,4 210:22
211:9 213:20
214:1 216:2
218:5 221:5,9
221:11,13
222:13,25
224:22 225:7
225:11 226:8
226:22,24
227:11,23,24
228:5 229:2,14
231:7,8,20,25
234:11,24
235:2,14,16,16
238:16,19
240:2,11 241:3
241:24 243:8
243:25 244:18
244:21 249:11
249:18 250:23
251:1,10,14,22
252:4,8 253:21
256:7 258:15
258:16 261:14
262:14,14
263:2,4,13,15

263:18,23,23
264:1,9 267:2
268:16 269:4,5
269:24 270:12
271:3,7 272:18
272:25 273:8
273:25 274:12
274:17,17,17
277:13 279:24
281:6 282:10
283:2,5,7,10
283:18 284:20
285:15,15
290:5,7,7,8
291:1,7 292:10
292:18 294:11
294:11 296:14
298:12,16
300:8,25
302:20,21
303:18 304:1
305:1,9,12,15
305:24 309:20
309:20,22,25
310:1,4,17
312:8,11,14,15
313:4,7,9,17
314:2,12 318:9
318:11,12
**knowing** 92:17
254:18
**knowledge** 8:19
34:14 35:3
43:21 56:24
63:16 110:12
136:1 155:8
222:15 231:7
236:5 262:24
282:23 289:24
318:12
**known** 63:5
289:7
**Kristen** 23:23
24:12
**Kristin** 24:18
25:8

**L**

**L** 1:8 35:15 36:4
36:12 37:17
**L-A-N-E** 304:20
304:21
**L-A-N-G** 304:20
**L-Y-N-N** 66:5
**La** 180:17
**ladies** 50:13
155:19
**lady** 158:7
196:10 239:11
255:23 264:14
**lamtsbuechler...**
2:17
**landing** 156:15
**Lane** 304:16,20
306:15
**Lang** 304:20
**language** 193:13
202:23 251:10
320:24
**laptop** 183:20
**large** 94:9
109:19 231:5
293:16 297:20
**larger** 108:21
**late** 10:15 39:12
39:19 56:20
57:20 58:3,10
87:2 88:22
117:24,25
118:5 162:1
168:11 288:18
289:25 291:3
304:1
**lateral** 182:3,16
183:10 218:9
**launched** 13:24
**laundry** 50:13
51:17 55:17
85:12 113:18
125:23,25
128:5 311:1
**Laura** 2:12 7:6

8:15 170:6
191:20 278:24
313:19
**lawsuit** 8:20
185:6 187:18
**lawyer** 176:24
**lay** 110:20
**layout** 95:22
**leading** 123:19
124:2,3
**leaned** 39:9
**learn** 38:18
39:20,23 50:14
84:13 311:22
**learned** 84:10
85:1,13 263:25
264:2
**learning** 256:24
**leave** 15:6,8
50:8 57:11
158:6 160:25
206:19,21,22
220:21,24,24
302:18 303:3,5
303:6 305:11
305:11,13
**leaving** 157:22
162:6 184:19
188:11 193:25
229:7 239:4
**led** 38:21 123:23
168:21 193:22
**left** 52:24 53:4
54:22,23 55:1
55:10 56:25
66:1 85:16
87:13 93:5,22
94:2,8,15
102:14 103:25
104:23,24
107:5,25
108:17 111:9
121:7 125:6
134:20 139:14
143:14 146:21
152:12 153:11

153:11,12
159:12 160:7
168:1 170:4
179:14 188:4
194:3 202:5
205:21 248:24
264:9 302:19
**legs** 65:4,5
**lengthy** 212:19
**lessened** 172:13
**let's** 21:14,14
25:11 40:2,20
42:2 43:5
47:23 48:7
61:3 93:21
94:24 102:20
104:10 112:25
115:8,9 122:12
122:19 123:20
123:23 124:14
136:10 137:13
137:13 147:9
148:19,25
152:12 162:12
182:10 191:4,5
193:14 205:14
209:10 223:6
248:17 255:2
256:25 261:21
274:15 282:6,6
308:9,15
**letter** 149:23
208:20 220:10
247:6 268:8,13
268:20,24
269:5,7 293:9
293:11,15
**letters** 120:7
270:4
**letting** 62:16
**level** 19:13
230:15 297:23
**levels** 23:4 296:8
**Lewis** 224:25
272:20
**liability** 319:5

321:1
**liable** 144:19
**lie** 58:17,20
63:18,23 64:1
64:2,4 128:22
159:16 252:16
289:7,8,8
311:1
**lieu** 143:8 150:1
150:21
**lieutenant** 22:3
22:17 45:10
58:14 59:14
61:4 62:20
63:7,11,17,22
69:16 70:16
71:11,21 78:11
78:17 79:10,13
79:15,17,19
80:7,21 87:20
88:1 89:25
92:8,14 93:2
113:23 114:12
191:10 223:23
224:1 225:13
225:21 226:3
228:16 229:6
237:23,24
239:25 240:9
241:13,18
251:18 272:2
272:24 283:8,8
283:11 288:12
290:10,16
291:9 297:1
298:7,10 301:8
301:9,10,10
**lieutenants**
44:13 301:11
**life** 141:3 189:1
274:5 286:15
286:16 316:25
**lifted** 317:13
**light** 103:14
131:6 133:5
**liked** 275:19

276:10,11
likes 51:18
liking 217:6
limited 33:10
  50:25
line 212:3,22
  281:24
link 58:23
  183:19
linked 183:17
list 48:7 185:20
  209:15 238:12
  259:21 260:5
  288:22
listed 9:25
  180:10
listen 77:7 99:12
  100:9 131:13
  134:19 139:19
  168:11,12
  264:11 274:8
  274:15 279:20
  281:20
listened 99:2,14
  99:14 100:18
  128:1
listening 157:4
literally 284:3
litigation 144:18
  160:17
little 9:23 12:15
  13:24 20:14,15
  20:15 21:19,19
  24:20 25:21
  31:5,12 38:17
  39:2,3 46:8
  56:4 58:4 65:5
  65:23 66:6
  83:24 84:16
  91:13,18
  103:25 106:24
  108:22 109:4
  109:13 122:23
  131:5 133:4
  135:17 138:16
  140:17,19

146:11,12,14
151:10 156:12
156:15 179:5
179:13 182:10
182:24 190:16
190:21 194:6
204:19 211:22
212:4 243:19
249:14 316:5
lives 112:16
  141:16
loads 52:25
lobby 199:10
  202:12 203:5
  203:12,18
  204:4,5,23
  275:13 278:8
located 1:17
  95:4 210:6
  253:23
location 231:23
locations 7:10
lock 96:13 100:3
  105:24 195:24
  256:1
lockdown 93:18
  98:8 100:2
locked 103:16
  194:9
locking 100:3
logs 34:11,12
long 14:15 43:22
  47:10 72:20
  74:19 90:23
  97:17 106:25
  117:10,12
  138:18 139:23
  144:23 157:4
  171:10 223:20
  230:8 233:1,14
  244:7 249:24
  250:5,11
  283:25 310:19
  314:13
longer 43:13
  106:25 178:24

193:8 235:5
250:18 314:4
Longmire 218:5
look 52:24 69:22
  73:9,10,23
  74:16 122:4
  129:20 131:23
  132:1,3 135:5
  137:20 148:21
  181:13 182:2
  196:24 203:25
  214:3,4 232:18
  242:14 248:15
  249:7 252:3
  254:20 259:9
  260:4 264:12
  269:6 270:15
  271:4,8,10
  273:7 281:7
  284:4 306:16
looked 14:7,11
  51:16 53:13
  69:11 74:14
  82:11 95:15
  102:3,11 130:8
  130:16 133:9
  141:13 151:21
  163:19 200:6
  205:10,10,17
  270:11 282:4
looking 59:20,24
  73:23,24 144:1
  149:14 162:11
  169:17 182:1
  182:11,14
  189:25 191:6
  195:10 201:11
  205:21 207:12
  212:3 213:23
  265:17,18
  283:17 319:22
looks 102:7
  144:2 147:15
  212:2,21
  216:25 223:22
  240:1 321:13

loop 61:3 148:10
loosely 36:12
  37:4 38:21
Lori 1:5,14,16
  3:4 6:7,7 7:2,3
  8:5 12:23 39:3
  39:13 51:20
  67:19 77:8
  78:20 80:23
  90:4 100:6
  118:11 128:18
  141:21 142:24
  144:12 147:24
  148:9 149:11
  151:25 154:2
  154:12,19
  155:2,3 157:1
  157:20 158:1
  160:7,13
  161:12 163:17
  164:24 165:10
  169:13 199:6
  201:8 203:1
  205:9 225:25
  226:1 237:25
  242:14,19
  272:20 283:19
  287:25 288:9
  312:25 315:4
  322:13 323:7
  323:10
lose 141:1
  242:19
losing 322:7
lost 40:3,20
  61:21 73:12,17
  135:10 136:11
  152:4,4 159:24
  211:7,9,9
  238:25 239:5
  248:16,17
  264:14,15
  290:22 299:21
lot 37:8,21 42:25
  46:8 48:9
  78:25 89:12

98:10 111:23
116:14 121:15
121:19 126:3
147:2,4 154:12
187:9,25
189:17 194:15
194:25 213:17
228:11 231:22
236:12 264:13
267:14,14
281:19 292:12
296:8 306:8
315:11 321:25
lots 82:7
loud 12:11 39:6
  97:19,22
  146:11,12,14
  146:15 198:13
  198:14 295:16
  295:23 297:14
  298:4 303:2
  306:9
louder 12:18
  295:17 302:21
  306:15,15
Loudermill
  50:18 51:2
  99:4 124:8,9
  124:22 125:9
  125:18,20
  197:10
loudly 12:8
  203:13 295:17
love 185:11
low 36:23
lower 39:3 96:13
  104:15 313:25
luck 182:23
lunch 88:5 102:5
  115:23 120:24
  121:6 247:8
lunchbox
  110:19,21
luncheon 51:24
lunches 229:18
lunchtime 56:6

56:7,8,9
**lying** 64:6
**lymph** 188:18
**Lynn** 1:5,14,16
3:4 6:7,8 8:5
66:5 67:1,3,5
67:10,14,22,24
68:1,2,6 82:17
82:24 217:18
280:10 282:20
282:25 283:5
284:2 323:7,10

**M**

**M** 173:20
**ma'am** 7:15
89:15 222:9
281:6
**machine** 52:14
**machines** 12:4
**mad** 46:4 120:4
311:8
**magazine** 36:24
**magazines** 36:5
**magnetic** 282:2
317:5,20
**maiden** 13:5,10
272:12
**mail** 88:20 183:6
**main** 99:25
102:23,24
103:3 105:9
236:12
**maintaining**
35:18
**major** 268:8,25
269:9
**majority** 32:2
**making** 64:19
65:3 77:16
97:4,8 106:10
106:13,15
139:25 157:16
159:13 178:11
180:18 218:1
225:19 228:22

245:19 246:18
246:20 249:18
263:2 266:12
271:19
**male** 66:10
242:6,13,17,22
279:15,23
280:3,5 281:19
284:3 294:5
307:17 318:6
**males** 76:22
81:19 300:3,4
310:5 318:6
**Maloney** 1:8
**man** 231:5 232:8
303:17 306:16
306:18
**management**
54:14,14 55:6
266:15 294:11
294:13 296:14
300:13,17
301:1
**management's**
313:5
**Mangioni**
191:10
**manner** 6:23
121:19 215:24
**manufacturer**
180:18
**marathon** 15:2
**March** 57:8 69:7
84:2 87:3
88:22,23
**Marcie** 85:14
**Marine** 55:25
56:18
**Mark** 45:10
58:17 114:12
224:12 228:19
229:1 240:18
241:12,13
289:7
**marked** 17:13
17:17 20:3

21:10,15 23:12
23:16 25:14
26:12 29:20
34:15 38:4,8
41:4,22 42:17
49:22 102:16
102:21 109:10
122:15 123:8
136:20 137:9
147:5 150:22
151:1 152:17
162:24 166:1,4
176:13 180:3,9
192:6,9,24
208:9 209:2
219:11 220:3
223:13,18
253:5 259:5
260:11,14,18
265:3
**marking** 20:7
25:18 42:1
209:7
**marriage**
287:21
**marriages** 13:21
**married** 11:14
11:15 13:13,18
231:22 272:12
273:21
**marry** 13:4
**master** 35:24
36:1 37:14
51:24 55:2
62:7 94:19
205:7,8 301:23
302:11 303:22
304:9
**material** 36:5
190:24 282:2
**materials** 36:24
**Matt** 85:15
120:18 296:19
296:22,24
297:10 301:21
306:18,23

**matter** 37:18
58:6 59:13
63:6 64:4
131:18 142:12
227:21 233:14
261:15
**Matthew** 302:5
**meal** 89:2
**meals** 69:7 89:7
**mean** 13:15
15:10 20:19
21:5 27:13
36:14 50:6
73:2 87:20
91:13,22 92:14
97:22 101:23
111:4,24
118:14 125:24
127:5 137:24
148:12 154:18
154:24 161:6
166:19,19
174:15 176:23
178:6,17
185:10 213:17
222:24 234:2
261:2 264:10
275:13 281:15
303:13,14
304:14 305:12
306:11,13
310:2 314:7,8
317:2,23
**meaning** 224:11
278:7
**means** 15:2
35:10 249:22
**meant** 114:19,20
128:3 150:2,17
166:22 236:25
251:17 305:15
307:6
**meat** 261:14
**med** 174:4
**mediating** 85:25
**Medicaid**

154:24 173:16
175:11 176:8
**medical** 43:12
166:24 173:22
176:10 210:19
293:19,23
**Medicare**
154:24 173:18
174:11
**medication** 9:3
9:5,24 190:23
190:24 208:21
211:21
**medications**
175:8
**medicine** 166:25
**meds** 10:1,2
174:9,17
190:19 316:18
316:19
**meet** 11:16
89:25 91:2
125:21 126:4,5
269:21 289:12
**meeting** 14:3
50:16 51:6,11
52:20 53:20
56:2 99:4
112:24 113:13
113:14 125:20
126:5,7 127:6
127:8,9 128:20
129:4,9 130:19
133:4,21 134:2
134:8 137:22
141:24 146:6
196:8 200:2,3
200:6,10,20
201:18 203:11
203:18,22
205:1 208:2,17
211:19 216:24
217:22 218:12
218:13 219:5,6
223:23 277:9
**meetings** 124:1

124:3,5 199:15
247:21 293:10
**member** 42:11
**memo** 123:13
137:1,3 163:3
264:17,19
**memory** 63:10
227:3
**men** 282:13
294:13,24,25
299:3
**mental** 205:2,24
209:12 291:19
316:15
**mentally** 8:24
60:22 118:2
177:8,10,23
178:12 179:18
208:18 211:20
293:10 296:6
310:23
**mention** 258:9
289:1 310:13
**mentioned**
121:10 289:22
298:24 299:12
301:21 305:5
305:17,17
310:12 311:2
**mentioning**
269:14 316:21
**MERS** 152:1
154:20 155:11
156:1 157:6
162:6 190:3,3
**mess** 119:18
196:24 198:10
**message** 12:7
139:14 171:1,4
181:10 186:7
239:4 252:25
**messages** 171:9
186:11,14
187:3,15
**messaging** 186:9
**Messenger**

186:11,20,20
187:7
**met** 11:17,22
259:1 294:4
**metal** 103:10,11
103:13 105:16
105:16 305:22
317:22
**Meyer** 186:2,4
**Meyers** 281:14
311:6,18
**Michael** 2:23
**Michigan** 1:2,17
1:20,21 2:7,15
6:1,10,13,19
181:3 213:12
323:1,24
**microscope**
279:18
**microwave**
229:19
**mid** 62:4 289:25
291:3
**middle** 62:4
152:24
**midnight** 168:9
**Mike** 13:18
201:12,13
206:10
**Miller** 78:8 83:4
83:7
**milligram** 9:6,9
9:11
**milligrams** 10:4
10:4
**million** 135:15
135:16
**mind** 10:9
117:20 150:2
161:23 178:9
204:24 217:19
221:15 237:4
304:11 310:3
316:2
**mine** 110:21

131:7,18,24
133:6 134:25
139:14 196:20
**mini** 40:22
**minimum**
188:12
**minor** 268:10
269:1
**mint** 40:7
**minute** 17:22
29:17 32:3
48:6 49:18
58:23 70:21
116:5 123:20
139:24 142:14
158:9 159:11
180:19 194:15
194:25 195:20
200:20 205:9
209:21,21
217:21 232:4,4
245:9 282:7,22
283:16 286:11
314:21
**minutes** 90:24
117:10,15
138:21 140:1
140:10,15
170:6 195:1
199:20 200:16
207:17 292:5
306:7 314:6,13
**mis** 92:1
**mischaracteri...**
32:4 227:16
**miscommunic...**
202:4
**misconduct**
70:18 71:12
228:15,18
320:8
**misfortune**
307:4,5
**mishandled**
48:10
**missed** 83:9

103:20 168:4
200:20 271:11
**misspoke** 91:21
156:5 291:6
319:1,16
**mistreat** 47:18
48:8 49:13
**mistreated**
186:15 286:21
**misunderstan...**
101:7
**mix** 283:1
**mixed** 172:19
**model** 75:14,15
**mom** 112:13
128:15 133:16
135:15 253:21
**moment** 180:17
230:7 319:16
**momentarily**
40:13
**Monday** 168:14
199:19 247:17
247:20 251:11
**monetary**
212:21
**money** 59:10
175:1,15 222:4
**monkeys** 48:4
49:1
**month** 154:16
157:2 171:21
175:12 229:13
**months** 56:25
69:19 118:2
154:4 155:17
165:9 173:21
174:16,25
175:14,16
188:17 250:7
250:15,15
251:22 255:16
264:10 268:9
268:25 269:9
**morning** 16:25
110:18 199:24

222:5,7
**Morris** 243:4,5
243:12,13
244:5,9,23
**mother** 11:19
48:20 141:15
274:3 285:2
**mother's** 11:17
193:24
**motion** 154:22
202:24
**motions** 203:2,2
**mouth** 40:8,8
106:25 107:3
235:22
**move** 20:13,14
25:21 69:2
182:16 192:18
195:22 205:18
218:9 255:7,8
255:19 272:10
274:15 301:24
**moved** 65:22
76:8,8,8,9
190:10 210:10
210:11 231:22
231:23 317:23
**moving** 54:1
82:10 188:20
203:19 262:1
316:11
**muffled** 305:25
**multi-page**
170:9
**multiple** 22:4
59:2 114:15
115:2 117:21
197:4 228:10
235:24,25
236:9 237:16
249:21 255:25
307:9 317:11
**murder** 273:9
**music** 198:12,14
**Muskegon** 1:9
6:8 20:8 21:16

35:25 184:8
190:6 210:6
214:22 253:24
269:11 286:24
286:25 287:1
308:16 311:14
311:15
**mute** 191:20
198:23 280:17
280:22 281:17
281:17,20,23
281:25 282:6
316:22 317:19
**muted** 7:19 77:5
77:6 198:1
282:19 314:12
317:6,17

**N**

**nah** 79:2
**nail** 190:21
**name** 6:14,17,24
8:15 11:7
12:20,25 13:5
13:10 27:8
30:15 43:18
66:3 148:5
189:8 213:18
213:25 216:12
217:23 231:15
235:7 238:8
239:6,7 241:5
241:11 242:25
271:11 272:12
272:12 273:13
284:20 285:14
304:11,21
306:19
**named** 13:4
241:17
**names** 89:21
217:17 283:22
303:18 308:21
308:22
**narrow** 182:13
**Nash** 238:4,5,17

239:18 244:3
264:6
**Nate** 43:7,14
83:25 84:18
86:5 90:7,8,10
90:11,13,15
91:9 99:20
114:24 119:14
119:17 125:14
125:24 127:10
200:11 202:11
283:22 294:15
295:1 307:7
309:7,23 310:4
**Nate's** 115:1
**Nathan** 114:8
**nature** 46:7
232:12 272:19
272:20 313:10
**Nay** 246:19,19
249:19,19
**Neal** 85:14
**near** 62:8,8
101:12,18
255:22
**necessary** 96:23
198:24 257:4
**neck** 97:16
106:23
**need** 14:19 15:1
20:10 23:24
25:22 26:13
45:23 60:17
78:19 85:16
87:22,23,24
115:12 121:12
137:18 140:20
141:13 144:24
144:25,25
151:25 161:14
161:15,22
167:8 174:2
177:4 179:12
179:16 193:8
204:20 223:3
233:2 246:12

249:13 295:10
299:17 300:8,8
300:9 313:17
**needed** 11:20
22:6 23:9 55:4
88:17 101:9
108:2 113:18
132:1 139:1
141:2 149:24
167:2,7 176:1
216:18 243:5
244:6 246:7
264:15 287:6
299:19 316:25
**needs** 115:16
140:13 154:21
156:3 159:12
**negative** 185:14
**neglected**
280:17
**negotiation**
319:6
**neighbor** 11:23
**neither** 61:22
168:8
**Nelson** 284:15
284:24
**nervous** 177:23
**never** 15:18
18:14 28:19
29:6 30:21
31:2 42:19,20
42:21,24,25
44:10 52:10
53:23,24 55:7
58:15,16 78:18
96:19 112:17
112:17,18
116:21 117:2,5
145:14 155:5
177:24 183:18
188:25 189:2
206:1 208:6
213:15 221:15
227:4,5 232:23
247:3,22

251:12 263:5
275:23,24
276:16 279:8
279:16 280:12
290:7 298:16
306:9
**new** 15:25 35:7
41:12 75:11
76:12 94:19
159:21 183:14
197:21 207:18
229:17 235:13
236:20,24,25
239:13 264:16
277:15 322:4
**Newago** 15:25
**newspapers**
36:6
**Nexus** 273:9
**nice** 56:3
**night** 10:1,2,5
55:3 60:6
80:16 83:22
200:12 281:8
317:12
**nights** 26:20
28:23
**nightshift** 68:21
96:5
**nine** 251:21
299:4
**nine-hour**
189:15
**nodes** 188:18
**noise** 98:10
106:4 130:16
131:5,25 133:4
133:5 207:7,8
295:21 296:5,8
299:8,25
305:21
**noises** 106:3
245:19,19
246:18,21
249:18
**non-work** 36:6

**nonchalant** 79:2
**Nope** 40:3,3
**normal** 12:11
97:20
**normally** 68:19
96:5 196:11,17
196:17 199:23
218:20,20
**north** 111:9
112:16 190:6
253:24
**Northwest** 6:12
**Norton** 210:7
**notary** 1:19 6:18
323:23
**note** 55:2,11,11
86:8 152:16
153:9,10
158:17,17
162:14 164:16
166:8 170:16
178:17,19,19
178:21 179:6
217:20 219:16
261:22,25
321:11
**notebook**
178:25 179:3
179:11
**notebooks** 179:2
**noted** 17:1
225:14
**notes** 163:7
212:1 216:23
216:24 225:17
252:3,4 313:15
313:24 315:11
315:15 321:19
**notice** 8:12
16:22 113:11
122:25 130:13
136:19 163:4
163:10,13,15
164:19 193:3
252:17 253:11
288:16

LORI LYNN HEETHUIS, 9-25-2020

**noticed** 130:15
  215:17
**notified** 136:22
**November** 47:5
  193:12 197:17
  200:9 265:9
  322:3
**number** 6:11
  17:17,24 20:8
  21:15 23:16
  25:18 26:12
  29:17,18,25,25
  34:19 36:12
  38:8 41:9,12
  41:19 42:2,9
  42:18 48:20
  50:2 102:8,21
  110:6,13
  122:24 125:20
  140:18 144:3
  144:12 145:21
  148:15 153:3
  160:10,12,15
  170:7 176:17
  180:9 185:6
  212:21 253:22
  260:19 267:11
  313:18,19
  314:2 319:15
  319:19
**numbers** 157:3
  313:25,25
  315:1
**nurse** 213:15
**nuts** 234:2
**NW** 2:6

**O**

**o'clock** 90:25
**O-G-R-E-N**
  231:16
**Oak** 155:20,22
  214:24
**oath** 7:21
**obey** 256:1
**object** 32:3

232:7 237:9
  270:19
**objected** 287:14
**objection** 32:16
  33:23 70:22
  71:13 227:16
  234:3 237:8
  286:11,12
  315:5 320:15
  320:17
**objections** 6:22
**obligation** 23:1
  32:20,21 33:19
  33:21
**obscene** 193:13
**obscenities**
  300:21
**observe** 109:24
**obviously** 46:14
  110:2 120:5
  165:12 188:4
  198:8 295:21
**occasions** 295:8
**occupation**
  11:25
**occur** 59:9
**occurred** 254:15
  278:17,21
  292:2
**occurring** 124:7
  265:24
**occurs** 304:19
**October** 13:18
  58:3 59:6
  77:13 78:15
  264:17,24
  265:8,9,14
  322:3
**odd** 172:3
  287:20
**offense** 216:2
  258:7
**offenses** 253:12
**offensive** 265:20
  265:22
**offhand** 155:19

**office** 7:7 14:9
  21:5,6,18 28:2
  36:11 47:6
  49:15 57:18
  65:2 67:17
  72:8,10,20
  73:1 74:6
  80:12 81:4,8
  83:14 88:6
  89:6 91:3
  93:24 94:1,18
  95:3,4 100:10
  111:8 122:3,9
  148:12 152:21
  158:10,14
  161:5 170:1
  179:2,4 181:2
  182:12,15
  184:23 185:14
  185:24 186:8
  186:16 187:4
  187:21 205:15
  205:15 209:11
  210:3 213:11
  239:9,17,23
  241:16 245:16
  259:19 262:13
  265:1 278:1
  283:4 322:5
**officer** 10:23
  15:16,20,22
  17:7,8 19:12
  19:25 21:6
  22:13 29:13
  34:21 37:14
  83:22 93:13
  197:2 212:5
  216:12 234:17
  242:13 244:4,5
  246:14 248:10
  282:11 286:24
  303:16 308:16
  308:18 310:10
  317:13 320:8,9
**officer's** 255:15
**officers** 18:25

37:13 82:22
  94:15 96:7
  194:5 196:15
  217:16 234:13
  271:20 279:7,9
  279:13,15,23
  280:3,5,7
  284:3 294:5
  307:17,18
  318:6
**offices** 54:6
  94:19 182:8
**officially** 322:4
**ogling** 246:21
**Ogren** 231:14
  234:25
**oh** 12:10 17:21
  28:14 39:5
  40:2 53:2
  65:21 78:11
  82:7 86:6 90:4
  98:22 114:1
  116:5 127:6
  128:5,20,23
  130:17 131:8
  141:19 146:2
  148:9,16 154:5
  158:5 159:14
  160:21,23
  169:1 172:6
  180:22 191:22
  191:25 194:20
  205:11 211:25
  224:19 231:3
  241:13 242:6
  245:25 291:6
  301:5 312:3
  314:11
**okay** 7:16,18 9:3
  9:10,15,18,20
  9:24 10:9 11:6
  11:8 12:7,13
  12:15,16,19
  13:4,6,11,23
  14:11,14,23
  15:10,13 17:19

17:21,24 18:2
  19:17 20:22
  21:14 23:6
  24:6 25:7,11
  26:12,16 27:4
  29:3,5,12
  33:10 34:19
  37:17 38:8,22
  39:15,23 40:2
  40:8,14,21,22
  41:15 42:6,8,8
  42:9 43:3,5,22
  44:18,21 46:9
  46:19 50:22,24
  52:15,19 53:10
  53:19 56:14
  57:8 58:8 59:4
  61:2 62:25
  65:1,15,21
  66:1,6,25 69:5
  71:6,24 72:4,6
  72:15,20 73:22
  74:2 76:14
  77:2,9 78:9,20
  81:5,18 83:2
  83:24 84:25
  85:6,23 86:25
  87:9 88:2,21
  89:11,17 90:20
  90:21 91:21
  92:6,7,19
  94:24 95:7,24
  96:24 97:21
  100:20 101:16
  102:20,22
  103:4,7,13
  104:5 105:6,18
  106:4,10 107:7
  109:7 111:16
  111:20 112:1,6
  112:21,25
  114:1,7 115:14
  115:18,20
  117:1,12
  118:12,18

119:14 120:12
121:9,19,20,23
121:24 122:19
123:6,12,16,19
123:25 124:1
124:14 125:12
127:9,21 128:8
128:23 129:4
134:2 135:24
136:10,25
137:13,14,22
139:24 140:8
141:6 142:11
144:1 145:15
145:24 147:9,9
147:22 148:1,7
151:1,4,11,24
152:12 153:5
153:16 154:3,7
155:3,21 157:4
157:8,8,8,13
157:24 158:16
160:4 161:6
162:13,23
163:7 164:9
167:10,24
169:6 170:13
170:14 173:13
176:6,10,17,20
176:24 178:1
179:17 180:12
180:22 181:24
183:1 185:23
186:14 189:21
191:22 192:13
193:7,15 194:1
195:19 196:7
202:12 204:13
204:23 205:1
205:18 206:11
207:5 209:21
209:25 210:13
210:18 211:4
211:11,18,23
214:7,9,22,25
215:8,20

216:23 217:20
219:8,15
221:15 222:10
223:7,21 224:1
227:1 233:1
235:9 236:2
239:16,22
240:5,22 241:7
241:19 243:2
245:1 247:12
253:2,10
254:15 255:2
256:4,5,9
257:14 259:3
259:11,21
261:16,21
262:2 265:14
266:2 270:7
282:8,15 285:3
287:19 304:7
307:3 308:4,15
309:6,16 310:4
311:22 312:3
314:7,10,25
316:9 319:22
319:23,25
321:8 322:8
**old** 72:10 76:15
88:17 114:20
215:10 236:3
236:18 253:22
307:2
**older** 171:12
**once** 43:23 56:9
61:1 72:13
76:9 84:17
102:5 120:19
132:18 148:11
148:11,23
206:15 216:9
220:25 236:10
247:25
**one-on-one**
49:14
**ones** 78:14
171:13 178:9

185:21 191:1
240:3 273:5
280:11 294:19
300:5
**ongoing** 199:17
231:10,11
**online** 176:4
207:19
**onset** 216:17
**oops** 159:24
211:7
**open** 84:7,14,18
84:18,21
102:14 116:6
157:25 158:6
158:11 239:13
297:21
**opened** 94:23
108:13 130:13
201:10
**opening** 85:2
94:12 157:24
247:19 251:11
**openings** 184:2
**operated** 42:16
**operation** 36:2
**operations**
35:24
**opinion** 216:21
304:13
**opportunity**
8:18 113:22
244:25 247:23
**opposed** 25:7
**optician** 189:11
**option** 182:6
191:20
**options** 20:1
173:8
**oral** 218:1,10,15
218:16
**order** 18:1,6,9
18:12,14 25:11
25:20,22,23
26:4,12 29:24
34:20 38:9,11

88:18 89:3,4,5
90:15 122:24
141:7,19,20,20
146:16,17,17
146:19,21
155:16,23
162:2,10
163:23 201:6,6
202:5 210:14
293:12
**ordered** 46:5
154:5
**orderliness**
35:19
**Orders** 16:3,5,7
16:12,19,23
17:4,9 37:23
**original** 50:11
54:10 147:21
147:24 148:8
148:24 171:2
261:17 269:16
**originally** 55:21
212:10 216:20
**Ottawa** 2:6 6:12
183:14 184:5
184:16
**ought** 115:7
**outburst** 205:6
205:25 206:1,2
206:7,8 207:1
207:5,10,13
291:19 292:4
296:2 304:4,23
305:3,6 306:3
307:7 315:4
**outbursts**
292:19 294:6
294:13 295:1
296:15 297:24
298:9,11,18,25
301:2,12,14,19
301:22 302:6
**outcome** 208:1
**outdated** 270:1
**outpatient**

175:13,17
**outside** 97:25,25
138:16 205:13
270:4 282:25
**overall** 49:15
**overheard**
218:24
**overpassing**
113:22
**overqualified**
185:11,12
**overtime** 207:19
**overwhelmed**
142:11

___

**P**

**P** 86:24 214:2
**P-A-B-E-K**
241:6
**p.m** 55:21
102:18 121:2,3
121:4,6 122:17
123:10 137:11
147:7 150:24
152:7,8,9,10
163:1 166:3,6
169:21 170:17
176:15 179:23
179:24,25
180:2,5 192:11
193:1 208:11
209:4 219:13
220:5 223:8,9
223:10,12,15
248:18,19,20
248:22 249:2
253:7 259:7
260:13,16
265:5 288:2,3
288:4,6 322:14
322:15
**Pa** 213:14 241:1
**Pabek** 239:24
240:22 241:2,4
241:18
**packet** 169:10

169:11
page 3:3,15 15:7
  18:2 23:17
  24:8 25:19
  30:1 38:10
  54:13 166:8
  169:18 180:12
  193:8 209:10
  209:12 210:18
  210:18,25
  211:2 219:16
  223:20 253:12
  254:11 259:22
  259:24,25
  260:20,21
  261:21 264:19
  315:10
pages 50:1
  137:19 170:11
  181:14 209:10
  228:5 253:10
  265:8 313:24
  314:25 323:6
paid 173:15
  174:2,4 175:6
  175:9 176:8
  189:21 220:17
  220:21 221:2,3
  221:4
pandemic 188:4
pants 103:18
  106:8,11,18
  202:21 236:1
  236:16 237:6
  237:15 240:6
  240:19
paper 31:6
  107:17 108:1,1
  108:3 206:12
papers 302:14
paperwork 88:7
  88:10 152:1
  153:11 154:20
  162:7 169:2
  238:25 239:3
  273:7 281:21

299:21
paperworks
  242:2
paragraph
  144:3,21 145:6
  145:18 177:5
  265:18,19
  316:6 318:24
  319:2,7,18,24
parameters
  182:2
Pardon 221:12
  222:6 306:12
Parrett 213:22
  214:2
Parrier 213:22
  214:2
part 16:2 20:23
  21:7 24:1
  35:21 36:15
  49:12 81:7
  107:1 108:22
  141:21 146:20
  165:2 170:12
  173:18 181:4,4
  191:9 192:19
  203:22 210:24
  215:10 221:7,7
  228:14 232:9
  233:20 241:14
  247:9 257:8
  271:1 287:21
partial 171:20
particular 28:20
  50:9 96:7
  150:13 182:12
  191:2 272:17
  283:3 285:20
  309:10
parties 2:2 6:21
partner 55:25
  57:2,3,6
parts 31:4 102:7
party 153:13
  163:4,10,13
  164:19 323:13

323:14
pass 86:6,23
  179:9
pass-through
  84:17
passed 216:18
passing 51:14
  69:7 159:7
passive 39:20
password
  133:18
Pat 213:15
path 64:18
patient 292:13
Paul 1:8
pay 158:7
  174:12,18
  253:11
paying 204:7
PC 2:13
peeked 317:15
pending 7:25
  187:18
penetrate 204:3
pension 157:1
  171:20
Pentwater
  210:11
people 17:8 37:8
  37:21 52:11
  54:24 55:1
  56:12 57:16,22
  57:23 60:6
  62:14,15,15
  64:19 68:22
  78:22 81:23
  82:1,1,7,13
  83:2 93:18
  111:23 112:12
  122:3 124:22
  125:2 128:14
  128:17 139:10
  141:11 154:12
  154:19 161:12
  161:16 177:21
  183:7 186:12

186:14,23
  187:3 194:6,7
  195:4,5,14,22
  195:22 204:4,4
  204:6 222:16
  226:14 228:25
  232:19 245:2
  246:12 263:4
  273:15 276:4
  279:21 281:4
  281:16 283:14
  283:18 296:6
  297:24 298:15
  299:4 300:9
  303:20 304:8,9
  304:17 316:25
  318:2 321:16
people's 133:7
Peoples 193:14
  193:21 194:24
percent 157:2
  182:19
percentage
  172:14
perfect 27:14
performance
  36:7 37:3
  54:14 270:6
period 35:19
  36:8 122:13
  220:17
permission
  191:18 270:18
person 19:24
  67:6 114:22
  183:4 218:23
  226:11,17
  244:18 273:23
  291:21 293:6
  296:7 302:9
  309:19
person's 271:11
  316:19
personal 36:4
  186:18,22,23
  252:25

perspective
  126:17
pertain 122:8
pertained 34:4,7
  34:10
pertaining 18:7
  26:4 30:19
pertains 18:2
pertinent 55:12
Pete 284:15
pharmacy 190:6
  190:7
phase 258:25
phone 48:18,20
  48:21 54:2
  65:5 66:7,11
  67:10,15 68:6
  68:12 69:23
  70:12,13,15,17
  71:18 73:9,23
  74:15,15,19,21
  75:1,3,6,7,9,10
  75:11,13,17,19
  76:3,4,12,15
  79:20 83:3,4,7
  92:9,15,16,19
  93:19 97:3,4
  97:11,14
  100:15,17
  101:2 106:21
  106:25 107:2
  110:4,6,10,11
  110:13,15,24
  111:1 112:3,24
  114:7 122:5,6
  122:8 124:15
  124:16,18,23
  125:5,10,13
  126:12,14
  129:14,20,22
  129:23,24,25
  130:1,2,3,4,6,6
  130:8,10,10,12
  130:12,17,21
  130:22,23,24
  130:25 131:4,9

131:11,14,20
131:22 132:1,3
132:10 133:3,6
133:10,11,12
133:13,13,17
133:18,23,24
134:10,15,21
135:2,5,11,21
137:3 138:23
138:24 139:16
141:8,15,18
142:7 146:1
151:7 163:8
165:20,21
183:5,20,22
187:12 195:10
197:20,21,23
198:22 207:22
252:23 253:14
253:17,22
268:23 280:1
282:19,20,25
phones 53:24
57:19,22 66:17
67:17 68:16
82:3 110:17
133:7 207:20
281:1 284:3
phonetic 56:17
141:25 191:10
213:22
photo 71:16
physical 187:19
188:1,8 265:21
265:24 266:2
305:18,18
physically 8:24
101:17 187:24
245:18 265:22
266:17 287:8,9
301:12 305:13
318:3
pick 83:9,19
154:19 167:12
173:18
picked 133:8

303:9,10
picking 81:6
picks 109:20
picture 48:13
159:24
pictures 186:23
piece 107:17
315:15 316:8
321:12
Pierce 213:7,8
214:7 216:16
pile 83:22
pill 9:11,13
pillar 104:11,11
pinpointing
248:12 249:3
pipe 302:11
306:2
place 17:5,10
86:13 131:12
places 54:7
180:20 181:10
181:15,22
185:9 190:18
236:12
plaintiff 1:6
2:10 6:8 7:2
264:18
plaintiff's
223:19 259:10
264:18 265:17
planned 153:15
planning 115:23
161:7 188:9
314:5
platform 184:17
plausibly 237:4
play 72:2 115:7
115:11 117:9
186:17
played 168:19
171:4
playing 66:17
116:20 117:4,4
198:12 201:17
204:18

plead 173:17
please 6:15,23
6:25 7:22
13:17 15:1
20:12,14,15,16
21:19,20 25:21
33:15 39:3
66:4 73:10
88:13 94:24
118:7 121:17
152:19 171:15
194:18 196:3
196:18 214:4
217:17 231:15
241:5 312:25
pled 254:24
pocket 53:14
110:22 130:9
130:15,18
178:23 179:6
197:24
pockets 197:25
pod 86:24 89:2
195:15 299:2
point 21:1,3
29:11 30:22
31:11,19 43:4
43:8,10,14
60:23 61:15,17
63:11 67:3
68:24 69:3,3
72:3 75:19
84:9 88:19
92:3 97:7
105:5 106:10
108:6,9 111:21
112:18 123:1
125:2 126:15
127:21 128:8
130:25 136:9
144:3 146:11
150:16 155:10
155:13 156:4
156:17 157:18
159:17 162:9
164:20,24

165:1,15
173:22 174:24
176:1 186:10
188:21 191:11
192:23 207:17
208:25 212:14
223:25 226:19
228:6,21 230:4
233:5 243:10
244:4 250:6
255:13 267:19
273:17 274:7
274:24 277:13
277:14 285:25
286:22 287:7
290:22 301:23
310:21 320:22
321:7,24
pointed 143:6
pointing 225:15
points 300:20
police 15:20
215:4,4,5,8
216:9,12
286:24
policies 23:21
24:8 26:20
28:19,22 29:9
policy 19:17,18
19:21 20:8
21:16 28:20
30:11 34:22
35:2,7,11,16
35:22 36:16,18
37:19 38:12,13
59:25 60:19
77:19,24 78:7
78:23 80:11
82:2 143:12
256:20,21
257:1,3 281:9
282:9,10
316:23 318:9
polite 96:8
142:12

pop 84:18
popped 309:23
pops 52:13
portion 31:7
180:7
portions 30:11
position 165:18
182:3 217:25
230:12,13
253:25 291:2
301:2
positive 155:16
possible 20:20
101:17,22
143:24
possibly 52:23
53:22 85:24
91:5 117:25
120:3,18 168:3
177:20 182:4
215:1 224:25
237:22 252:5
293:15
post 93:12
posted 176:3
posting 207:19
posttraumatic
167:1 216:21
potentially
318:3
Poulin 2:23 7:17
7:17 8:17
16:21 26:19
28:19,21 46:3
46:13,25 47:4
47:14 48:7
49:7,8 61:10
61:11,19
148:12 222:22
247:2,3 256:15
257:6,15,23,25
258:1,2 263:15
268:22 274:21
275:8 276:10
276:17 277:4
277:20 278:16

LORI LYNN HEETHUIS, 9-25-2020

278:21 279:5
290:15 291:4,5
291:9 314:20
**pound** 305:22
305:24
**pounded** 305:20
305:20
**pounding** 48:2
48:25 305:17
**Powell** 174:16
175:4,5 214:15
216:19 220:13
**PowerPoint**
25:2
**practice** 213:13
213:16
**pray** 276:12
**predator** 201:23
**premarked** 14:8
14:11 191:15
**premises** 78:24
78:25
**prepare** 14:1,3
**prepared**
232:24
**prepping** 14:5
**prescribe**
316:20
**prescriptions**
190:15
**present** 2:20
8:17 51:3
62:13 137:22
144:17 190:12
288:14 300:18
320:10
**presentation**
23:23,25 25:2
**presumably**
91:10 133:23
167:22
**pretty** 96:14
107:3,18,22
132:13 188:6
191:12 220:12
226:17

**previous** 222:23
**print** 31:21,21
31:23
**printing** 179:5
**prints** 253:18
**prior** 18:12
28:12,18,19
29:6 30:5
34:23 35:11,22
47:8 51:19
52:3,15 91:9
91:14 92:16
128:6 170:24
172:7,7 174:22
175:15 190:8
194:8 229:6
244:10 255:8
255:16 283:22
285:4,6 289:12
306:20,20
322:6 323:9
**prison** 308:14
**prisoner** 11:8,10
**prisoners** 35:18
58:6
**privacy** 98:13
98:22 116:24
**private** 186:18
186:22
**probably** 12:17
19:4,19 30:22
31:4 36:13
39:10 47:1
56:20 67:11
68:8,9 69:19
70:4 74:20,22
80:9 82:9 91:8
94:14 99:21
100:19 112:12
128:17,21
131:7,9 138:5
140:14 151:16
154:20 162:1
170:1,2 188:3
201:4,5,24
206:8 216:17

219:20 228:16
228:19,22
237:17 243:13
249:23 250:6
268:14 275:11
281:15 297:18
310:2
**probation** 194:5
195:14
**problem** 7:4
17:23 29:19
40:4 54:8
146:3 205:13
225:2 253:4
276:7 318:24
**procedure** 7:2
20:22,24
**proceed** 8:22
9:18 89:12
**produced** 38:11
75:4 209:12
**profanities**
300:7
**profanity** 297:6
298:8 301:12
305:5,7
**professional**
216:21
**profusely**
196:11,17
**prohibited** 19:3
45:4
**prolong** 189:1
**promoted**
302:16
**pronunciation**
246:23
**proper** 211:21
**property** 36:7
**prosecutor**
209:19 273:20
**protect** 17:10
76:19
**protective** 38:11
**proud** 292:9
**prove** 138:23

**provide** 214:4
**provided** 64:22
223:19 260:2
**providing**
261:19
**provision** 36:10
45:3
**PSA** 188:23
**PSMA** 188:17
**psychiatric**
285:4
**psychiatrist**
208:19 211:20
285:9 293:25
315:7
**psychiatrists**
175:3 219:25
316:19
**psychological**
206:14 285:4,6
287:5,6
**psychologist**
206:15 274:8
285:8 292:18
292:25 293:3,5
293:6,13,14,18
293:20,21
**psychologists**
316:20
**PTSD** 9:22
213:5 216:16
**public** 1:19 6:18
27:5 36:8 37:1
290:5,6 323:23
**pull** 122:19
130:5,22
151:11 191:18
235:23 240:19
246:18 249:17
313:16 319:10
**pulled** 62:20
321:20
**pulling** 157:24
**Pump** 12:3
**punish** 222:3
**purchase** 173:2

**purpose** 1:18
27:1 134:21
135:3
**purposes** 8:12
39:25
**purse** 205:19
**pursuant** 8:11
**pursue** 143:24
159:15,18
215:23 239:9
**pushed** 226:12
226:16,16,17
**put** 23:16 26:19
28:23 38:23
40:7 42:24
47:21 48:1
53:14 56:17
86:8 87:11
88:8,16 96:20
114:21 116:10
116:13 119:18
119:20,25
126:2 138:10
141:7 147:14
148:12,22
152:2 162:2
164:19 169:5
169:15 174:6
184:19 186:21
190:24 199:7
202:24 203:6,7
203:8 204:12
206:21 219:8
220:7,18
223:17,21
235:20 237:6
241:22 246:6
247:23 253:9
259:9 261:6,11
269:15,15
279:18 280:17
281:17,19,24
282:2,3 284:25
286:22 287:18
294:15 295:11
314:18 316:22

317:4,17,20
**puts** 145:7,11
**putting** 25:8
  40:2 85:19
  134:22 163:4
  208:13 209:6
  212:15 236:15
  241:25 264:17
  265:7 268:5
  270:12,14
  280:22

## Q

**question** 14:16
  15:5 24:1 26:3
  32:4,13,23
  33:5,9,12,14
  33:18 35:14
  36:17 42:20
  56:14 59:4
  66:12 70:22,23
  70:25 71:6,8
  71:13 76:5
  77:7,8 78:9,9
  83:15 89:11
  91:21 93:21
  94:24 98:19
  101:14,15
  106:14 111:12
  111:15 112:25
  113:24 118:8
  118:11 120:12
  120:15,15
  121:12,15,17
  145:3 157:13
  185:17 191:7
  209:22 211:23
  225:9 226:15
  233:23 237:10
  243:14 244:13
  249:3,7,10
  254:25,25
  257:14,14,14
  257:18 270:7,7
  274:15,20
  275:1,7 278:4

280:2,2 286:17
289:10,11
295:8 301:24
313:1 315:6
321:11
**questioned**
186:25
**questioning**
113:5 125:3
233:9 235:9
321:6
**questions** 8:18
  9:1 14:5 50:23
  58:18,21 77:3
  89:13 121:18
  126:18 153:12
  187:1 215:6
  232:11,16
  233:3,6,19
  243:24 255:2
  280:24 285:3
  287:24 288:24
  289:16,18
  321:25
**quick** 65:4
  255:22
**quickly** 89:12
  123:3 125:5
  130:8 137:17
  182:6 250:17
  260:22 289:1
**quiet** 48:5
**quietly** 203:24
**quit** 43:12 61:21
  231:16 233:1
  242:6 290:22
  299:14 302:14
  303:5
**quite** 30:17 94:9
  108:23 149:24
  199:17 203:24
  229:1 231:4
  234:23 246:16
  255:22 264:10
  270:10 287:20
  297:20,20

299:7 306:6
322:7
**quote** 35:16,20
  36:4,9 116:3
  217:4,4 225:25
  315:15 316:7
  321:11,12

## R

**R** 2:4
**R-A-P-P** 11:5
**R-A-T** 11:4
**R-O-E-S-L-E-R**
  216:8
**R-O-E-S-S-L-...**
  216:6
**rabbit** 161:4
**radiated** 305:25
  306:2
**radiation**
  173:19 188:16
**radiologist**
  174:1
**railing** 302:10
  305:17
**raise** 7:22 146:9
  146:9
**raising** 202:14
  274:3
**ran** 84:16
  134:21 135:2
  135:10 199:9
  220:23 221:9
  221:10 222:23
**ranging** 279:25
**rape** 232:10
  307:15,16
**raped** 114:25
  115:2 117:19
  117:19 118:16
  125:14
**Rapids** 1:17 2:7
  6:1,13
**Rapp** 11:3,3,5,5
**rarely** 61:23
**rat** 11:4

**rate** 173:2
**razzing** 302:8
**re-call** 174:8
**RE-EXAMIN...**
  3:10 321:9
**re-track** 131:2
**reach** 129:18
  130:22
**reached** 235:22
  236:6
**reacted** 280:23
**reacting** 296:11
**reaction** 300:24
**read** 6:15 19:18
  19:19 23:22
  24:4 25:22
  29:10 30:25
  31:2,4,10 32:1
  32:15 33:14,16
  35:7 71:1,3
  137:18 138:14
  139:2,3,5
  140:17,25
  141:25 142:17
  144:6,10
  146:13 177:2
  184:21 199:21
  199:24 201:19
  208:24 212:1
  217:2 220:10
  224:18 245:13
  249:1 265:13
  315:18 319:7
  319:18,19,24
  320:10,11
  321:19
**reading** 19:20
  20:17 36:5
  140:24 143:17
  143:18 219:21
  261:1 316:3,5
  320:24
**readjust** 9:19
**ready** 302:14
**real** 62:11 79:1
  215:17 226:2,8

321:18
**realize** 52:14
  89:8 125:15,20
  127:17 128:7
  243:19 274:7
**realized** 52:8
  264:11 270:13
**really** 12:18
  14:16 15:9,10
  19:19 22:9,15
  22:23 24:1
  30:21 31:16
  37:5 42:20,24
  43:16 44:10,25
  45:15 46:3
  56:21 57:10
  60:25 64:9,12
  66:15 69:11
  73:2 74:9,18
  75:6 76:1,1
  80:23 90:18
  97:18 98:4,7
  103:2 105:20
  105:21 106:2
  115:13 118:7
  118:14 119:6
  119:17 121:14
  128:16 129:9
  129:10,19
  138:20,22
  139:22 140:16
  142:16 145:25
  151:18 153:18
  154:8 158:2
  159:1 161:6,13
  163:21,21
  164:24 165:10
  165:16 169:13
  171:6 172:6,19
  172:19 174:9
  177:2 178:5,8
  186:9 187:16
  189:18 192:5
  198:13,14
  199:5 202:8
  203:24 204:20

207:16 209:24
214:1 222:13
224:15,22
225:3 226:4
228:4 229:13
231:21 235:14
240:20 243:7
245:25 249:11
250:23 251:5,9
251:21 252:3,6
252:9 254:5
259:4 266:4,6
266:7,8 269:24
270:1 273:25
274:10,12
276:1 280:11
285:15,22
298:13,13
305:23 306:9
314:9 317:15
317:22 321:17
321:18,19,20
**realm** 186:22
**Realtor** 273:9
**reapply** 174:8
175:16
**reason** 8:24 9:17
27:18,20,22
40:6 59:17
62:25 110:24
111:2 119:8,14
124:11 134:19
166:16 194:10
234:3 235:2
237:3 253:18
254:16 255:20
267:23 274:19
275:6,10,17
303:10 304:10
**reasonableness**
233:21
**reasons** 222:5,7
**rebooted** 198:11
**recall** 10:20 11:1
13:20 18:10,11
19:19 20:9,17

20:19,20 21:20
22:9,16,23
23:11 24:16,17
24:22,23,24
25:1,4,5,6,7,10
28:20,25 29:7
29:9,11 31:14
31:16,20 32:17
32:18 35:3,8
38:17 39:11,11
39:18 41:21
42:23 43:6
46:10,11,12
49:3,17 50:2
51:5,10,13
52:21 54:18
56:21 63:8,13
64:5,9,10,17
65:3 67:8 69:2
69:3,18 72:22
73:2,5,7 74:9
74:18 76:2,6,7
76:14,16 77:16
78:13 79:12,16
86:25 91:1
109:9 111:20
112:2,6,19
113:4,6 114:6
119:6 123:2,3
123:5,14 124:2
124:5,11,13,15
129:5,10,10,12
129:13 130:11
134:3 135:7,7
135:9 136:1
141:24 144:22
145:19,21,22
151:18 158:18
170:21 172:6
172:20 177:20
178:8 179:20
183:16 186:9
187:5,5,6
191:11 192:17
192:21,22
193:4,9,10,21

194:1 197:12
197:22 199:7
202:20 205:1
207:3,5,21
209:7 210:2
211:12,18,23
211:24 212:18
212:20 214:1,8
217:21 218:2,3
218:4,5,10,12
218:13,17,17
218:19,25
219:3,6,7,17
220:8 221:8
223:24,25
224:1,6,12,22
224:23,24
225:2,3,5,9,13
225:20,23
226:3,5,6
227:4,5,6,7,8
227:10,23
228:5,7,7,18
229:13 230:5,7
230:8 236:21
236:24 237:2
237:14 239:7
240:4 241:17
243:7,15
245:14 246:3
247:18 252:3
252:14 254:12
256:14 259:4
261:18,22
262:3,4,8,22
262:22 263:14
264:5,21 265:9
265:11 266:6
270:3,9 273:5
273:8 275:5
278:19,22,22
279:11 280:11
285:25 294:19
298:8 304:10
306:6 312:17
312:17 313:11

313:13 315:17
315:19,22,22
321:24
**recalled** 262:7
**recalling** 21:22
22:19 228:4
261:9
**receive** 16:2,7
16:18,22
123:16 193:6
**received** 42:25
54:3 123:12
136:25 252:17
253:13 288:16
288:18,18
**receiving** 50:2
94:20 123:4
192:21 193:4,9
219:17 220:9
229:22 250:9
250:10 254:12
280:19 295:13
295:21 296:4
297:13,23
300:16
**receptionist**
184:6
**receptive** 273:18
274:10
**Recess** 65:11
179:24 223:9
248:19 288:3
**recognize**
253:11 260:23
**recollection**
28:9 260:25
**record** 6:5,24
33:16 40:11,12
40:15,16,17,18
57:16 65:10,12
65:13 74:5
81:24 82:8,14
90:17 115:12
121:1,3,4,5
152:7,8,9,10
179:22,25

180:1 181:6
193:17 223:8
223:10,11
232:5 248:5,18
248:20,22
249:1 288:2,4
288:5 322:13
323:6
**recorded** 6:6
92:9,11,19
93:10 115:17
124:24
**recording** 64:19
65:6 70:18
71:21 72:23
76:17 82:13,15
82:16 92:14
99:6,8,9,22
101:2 115:4
125:17 126:16
126:19,21,23
127:22 128:1
128:21 136:3
138:4 178:11
**recordings**
72:25 74:8,13
75:3 122:1,2,7
122:8
**records** 133:23
133:24 135:20
142:19 181:12
206:17 209:6
210:14,24
293:4
**recounts** 247:18
**redid** 28:21
**redo** 26:20
**redoing** 28:19
**redone** 30:23
**reduced** 172:12
173:2
**reentering**
253:19
**reevaluated**
216:19
**reevaluation**

216:19
**refer** 95:1
  314:25
**reference** 105:5
  122:19 123:1
  310:14,20
**referred** 46:13
  149:8 227:2
**referring** 241:11
  290:20 311:4
**refile** 239:9
**reflected** 54:4
**reflects** 27:5
**regarding** 8:18
  18:12 19:11,22
  30:8 38:9,12
  55:6 57:14
  197:18 216:23
  216:24 291:19
  292:19
**Regardless**
  29:12
**registers** 92:2
**regular** 98:15
  204:8
**regular-sized**
  109:18
**regularly** 188:6
**regulation** 30:19
**Regulations**
  29:25 30:2,5,7
  30:9,10,14,23
  31:3
**rehash** 222:8
**relate** 49:15
**related** 10:23
  11:12 36:6
  52:21 53:10
  58:5 192:15
  200:5 224:2
  319:5 321:1
**relates** 193:12
  254:15
**relating** 197:19
  253:12
**relation** 88:3

**relationship**
  222:22,24
  287:12
**relative** 323:12
  323:14
**relayed** 55:1
**release** 206:17
  293:3 299:17
  319:3
**released** 48:16
  54:24
**releases** 126:3
**releasing** 320:25
**relevance** 237:7
  237:8 286:12
  287:11,14
**relevant** 232:10
  232:18,19,20
  234:1,3
**religion** 217:14
**relinquished**
  43:14
**remember**
  54:22 57:9,11
  60:15 71:6
  113:1 123:7
  145:24 159:5,7
  172:3 178:5
  216:12 224:4
  224:17,20
  233:16 252:10
  252:18 260:4
  261:4 262:16
  306:4 308:21
  308:22 310:19
  313:19 315:24
  317:12 319:8
**remembered**
  114:3 261:24
**remembering**
  228:9 230:4
  261:5
**remotely** 1:19
  323:7,10
**removed** 145:22

**rep** 43:3,13,13
  43:16 66:13
  79:13 138:18
  200:11,13
  227:24 228:1,2
  228:3,7 239:19
  239:22 241:16
  281:12
**repeat** 194:18
**rephrase** 15:5
  35:14 47:3
  61:25 71:8
  136:18 267:24
**replied** 252:25
**report** 19:24
  21:24 22:7
  37:23 38:2
  66:9,12,14,16
  66:20 78:15,18
  78:19 208:13
  208:16 219:17
  220:8 306:22
  306:24 307:7
  307:11
**reported** 84:11
  85:1,3 89:22
  91:24 119:16
**reporter** 6:15,17
  6:18,20 7:22
  8:4 33:16 39:2
  40:5 115:19
  194:17,21
  216:6 245:23
  248:25 249:1
  249:25 263:7
  267:17 271:11
  271:15 278:24
  279:2 313:14
  314:8,11,16
  317:11
**reporting** 6:23
  19:22 224:24
**represent** 45:15
  45:16 102:22
**representative**
  7:9 28:2 43:19

51:7
**represented**
  44:6 146:7
**reprimand**
  49:20 50:3
  54:3,11 57:14
  57:25 58:9
  193:4,11
  197:10,13,17
  198:17 254:12
  255:4 259:2
  298:17
**reprimanded**
  81:12 205:5
  255:5 298:17
  305:2 310:8
  318:10,11,13
**reprimanding**
  301:18
**reprimands**
  254:19
**reprinted** 146:4
**reps** 18:22 32:18
  43:2 50:9
  138:15 199:15
  258:19,21
**Reputation**
  26:17,25
**request** 145:19
  145:22 180:8
**required** 77:5
**requirement**
  34:2
**reserves** 55:25
**residents** 28:4
**resign** 154:16,17
  154:17,19,25
  155:15,16,23
  156:3,8 160:2
  160:4,20 165:2
  166:16 168:14
  168:15
**resignation**
  152:15 156:4
  158:17 162:9
  165:5 167:10

168:21 169:11
  170:8,10,20
**resigned** 155:7
**resigning** 155:6
  165:18 166:9
  169:3
**resistance** 39:21
  39:21
**resolution** 156:5
  226:19
**resort** 53:25
**resources** 25:8
  168:4 169:5,24
  170:4
**respond** 84:19
  96:10 271:20
  271:23 282:11
**responding**
  118:7
**response** 53:19
  70:3 164:25
  182:20
**responses**
  182:18
**responsibilities**
  34:20 35:12
  37:13
**responsibility**
  16:11 17:3
  37:22 38:1
**responsible**
  35:17 37:11
**rest** 102:13
  117:3 140:24
**restroom** 93:15
  93:15 223:4
  287:25
**result** 26:9 66:7
  187:20,22
**resume** 184:3,12
**retaliate** 119:8
  119:15 221:24
  275:8,17
**retaliated** 21:25
  63:14 64:21
  72:13 74:11

114:14 307:9
320:3
**retaliating**
221:21 222:11
257:8,17
320:13
**retaliation**
18:19 19:2,9
22:7 57:25
58:9 59:1,5,9
59:19 73:6
117:23 120:5
221:18 246:5
266:12 271:19
273:24 291:15
320:20
**retaliations**
228:23
**retaliatory**
57:19 274:22
**retire** 12:5
148:20 149:15
149:18 151:7
151:20,22
153:18 154:4
158:21,22,25
160:2,4,6,20
163:15,18,19
163:20 164:24
165:8,11
166:16 188:10
212:13,17
**retired** 12:1
172:12,12
222:20 238:18
250:17
**retirement**
151:13 153:10
158:16 162:14
162:19 163:4
163:10,12
164:16,23
165:1,15
171:17 173:8
188:9 213:2
276:24

**retiring** 153:16
156:7 163:16
**return** 220:14
316:12
**returning** 153:9
**revert** 168:24
**reverts** 148:24
**review** 35:9
176:7
**reviewing** 59:22
60:9,18
**reviews** 270:3
**revised** 35:7
**revocation**
149:21 150:17
151:6,8,9,13
151:15 162:15
162:18 164:11
168:21 170:20
**revoke** 145:1,2
168:15
**revoked** 147:10
150:2 156:7
**revoking** 149:16
168:24
**rid** 43:23 135:16
153:4 179:12
211:10 212:16
270:1
**Riddle** 43:11,15
51:4,7,13 54:5
60:5,8,24
99:20 111:7
112:14,22
124:16,18,25
125:5 127:25
128:10,14
130:19 136:8
137:23,23
138:3 139:6
140:21,22
141:13,20
142:23 146:1
177:19 178:6
199:3,4 280:8
**Ridge** 155:20,22

**ridiculous**
227:25 228:2
**Ridout** 248:11
251:16
**right** 7:23 13:21
14:25 15:15,16
17:18 23:9
25:22 26:2
30:13 33:9
36:18 38:2
39:20 40:22
42:1,6 46:13
47:8 48:6,22
49:4,6 50:14
51:6 54:22
55:9 57:9 67:8
67:13 70:5
72:15 73:3,4
74:5,20 76:11
76:12 80:3,5
83:24 86:19
89:17 92:4
93:21 94:8,16
95:10,17,22,25
96:16,18 98:15
98:17 101:1,1
101:5 102:4
103:7,11,15,22
103:25 104:2,9
104:15,15,15
105:7,10,14,14
105:19 106:7,8
106:15,18,24
108:6,23,25
109:11 111:4,5
112:17 114:21
115:4,21,21
116:7,15 117:9
118:19 120:23
121:9,25
122:13,21,23
123:12,23
124:7 127:10
129:2 130:14
131:10,23
132:2,17 133:1

133:25 135:4
136:10,12,15
136:20 137:1,2
143:15 145:6
146:2 147:1,15
150:5 152:24
153:7,7 157:9
158:20 159:10
160:11,18
162:10,14,23
164:6,7,16
165:4,24 168:2
169:25 170:16
173:11 175:4
176:3,11 180:7
180:17,25
181:1,17,20
185:19 186:19
188:15,22
191:4 192:3,8
193:3,11
194:21 199:24
200:5 201:21
201:21 208:13
208:24 211:14
212:1,5 213:9
215:2,11 216:7
219:15,21,23
220:17 221:20
224:17 225:14
225:15 228:10
235:9,15
239:14 240:13
241:14 242:3
244:24 245:10
245:12 246:2
247:8 248:23
249:10 252:18
252:21 256:4
256:11 259:25
260:9 263:15
264:3 269:12
271:10,17
274:14 275:25
276:21,25
287:22 288:10

288:14 289:14
289:23 290:21
291:16,25
294:19 295:10
304:3,25 310:5
314:14,23
315:4,18 316:6
316:8,11,13
318:17 319:2,7
319:21 320:16
320:22 322:8
**right-hand**
40:24 104:3,14
109:5 313:25
**rights** 144:12,19
148:15 160:16
160:16 264:7
320:6,6
**righty** 88:12
**ring** 300:2
**rinse** 108:1
**ripping** 302:20
**road** 15:18
46:20 68:23
212:6 234:13
**roam** 201:23
**Robert** 11:2,10
273:8
**Rodney** 141:25
**Roesler** 29:1
216:5 222:23
235:6 238:2
241:9 290:21
322:2,6
**role** 267:12
**rolled** 141:4
**room** 6:21,25
7:3,4,5 51:24
56:12 65:18,19
65:20 93:25
94:4,6,6,9,17
94:17 95:1
105:4 119:11
135:18,21
140:7 146:21
154:6,6 195:23

195:24 205:22
205:22 222:17
247:2,3,7
255:10 295:11
**rooms** 65:17
194:6,9 215:10
**Rosati** 2:13
**rotated** 37:15,16
**roughly** 250:14
**rounds** 188:16
**rubber** 295:11
**rubbing** 203:19
**rule** 30:19 41:8
41:19
**rules** 8:12 13:25
29:25 30:2,4,7
30:9,10,14,23
31:3,25 32:2
32:14,20 33:19
33:22 34:2
37:23 77:5
**rumors** 127:21
**run** 68:15 89:8
142:2 157:6
302:13
**running** 62:16
94:12 95:18
98:24 100:23
101:12 107:5,8
107:9,12,20,25
108:4 131:13
**runs** 215:1
**Rutt** 56:17,25
**Ryan** 1:10 2:22
6:9 7:8,13,14
217:23 218:14

_____
**S**
**S** 2:12 216:8
**S-T-O-U-T**
271:14
**S-T-R-A-N-G**
293:22
**sacrificing**
232:21
**safe** 32:22

**safety** 17:10
**sale** 102:7
**Samsung** 75:2
75:14
**Sanford** 53:9
**Sara** 149:8
170:22 172:5
173:3,11
**Sarah** 172:9
**sat** 106:13,15
140:7
**save** 270:23
294:12 319:10
**saw** 28:8 30:22
37:24 38:2
42:20,21 51:17
58:15 69:18
71:15,16 82:7
82:10,12 102:9
130:5 133:9
141:3 158:22
158:23 191:17
192:22 204:11
209:25 213:23
216:20 219:5
237:25 248:3
282:19 289:9
298:3 315:2
316:11
**saying** 29:1,5,10
30:18,18 31:5
54:22 60:14,22
62:23 64:13
76:1 84:24,25
91:15 96:8
99:25 100:2
105:22 109:3
109:10 114:5
118:2,9 120:20
124:15 127:13
130:6 131:21
134:19 135:22
139:3,4,4
140:2 143:9
144:16 146:15
147:19 148:24

151:12 155:7
161:22,23
163:12 165:6
166:9 167:16
168:12 173:9
177:22,24
185:17 201:11
202:9,23
203:20,25
208:25 212:20
213:3 218:3,4
218:10,17,18
226:21 227:14
229:7 239:5
241:2 242:10
242:13 249:18
256:20 266:2
271:5 272:24
274:1 287:10
292:9 295:24
297:8,10 303:1
309:21,21
310:9 312:20
315:19 321:15
**says** 19:24 27:4
54:13 78:23
84:21 102:24
102:25 119:1
136:5 139:9
155:20 156:18
158:1 159:11
160:21 170:17
177:6 188:20
194:14,22
197:2 212:5,23
212:24,24
214:9 215:2,3
216:25 217:2
225:24 227:1
227:18 232:19
247:7 259:13
259:16,21
264:21 265:19
271:19 316:6
**scale** 105:3
109:3

**scared** 234:16
307:12
**schematics**
109:20
**schmooze** 64:5
**school** 218:9
**Schultz** 2:13
**scootch** 39:15
**scope** 279:14
**Scott** 82:21 83:2
207:16,22
**screamed**
298:14
**screaming** 296:9
300:20,24
**screen** 17:20
20:23 21:15
23:16 25:11
39:24 41:8
45:3 49:19
73:10 82:12,19
82:20 109:19
122:20,21
180:7 191:19
192:13 193:3
197:25 208:13
209:6 211:10
219:8,9 220:7
223:17 253:9
259:9 264:17
278:24 314:1
**screening**
183:14
**screens** 104:1,2
104:21 109:19
**scripts** 190:5
**scroll** 20:11,12
21:19 38:16
147:12 180:16
191:18 193:7
**scrolling** 144:4
224:16 260:22
**scrutinized**
279:14,16
281:3 283:16
283:23 284:9

**scrutiny** 307:6
**sdrew@dca-la...**
2:9
**search** 314:16
**second** 9:13 23:2
23:5 27:4
48:11 68:14
94:16,21 124:9
133:20 145:3
146:20 160:13
162:3,5 165:23
166:12 180:12
180:19 191:25
194:12 196:21
205:11 210:18
219:23 236:10
247:24 248:25
252:7 255:11
265:18 288:1
**secondhand**
289:5
**seconds** 86:5
117:10
**secretary**
147:18 182:12
**section** 19:21,21
26:16,16,24
27:15 34:1
35:15 36:4
37:12,17,17
39:24 225:14
**sections** 224:18
**security** 35:19
109:21
**see** 11:20 17:18
17:24 18:6
19:22 21:14,17
21:22 25:11,12
26:13 29:3
34:24 35:2
36:22 40:2,20
41:8,11,17,18
41:19 42:2,4
43:15,18 47:15
47:24 48:9,9
48:12 49:8,17

49:19 53:23
54:15 58:19
59:18,18,19
60:18 64:6
69:24 70:7,12
70:14 71:15
81:23 82:4
90:6 95:13,14
96:6 102:23,24
103:3 104:14
109:1,21 115:8
115:9,10
122:21 131:11
131:11,20
133:16 135:5
136:13 137:13
137:15,18
142:24 144:4
148:19 149:1
149:14 150:7
151:2 152:6,14
153:7,8,18,22
162:11 163:5
166:10 170:12
172:8,24 173:7
174:8,21,24,25
176:18 180:9
180:12 182:17
183:7 191:4,5
191:20,24
192:4 193:7,8
194:24 198:5,6
206:13,15
207:18 208:19
209:21 210:8,9
211:8,12,18,24
212:4 213:21
214:15,16,23
216:25 219:8,9
219:9,10,20
225:13,15
226:4 231:6,25
232:23 234:18
234:20 237:25
239:2 241:19
245:21 248:1

252:4,24 254:6
256:25 260:5,6
261:21 263:24
265:25 266:1
281:9 292:11
292:17,18,24
293:4,8,13
296:9 301:1,2
301:12 302:5
312:8 314:15
314:18,20
315:7,12,14
316:4,15
317:10,14,23
317:25 318:2
**seeing** 20:9,18
21:20 64:11
194:6 195:15
209:18 218:25
219:6 227:7
293:21,22
**seek** 211:20
285:19 287:4
292:24 293:14
**seen** 18:4 42:19
145:14 174:21
175:3 208:15
208:23,24
213:15 227:5
228:6 270:10
285:8 289:4
301:4,21
**seized** 317:11
**selves** 171:10
308:13 318:4
**Seminole** 210:4
**send** 153:1
173:25 181:18
**sending** 133:17
222:11
**sense** 111:4
131:24 134:23
211:16
**senseless** 228:23
**sensitive** 190:23
**sent** 15:24 35:4

99:13 100:11
154:5 163:15
169:2 170:11
183:18 191:14
199:19,21
205:2 207:24
218:9 221:17
252:25 259:20
268:8,15,18,24
293:9,18
**sentence** 27:4,6
**sentences**
149:25
**separate** 7:3,10
21:7 48:1
65:20 263:22
265:10
**separated**
268:11,11
269:1,2,10,11
**September** 1:21
6:2,14 118:1
266:14 290:3
**sergeant** 22:2,16
22:21 45:10
50:21 52:10,10
52:15 54:24
55:3,3,7 59:2
59:22 60:1,2,9
67:7 68:18,18
68:18,19,25
78:5,5,6,6,6,12
78:12 80:11
85:7,7,9 87:13
87:14 92:16,25
99:5 113:9,13
113:21 114:9
114:16 117:21
119:17 126:1,5
142:9 148:11
159:20 177:7
177:10,11,25
178:5,6,7,14
179:18 196:22
196:23 204:14
205:16 215:3

225:5 229:17
230:3,5,6,9
235:13,14,16
238:6 239:24
239:24 240:22
241:2,17,18
242:18 245:17
245:20 246:14
248:11,11
250:13,20,25
251:16,17,18
253:19 254:22
255:17 256:2
257:1,2,11
265:23 266:17
267:7,8 272:1
272:6,10,24
273:11 281:8
281:13,14
284:22,22
296:18,18,19
296:21,22,23
296:24,24
297:10,10
301:1,6,7,7,21
302:16,23
303:2,9,11,15
305:1,18
306:14,19
307:2 308:23
311:7 313:5
**sergeants** 22:4,4
44:14 68:23
78:3 237:23
241:1 300:17
300:19 301:5
301:11
**sergeants's**
205:15,15
**series** 192:14,14
**serious** 65:8
**Seroquel** 10:3,4
10:5
**serve** 267:9
**service** 156:21
156:23,24

157:9 224:4
**serving** 67:18
**session** 257:13
**set** 108:15 109:9
132:11,14,16
132:24 158:24
171:11 194:11
242:1 270:16
**setting** 268:6
**settings** 171:11
**settled** 58:4
61:19 62:11
290:9 291:8
**settlement** 59:8
117:24 289:22
289:24 290:4
291:3
**seven** 43:25 44:2
77:5 142:1,5
161:9 200:16
233:18,21
**seven-and-a-h...**
99:21
**seven-day** 143:1
149:14
**sex** 218:1,10,15
218:16 276:17
**sexual** 245:19
246:21 249:18
258:9 277:4,21
278:13,17,20
284:17 287:21
**sexually** 59:2
114:15 117:21
206:15 209:18
215:2 234:11
234:20,22
245:17 246:13
265:22 286:2,2
286:5,5,16,17
286:21
**shape** 141:16
**share** 41:8 70:4
122:20 191:19
**sharing** 17:20
21:15 42:4,5

LORI LYNN HEETHUIS, 9-25-2020

Page 361

122:20,22
192:13 264:17
278:25
**Sharon** 1:19
6:15,17 33:15
115:11 191:14
248:24 314:10
323:22
**Shawn** 186:4
**sheet** 317:5
**sheriff** 7:8,17
8:17 18:7
28:23 29:1
42:10 44:12
45:13 47:4
49:6,7,8,11,13
51:5 52:19
53:20 59:15,24
61:4,7,9,10,11
61:13,19,20,21
62:2,9,21,25
63:2,2,3 99:11
120:3,16,17
123:13 128:25
132:12 136:25
137:25 138:13
140:6,10,12
142:14 143:9
147:18 148:2
148:11,12
150:16 151:2
157:18 158:12
159:25,25
163:25 164:1
164:20 199:9
201:14,18,25
202:13,25
205:9 216:4,5
221:22,23
222:22,23
237:24 238:1,2
241:9 251:18
258:1 274:21
275:7 276:10
276:17,19
277:4,20,20

278:16,17,18
278:21,21
279:5 280:4
284:7 290:13
290:14,15,17
290:19,25
291:4,5,8,9
292:22 314:20
317:8 318:22
322:2,2,4,6
**sheriff's** 16:6
18:6 21:18
36:11 49:15
73:1 74:6
100:9 112:2
122:3,9 142:8
145:10 152:20
170:1 179:2,4
184:23 185:14
185:24 186:8
187:4,21
239:17,23
241:15 262:23
270:18 285:17
285:21 289:20
292:20 308:16
**sheriffs** 28:3
**Sherry** 231:14
234:8,25 235:2
**shift** 55:15,16,17
56:22 68:25
69:2 80:13
91:17 174:22
204:12 273:10
273:14
**shifts** 179:8
304:16
**shirt** 205:12
236:7 237:16
**shit** 303:4
315:16 316:8
321:12
**shook** 140:25
202:2
**shoot** 154:24
256:25 257:12

**Shoreline**
180:13
**Shores** 210:7
**short** 154:4
157:2 165:9
206:19
**shortcut** 116:4
**shorter** 102:4
**shortly** 19:4
**shotty** 256:22
**shoulders**
250:22
**shove** 246:20
**shoved** 235:25
**show** 14:9 17:17
42:1 57:21
70:9 72:11
74:10 79:8,15
80:1 82:23
83:15 100:7
124:7 133:25
163:8 176:17
203:4 260:18
**showed** 70:17
71:11 72:6
79:10,12 83:6
83:17 134:6
**showing** 20:7
29:17 38:8
79:12 122:23
122:25
**shows** 65:4
173:24
**shredded**
269:16
**shredding**
269:23 271:12
**shrugged**
250:22
**shut** 93:16,19
95:24 98:4,14
98:24 100:22
100:25 101:12
103:7,15,15,16
105:16 107:23
107:23 110:2

116:24 198:1
198:22 205:19
299:9,10,15
300:21
**shutting** 94:2
100:2
**sic** 9:8 214:16
245:25 260:19
**sick** 172:24
220:25 221:1,5
221:7,9 299:9
311:11
**side** 40:23,24
53:5 84:9,9
104:3,14 109:5
110:21 157:25
198:10
**sight** 37:1
**sign** 16:25 23:24
87:21 138:22
138:25 139:19
140:13,24
141:13,14
143:2 146:22
148:23 150:1
150:20 177:4
206:17 318:17
**signature** 23:17
148:24,25
149:16 150:2
151:6,8,9
176:20 265:14
**signed** 23:22
24:4 88:7
141:5,22
143:16,16
146:5 147:13
147:15,23
210:15 238:11
320:11,14
**signing** 143:7,7
143:14
**silly** 251:24
**similar** 114:18
196:5 243:24
259:10 296:11

308:7
**similarly** 38:1
**simply** 14:23
**simultaneously**
32:11 120:13
174:14
**single** 114:21
238:23 246:16
274:3 285:2
299:2
**singling** 59:20
**sink** 107:8,9,15
142:18
**sir** 196:12,20
206:1 292:16
**sirens** 220:19
**sisters** 90:5
**sit** 48:4 66:16,17
131:11 204:22
204:24 252:6
252:15 258:24
265:13
**site** 184:10,20
**sitting** 19:20
44:9 68:11
283:3 297:18
**situated** 195:20
195:24
**situation** 43:12
49:14 114:21
125:23,24,25
178:1 195:12
196:23 197:20
200:4 216:10
222:16 224:20
224:23 246:4
272:9 306:16
**situations**
307:17
**six** 43:25 44:2
94:14 129:7
175:14,16
250:15 266:23
268:9,25 269:9
280:8
**sixth** 200:19

| | | | | |
|---|---|---|---|---|
| sixty-six 154:15 | 82:10 99:22 | 196:14,25 | 116:19 167:20 | squeeze 204:2 |
| size 299:5 | 100:5 115:2 | 197:8 203:15 | speakerphone | SS 323:2 |
| skimming 123:3 | 119:1 126:16 | 209:23 211:25 | 149:11 154:2 | staff 16:24 22:10 |
| skin 255:14 | 139:7 170:24 | 214:8 215:13 | 165:22 254:8,9 | 35:16,18 |
| slammed 134:11 | 178:15 179:8,9 | 219:15 228:1 | speaking 16:4 | 189:20 225:25 |
| sleep 214:10,14 | 182:24 195:23 | 230:7,8 231:3 | 32:11 119:6 | 226:6 244:10 |
| 214:16,18 | 207:16 215:25 | 232:17 234:18 | 120:13 174:14 | 245:1 302:17 |
| sleeping 84:11 | 226:22 227:10 | 236:22,23,24 | 229:4 258:6 | staffed 206:19 |
| 84:24 85:11,17 | 239:8 241:11 | 241:13 243:15 | 276:9 297:14 | stage 242:1 |
| 85:25 89:23 | 268:19 274:11 | 252:8 263:8 | 309:17 | 268:6 270:16 |
| 91:11,23,24 | 282:17 286:17 | 267:18 272:11 | speaks 115:4 | stairs 85:13 |
| 119:16 214:10 | 292:20,20 | 273:11 275:15 | special 84:6 | 229:24 |
| slide 69:23 | 308:2,14 311:2 | 278:23 279:3 | 173:20 188:17 | stamp 20:9 |
| slowing 120:9 | 311:11,23 | 285:6 291:6 | specialist 156:18 | 21:17 23:17 |
| small 54:6 | 312:18 315:20 | 292:7 293:25 | specific 55:8 | 25:19 30:1 |
| 108:14,18 | somewhat | 301:24 308:4 | 111:25,25 | 38:10 169:18 |
| 109:17 178:24 | 173:19 | 312:17 313:2 | 145:24 177:13 | 170:10 193:17 |
| 191:22 | son 217:24 | 314:3 319:14 | 280:15,20,21 | 208:15 219:16 |
| smaller 102:1,12 | 285:2 | 319:17,21,25 | 282:18 | 220:8 223:19 |
| 109:19 | soon 130:13 | 321:24 322:10 | specifically 68:5 | 259:11 260:20 |
| Smith 78:5 | 142:24 195:2 | sort 228:19 | 72:11 76:25,25 | 261:21 264:19 |
| 80:11 82:21 | sorry 9:7,8 | 247:21 | 98:21 126:19 | 265:17 315:1 |
| 83:2 85:9,15 | 13:15 24:3 | sorting 187:18 | 178:3,16 | 315:10 |
| 120:18 177:12 | 28:14,15 39:5 | sought 204:16 | 179:19 183:13 | stamped 18:1 |
| 178:14 179:18 | 51:1 52:5 | 285:24 | 223:25 249:16 | 50:1 137:19 |
| 207:16 284:2 | 61:15 73:8 | sound 12:17 | specifics 76:2 | 169:14,23 |
| 296:19,22,24 | 74:2 78:11 | 116:13 133:5 | 179:17 187:6 | 209:11 |
| 297:10 301:7 | 88:9 90:18 | 254:3 273:24 | 240:5 | stand 11:6 |
| 301:21 302:5 | 91:11,25 94:21 | 305:23 | spell 186:3 | 171:16 228:24 |
| 303:2 305:1 | 101:8,16,24 | sounds 12:16 | 213:25 231:15 | 241:23 |
| 306:14,19 | 104:8 107:9 | 120:25 241:2 | 235:7 241:5 | Standard 25:24 |
| 308:23 | 111:16 122:2 | sources 270:4 | 242:25 245:23 | 26:5,13 29:5 |
| Smith's 305:18 | 123:6,7,22 | Southern 1:3 | 245:24 285:14 | standing 62:7 |
| smoked 81:14 | 124:20,21 | 6:10 | spend 173:3,7 | 86:2 101:18 |
| smoking 78:24 | 135:8 137:23 | space 131:14 | spoke 217:8 | 160:8 205:20 |
| 81:10 | 137:24 148:9 | span 73:3 | 229:2 247:10 | stands 32:13 |
| snippy 146:18 | 153:12 154:1 | speak 24:25 | 257:10 267:10 | 70:25 102:3 |
| snitch 84:24 | 156:9 162:8 | 39:2 66:22 | 275:12 280:16 | 237:10 |
| 85:4 86:12,14 | 167:9 172:18 | 133:19 158:11 | 302:9 309:11 | start 55:13 |
| 87:6 88:23 | 174:15 178:6,9 | 174:15 186:19 | 309:12,13 | 71:16 88:4 |
| 90:16,17 114:9 | 181:4 182:22 | 218:18 238:13 | spoken 45:20 | 97:4 154:21 |
| soft 97:22 | 186:3,4 187:16 | 239:3 248:9 | 97:22 132:13 | 171:17 193:14 |
| sold 179:4 | 189:7,8 190:21 | 251:16,24 | spot 94:11 233:3 | 229:15 230:6 |
| 213:17,17,18 | 191:21 192:7 | 277:25 291:12 | 317:24 | 300:1 308:15 |
| solemnly 7:24 | 194:17,19,20 | 309:16 | spring 172:8,15 | started 16:6 |
| somebody 50:14 | 195:10 196:4 | speaker 107:1,3 | square 104:7,9 | 19:6 30:11 |

LORI LYNN HEETHUIS, 9-25-2020

Page 363

31:17 50:4
52:11 55:21
56:10 59:9
61:2 64:18
65:22 73:6
80:13 97:8,8
103:18 106:10
106:11,13,15
109:22 113:9
117:18 120:9
125:25 142:25
144:10 148:11
172:21,23
182:7 209:17
214:2 221:1
226:21,23,24
227:14 229:14
229:20,25
230:11,14
235:9,12,17,18
291:14,14
306:10
**starting** 88:5
89:6 209:10
223:20 230:5
234:16 253:10
264:18
**starts** 226:2
260:19,19
261:16
**state** 6:19 7:24
16:17 17:2
51:23 112:18
117:19 203:13
203:17 205:2
215:4,4,5,8
216:9,12
232:22 323:1
**stated** 135:1
168:5 184:21
208:20 255:21
288:19 293:15
311:9 315:25
316:14,17
318:22
**statement** 6:16

46:24 128:3,4
128:9 178:3,14
215:5,9,19,20
**statements** 34:4
34:7,11 178:12
218:1,15 224:7
225:18,19
261:1,3 265:10
312:13,16
313:6
**states** 1:1 6:9
23:19 35:15,16
35:24 36:4
**stating** 6:24
23:24 120:7
199:21 200:24
257:2 268:24
288:23 293:10
**station** 94:15
185:2
**stations** 182:8
**stay** 113:16
160:9,9,11,14
160:19,21,24
160:24,24
161:8,22,23
171:10 204:14
255:10 287:25
308:9
**stayed** 142:15
171:23 172:1
172:11
**staying** 161:7
297:1
**stenographic**
6:18
**STEPHEN** 2:4
**Stephens** 88:24
92:17,20,24,25
92:25 93:6,9
93:22 114:10
**Stephenson** 43:8
83:25 84:21
89:21 99:20
118:19,20
217:18 283:22

294:15 295:2
297:1,6 298:4
298:8,16,21
307:7 309:7
310:4,7
**Stephenson's**
114:24 118:15
125:14 296:14
**steps** 86:3 94:9
**stern** 202:15
206:1
**Steve** 242:24
243:8 244:22
270:23
**Steven** 7:1
**Stevens** 87:14
**stick** 202:22
235:21 255:2
282:6,6 317:21
317:21
**sticking** 240:6
**stood** 107:8,9
**stop** 31:24 73:17
88:6 94:16
113:25 118:7
118:10,10,10
121:12 123:20
145:3 152:5
180:19 196:3
197:6 198:16
225:19 232:14
233:2,4,6
242:5,20,20
243:6 244:6,9
244:14,17,18
244:25 246:12
250:16 273:14
278:24 295:4
295:10 299:18
299:20 300:6,8
300:9,10
**stopped** 11:20
28:13 31:18
203:2 210:8,9
210:10 231:11
242:11 244:21

244:22 273:10
306:9
**stopping** 121:13
**story** 234:1
**Stout** 161:11
241:7,8 269:16
269:21 271:13
**straight** 73:11
73:24
**Strang** 174:20
174:20 216:20
293:22
**strangely** 52:23
**streamline**
261:13,15
**street** 170:5
213:12 214:24
**stress** 167:1
187:23 195:12
212:14 216:22
296:9,11,11
**stressed** 296:3
**strike** 307:13
**strip** 317:20
**stroll** 192:17
**struggle** 15:3
**struggled** 188:3
**stuck** 101:22
130:8,17
202:21
**study** 173:20,24
188:17 214:10
214:14
**stuff** 36:22
54:23 62:16
66:18,18 88:12
88:16,18 89:8
107:22 110:19
114:2 126:3
132:5 133:7
152:1 155:11
156:2 157:6,6
161:3,18
167:22 187:9
188:10 191:3
194:16 197:25

211:10 215:17
219:25 227:19
229:3,19
230:22 231:1
245:10 247:6
269:15,25
277:6 292:14
298:13 303:18
317:5
**stunned** 163:21
**stupid** 272:19
295:9,10
299:14
**subjected**
265:21 266:13
**submit** 259:18
259:18,22,23
**submitted**
176:18
**submitting**
265:10
**subpoena**
142:19
**subpoenaed**
288:23
**successful**
175:18
**sudden** 39:8
113:10,17
126:4 159:19
299:23,24,24
**sued** 318:12
**suffer** 40:8
216:21
**suggest** 14:22
**suggestion**
40:10
**suicidal** 318:3
**suicide** 318:1
**Suite** 2:6,14
6:13
**sum** 59:10
**summarize**
289:1
**summary**
210:19

**summer** 172:16
**sun** 300:21
**Sunday** 56:8
  87:1
**superiors**
  142:13
**supplied** 179:2
**support** 240:20
  268:4
**supposed** 73:10
  96:14 126:3
  190:16,18
  200:3 256:24
  277:9
**supposedly**
  126:25 127:2
  206:6,6
**sure** 7:19 15:6
  16:4,24 21:9
  30:17 31:11,18
  49:12 53:3
  54:8 63:7,9
  69:8 75:7,21
  76:1 78:13
  79:7 86:5
  88:18,21 92:6
  97:18 104:9
  105:8 108:25
  111:6,12,14,17
  120:21 121:22
  125:1,2,4
  126:8,9 128:12
  128:12 129:19
  139:1 144:15
  148:13 152:22
  154:25 155:5
  155:15,18,22
  155:25 156:2
  158:2 164:9
  165:16 171:6,7
  171:13 177:2,3
  180:17 181:9
  183:21 186:25
  191:3 193:18
  204:23 205:11
  207:16 211:21

218:22 220:12
222:14 224:12
225:19 230:11
230:11,13
232:6 237:22
240:22 244:16
244:20 246:1
248:25 252:5,6
257:4 279:3
285:16 286:8
299:20 302:19
305:11 312:25
313:12 317:10
321:17,20,22
322:7
**surgeries** 166:24
**surgery** 175:12
  175:13,18,20
  175:24 176:2
**surrounding**
  8:19
**surroundings**
  29:15
**survive** 188:25
**survivor** 189:2
**suspected**
  215:15
**suspended**
  298:17 305:1
  310:8
**suspending**
  301:18
**suspension**
  122:25 136:19
  143:1 149:14
  252:17,20
  253:11 266:14
  266:22 267:5,9
**suspensions**
  136:23
**swear** 6:16
**swearing** 290:24
**sweet** 53:1
**swing** 297:22
**swish** 107:25
  108:2

**switch** 122:11
**switched** 43:7
  166:16
**switching** 83:24
  304:16
**sworn** 8:7 15:20
  212:9,10 291:8
  323:7,10
**symptoms** 211:5
**syndrome**
  276:14
**system** 190:3

---

**T**

**T-H-I-E-L-B-...**
  69:6
**T-O-M-A-S-C...**
  175:20
**table** 3:1 48:3,25
  134:12
**Tague** 273:21
**take** 13:9 14:25
  32:13 47:6,6
  53:23,24 55:5
  75:16,18 83:20
  85:12 86:13
  97:17 100:8
  110:9,15
  120:24 122:12
  142:23 144:11
  144:13 146:3,3
  147:24,24
  148:15,24
  156:25,25
  160:10,12
  161:24 169:3,4
  179:21 191:2
  199:16 204:20
  229:24 231:17
  237:10 242:21
  291:22 320:6
**taken** 1:17 6:7
  8:11 9:24
  11:21 50:7
  65:11 71:21
  122:5 145:18

179:24 211:19
223:9 238:24
248:19 288:3
288:21 291:19
310:23 315:3
322:5,6
**takes** 233:14
**talk** 12:8,11,11
  12:18 13:24
  22:20,22,24
  44:22 46:1
  64:14,16 70:6
  87:25 89:13,15
  90:7,8,25 93:1
  99:10 101:9
  105:22,24
  112:15 121:10
  121:23 122:11
  123:2,19,23
  124:14 128:25
  136:2 138:14
  138:14,20
  139:23 142:8
  144:20 146:24
  149:9,20
  150:10 157:15
  157:18 158:1,9
  161:16 162:7
  170:18,23
  172:10 196:10
  197:1,9 205:9
  205:23 215:2
  216:9 217:5
  224:9 228:19
  233:12 238:5
  245:9 248:4
  254:4 258:21
  258:23 262:11
  269:22 284:5
  284:12 310:13
  316:18,19
**talked** 14:1
  22:16,17,25
  32:17 51:19
  53:15 77:12
  81:3,10,21

90:9 91:18
92:20,24 111:7
111:7,22,23
112:13,15
114:4,9 125:8
128:6,13,14,15
128:15 132:7
136:13 137:1
138:9 142:14
145:4 150:16
151:19 153:14
155:4,14 156:6
158:20 162:3,5
162:19,21,21
163:12,14,24
163:25 164:1
164:15,20,22
165:2,4,17
170:17,21
173:3,11 177:5
188:9 192:16
200:11,17
216:13 222:5,7
228:16 229:1
242:11,13
243:12 244:10
245:1,2 247:12
247:19 250:20
258:3,3,18,19
262:16 263:4,5
264:4 266:10
266:21 267:4
274:23 275:3
279:24 282:16
282:24,25
283:11,13
284:11,11
288:9,17
290:11 295:18
297:4 300:14
306:5
**talking** 23:3
  28:13 46:16
  48:15,22 49:1
  49:15 58:5
  61:2,7,9 64:12

66:1,7 68:11
73:2 75:10
76:23 82:17
86:14 90:23
92:16 97:19,20
98:6,14 100:5
104:15,20
107:2 110:4,5
111:6,13,17,21
112:3,7,10,11
112:19,21
113:2 117:6
121:25 124:24
125:4,10,13
126:13,14
127:5,14,18,19
128:2,9 132:9
132:22 133:25
138:18 139:22
144:22 147:1
153:25 157:23
159:6 160:1
165:20 169:18
177:8 184:15
187:21 194:19
201:13 202:13
203:13,23,24
206:2 207:24
217:22,24
218:12 222:18
224:1,4 225:1
225:3 226:19
227:22 239:8
239:16,18,22
247:4 252:10
254:8 256:23
257:20 266:9
266:18 268:21
270:24,25
273:20 276:24
276:25 277:9
277:24 278:3,9
278:10,12
281:18 286:7,7
286:10,15
298:4 302:7

308:17,17,20
308:25 311:2
311:14,18
312:15,18,23
312:23 313:8,9
321:14
**talks** 213:5
**tape** 116:23
307:15 317:7
**tapes** 51:16
59:22 60:9,18
281:9
**Target** 190:16
**Taser** 38:12,13
38:19,23 49:3
49:4 251:23
252:9,17
254:12,17
256:14 268:23
**Tasers** 38:14
256:21,22
**taze** 254:21,22
254:23,25
255:7,12,17,19
256:2,13
**tazed** 255:8,20
258:13
**tazing** 255:5
**team** 60:6 257:2
257:5 272:3,9
272:13,14,15
272:18,22,25
**teamsters** 43:23
**tear** 156:12
**tears** 141:4
**Technical** 65:7
73:13 152:3
**TECHNICIAN**
6:5 40:10,13
40:15,18 65:10
65:13 73:16,25
116:15 121:1,5
152:7,10
179:22 180:1
191:17,24
192:4,7 211:15

223:8,11
248:17,21
252:24 253:2
288:2,5 322:12
**Technology**
137:6
**tee** 37:8
**telephone** 122:2
122:2 167:16
**tell** 20:13 25:3
31:17,25 32:8
32:14 50:9
58:19,22 61:24
63:22,24 64:3
67:5,6 69:10
69:12,12 75:21
76:25 79:17,22
82:13,15,24
83:18,18 87:9
87:19 98:4
99:8 112:6
113:22 124:20
124:22 125:8,9
127:2 128:21
129:17,22,24
132:9 138:1
144:25 145:1
146:13 165:7
169:5,7,7,8
192:18 195:24
206:25 207:2
208:6 212:6,11
212:16 215:18
228:24,25
231:18 233:8
233:24 234:8
247:1 248:23
261:2,12 262:1
270:11 289:10
295:4 300:6
302:8 311:23
323:7,10
**teller** 86:15
**telling** 35:7 48:3
63:22 132:4
135:9 146:23

157:23 160:18
177:7 185:5
218:5 222:3
225:13 234:2
235:1 244:3
302:12 315:17
321:15
**ten** 47:12 199:20
200:15 250:15
251:22
**ten-minute**
23:23
**tend** 292:11
**tending** 73:23
**tense** 146:18
**tension** 303:15
**Teresa** 205:16
**term** 94:25
**terminate** 138:9
145:1
**terminated**
140:13 143:2,8
148:25 149:17
150:3,18
154:10 156:17
165:16 168:9
268:10 274:25
318:17
**terminating**
139:20
**termination**
149:22 150:1
150:21 168:25
270:16 310:9
**terms** 286:19,19
293:23 294:2
**terrible** 169:1,2
**test** 188:23
**testified** 8:9
10:12 61:11,13
62:1,12 63:12
106:20 122:5
221:25 286:3
291:16 298:22
302:3 320:3,20
321:16

**testify** 8:7 10:10
63:10 240:9
316:7
**testifying** 53:16
253:25
**testimony** 7:24
10:19,21 11:12
18:11 23:8
24:13 31:2
32:5 37:6,19
37:20 42:22
43:20 57:20
58:1,5,9,13
59:6,7,10,15
60:8,11 61:2,5
61:8,18 62:3
62:12,20,22
63:1,6,15,17
64:8,14,15,16
70:19 71:11,20
72:12 74:7
76:21 80:6
95:10 103:5
114:3 117:23
120:4 135:19
135:24 137:17
144:1 159:23
167:11 175:2
206:25 227:17
227:21 275:9
288:10 291:11
303:23 321:14
322:1 323:7
**testing** 173:20
**text** 53:13 111:9
112:22 124:19
133:17 200:14
232:25
**texting** 68:12
**thank** 7:16 8:4
20:15 38:17
73:25 74:3
96:9 104:11
115:18,19
121:24 140:8
142:11,13

153:5 164:4
169:16 193:19
201:11 204:1
253:2 271:15
279:1,2 313:1
322:12
**thanked** 142:22
169:12
**thanks** 95:15
102:13 105:12
**Thanksgiving**
173:5
**theirs** 82:7
**therapist** 174:20
**therapists** 175:3
**therapy** 199:16
**Theresa** 205:19
273:11
**they'd** 114:22
**thick** 269:25
**Thielbar** 69:5
70:7 71:22
82:2,18,24
217:19 280:10
282:19 284:2
294:17 298:24
299:13 301:2
301:14,19
302:2 307:8
308:22
**Thielbar's** 80:1
**thighs** 203:8,9
204:3
**thin** 282:2
317:20
**thing** 9:13 18:19
47:25 55:18
60:17 69:23
70:14 74:15
76:5 99:16,23
102:25 113:9
113:18 117:2
131:19 139:5
143:17 150:13
152:13,24
155:7 159:4

165:1 182:5
186:23 193:7
200:13,24
229:15 230:17
232:13 236:15
241:19 243:10
258:20 283:21
285:20 294:7
306:14 307:16
317:14
**things** 13:23
24:20 29:9
45:22,25 46:7
46:11,12 47:21
47:22 59:8,20
62:14 66:10
67:18 76:22
80:8,19 81:6
84:6 89:3,4,5
96:21 98:3
102:8 120:10
121:11 128:6
132:6 140:23
142:10 143:11
150:8 154:1,3
154:22 159:2
161:19 171:16
172:21 178:25
179:6,10 185:7
186:22 187:21
189:1 193:12
194:25 196:18
197:24 199:14
203:20 204:19
204:20 206:3,4
222:1 228:5,11
230:17,24,24
232:12 233:20
236:14 240:10
240:18 241:25
242:4,11 246:6
252:11,13
256:20 258:17
261:6,10,11,15
264:13 268:5
269:23 270:2,9

270:12,14
272:19,21
273:1,22
274:16 276:5,6
279:16 280:11
280:24,25
285:16 287:20
289:5 291:14
291:14,18
295:1,12,14
297:25 299:10
299:18,22
300:15 302:13
302:17,18,22
303:1 305:11
307:17,20
312:14 313:10
320:21 321:25
**think** 12:17
15:13 23:6
26:19 29:17
31:13 33:8
39:8 53:3
60:21 61:4
62:18 64:3
65:15 66:1
74:7 75:24
77:15 85:10
88:21 90:9
92:1 94:7
96:22 98:7
99:4,17 101:17
104:11,17,20
106:20 108:15
110:21 115:11
115:13,16
116:2,5,10
119:8,14 120:2
120:3,23
125:18 128:15
128:18,19
129:8 131:1,10
131:23 141:1
143:9 144:7
145:20 148:21
149:8 153:19

156:3 159:10
160:6,8,24
168:2 170:7
177:19 179:21
181:22 183:15
183:17 184:5
185:3,3,5,17
191:12 192:16
194:5 197:6
213:14,18,22
213:23 215:12
216:6,8 217:22
223:1,18 224:9
224:12 231:22
232:8 233:7
234:23 235:13
244:24 245:6,6
245:25 246:10
247:8,25
251:21,22
252:4,5,7,15
252:19,19
256:4 257:16
258:2,16 260:1
263:9 265:18
267:14 269:20
270:4,25 271:4
273:12 274:5
274:24 275:7
275:17,19,23
276:13 279:6
279:12,13
288:13,18
290:2,4 291:6
295:25 296:3
299:3 302:23
303:25 304:1,2
306:4 313:20
313:23 314:13
**thinking** 98:19
98:21,22 240:1
274:13
**thinks** 115:14
**third** 14:9 56:12
81:2,3 93:11
93:24,25 94:21

94:22 133:11
177:5 204:12
213:12 247:24
252:7
**thirty** 233:20
**thirty-six** 172:2
172:2,3
**thoroughly**
321:18
**thought** 12:8,17
28:14 45:6
46:9 49:11
50:12,14 51:14
52:7,23 59:16
64:20,24 75:23
79:22 80:21
84:10 85:1,2,3
86:10 89:7,22
91:10,23,23
98:11 119:15
125:22 128:12
128:22 131:4,8
133:5 134:10
134:20,24
138:2 142:3
151:11 159:11
164:22 166:17
170:22 173:6
192:2 193:23
198:15,22
208:20 215:25
219:4 225:2
230:22 247:5
256:8 274:10
276:5 277:1
310:24 313:22
**thousand** 264:4
**threat** 255:21
**threatening**
305:12
**three** 9:25 56:24
63:10 64:24
80:9 103:25
104:18,20,21
108:21 109:2
120:7 124:1,5

125:2 129:9
140:15 141:16
142:1 156:19
160:7 174:16
182:22 228:12
228:13 237:14
237:18 251:15
251:19 281:15
294:18,21
306:7
**three-day**
266:22
**threw** 83:22
144:7 179:16
309:25
**throat** 310:22
**throw** 110:22
**throwing** 77:14
77:14 110:19
**Thursday** 168:2
247:22 251:12
**tied** 162:9
**tier** 45:16 96:13
96:13,14 280:8
**tight** 103:15
**till** 255:14
**Tim** 264:18,20
**time** 10:7,18
11:1 14:25,25
16:8,9,10,17
16:17,18,18,20
20:17 21:18
22:25 23:2,5
26:15 28:9,11
28:16 30:10
31:8,19 32:1
32:15 33:11
36:11 38:14,24
43:10 46:6,12
46:12 47:23,25
48:12,25 50:25
52:11,12 54:13
54:14 55:1,6
55:19 57:1,5
58:17 60:23
65:24 68:25

69:18,24 70:10
70:14 73:7
74:17 78:5
80:10 82:9
84:10 85:7,9
88:19 91:1
92:11 93:11
94:22 98:5
99:1,2 100:4
100:16,18
101:6,7,10,13
102:5,6 110:5
110:13 112:8
112:18,25
113:3,20 117:6
120:19,24
121:11 122:13
123:12 124:16
125:1,15,16
129:11,19
133:11 138:14
139:19 140:3,7
140:12,17,19
140:20 143:10
144:24 147:19
147:23 148:3
149:15,21
151:18 154:18
155:2,21,25
160:13 161:8
161:25 162:3,5
168:6 169:14
169:21,23
170:18 171:24
173:4,7 177:12
179:7,21 184:7
184:9 187:14
188:23 191:9
192:23 194:4
194:10 195:7
198:12 199:14
199:16,22,23
201:7 202:10
202:12 207:9
213:19 216:4
219:23 220:16

220:17,23
221:2,3,4,5,7,8
221:9,11,13
223:3 225:7
227:25 228:3
228:10,12,13
229:13,14,22
230:10,20
233:7 234:4
237:4 238:7
239:18,19
240:5 241:7,9
241:15 246:16
248:3,8,14
249:5,21
251:20 252:14
254:18 255:11
256:21 257:3,5
257:6 259:1
260:9,10
262:10 263:25
264:2,5,8,23
264:25 266:22
267:16 270:10
270:24 271:3
273:8,17 274:7
275:5 278:16
279:16 280:9
283:3,17,18,24
284:14,23
285:17,24,25
286:15,16
287:4 288:14
288:17 290:4
290:14,14,21
291:5,7 293:9
294:3,12
295:19 303:25
304:10 305:6
305:19 306:20
308:12 309:19
310:14,15,21
313:11,12,13
316:1 318:1,5
319:10 320:2
**timeframe**

237:22 239:16
243:17 298:20
**times** 16:24 17:1
17:12 45:20
46:8 49:10
55:9,20,20
59:3 60:24
66:10 80:9
84:16,20 95:20
98:7 110:9
114:15 115:2
117:21 125:4
135:15,16
139:17,17
152:19 197:4
202:4 207:11
213:23 222:17
235:24,25
236:9 237:5,13
237:14,15,16
237:18 239:4
240:23 249:20
249:21 250:13
255:25 261:2
262:11,14,15
262:17 272:5
272:18 281:19
283:12,23
284:4,10,12
295:20 297:11
298:11 300:20
301:8 305:6,8
307:10 313:12
317:11 318:25
**tiny** 179:13
**tirades** 208:20
293:16 316:16
**tired** 207:10
233:16 302:15
319:21
**tobacco** 77:25
78:24 81:11
**today** 8:18,22
9:1,3 10:10
14:14 15:6
33:11 50:25

121:19 142:6
181:13 209:24
233:8,13,14
266:5 274:23
275:3 284:11
286:3 321:3
**Today's** 6:11,13
6:15
**toilet** 97:2 98:24
103:17 106:7
**told** 20:25 21:2
21:3 22:7 23:7
23:9 31:23
45:17,20 46:3
46:5,24 51:13
53:15 55:7,8
58:13,17 59:14
60:3,4,5,8 61:3
61:4 62:2
63:17 64:1,3,8
66:13,25 67:3
67:21 68:2
69:22 71:24
79:19 80:17,21
83:8 85:7,9,15
86:8 87:14,17
90:3,9 99:20
113:23 114:8
119:24 126:19
127:9,25
131:22 134:15
135:24 138:3
143:2 151:6
160:18,19,21
166:14 169:10
177:15,18
178:3,15,20
184:7 185:13
196:23 199:3
200:22 201:22
211:19 212:3,8
225:17 232:1
237:22,23,23
238:6 240:10
240:18 242:6
243:3,5,9,9

LORI LYNN HEETHUIS, 9-25-2020

244:5,9,18,23
244:23 246:4
247:6,19 252:9
254:2 258:17
258:22 261:5
261:11,13
263:3,5,24
264:8 267:3,6
267:8 276:4,22
277:10 281:4,4
281:6,8,10,11
281:12,13,14
281:16 283:15
289:2,2,3
292:6 293:2,8
293:9 294:4
295:5 315:7,16
316:14
**tolerance** 24:9
**Tomasczyk**
  175:21
**tomorrow** 87:20
  88:1 163:19
**tongue** 162:8
  235:21
**tonight** 232:24
  299:16
**Tony** 273:21
**top** 49:4 78:13
  107:1,18
  235:22 260:4
  261:16 294:19
  296:5
**topic** 54:20
  116:2
**total** 50:21
  319:25
**totally** 116:4
  191:13 232:18
  285:16
**touch** 201:9
  206:23 237:5
  238:13
**touching** 104:25
  144:17 234:25
  240:6 242:10

242:19 245:18
265:22 320:25
321:1
**touchy-feely**
  215:17
**toughing** 319:5
**towel** 108:1,2
**toweling** 107:17
**towels** 108:3
**town** 153:15
**township** 277:16
**track** 16:11
**tracking** 91:22
**training** 16:2,5
  23:20 24:7,12
  24:21 25:1,8
  38:13,18,21
  39:22 40:1
  120:18 207:6,6
  207:14 246:14
  256:22
**trainings** 24:23
**transcript** 3:16
  323:5
**transfer** 100:14
**trash** 77:16
  79:11,20 81:6
**Traverse** 210:11
**trays** 83:8,9,20
**treat** 49:6,7
**treated** 114:13
  146:6 191:7
  246:8 256:16
  286:23 288:25
**treating** 118:24
**treatment** 285:4
  285:4,6,24
  287:4,5,6
**treatments**
  166:24 167:7
  173:22
**Treutler** 182:20
  185:18
**trials** 173:18
**tried** 112:14
  124:19 131:12

132:11,14
139:12,13,17
168:10 183:22
184:15 198:5
202:22 228:24
235:21 241:23
273:9 307:11
310:25
**tries** 191:2
**triple** 188:23
**trouble** 9:19
  111:3 201:4
  214:9 317:9,9
**trousers** 96:20
**true** 119:13
  135:12 203:4
  236:15 270:15
  323:6
**truly** 32:18
  230:7
**trust** 85:10
**trustee** 52:9,16
  84:20 275:21
  284:17,19
**trustees** 51:17
  51:23 52:12,17
  54:1,25 57:23
  83:8,12 85:12
  86:16 87:11,16
  224:25 275:24
  283:1
**truth** 7:25 8:1,1
  8:8,8,8 58:20
  75:21 202:24
  222:3 289:10
  289:19 323:8
  323:11
**truthful** 34:2
**truthfully**
  289:16
**try** 27:14 50:22
  51:20 57:15
  59:24 60:10
  76:19 92:17
  93:21 111:10
  115:14,21

116:9 125:4
128:18,19
131:1 132:3
139:15 150:7
150:10 191:4
198:7 239:8
242:15 253:23
255:7 274:15
306:10 314:14
**trying** 12:8 39:5
  48:19 49:18
  51:2 70:1 76:4
  76:4 80:1
  86:23 89:3,15
  90:22 91:16,16
  91:17 94:25
  96:12 104:12
  105:1,3,22,23
  107:15 113:16
  113:16 117:9
  118:22 123:5
  126:17,25
  129:18 132:16
  132:21,24
  139:2,5 144:8
  144:11,12,13
  146:12,13
  148:15,21
  149:11,17
  154:8 156:14
  157:20 158:7
  158:25 162:2
  162:10 163:23
  182:8 183:15
  183:24 194:4
  195:3,6,6,12
  195:22,22,23
  198:7,9 202:21
  203:10,25
  204:1 207:6
  210:14 211:9
  212:23 224:15
  224:18 225:8
  227:11,18
  229:23 231:4
  235:23 236:1

237:17,18
240:3,7 242:1
244:1 246:20
252:9 255:15
261:9 270:4,21
281:21 284:4,4
284:5 286:9
302:19 303:16
304:18 306:16
314:16 315:22
320:5
**Tubergen**
  182:20 185:18
**tuck** 107:1
**tucked** 106:20
**Tuesday** 68:9
  247:20 251:11
**turn** 107:23,24
  108:10 131:7
  153:20 154:13
  165:5 197:21
  198:10,22
**turned** 53:13,22
  75:11,17 88:11
  94:1 97:2
  108:6,9,12
  131:8 147:10
  147:11 149:21
  149:22,23
  151:12,15
  152:15 158:16
  158:17 162:15
  164:11,16
  167:10,14,25
  168:7,7 170:19
  171:16 201:14
  272:3,9,15,17
  272:25
**turning** 198:4
**turns** 155:17,24
  169:13
**TV** 317:6
**twenties** 285:13
**twenty** 188:16
**twenty-eight**
  299:4

LORI LYNN HEETHUIS, 9-25-2020

Page 369

| | | | | |
|---|---|---|---|---|
| twenty-four 299:3 | 183:10 224:22 226:19 229:3 | 148:2 159:6,14 196:8 199:1,9 | 270:21 276:2 284:24 287:11 | 143:24 144:14 144:20,22,23 |
| twenty-somet... 313:24 | 230:17 243:10 276:14 282:2 | 199:19 200:24 202:13 203:1 | understanding 14:16 19:11,12 | 145:4,7,11 146:8 149:20 |
| twenty-two 154:15 | 296:11 307:16 307:24 310:8 | 205:21 206:12 207:23 221:22 | 20:1 22:1 73:3 91:15 152:13 | 150:4,5 199:15 200:11,13 |
| twice 76:8,9 250:2 | 311:20 316:16 typed 177:2 | 237:23 241:7,8 241:10 245:15 | 173:1 177:11 185:17 188:25 | 217:22 227:24 228:1,2,3,7 |
| twisting 256:20 | types 102:6 | 245:21 246:2 | 290:19 294:1 | 239:19,22 |
| two 25:25 26:14 | typing 101:2,6 | 247:1,4,10,13 248:2,3,13 | understood 15:12 17:3 | 241:16 258:19 258:21 281:12 |
| 48:1 49:4 54:3 75:6,8,7 77:11 | **U** | 249:4,12 250:12,16,25 | 24:6,8,9 27:2 27:22 30:16 | 319:3 unit 84:6 212:6 |
| 77:12,13 81:3 81:15 94:8 | U 173:20 uh-huh 13:12 | 251:9,18 271:13 277:14 | 32:20,21 33:18 33:24 37:4,18 | United 1:1 6:9 unlock 133:18 |
| 109:19 117:10 117:15 118:2 | 14:20,21 48:24 109:6 118:9 | 278:1 284:7 292:22 318:21 | 60:2 112:12 114:17 119:10 | unmute 7:13 unpaid 266:14 |
| 121:11 143:10 154:15,20 | 225:16 uh-hun 14:20,21 | undersheriff's 56:2 | 139:2 166:21 188:22 320:10 | unquote 116:3 unreasonable |
| 167:4 189:17 194:4,5 205:5 | unaware 44:25 unbecoming | understand 7:9 14:24 15:4,9,9 | 320:12 unemployment | 233:25 unrelated |
| 222:15 228:13 234:13 237:18 | 87:15 141:10 320:9 | 15:11,13 16:10 16:11 17:4 | 144:2 181:2,3 181:14,23 | 285:16 unsettling 48:5 |
| 237:22 242:22 249:23,25 | unbeknownst 241:25 242:17 | 19:6,7 26:15 26:24,25 27:18 | unfairly 256:16 Unfamiliar | unwarranted 46:8 |
| 251:25 259:9 264:4 265:8,10 | 243:8,12 uncalled 305:16 | 28:2 29:12 30:17 33:21 | 224:15 unfit 60:23 | updates 16:18 16:21,23 |
| 268:8,22,24 269:8,20 280:1 | uncertain 293:23 294:2 | 34:1,4,7,10 37:2,11,22 | 118:2 177:8,10 177:23 178:12 | 135:10 updating 31:24 |
| 282:22,24 284:19 286:19 | uncomfortable 15:3 217:13 | 45:12 49:12 70:2 84:25 | 179:18 208:18 211:20 293:11 | uphold 27:2 upper 45:16 |
| 291:25 297:22 two-and-a-half | 230:25 Underneath | 88:21 89:3,18 95:2 108:25 | 310:23 unfolded 206:12 | 96:13 104:14 189:20 280:7,7 |
| 157:2 two-minute 99:3 | 212:23 undersheriff | 109:3 114:22 115:3 118:22 | unfortunately 116:17 | 284:6 upset 54:25 |
| 99:13,16 100:8 100:11,11 | 44:13 45:13 51:4 52:19 | 118:23 119:1 121:15,21 | unfreeze 70:15 unhappy 251:7 | 83:19 86:10 93:3,5 97:21 |
| 117:12 two-thirds | 53:9,20 54:21 59:23 61:22 | 124:1 125:12 126:20 132:21 | 291:10 uniform 276:15 | 118:19,20 119:1 126:1 |
| 212:4 two-year 143:9 | 62:10,21 113:11 120:3 | 144:1 146:23 162:10 186:17 | union 18:22 32:18 42:12 | 202:7,8 203:22 245:3,5 251:3 |
| type 36:12 47:25 55:18 64:11 | 120:17 124:10 132:12 134:3 | 190:2 198:23 206:9 213:3,8 | 43:1,3,13,13 45:4 50:9 51:7 | 251:5 258:12 275:11 |
| 74:15 76:23 99:6 101:4,20 | 135:25 137:25 138:13 140:6 | 222:24 233:19 239:11 244:1 | 66:13 79:13 87:23 138:9,14 | upstairs 49:9 69:25 153:24 |
| 103:10 133:5 182:5,12 | 141:25 142:15 146:11,15 | 245:12 252:10 | 138:18 143:21 | 210:6 242:1 |

usage 57:15
use 23:7 38:10
    38:12 39:24
    47:25 81:12
    93:14 94:25
    95:16 96:4,9
    105:12 145:20
    145:25 155:23
    175:14 186:11
    190:19 191:3
    221:4 252:22
    253:15 287:25
    305:6
usually 189:17
    189:20 228:19

_____
V
_____

V-A-V-A-N-C...
    9:8
vacation 221:2,5
    221:8,9,14
    242:16 243:8
    243:11 266:24
vacations 179:7
vague 64:11
valid 254:1
validity 255:3
Van 182:20
    185:18
Vanderlaan
    54:25 60:2,9
    60:18 113:9,13
    113:21 126:1,5
verbal 231:1
    316:7
verbally 18:23
    45:18 54:5
    141:12 146:1
    265:19
verdict 58:10
verify 7:11,13
Vern 244:3
versa 311:18
version 31:3
    34:24 35:2
    317:7

versus 6:8
vice 311:18
video 6:5,6,6
    40:10,13,15,18
    48:12 57:16
    65:1,10,13
    66:2 68:7 69:5
    70:9,11 71:12
    71:15,21,24
    72:1 73:16,25
    75:3,23 76:11
    76:17 77:15
    79:5,8,10,15
    79:17,19,22
    80:1,8 82:15
    82:16,18,19,19
    82:25 83:2
    99:2,24,25
    100:7 116:15
    121:1,5 122:7
    134:6 152:7,10
    179:22 180:1
    191:17,24
    192:4,7 211:15
    211:15 223:8
    223:11 248:17
    248:21 252:24
    253:2 282:15
    288:2,5 317:14
    322:12
videoconference
    1:13,16 2:2
    6:12
videoconferen...
    6:20
videoed 82:18
    82:20
videographer
    7:20 12:7
    73:12 116:11
    121:9 153:1
    312:25 313:17
    314:18 315:12
videoing 80:20
    81:25
videos 64:22,23

77:11 81:20
82:3,21,22
282:24
VIDEOTAPED
    1:13
view 53:21
    198:9 199:22
    300:13 318:3
viewed 36:8
    300:11,15,18
violate 59:25
    282:9
violated 143:11
violating 82:2
violation 37:23
    77:19 78:1,15
    202:5 316:22
    318:9
violations 60:19
    136:22 143:13
    281:10
Vision 180:13
visitors 194:11
visits 152:20
    194:8,8,9,11
visually 317:23
    317:25
voice 39:3 97:22
    98:15 105:21
    106:2 146:9
    196:2 202:14
    202:15 303:2
    312:8,10
voicemail 111:9
    125:6 168:1,19
    171:4
vs 1:7
vulgar 202:23
vulgarities
    202:19
Vyvanse 9:6,8
    9:21,22 174:6
    175:8

_____
W
_____

W-O-O-D 251:2

Wade 23:23
    24:12 25:8
waist 246:18
    249:17
wait 29:17 32:3
    32:24,24 47:24
    70:21,21,21
    114:11 116:5
    173:21 192:20
    194:15 209:21
    209:21 232:4,4
    242:7,14
    286:11 313:1
    314:4
waited 86:4
    200:16
waiting 85:11
    86:2 299:16
waive 6:22
waived 254:23
walk 94:8 95:14
    102:2 105:9
    242:8,15
    246:13 253:23
    285:20 300:19
    301:5 302:14
walked 52:24
    53:7,14 88:10
    89:9 94:1
    101:20,25
    102:1,9,10,11
    103:4,4 104:5
    138:6,7 139:21
    142:14,25,25
    159:9 244:4
    255:9
walking 102:2
    140:2 147:1
    205:12 229:16
    242:23 247:9
    297:19
wall 312:22,23
want 15:6,7
    28:13 29:24
    32:9 36:21
    38:16 40:3,12

42:3 62:8 87:2
89:13,15,18
90:17 107:22
113:7 117:3,25
119:8,14
121:10,16
122:11 123:19
130:25 132:20
137:6 139:8,19
141:11 142:16
142:22 144:25
145:2 148:13
150:11 151:22
157:21 158:3,9
159:15 161:17
163:20 165:10
169:4 172:6,8
172:19 177:19
178:7 180:17
182:22 185:5
192:17,18
196:5 205:20
205:23 206:18
206:18 209:24
210:11 214:24
221:23 222:8
232:13 233:10
233:16 234:17
237:24 240:1
242:20 245:6
246:17 253:22
270:2 271:7
275:8,17
281:13 285:12
286:21,22
wanted 29:24
    54:9 58:16
    63:4 87:14
    90:3 119:17
    132:19 143:22
    153:13 158:23
    161:3 165:13
    169:9 172:8,24
    172:25 173:3,7
    182:3,15 183:2
    184:9,10

LORI LYNN HEETHUIS, 9-25-2020

Page 371

196:25 212:11
212:16 214:15
216:19 229:17
238:10 239:9
247:14,15
255:11,11
267:11 269:4,5
269:22 276:13
287:20 289:3
319:15
**wants** 139:6,7
139:10 151:21
158:8 163:18
163:19 233:13
**warn** 243:13
**warning** 138:6
**warrant** 132:19
**warranted**
246:11
**wash** 106:18
**washed** 107:4,12
107:16
**washing** 97:3,14
**wasn't** 24:1 31:9
33:4,7 36:15
37:8 39:22
45:18 50:4
60:12 61:8
67:13 69:19
80:19 81:9
82:9 85:2
91:15 92:11
96:22 97:23
98:21,22
103:14 110:12
115:7 125:2
126:9 141:2
146:13 160:21
178:1 181:2
182:18 198:19
201:6 202:15
202:16,18
203:6,7 204:15
207:8,9,23,25
218:6 220:22
222:16 238:7

247:20 248:8
251:9 257:21
263:10,11
268:6 274:1,10
277:10,11,25
279:21 280:15
283:3 285:17
291:1 300:4
305:24 310:2
310:17 312:20
312:23 319:17
321:18
**wasting** 234:4
**watch** 60:17
68:13 69:24,25
85:16,18
242:17 283:17
317:24
**watched** 279:18
**watching** 281:8
**water** 97:3
98:24 100:23
101:12 107:5,8
107:9,12,20,23
107:24 108:3,6
108:10,12
**way** 10:10 13:11
14:22 27:24
44:22 49:13
50:5 60:10
95:5 102:13,15
103:1,15,20,20
105:9 109:13
113:24 115:21
118:24 120:22
128:20 131:7,8
131:15 134:22
140:3 155:1
163:3 166:21
176:3 182:13
184:11 191:17
194:13 196:10
196:14 197:7
199:8 201:12
201:15 205:10
205:11 209:22

212:4 233:10
243:25 244:7
248:12 249:3
253:23 254:18
256:19 257:10
258:4,18,19
273:19 276:1,9
276:16 279:14
279:17 280:16
280:16,17
287:18 296:1
298:14 302:13
306:1 310:20
312:11 313:4
317:22 320:10
320:24
**Wayne** 1:20,20
323:3,24
**ways** 186:15
287:9
**we've** 58:17
177:5 210:13
249:14 282:24
**weapons** 38:9
**wear** 96:19
276:15
**website** 184:18
**week** 67:11 99:4
206:15 249:23
249:25 250:3
**week-and-a-h...**
99:5
**weekend** 266:25
**weeks** 69:20
154:20 167:4
270:11
**weight** 187:25
**went** 11:19 14:4
14:4 38:20
50:17 55:10
64:9 68:21
72:5,11 84:17
84:20 87:11,13
87:18 88:6,12
88:12,16,23
89:10 90:19,25

93:14,19 94:2
94:22 95:10,13
95:24 96:3
97:1,2,4,5
101:11 103:17
104:5 106:7,18
111:5 113:20
114:9 126:7
130:16,17
135:20 138:2
140:7,9,21
145:17 147:9
152:14 153:14
153:24 155:4,6
155:10,14
156:3,7 157:7
163:13 168:13
169:14 170:4
172:6 173:7,10
181:11 182:17
183:11 195:3
201:10,15
202:2 205:15
215:3 219:20
240:21 242:16
242:18 243:2,8
243:11 245:17
245:20 246:2
247:1 248:1,4
248:13 249:4
249:12 254:23
257:13 264:11
273:14 274:6
277:2 283:24
285:16,18
298:12,12
304:1 308:14
311:6
**weren't** 30:18
59:20 62:17
74:11 81:7,19
126:8 148:2
158:23 159:18
160:19 192:18
201:19 204:15
236:13 247:7

258:23,23
295:6,6
**west** 236:11
**Western** 1:2
6:10
**wheel** 307:4,5
**whichever** 96:14
**whining** 303:8
**whiny** 305:10
**Whitehall**
180:18
**wife** 114:18,24
115:1 118:15
125:14 127:11
127:13 204:15
**willing** 167:4
**window** 84:17
277:2 317:18
317:21
**windows** 197:3
282:3 292:13
**wipe** 75:18,19
**wiping** 107:17
**wiry** 255:23
**wise** 303:25
**wish** 116:15
148:17 182:23
**wished** 114:24
**witch** 241:23
**withdrawals**
317:3
**witness** 3:3 6:16
6:20 8:3,6 39:5
39:15 40:7,23
71:7 73:22
74:2 77:9
118:12 120:25
152:23 153:5
194:20 225:18
230:1 234:9,10
234:22 250:1,2
268:22 269:7
271:2 287:16
287:19 297:3,8
297:9 313:2,21
314:1,20

**witnessed** 236:2
284:16 296:18
296:19,19,24
297:2,3,5,12
**witnesses**
259:21,22,23
260:2,8 262:25
**woman** 246:16
**women** 81:14
201:24 279:6,8
279:13 282:13
**wonder** 98:22
**Wood** 22:16,17
22:20,21 23:9
45:10 78:6,6
239:24 241:18
245:17,20
250:13,20,25
251:1,2 253:19
254:22 255:17
256:2 267:7,8
272:1,6,24
296:18,18,23
296:24 297:10
**Woods** 251:1
**word** 70:5 85:5
85:25 90:17
155:16,23
310:2,2
**wording** 60:13
**words** 60:13,15
60:15 87:16
183:13 292:8
305:8
**wore** 96:19,20
**work** 50:17 57:4
57:6 61:21,22
68:20 70:8
84:9 97:25
100:12 114:20
114:22 115:20
116:19 117:22
118:16 120:6,8
120:8,9 122:6
146:24 147:2
174:24 179:8

179:15 180:24
187:22 189:12
191:1 206:20
212:11 220:14
230:14 271:21
286:7 290:23
293:12,24
294:2 304:1
310:20,21
316:12,13
**worked** 12:3
58:17 74:6,12
83:25 115:2
174:23 180:17
180:21 184:7
188:12,13
218:7 230:15
283:25 306:20
**worker** 159:1
161:10 182:5
**workers** 36:15
224:3
**working** 17:21
19:18 20:10
21:18 26:3,21
36:11 41:20
55:15 57:1
68:24 84:2
88:15 96:16
99:25 101:18
175:13 189:3,4
194:3 200:15
205:7 242:9
274:3 284:16
300:16 312:24
**works** 80:25
96:5 137:7
181:3
**world** 166:22
311:12
**worry** 70:6 79:2
90:8 142:23
201:8
**worse** 192:1
294:7
**wouldn't** 81:12

84:14 110:2
111:4,5 119:18
119:20,25,25
131:17 132:8
143:17 172:18
203:17 245:5
317:24
**wow** 86:20
128:22 251:5
**wraps** 197:3
**write** 51:20
85:23 151:4
155:7 158:18
176:24,24
177:1 248:7
**write-up** 54:10
76:23,23
252:19
**writing** 19:24
176:22 209:13
210:23 261:18
261:23 262:3,6
305:2
**written** 21:23
49:20 50:2
54:3,11 57:14
57:25 85:10
89:22 136:23
147:19 184:22
193:4,11
197:10,13,17
198:17 248:6
254:11,19
255:3 266:13
298:17 310:8
**wrong** 86:20
152:13 170:23
171:2 218:23
252:20 275:2
279:16 306:18
316:15
**wrongfully**
177:7
**wrote** 85:24
151:2 153:11
166:9,12

178:22 257:2
261:1 262:8
270:5

---

**X**

**X** 152:25 153:4
179:7

---

**Y**

**yeah** 12:17
13:14 27:12
39:10 50:20
54:8 69:11
70:5 73:16
78:25 79:9
81:17 83:19
84:22,22 86:6
86:6 90:12,19
91:6,12,20,20
93:1 96:25
100:14 103:3
104:22 106:23
107:21 108:8
108:22 109:9
109:12,12
110:17 111:14
113:21 115:25
117:5 118:7
123:3 127:7
134:7,8 139:25
140:1 146:2
147:12 151:20
151:25 153:4
155:1 157:10
159:10,18
170:14,14
172:23 176:5
187:9 198:13
201:4 205:13
205:20 208:24
218:13,17
223:5 225:7
228:9 230:22
231:19 248:4
266:11,11
267:10 269:7

271:18 273:3
273:16 277:7
278:15 287:1
290:12 294:25
299:23 301:15
308:9 312:21
314:16 315:7
317:19
**year** 25:3 58:4,4
100:19 172:15
173:5,6 178:25
178:25 179:12
237:2 243:14
250:6,7 289:23
310:19
**years** 12:6 16:14
24:15,19 25:25
26:14 42:23
43:25 44:2
47:11,12 58:18
74:20,22,24
140:22 143:10
145:16 156:21
156:23,24
157:9 159:3
160:7 167:6
171:23 172:1
184:8 190:7,11
210:1 212:9,12
212:12 229:6
231:16 238:8
243:23 253:22
272:13 287:13
289:8
**yell** 146:9 296:7
299:23
**yelled** 295:7
298:15 299:22
300:7
**yelling** 80:16
97:23 202:14
202:15,16,17
202:18 203:13
295:13,15,16
295:17,20,22
295:23,25,25

LORI LYNN HEETHUIS, 9-25-2020

Page 373

296:1,10,14
297:14,24
299:1,5 300:1
303:2 305:19
306:9,9,14
**yellow** 109:10
281:25
**yep** 108:16
200:12
**yesterday**
170:11
**young** 48:18
196:10 234:16
255:22

---
**Z**
**zero** 24:9
**Zoom** 121:7
**Zyrtec** 9:11

---
**0**
**061** 188:21

---
**1**
**1** 3:18 17:14,18
17:24 19:17
25:11 26:13
29:3
**1,600** 174:10,10
**1,668** 171:20
**1.14** 34:20
**1:00** 151:17
**1:10** 121:4,5
**1:12** 122:17
**1:13** 123:10
**1:19-cv-00940**
1:7
**1:30** 56:11
**1:33** 137:11
**1:38** 56:11
**1:48** 147:7
**1:53** 150:24
**1:56** 152:7,8
**1:58** 152:9,10
**10** 4:2 9:11
41:23 42:2,9

42:18 90:24
137:19 189:22
**10:00** 55:21 56:5
199:18 200:12
200:16,21,25
201:7
**10:03** 40:15,16
**10:05** 40:17,19
41:6
**10:06** 41:24
**10:15** 189:16
**10:22** 49:24
**10:30** 147:14,19
151:10,15
152:15 162:16
**10:48** 65:10,11
**100** 10:4 75:11
**102** 4:4
**10th** 265:9
**11** 4:3 49:23
50:2 54:4
124:8 127:18
160:10,12,15
160:25 167:6
259:15 318:25
319:15,17,19
319:25
**11-27-17** 193:4
**11-D** 137:19
**11.9** 188:19
**11:04** 65:12,14
**11:59** 102:18
**119-cv-00940**
6:11
**11th** 124:14,23
125:9,19 126:8
128:10 129:2
290:24
**12** 4:4 50:1
90:20 93:16
102:17,21
208:14
**12:15** 91:7 115:9
**12:27** 121:1,3
**12:30** 151:17
**122** 4:5

**123** 4:6
**13** 4:6 39:12
65:1 66:20
67:2,23 123:9
123:13 220:7
**13-D** 50:1 54:13
**137** 4:7
**13th** 66:2 67:24
68:1,3,5,8
**14** 4:5 39:12,19
122:16,24
136:12,13,20
209:10 266:15
**14-year-old**
218:24
**147** 4:8
**14th** 193:24
**15** 4:7 137:10,14
314:6,13
319:22
**150** 4:9
**153-D** 169:18
**156-D** 170:11
**157** 220:8
**158** 220:8
**16** 4:8 35:9
147:6,9 322:3
**16-D** 23:17
**162** 4:10
**162-D** 219:16
**164-D** 164:2
**166** 4:11,12
**17** 4:9 34:21,25
35:11 124:9
150:23 151:1
152:17 193:12
199:8 228:5
261:22 322:3
**171-D** 260:20
**176** 4:13
**178-D** 261:22
**17th** 129:4
130:20 133:20
134:9 193:23
**18** 4:10 77:11
118:5 162:25

163:3 219:16
261:17
**180** 4:14
**180-D** 260:21
**19** 3:18 4:11
34:22 35:9,22
77:12 166:2
197:18 223:17
223:24 231:16
254:16
**19-D** 193:8,18
**192** 4:15,16
**1998** 15:15
16:13

---
**2**
**2** 3:19 10:4 20:4
20:8 90:25
**2-14-18** 23:19
**2.01** 29:25
**2.01.11** 34:1
**2.01.5** 30:7
**2.01.8** 30:13
**2:00-ish** 91:7
**2:15** 163:1,5
164:19
**2:19** 166:3,6
**2:26** 163:9,9
**2:30** 155:10
**2:35** 176:15
**2:40** 179:22,24
**2:55** 179:25
180:2,5
**20** 3:19 4:12
87:2 90:24
166:5,8 169:17
170:7,9 172:17
313:20
**200** 2:6 6:13
**2000** 11:1,3
13:18 39:11
47:1,1 244:15
**2006** 13:19
287:3
**2009** 23:2 213:5
223:17,21,24

224:1,21
227:21 228:14
229:11,12
235:11,12
**2010** 59:1
237:21,22
238:15 239:16
239:23 240:10
240:15 241:1
241:20 242:4
242:12 243:17
244:1,2,8,14
244:15 245:2
264:3
**2012** 244:15,17
245:10
**2013** 39:19 47:1
**2013-2014**
265:21
**2014** 22:21,23
23:1,2,4 39:12
47:16 57:15
213:6 239:14
241:20,21
242:4 243:17
244:2 245:8,14
248:13 249:4
252:12 254:11
254:16 259:15
261:5,17,22
262:5 263:16
264:17,24
265:7,25,25
266:3 267:13
268:2 277:24
277:25
**2016** 10:15
11:15 12:21
38:15 47:4,5
57:20 58:1,3,9
58:10 59:6,13
117:24 190:12
237:3
**2017** 11:3 19:17
19:19 29:3
31:2 47:7

58:11 59:14
62:1,5 73:5
74:7,8 76:11
77:11,13 78:16
80:4 117:24
192:15 193:12
197:18 205:2
208:14 219:16
289:25 290:24
291:4,6 304:1
**2018** 31:15 43:5
43:6 47:2
76:12 172:19
216:24 220:7
304:2 307:21
**2019** 34:25
35:11 43:9,10
43:11 44:1
49:20 51:12
54:4 55:15
58:8,24 59:5
65:1 66:20
83:25 84:4
87:4 88:23
122:12,25
123:16 134:2
175:4 176:18
177:6 178:15
179:14
**2020** 1:21 6:2,14
175:22
**2025** 323:25
**208** 4:17
**209** 4:18
**20s** 87:2,3 88:22
313:21
**20th** 11:15
**21** 3:20 4:13
48:19 58:18
145:16 159:3
172:13,17,18
176:14,17
184:7 253:22
262:5 286:8
289:7 313:20
313:22,23

**219** 4:19
**21st** 135:10,19
262:6,7
**22** 4:14 134:2
172:13 180:4,9
**220** 4:20
**223** 4:21
**22nd** 124:10
135:4
**23** 3:21 4:15
122:25 123:6
123:16 136:10
172:13 191:16
192:10,13
313:22
**231-457-3661**
110:7
**23rd** 50:16,18
51:3,11 52:2,4
52:6,7,21
53:10,20 54:15
69:7 87:3
92:22 123:23
124:2,3 136:19
137:22 145:18
147:3 149:20
151:11
**24** 4:16 49:20
54:4 58:8
140:9,11
192:25 193:3
**248.489.4100**
2:16
**24th** 50:17 87:3
88:22 92:21,22
92:22
**25** 1:21 3:22
4:17 6:2,14
117:10 157:8
171:23 172:1
172:11 208:10
208:14 212:12
**250** 2:14
**253** 4:22 259:11
**254** 259:11,25
**255** 259:11

**256** 264:19
**259** 4:23
**25th** 90:23
**26** 4:18 164:11
209:3,7 314:22
**260** 4:24,25
**263** 264:19
**265** 5:1
**266** 223:20
**26th** 151:1,4,14
151:15 152:14
152:16 162:14
164:15,17,20
165:19,24
166:9 167:10
168:1,9
**27** 4:19 83:10,19
219:12,16
**27555** 2:14
**277** 223:20
**28** 4:20 12:6
220:4,7
**288** 3:9
**29** 3:23 4:21
216:24 223:14
223:18
**291** 265:17
**29th** 164:3
170:25

──────── **3** ────────

**3** 3:20 21:11,15
140:6
**3-D** 170:11
**3.01** 18:1
**3:17** 192:11
**3:18** 193:1
**3:30** 155:10
**3:41** 208:11
**3:42** 209:4
**3:50** 170:2
**3:59** 219:13
**30** 4:22 15:23
86:4 175:17,18
253:6,9 254:11
254:11 286:8

**300,000** 213:4
**30th** 169:22
170:16
**31** 4:23 259:6,10
259:10
**32** 4:24 260:12
260:21
**321** 3:11
**323** 323:5
**33** 4:25 260:15
260:19
**34** 3:24 5:1
265:4,7
**3406** 323:22
**36-D** 253:10
**3669** 110:14
**378,000** 212:22
212:25
**38** 3:25
**38-D** 254:11

──────── **4** ────────

**4** 3:21 23:13,17
**4-29-19** 170:17
**4:00** 170:2 220:5
**4:06** 223:8,9
**4:10** 170:3
**4:12** 170:3
**4:15** 223:10,12
223:15
**4:16** 169:21
**4:20** 163:8,24
164:2 170:17
**4:30** 233:8
**4:46** 168:3
**4:56** 248:18
**4:57** 248:19
**400,000** 212:25
213:4
**41** 4:1,2
**457** 110:14
**47-D** 253:10
**480** 220:18,24
**48331** 2:15
**49** 4:3
**49503** 2:7

**4th** 317:1

──────── **5** ────────

**5** 3:22 25:15,18
26:12 177:6,13
178:4,15
**5-1-2017** 18:4
30:4
**5:09** 248:20,22
249:2
**5:17** 253:7
**5:27** 259:7
**5:29** 260:13,16
**5:38** 265:5
**55** 153:20
154:13 155:17
155:24 167:14
167:25 168:7
171:16
**553** 38:10
**55th** 154:21
**565** 38:10
**59** 188:12

──────── **6** ────────

**6** 3:23 29:21,25
140:4
**6:00** 55:21
284:14
**6:15s** 189:17
**6:16** 288:2,3
**6:19** 288:4,6
**616.454.8300**
2:8
**618** 25:19
**620-D** 25:19
**630-D** 30:1
**638-D** 30:1
**64** 132:5 187:10
**646-D** 208:15
**648-D** 208:15
**650-D** 18:2
**651-D** 20:9
**652-D** 20:9
**653-D** 21:17
**654-D** 21:17

LORI LYNN HEETHUIS, 9-25-2020

Page 375

| | |
|---|---|
| **66** 188:13 | **9:51** 33:17 |
| | **9:52** 34:17 |
| **7** | **9:59** 38:6 |
| **7** 3:24 34:16,19 | **911** 184:13,14 |
| 78:15 205:2 | |
| 264:17 315:10 | |
| **7:00** 189:16 | |
| **7:15** 189:16 | |
| **7:23** 322:14,15 | |
| **70** 9:6,8 | |
| **7th** 205:4 | |
| | |
| **8** | |
| **8** 3:7,25 38:5,8 | |
| 140:18 145:21 | |
| 148:15 265:14 | |
| 317:6 | |
| **8:00** 56:4,23 | |
| **8:10** 200:24 | |
| **8:30** 56:4,23 | |
| 189:15,20 | |
| 199:22 200:22 | |
| **8:32** 55:10 | |
| **8:36** 55:11 | |
| **80** 2:6 6:12 | |
| **82-year-old** | |
| 141:15 | |
| **8th** 175:22 205:4 | |
| 265:9 | |
| | |
| **9** | |
| **9** 4:1 41:5,9,9,12 | |
| 41:19 144:3,12 | |
| 318:25 319:17 | |
| 319:18,24,25 | |
| 320:1 323:25 | |
| **9:00** 10:8 | |
| **9:07** 1:22 6:3,5 | |
| **9:15s** 189:17 | |
| **9:23** 17:15 | |
| **9:28** 20:5 | |
| **9:32** 21:12 | |
| **9:37** 23:14 | |
| **9:40** 25:16 | |
| **9:45** 10:8 | |
| **9:46** 29:22 | |