UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI LYNN HEETHUIS,                                    Case No. 1:19-cv-940

     Plaintiff,                                        HON. PAUL L. MALONEY

v

COUNTY OF MUSKEGON; et al.,

     Defendants.
_____/

Stephen R. Drew (P24323)                 Laura S. Amtsbuechler (P36972)
Adam C. Sturdivant (P72285)              Melanie M. Hesano (P82519)
DREW COOPER & ANDING                     ROSATI, SCHULTZ, JOPPICH &
Attorneys for Plaintiff                  AMTSBUECHLER
80 Ottawa Avenue NW, Suite 200           Attorneys for Defendants
Grand Rapids, Michigan 49503-2648        27555 Executive Drive, Suite 250
Phone: (616) 454-8300                    Farmington Hills, Michigan 48331
E-mail: sdrew@dca-lawyers.com            Phone: (248) 489-4100
E-mail: asturdivant@dca-lawyers.com      E-mail: lamtsbuechler@rsjalaw.com
                                         E-mail: mhesano@rsjalaw.com
_____/

**<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ………………………………………………………… ii

I.    INTRODUCTION …………………………………………………………… 1

II.   STATEMENT OF FACTS

    A. The Prior Sexual Harassment and Plaintiff's EEO Filing …………………… 1

    B. Plaintiff's Ongoing Complaints of Retaliation and Defendant's Failure to Address or Investigate Them ……………………………………………………….. 2

    C. Plaintiff's Testimony in the ACLU *Semelbauer* Case ……………………… 6

    D. The Fitness for Duty Suspension ……………………………………………… 7

    E. The Write-Up for Giving Cookies to Trustee ……………………………… 10

    F. Heightened Scrutiny by Sergeant VanderLaan ……………………………... 10

    G. The Eavesdropping Recording by Defendant Boike ………………………... 12

    H. The Separation through a Forced Signing of a Last Chance Agreement …… 14

III.  LAW AND ARGUMENT

    A. Summary Judgment ………………………………………………………….. 17

    B. Time Limitation and Title VII – Acts Prior to September 15, 2018 ………… 17

    C. Time Limitations under ELCRA – Acts Prior to November 6, 2016 ………. 18

    D. Gender Discrimination under Federal and State Law ……………………… 18

    E. Retaliation under Federal and State Law …………………………………… 23

    F. Eavesdropping ………………………………………………………………… 30

    G. Termination with a Forced Last Chance Agreement ………………………… 32

IV.   CONCLUSION ……………………………………………………………... 35

INDEX OF EXHIBITS............................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbot v. Crown Motor Co.*, 348 F.3d 537 (6th Cir. 2003) …………………………………  23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) …… 17

*Ballanger v. Bunge Foods*, 238 F.3d 419 (6th Cir. 2000) …………………………………  29, 30

*Barnett v. Norman Yatooma & Assocs.*, 2007 WL 840880 (C.A. Mich. Mar. 20, 2007) ……  30

*Chen v. Wayne State Univ.*, 284 Mich.App. 172, 771 N.W.2d 820 (2009) ……………………  34

*Denhof v. City of Grand Rapids*, 494 F.3d 534 (6th Cir. 2007) …………………………  28, 29

*Dickerson v. Raphael*, 461 Mich. 851 (1999) ……………………………………………………  31

*Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 472 Mich. 263 (2005) …………………  18

*Jewett v. Mesick Consol. Sch. Dist.*, 2020 WL 3005995 (C.A. Mich. May 20, 2014) ……  33, 34

*Kline v. Tenn. Valley Auth.*, 128 F.3d 337 (6th Cir. 1997) …………………………………  18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) ……………………………………………………………………………………  17

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) …………………………………  24

*Miles v. City of Bay City*, 2014 WL 2118155 (C.A. Mich. May 20, 2014) ………………  33, 34

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ……………………………  17

*Navarro-Teran v. Embraer Aircraft Maint. Servs., Inc.*, 184 F.Supp.3d 612 (M.D. Tenn. 2016) … ……………………………………………………………………………………………………  17

*Powell v. Time Warner Cable, Inc.*, 2011 WL 2604802 (S.D. Ohio June 30, 2011) …………  17

*Texas v. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ……………………………  24

*Vinova v. Henry Cnty. Bd. of Educ.*, 2016 WL 4993389 (E.D. Ky. Sept. 15, 2016) …………  18

*Vollmar v. Laura*, 2006 WL 1008995 (C.A. Mich. Apr. 18, 2006) …………………………… 30

**Statutes**

42 U.S.C. §2000e et seq. …………………………………………………………………  17, 23

MCL §37.2202…………………………………………………………………………………  18

MCL §750.539a …………………………………………………………………………………  30

MCL §750.539c …………………………………………………………………………………  30

MCL §750.539h(b) ………………………………………………………………………  30

MCL §600.5805(2) ………………………………………………………………………  18

**Rules**

Fed. R. Civ. P. 56 ………………………………………………………………………  16

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

On August 31, 2011, an investigative report of the Muskegon County Jail found, through multiple interviews, that the jail was inefficient, chaotic and hostile.[1] Some examples of the jail's culture included the unfair and disrespectful treatment of female staff and that staff operated in fear of retaliation or reparations for raising concerns to management. The investigator, after determining inappropriate touching and lack of professional decorum were commonplace, recommended heightened awareness and proper punishment for those who violated the County's policies.[2] Plaintiff's complaint, and the discovery and evidence in this matter, demonstrates that some of this culture continued to prevail contributing to Plaintiff's forced separation after 20 years of service.

## II.   STATEMENT OF FACTS

### A.   The Prior Sexual Harassment and Plaintiff's EEO Filing

Plaintiff Lori Johnson Heethuis, was hired as a deputy by Muskegon County Sheriff's Department on April 11, 1998. Between 2009 and 2014, Lori was verbally and physically sexually harassed by Sergeant G who, while out of sight of witnesses or cameras, grabbed and pushed Lori's head towards his genital area, put his hands under her shirt fondling her breasts, put his hands down her pants, forcefully attempted to kiss her, and grabbed her buttocks.[3] On July 11, 2014 Lori filed an internal complaint with the County EEO office headed by Timothy Bracey.[4] She filed an addendum on July 18, 2014 regarding the culture of demeaning females, and the hostile and

---

[1] *See* Exhibit 1.
[2] *Id*.
[3] *See* Exhibit 2, p. 229, 235-237.
[4] *See* Exhibit 3.

retaliatory environment she experienced as a female.[5]

Lori provided the EEO office with names of witnesses who she complained to at the time, and those witnesses verified that she told them of the harassment but had not witnessed it. Sergeant G denied the allegations. Mr. Bracey ruled on October 17, 2014, that there was a "no cause" finding of sexual harassment.[6] Sergeant G was never disciplined and continued to be one of her supervisors. He later became the interim jail administrator. Lieutenant Mark Burns told her she should just put her big girl pants on and get over it.[7] Lieutenant Burns denies it.[8] Lori could not and did not just get over it. Sergeant G, her alleged harasser, continued to supervise her and was often involved in matters regarding her discipline.[9] Her physicians have indicated that when a person is physically assaulted by a superior and forced to continue to be in the presence of that person who remains undisciplined, it is not unusual to suffer from Post-Traumatic Stress Disorder.[10] Plaintiff is not claiming damages in this action for the sexual harassment and hostile environment that occurred between 2009 and 2014.

### B.    Plaintiff's Ongoing Complaints of Retaliation and Defendant's Failure to Address or Investigate Them

Between 2014 and her termination in 2019, she continued working at the jail where Sergeant G was one of her supervisors, and she continued to complain and raise concerns that she was being discriminated and retaliated against by Sergeant G and management of the Sheriff's Office for having filed against him. Management at the Sheriff's Office were aware of her complaints that she was being scrutinized more than her fellow male deputies. Her concerns and

---

[5] *See* Exhibit 4.
[6] *See* Exhibit 5.
[7] *See* Exhibit 2, p. 240.
[8] *See* Exhibit 6, p. 17.
[9] *See* Exhibit 2, p. 266-268.
[10] *See* Exhibit 7, p. 17; *see also* Exhibit 8, p. 84-85.

complaints were not addressed. She also complained to management that females were still being treated differently in the workplace.

Lori complained to Sergeant David VanderLaan. She asked him if he would like it if the things that Sergeant G did to her were done to his family and informed him that the harassment continued. In late 2017 Undersheriff Kenneth Sanford learned from Lieutenant Burns that something had happened to Lori in the past (the assaults by Sergeant G).[11] Sanford also knew that Lori was complaining about continuing to be harassed by Sergeant G and other management in the Sheriff's administration, and that she was complaining that she and the female deputies were being harassed and not the men. Sanford had the ability and authority as Undersheriff to investigate this and chose not to. [12]

Sheriff Michael Poulin and Undersheriff Sanford were advised by Dr. Auffrey (described below in a later section of this brief), that Lori was complaining about the retaliation against her for filing prior sexual harassment complaints against Sergeant G and for testifying in the ACLU *Semelbauer* case. Sheriff Poulin admitted that in January or February 2018 he did know of Lori's complaints of retaliation for having filed the EEO complaint against Sergeant G and her testimony in the case. He had the authority to investigate those complaints and chose not to because he assumed that her complaint of being physically assaulted by Sergeant G **was a false claim**.[13] Undersheriff Sanford also knew of her complaint of retaliation identified by Dr. Streng for having filed against Sergeant G and was aware that she was making these complaints but did not investigate.[14] Sanford knew in December 2017 that Plaintiff contacted Defendant's Human

---

[11] *See* Exhibit 9, p. 15-16.
[12] *Id*. at p. 40-43.
[13] *See* Exhibit 10, p. 53-60; *see also* Exhibit 16.
[14] *See* Exhibit 9, p. 58-59, 65-66.

Resource Department crying and telling them that she was being trained by the same sergeant responsible for sexually assaulting her.[15] Neither Sanford nor Human Resources followed up in any way by commencing an investigation.[16]

Lori's continued complaints about discrimination and retaliation continued to not be addressed by management except through write ups and reprimands until her suspension on 4/23/2019, that resulted in her termination. When she complained that Sergeant VanderLaan was watching her tapes to find something on her, no one listened. When she said that men could use their cellphones when she could not, no one addressed it. She continued referencing Sergeant G's harassment of her and the continued retaliation against her. The Sheriff's Office management, still upset about her continued complaints, put a clause in her 4/23/2019 suspension, when they presented the last chance agreement that fully released all claims against the County, stating, "at no time while you are working for the Muskegon County Sheriff's Office will you discuss any past allegations of misconduct by any member of the Muskegon County Sheriff's Office."[17]

Defendant's policies provide that management officials should investigate her complaints of discrimination or retaliation. Muskegon County Sheriff General Order 3.01 provides that any employee who believes he/she has been discriminated against shall report the incident either in writing **or in person** to their Commanding Officer, Captain or Jail Administrator.[18] It shall be the duty of any command officer with personal knowledge of a violation of this policy to intervene and immediately report the incident so that a complete investigation may be conducted.[19]

Their Anti-Harassment policy #2009-378 provides that it is the employer's responsibility

---

[15] *See* Exhibit 9 at p. 44-45.
[16] *Id*.
[17] *See* Exhibit 32.
[18] *See* Exhibit 11, §F (emphasis added).
[19] *Id.* at §K.

4

to ensure a work environment free of harassment by its management personnel, coworkers or others with whom she must interact in the course of her work as a County employee. Muskegon County is responsible for promptly investigating **any allegation** of work-related harassment. Anyone that experiences harassment does not have to report it to the EEO office **and may instead report it to any other member of Muskegon County's management**. The policy promises that all allegations of harassment will be investigated.[20]

Defendant's Anti-Retaliation Policy #2013-19 provides that it is their policy to afford each individual employee the ability to exercise his or her right in good faith to bring issues of concern to management or governmental agencies or to participate in an investigation free from the threat of retaliation. The County will not tolerate any retaliatory conduct or harassment, either explicit or implicit based on an individual's good faith exercise of a statutorily protected workplace rights. No individual shall be retaliated against for making a good faith complaint. Compliance with this policy is required of all employees, appointed and/or elected officials. The County will promptly investigate all complaints of retaliation and will take prompt and appropriate action to remedy the situation. Anyone that experiences or witnesses prohibited retaliation should immediately report the incident to the Equal Employment Opportunity office **or a member of County management and that all allegations of retaliation will be investigated**.[21]

Undersheriff Sanford was hired by Sheriff Poulin in January 2017 and received training and reviewed all of Muskegon County's policies but neither reviewed nor was he notified by Poulin of the investigatory findings in 2011 of the pervasive sexual discriminatory culture and

---

[20] *See* Exhibit 12 (emphasis added).
[21] *See* Exhibit 13 (emphasis added).

recommendations identified in the report.[22] At the time of the report, Poulin was captain.[23] Lieutenant Burns testified that verbal complaints of harassment are sufficient notice under their policies.[24]

### C.    Plaintiff's Testimony in the ACLU *Semelbauer* Case

On October 19, 2016, Lori Heethuis, as an employee of the County, testified in the ACLU *Semelbauer* case where it was alleged that the County treated female inmates in a discriminatory manner. Although it was not Title VII, it involved parallel issues to her complaints of the culture of her workplace and the male deputy's treatment of the female inmates. The alleged retaliatory actions were by employees against her as an employee. Prior to her deposition, Lieutenant Burns, the jail administrator, met with Lori suggesting that she not recall certain matters. She responded that though she worked with him and the department for 21 years, she would not lie for the department.[25]

Lieutenant Burns, after first testifying that he did not recall whether Lori testified in the ACLU case or not, later recalled having a conversation with her prior to the deposition.[26] Burns denied telling Lori not to recall anything and he could not recall her statements in response. Later in his testimony, Burns indicated that he, in fact, did not recall talking to Lori before her testimony but that if he did, that is what he would have said to her.[27]

In 2017, around the time the ACLU case was settled and after January in which Poulin was elected sheriff, Lieutenant Burns told Lori that Sheriff Poulin was not pleased with her testimony.[28]

---

[22] *See* Exhibit 9, p. 13, 73-75.
[23] *See* Exhibit 10, p. 9-10.
[24] *See* Exhibit 6, p. 18.
[25] *See* Exhibit 2 p. 58.
[26] *See* Exhibit 6, p. 19-24.
[27] *Id*.
[28] *See* Exhibit 2, p. 59.

Lieutenant Burns denied this conversation.[29] Sheriff Poulin also denied this conversation.[30]

### D.    The Fitness for Duty Suspension

Instead of hearing and investigating Lori's complaints, Defendant's management took various retaliatory actions against her. In December of 2017, Poulin and Sanford decided that Lori should be taken off work and sent her to their psychologist to determine that she was unfit for duty for at least 60 days.[31] Her three treating health care professionals felt that she was fit for duty.[32] Both Poulin and Sanford had the authority and ability to contact her health care professionals for their opinions but did not.[33] Poulin said she was paid for the 60-day period in which she taken off. She was not as she was forced to use accrued sick time.[34] Poulin told Human Resources that she was under the care of Dr. Auffrey. [35] She was not. He was the psychologist Defendant used to perform their preemployment psychological examinations. Neither Sheriff Poulin nor Undersheriff Sanford, before Lori, requested or sent any male deputies for a fitness for duty exam for outbursts.[36]

Undersheriff Sanford did however, prior to the exam send a three-page document to Dr. Auffrey in an obvious attempt to negatively influence his opinion of Lori.[37] Sanford with knowledge from Burns of Lori's sexual assault[38] began the letter to Dr. Auffrey:

> Lori Heethuis- Johnson has been placed on paid administrative leave with her employment with the Muskegon County Sheriff's Office. **Lori has a long history with the Sheriff's Office of being a "difficult" employee** and has several

---

[29] *See* Exhibit 6, p. 24-25.
[30] *See* Exhibit 10, p. 20.
[31] *See* Exhibit 9, p. 17, 20-21.
[32] *See* Exhibit 10, p. 51; *see also* Exhibit 14; *see also* Exhibit 15; *see also* Exhibit 16.
[33] *See* Exhibit 9, p. 50, 53-54.
[34] *See* Exhibit 10, p. 27-28, 64; *see also* Exhibit 2, p. 220-221; *see also* Exhibit 17.
[35] *See* Exhibit 18; *see also* Exhibit 10, p. 52.
[36] *See* Exhibit 9, p. 28-29; *see also* Exhibit 10, p. 34-35.
[37] *See* Exhibit 19.
[38] *See* Exhibit 9, p. 21.

documented incidences of her behavior. **In addition, Lori made allegations of being a victim of a sexual assault in 2009. The allegations were investigated by the Sheriff's Office and the Muskegon County Equal Employment Opportunity Commission and were unfounded.** In 2014, **Lori** continued to make the allegations (adding to the original claim) and **filed complaints** with the Michigan Civil Rights Board and the U.S. Civil Rights Commission. **Neither complaint was found to be true**.[39]

The inference to Dr. Auffrey was that Lori was a liar who brought a false claim against Sergeant G and another officer for physical sexual harassment. Sanford said that the Sheriff's Office did an investigation of her sexual assault complaints. They did not. The Michigan Civil Rights Department and/or the Equal Employment Opportunity Commission issued a right to sue but never made any determination that her complaints were not true. The Muskegon County EEO "investigation" made a finding of "no cause" after receiving Sergeant G's denial, even though Lori provided names of witnesses to who she complained at the time. Those witnesses verified that she told them of the assaults and harassment, but of course did not witness it.[40] Sanford did not include a job description of her duties in the document.[41]

Dr. Auffrey's 12/12/2017 report had the intended result. He found her unfit for duty for 60 days and pathologically diagnosed her with an anxiety disorder with anxious and depressed mood.[42] This diagnosis was completely contrary to the MMPI testing results done in his office and in his file which stated:

> **This profile does not clearly indicate the presence of psychopathology** … This person exerts an effort to maintain a positive, optimistic outlook and suppress negative feelings … This person expressed an average level of unusual experience, uncertainty, and concern with the accuracy of her perceptions. This suggests that she can understand socially constructed reality and distinguish this from individual beliefs and fantasies … This person does not express problems in any measures of affective functioning, including clinical depression, depressive content, manic

---

[39] *See* Exhibit 19; *see also* Exhibit 9, p. 25-27.
[40] *See* Exhibit 5.
[41] *See* Exhibit 20, p. 34.
[42] *See* Exhibit 21.

disorder, anger, and over controlled hostility … **The basic clinical scale profile indicates a normal level of general anxiety. This suggests that there is not a pattern of extreme worry, tension, and agitation.**[43]

These MMPI interpretation results, indicating a normal exam, and Sanford's letter were suspiciously not sent with the MMPI raw data records in the first subpoena Dr. Auffrey received asking for a copy of his file. Dr. Auffrey's explanation for failing to supply the entirety of the file was that when records are subpoenaed from his file the practice in his industry is to send the raw data but not the interpretations of that data.[44]

Dr. Auffrey also reported that Lori's "mood and response to stress may also be adversely affected by her current medications, which involve a considerable dose of psychostimulant, which is apparently offset by a considerable daily dose of benzodiazepine (tranquilizer)."[45] These statements, according to Lori's treating psychologist, Diane Streng, were concerning in that they were outside of Dr. Auffrey's licensure qualifications as a psychologist.[46] In Dr Auffrey's denial he admitted that he had no license to prescribe medications, no medical degree and had not taken any classes regarding medications in over 20 years.[47] While she was out for allegedly being unfit for duty, someone in management told inmates that Lori was off work due to a mental breakdown, which could place her in greater danger in her job.[48] Dr Auffrey never indicated in his report that she suffered a mental breakdown.[49] Sanford denied making that statement or having knowledge of others making it. [50]

---

[43] *See* Exhibit 22 (emphasis added); *see also* Exhibit 20, p. 42-43.
[44] *See* Exhibit 20, p. 37-40; *see also* Exhibit 41.
[45] *See* Exhibit 21.
[46] *See* Exhibit 8, p. 129-130.
[47] *See* Exhibit 20, p. 46-47.
[48] *See* Exhibit 2, p. 177-178.
[49] *See* Exhibit 20, p. 76.
[50] *See* Exhibit 9, p. 43.

Neither Sanford nor Poulin requested a fitness for duty examination for any male deputies prior to Lori. [51]

### E.      The Write-Up for Giving Cookies to Trustee

On January 24, 2019, Lori was written up for giving cookies to a trustee on January 17, 2019.[52] VanderLaan, while watching tapes on Lori, believed he saw Lori passing contraband so he sent it up the chain of command.[53] She gave a trustee a cookie, which was common practice among other deputies.[54] Deputy Riddle testified that deputies gave coffee to trustees while working.[55] Riddle heard that K-9 drug dogs were brought into the jail regarding the cookie incident.[56]

### F.      Heightened Scrutiny by Sergeant VanderLaan

Deputy Riddle who frequently worked with Lori testified that she was a good deputy who's ability to get along with the inmates and caring attitude toward them were positive job attributes.[57] In 2019, Riddle warned Lori to be careful as Sergeant VanderLaan was watching tapes of her at the end of the day trying to find discipline violations on her.[58] Normally tapes of deputies working are not reviewed unless there is an issue with an inmate.[59] Burns, the jail administrator, knew that VanderLaan was watching tapes of Lori during or after the end of shifts. He did not order VanderLaan to do so.[60] Undersheriff Sanford told Lieutenant Burns that they were watching her tapes to assess her productivity and work product.[61] Burns was the top management official

---

[51] *Id*. at p. 28-29.
[52] *See* Exhibit 40.
[53] *See* Exhibit 24, p. 67.
[54] *See* Exhibit 2, p. 52.
[55] *See* Exhibit 23, p. 22.
[56] *See* Exhibit 23, p. 20.
[57] *Id.* at p. 10-12.
[58] *See* Exhibit 2, p. 60; *see also* Exhibit 23, p. 25.
[59] *See* Exhibit 23, p. 26.
[60] *See* Exhibit 6, p. 28-29.
[61] *Id*.

physically at the jail with Sergeant VanderLaan and Lori directly under his supervision, yet he was not notified until after the fact that this scrutiny was ordered.[62] VanderLaan never informed Burns that he was directed to watch Lori's tapes and Burns never questioned upper management, namely Sanford and Poulin, why they went around him.[63] Burns was not part of the decision to have VanderLaan review Lori's tapes. He assumed the order came from the Sheriff's executive office since Sanford told him it was an executive decision.[64]

VanderLaan testified that although he did not work with or around Lori, he would use the laptop computer in Lieutenant Burns' office to view the tapes of her at work.[65] He unequivocally testified that he only viewed her tapes on the weekend. The record and his later testimony substantiated that he reviewed the tapes during the week. This included an email on Wednesday, January 19, 2019 indicating he had just finished his camera review of her.[66] Other incidents of his viewing her tapes during the week were identified. [67] Poulin and Sanford were aware that he was reviewing the tapes.[68] VanderLaan would send information regarding Lori directly to Sanford.[69] VanderLaan testified that he reviewed a male officer that was working with the Plaintiff, but then later said that he did not.[70]

Lori was disciplined for allegedly making offensive comments to a chaplain. When Sergeant VanderLaan learned that two male deputies made very offensive comments, nothing was done. VanderLaan ignored and did not bring to upper management's attention the comment that

---

[62] *Id*. at p. 31-34.
[63] *Id*. at p. 35.
[64] *Id*. at p. 41-45.
[65] *See* Exhibit 24, p. 12-14.
[66] *Id.* at p. 45-47; *see also* Exhibit 25.
[67] *See* Exhibit 24, p. 49-50, 55.
[68] *Id*. at p. 22.
[69] *Id.* at p. 28.
[70] *Id*. at p. 23-24, 39.

one male deputy made to another about a deputy talking to his attorney and getting his d--- out of his mouth.[71] He did not highlight it as he did with a comment Lori made regarding discrimination in a document that had both, and to his knowledge nothing was done in that regard.[72] Sheriff Poulin confirmed that there was no investigation of the d--- in the mouth comment, even after they knew of it prior to his deposition testimony.[73]

There was no investigation regarding male Sergeant Matt Smith having an emotional outburst against another deputy in the control room.[74] There were no investigations of any male deputies in which emotional outbursts and profanity at the inmates was cited as the reason, even though such events occurred on a regular basis in front of management in the jail.[75]

### G.    The Eavesdropping Recording by Defendant Boike

On March 24, 2019, after earlier being called a snitch and bitch,[76] Lori went into the bathroom in the control room, closed the door, and called her husband.[77] This call was made at 5:08 p.m. and lasted 8 minutes.[78] Defendant Boike, without Lori's knowledge or permission, recorded 2 minutes and 21 seconds of this conversation.[79] Lori had an expectation of privacy as she was in the bathroom and the door was closed. Boike did not inform Lori that he recorded her.[80] He sent the recording to fellow non-management officers Scott Smith and Nate Stephenson, and the following day to Sergeant VanderLaan, who was not Boike's direct supervisor, but was the

---

[71] *Id.* at p. 52-53.
[72] *Id*.
[73] *See* Exhibit 10, p. 73-75.
[74] *See id.* at p. 68-70; *see also* Exhibit 2, p. 302-303.
[75] *See* Exhibit 10, p. 72; *see also* Exhibit 2, p. 295-301.
[76] *See* Exhibit 2, p. 84.
[77] *See* Exhibit 2, p. 94.
[78] *See* Exhibit 26.
[79] *See* Exhibit 27, p. 16-17.
[80] *See* Exhibit 2, p. 92.

one directed to watch Lori's work tapes.[81]

Boike testified that on the day of the recording he was in the third-floor control room. Lori was not there when he first arrived. When she did arrive, he buzzed her in.[82] She never went in the bathroom but went straight to a common area around the computers and started talking on her phone not far from where he was sitting.[83] No one else entered the room while the two of them were there.[84] Boike started recording Lori's conversation with the other person without her knowledge or permission.[85] He was not a part of the conversation and he was not asked to be nor was he a part of any investigation of her.[86] He began recording shortly after Lori's phone conversation started. It was the only phone conversation Lori had while Boike was there. He testified that the total phone call lasted approximately three minutes.[87]

Boike's testimony is totally inconsistent with Deputy Scott Smith's statement given on March 27, 2019, three days after the call was recorded.[88] Smith's testimony, after his recollection was refreshed, was that Smith was in the third-floor control room when Lori arrived, but Boike was not.[89] Smith could hear Lori talking. Once Boike arrived he left.[90] When Smith left Lori was still in the bathroom with the door closed.[91] Boike's testimony is also inconsistent with an email from Sergeant VanderLaan to Undersheriff Sanford which indicated that Boike said that when he

---

[81] *See* Exhibit 27, p. 26.
[82] *Id.* at p. 42-44.
[83] *Id.*
[84] *Id.* at p. 45.
[85] *Id.* at p. 8-13.
[86] *Id.* at p. 14.
[87] *Id.* at p. 51-53, 66.
[88] *See* Exhibit 28.
[89] *See id.*; *see also* Exhibit 29, p. 7-8. 12-14. 17-21.
[90] *Id.*
[91] *Id.*

arrived in the control room, Lori was already on the phone.[92] Boike brought the recording to VanderLaan instead of to his direct supervisor Sergeant Corey Meyers. Boike denied and then did not recall if he did this because he knew VanderLaan was watching Lori's tapes to find violations.[93] Boike admits in the same deposition that he did know that VanderLaan was monitoring Lori's work duties. The recording he gave VanderLaan had nothing to do with those work duties.[94]

Lori did not tell management right away when initially questioned about the call that she was in the bathroom. She was not specifically asked, and she was not initially told that she had been recorded.[95] When Lori learned her conversation was recorded, she told management that she was in the bathroom and that she felt this was an invasion of her privacy.[96]

### H.   The Separation through a Forced Signing of a Last Chance Agreement

The Boike recording was used as one of the reasons to terminate Lori if she did not agree to sign the last chance agreement. On April 23, 2019 Lori was brought into the office and told that she was being terminated unless she signed the agreement that was being shown to her for the first time. This was a County management, not a union decision. The language in the agreement including full release of all claims in paragraph 9, was a management determination by Sheriff Poulin and Undersheriff Sanford, who were both in the meeting.[97] She asked for time to take it home and review with her husband or others. Nothing prohibited them from giving her that time, but they refused and told her she had to sign it that morning or be fired.[98] They adamantly would

---

[92] *See* Exhibit 30; *see also* Exhibit 27, p. 85-86.
[93] *See* Exhibit 27, p. 29-30.
[94] *Id*. at p. 31-32.
[95] *See* Exhibit 2, p. 126; *see also* Exhibit 9, p. 105.
[96] *See* Exhibit 2, p. 98.
[97] *See* Exhibit 31; *see also* Exhibit 9, p. 62-64.
[98] *See* Exhibit 10, p. 81-87; *see also* Exhibit 9, p. 68-69, 70-72; *see also* Exhibit 2, p. 138-141.

not give it to her.[99] Paragraph 9 of the agreement provided that Lori was fully releasing any and all claims that she may have against the County and that if she violated any rule within the next two years of the agreement, she would be terminated without union grievance or other recourse.[100] The language in paragraph 9 states:

> In consideration of this agreement, Deputy Lori Heethuis-Johnson **hereby releases the Employer**, and the Union, **their agents and employees, from all claims, damages, liability related to, arising from, touching upon, or concerning her employment** or the negotiation or execution of this Agreement.[101]

Poulin knew that this language was in the agreement. He knew that she raised concerns about this language in the meeting, but claimed to not be aware that she had raised complaints of retaliation and harassment for having filed prior complaints.[102] Sanford admits that he was aware that she was making prior complaints of retaliation and harassment but in denying the clear language of the release testified that it was not their intent to have her sign the agreement to release the County from all claims, damages and liability.[103] Sanford was aware at the time that Lori specifically was claiming that females had been treated differently than the men and that the female deputies were being harassed.[104] No male that may have had a similar clause in their last chance agreement had made claims of sexual or other protected class harassment or retaliation as Lori.[105] Poulin claimed to not understand that the plain language in paragraph 9 would be a full release of those claims.[106] Poulin and Sanford, on April 23, 2019, suspended Lori after she signed the agreement under duress and told her that she was not to talk anymore about the sexual harassment

---

[99] *See* Exhibit 23, p. 29-30.
[100] *See* Exhibit 31; *see also* Exhibit 10, p. 88-90.
[101] *See* Exhibit 31, para. 9.
[102] *See* Exhibit 10, p. 88-91.
[103] *See* Exhibit 9, p. 62-66.
[104] *Id*. at p. 67-69.
[105] *See* Exhibit 10, p. 134-135.
[106] *Id.* at 91-92.

she endured in the past.[107]

On April 26, 2019 Lori revoked the agreement due to the duress in forcing her to sign it at the time, knowing that would mean termination. It was clear she could only keep her job if she signed it.[108] Revoking it meant termination.[109] Lori's husband has a serious medical condition, and whether she could keep her health insurance was important to her. She initially understood that if she resigned, she could keep her insurance. Based on that assumption, on April 26, 2019 she tendered a resignation and retirement.[110] On April 30, 2019, after Lori found out from Ann James on April 29, 2019 that her resignation would not allow her health insurance benefits to continue, she notified Defendant that she revoked her resignation and was not retiring. [111] Ann James' memo of that phone conversation confirmed that when she called and told Lori that she could not keep her insurance if she resigned or retired, Lori was confused and now would have to revoke that resignation.[112]   Poulin refused to accept the change, mandating that her record indicate a resignation/retirement, even though her revocation of the last chance agreement meant termination.[113] Poulin admits, in his testimony, to refusing to accept her resignation.[114]

## III.   LAW AND ARGUMENT

### A.  Summary Judgment

Under Rule 56, summary judgment is only proper if there is **no** genuine issue of material

---

[107] *See* Exhibit 32; *see also* Exhibit 10, p. 81; *see also* Exhibit 40.
[108] *See* Exhibit 33; *see also* Exhibit 2, p. 150.
[109] *See* Exhibit 2, p. 150.
[110] *Id*. at p. 154-156.
[111] *See* Exhibit 34.
[112] *See* Exhibit 35; *see also* Exhibit 36.
[113] *See* Exhibit 37.
[114] *See* Exhibit 10, p. 132-133.

fact.[115] In reviewing a motion for summary judgment, a court must accept plaintiff's well-pleaded allegations as true and examine any pleading, affidavits, depositions, admissions and documentary evidence in a light most favorable to the nonmovant.[116] The court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.[117]

### B.  Time Limitation and Title VII—Acts Prior to September 15, 2018

Title VII requires that a charge be filed within 300 days after the alleged unlawful employment practice occurred.[118] In Title VII claims of discrimination, a discrete retaliatory or discriminatory act "occurred" on the day that it "happened."[119] Certain discrete acts, such as termination, failure to promote, denial or transfer or refusal to hire constitute a separate actionable unlawful employment practice.[120] Title VII permits consideration of events occurring prior to the 300-day period under what is commonly known as a continuing violations theory, [121]  but even if not actionable, history and background evidence of alleged discriminatory acts can be used as evidence.[122] The alleged physical sexual assault of Plaintiff by Sergeant G, and the fact that the she had to continue to work under him, even though not actionable for damages, are clearly relevant background evidence under this holding. The fact that Undersheriff Sanford and Sheriff Poulin disciplined her on April 23, 2019 her last day worked, by forbidding her to "discuss any

---

[115] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). (emphasis added).
[116] *Id.*
[117] *Powell v. Time Warner Cable, Inc.*, 2011 WL 2604802 (S.D. Ohio June 30, 2011) [quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-51, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)].
[118] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e)(1).
[119] *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).
[120] *Id*. at 114.
[121] *Navarro-Teran v. Embraer Aircraft Maintenance Services, Inc.*, 184 F.Supp.3d 612, 624 (M.D. Tenn. 2016).
[122] *Id*. at 113.

17

past allegations of misconduct by any member of the Muskegon County Sheriff's Office" is further evidence of its continuing relevance.[123]

### C. Time Limitation under ELCRA—Acts Prior to November 6, 2016

ELCRA has a three-year statute of limitation and does not recognize a continuing violation theory for time-barred conduct.[124] Plaintiff identifies those events occurring before November 6, 2016 as relevant background evidence for the discrimination and retaliation that continued to occur within the statute of limitation. This information provides critical context for her claims and are relevant in understanding the depth and scope of Plaintiff's claims of discrimination and retaliation.

### D. Gender Discrimination under Federal and State Law

In order to establish a *prima facie* case for gender discrimination under Title VII, the plaintiff must show: (1) she is a member of a protected class, (2) the discriminator knew of her protected class, (3) she suffered an adverse employment action and (4) others who were similarly situated were either treated more favorably or not subjected to the same or similar adverse treatment.[125] A plaintiff, in bringing a Title VII action, can establish discrimination by introducing either direct evidence of discrimination or inferential and circumstantial evidence supporting an inference of discrimination.[126] Since it is often nearly impossible to prove discriminatory intent by direct evidence, courts use the McDonnell Douglas-Burdine burden of proof mechanism.[127]

The November 27, 2017 written reprimand issued to Plaintiff, was for Plaintiff's use of

---

[123] *See* Exhibit 32.
[124] *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 472 Mich. 263 (Mich. 2005); *see also* MCL §§ 37.2202, 600.5805(2).
[125] *Vinova v. Henry Cnty. Bd. of Edu.*, 2016 WL 4993389 (E.D. Ky. Sept. 15, 2016).
[126] *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).
[127] *Id.*

"obscene language in dealing with Chaplain Peoples, violating Rules and Regulations 2.01.01".[128] There is a question of fact that this use as one of the bases for the fitness for duty examination was discriminatory and a pretext. Male deputies who used obscene language were not reprimanded. There was no fitness for duty exam or reprimand for male sergeant Matt Smith having an emotional outburst against another deputy in the control room.[129] There were no known reprimands for male deputies where they yelled emotionally and loudly and used profanity at the inmates, even though such events occurred on a regular basis in front of management in the jail.[130]

On December 7, 2017, Sheriff Poulin called Plaintiff into a meeting to discuss her having an emotional outburst at work.[131] Plaintiff was issued a written reprimand, placed on administrative leave and ordered to have a fitness for duty psychological evaluation by Dr. Joe Auffrey, who did all of the Defendant County's pre-employment examinations.[132] Plaintiff disputes that she had an emotional outburst and instead classifies it as a heated conversation. One of the bases for the exam that was used was her alleged use of a profane word when the chaplain was making noise, even though she immediately apologized to him.[133]

There is a material question of fact whether Defendant ordered Plaintiff off work as unfit for duty as pretext for the gender discrimination and/or retaliation for her continued raising of complaints regarding her prior sexual assaults and having to continue to work around her assaulter or because as they allege Defendant was genuinely concerned for Plaintiff's well-being. The latter is difficult to accept when they refused to review her medical records when she offered to allow

---

[128] *See* Exhibit 38.
[129] *See* Exhibit 10, p. 68-70; *see also* Exhibit 2, p. 296-298.
[130] *See* Exhibit 10, p. 72; *see also* Exhibit 2, p. 296-298.
[131] *See* Exhibit 2, p. 205-206.
[132] *Id.*
[133] *Id.* at p. 206, 291-292.

them to do so. [134] Male deputies often had similar "emotional outbursts" on the job without consequence, including no fitness for duty examination, even though management was well aware of these outbursts.[135] Lieutenant Burns corroborates Plaintiff's allegations that other men also had emotional outbursts on multiple occasions, including himself. [136]

Lieutenant Burns goes on to say that none of these men were asked to go in for a fitness for duty test because their outbursts did not reach the level of outburst as Plaintiff's.[137] Sanford also states that he never sent male jail officers for a fitness for duty examination even though there were multiple instances in which male officers used profanity.[138] This different standard applied to the female Plaintiff, and used as one of the reasons for a fitness for duty exam is on its face discriminatory and an issue for the fact finder. In this context a female's excited utterance is seen by males as an emotional outburst where a males hollering is seen as healthy aggression or just "letting off steam."

Plaintiff received a reprimand for use of her cell phone on 11/27, 2017 and being distracted by her cellphone during meal pass in violation of Rules and Regulations 2.01.8.[139] Deputy Riddle testified that it was common practice for employees to use their cell phones so long as it was not in view of the inmates.[140]

Other discriminatory treatment and/or heightened scrutiny that Plaintiff, as a female endured that the males did not was when she was formally reprimanded on January 24, 2019 for

---

[134] *See* Exhibit 2, p. 206.
[135] *See* Exhibit 2, p. 294, 296-298
[136] *See* Exhibit 6, p. 52.
[137] *Id*.
[138] *See* Exhibit 9, p. 28.
[139] *See* Exhibit 38.
[140] *See* Exhibit 23, p. 16.

giving cookies to an inmate trustee on January 17, 2019.[141] Sergeant VanderLaan reviewed the tapes and accused her of slipping contraband to the inmates.[142] Deputy Riddle said they brought a drug dog in to check the cookie incident. It was recognized that trustees were often given coffee and even food, but there is no evidence of male deputies being written up for it.[143]

There is credible evidence that VanderLaan discriminatorily scrutinized the work and actions of Plaintiff compared to male deputies and that he was directed to do so by upper management in the Sheriff's office either for gender discriminatory or retaliatory reasons for her having continued to raise issues about her prior sexual assault and having to work under her prior assaulter. Deputy Riddle frequently worked with Lori. She was a good deputy who's caring for and ability to get along with the inmates were positive job attributes.[144] He warned Lori to be careful as VanderLaan was watching tapes of her at the end of the day on a regular basis trying to find violations for which to discipline her.[145] Tapes of deputies working are not normally reviewed unless there is an issue with an inmate.[146] Lieutenant Burns, the jail administrator, knew that VanderLaan was watching tapes of Lori during or after the end of shifts, but that he did not the order VanderLaan to do so.[147] Sanford told Burns that they were watching her tapes to assess her productivity and work product.[148] Even though Lieutenant Burns was the top management official physically placed at the jail with Sergeant VanderLaan and Lori directly under his supervision, he was not notified, until after the fact, that this scrutiny was ordered.[149] VanderLaan never informed

---

[141] *See* Exhibit 39.
[142] *See* Exhibit 24, p. 67.
[143] *See* Exhibit 23, p. 21-22.
[144] *Id.* at p. 10-12.
[145] *Id.* at p. 25; *see also* Exhibit 2, p. 60.
[146] *See* Exhibit 23, p. 26.
[147] *See* Exhibit 6, p. 28-29.
[148] *Id.*
[149] *Id.* at p. 31-34.

Burns that he was directed to watch Lori's tapes and Burns never questioned upper management, namely Sanford and Poulin, why they went around him.[150] Burns was not a part of the decision to have VanderLaan review Lori's tapes and he assumed that this order came from the executive office of the sheriff since Sanford told him it was an executive decision.[151]

VanderLaan testified that, although he did not work with or around Plaintiff, he would use the laptop computer in Burns' office to view the tapes of her at work.[152] VanderLaan unequivocally testified that he **only** viewed her tapes on the weekend.[153] The record, and his later testimony, substantiated that he reviewed the tapes during the week. He authored an email on Wednesday, January 19, 2019 indicating he had just finished his camera review of her.[154] Other incidents of viewing her tapes during the week were identified.[155] Poulin and Sanford were aware that he was reviewing the tapes.[156] VanderLaan would send information and issues regarding Plaintiff to Sanford.[157] VanderLaan stated that he reviewed a male officer that was working with the Plaintiff as well, but then later said that he did not.[158]

Defendant Boike admitted showing VanderLaan the recording of Plaintiff's phone conversation while she was in the bathroom despite VanderLaan not being Boike's immediate supervisor. Initially Boike testified that he shared the tape with VanderLaan because he was the sergeant on duty. When asked why he shared the tape with VanderLaan and not Sergeant Meyers, his direct supervisor, Boike admitted that it was because VanderLaan was monitoring the two new

---

[150] *Id.* at p. 35.
[151] *Id.* at p. 41-45.
[152] *See* Exhibit 24, p. 12-14.
[153] *See* Exhibit 24, p. 21.
[154] *Id.* at p. 45-47; *see also* Exhibit 25.
[155] *See* Exhibit 24, p. 49-50, 55.
[156] *Id.*, p. 22.
[157] *Id.* at p. 28.
[158] *Id.* at p. 23-24, 39.

swing shift positions, of which Plaintiff was a part.[159] Boike knew VanderLaan was monitoring these two new shift positions because they discussed this in the past.[160] There is a genuine issue of fact whether Boike's taping of Plaintiff was to further VanderLaan's scrutiny of Plaintiff to provide Defendant with a seemingly justifiable reason for discipline or termination.

This heightened scrutiny of Plaintiff was designed to find "legitimate" reasons for disciplining Plaintiff and ultimately terminating her. The incidences for which she was written up were, when committed by male deputies, not worthy of discipline; but they were deemed serious enough to warrant discipline when committed by Plaintiff. They were used by Defendant for discriminatory purposes and justification for retaliatory purposes.

## E.  Retaliation under Federal and State Law

A claim of retaliation in an employment context can be proven through direct evidence or, in the absence of direct evidence, through the McDonnell-Douglas burden shifting framework.[161] Under this framework, in order to establish a *prima facie* case of retaliation pursuant to Title VII, a plaintiff must prove: (1) she engaged in a protected activity; (2) the employer was aware of the protected activity; (3) she suffered an adverse employment action; and (4) there is a casual connection between the protected activity and the adverse employment action.[162] Title VII specifically makes it unlawful for an employer to retaliate against an employee who has either: (1) opposed any practice made an unlawful employment practice by this subchapter; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.[163] Once plaintiff establishes her *prima facie* case, the burden of production

---

[159] *See* Exhibit 27, p. 29-30.
[160] *Id.* at 31
[161] *Abbot v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir. 2003).
[162] 42 U.S.C. § 2000e et seq.
[163] *Id.* at § 2000e-3(a).

of evidence shifts to the employer to prove the reason for the action was legitimate and nondiscriminatory.[164] Plaintiff then has the opportunity to demonstrate that the "proffered reason was not the true reason for the employment decision."[165] In essence, plaintiff must show that the reason for her termination was mere pretext to further employer's discriminatory intent.

Plaintiff, while employed was very vocal about the past physical sexual abuse and continued retaliation from her supervisor that she still worked around after he escaped any reprimand for his actions. She continuously endured the traumatic memories of her assault while also finding herself under the disciplinary control of the man responsible for the assault. It was because of her vocal opposition to the treatment that she endured, and her regular complaining of his presence without penalty, that Plaintiff was constantly monitored and disciplined. She continued to notify management of her concerns and complaints about being treated differently as a female, and about the harassment and retaliation she was getting from Sergeant G because of her prior complaints against him. All of these were in opposition to the protections afforded by Title VII and the ELCRA and are detailed in Section B of the Statement of Facts, along with managements' knowledge of them and their failure to act contrary to their policies.[166] The Sheriff's office was so tired of her raising these claims of harassment that on the day they forced her eventual termination they suspended her and told her she must not ever again discuss any past allegations of misconduct.[167]

Plaintiff opposed these discriminatory practices when she testified, on October 19, 2016, in the ACLU case where female inmates alleged discriminatory jail conditions. The case does not

---

[164] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).
[165] *Texas v. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).
[166] *See* Exhibit 9, p. 15-16, 40-45, 58-59, 65-66; *see also* Exhibit 10, p. 53-60; *see also* Exhibit 11; *see also* Exhibit 12; *see also* Exhibit 13.
[167] *See* Exhibit 32.

fall under the branch of Title VII's protection clause for testifying in a Title VII action. The testimony Plaintiff provided was given as, and because she was, an employee of the Defendant and spoke to the employment actions of the County and the male deputies against the female inmates. This was a part of her job and was in opposition to the policies and practices of her employer and arguably triggered some of the retaliation that she faced as an employee. The opposition clause of Title VII covers actions which done in an employment context. Before her deposition, Plaintiff was approached by Lieutenant Burns, her supervisor, strongly inferring that she should not recall certain things during the deposition.[168] In 2017, after the case was settled, Plaintiff was told by Burns that the sheriff was unhappy with her for her testimony in the ACLU matter.[169] Both of these confrontations were done by her supervisor and in the context of her employment. It was done only to her as a female who had given testimony regarding the treatment by the males to the female inmates.

The fitness for duty examination in which Plaintiff was subjected was also a pretext for retaliation. Undersheriff Sanford before the exam maliciously told Dr. Auffrey that Plaintiff had filed an untrue or false sexual harassment complaint against Sergeant G in the past.[170] It had the intended results. He received a report from Dr. Auffrey confirming Plaintiff was unfit for duty in contradiction of his own file contents and the medical reports from her other health care professionals. Sanford had learned of the alleged sexual assault by Sergeant G and Plaintiff's EEO claim filed from Lieutenant Burns.[171] Sanford nevertheless told Dr. Auffrey:

> Lori Heethuis- Johnson has been placed on paid administrative leave with her
> employment with the Muskegon County Sheriff's Office. Lori has a long history
> with the Sheriff's Office of being a "difficult" employee and has several

---

[168] *See* Exhibit 2, p. 58; *see also* Exhibit 6, p. 19-24.
[169] *See* Exhibit 2, p. 59.
[170] *See* Exhibit 19.
[171] *See* Exhibit 9, p. 21.

documented incidences of her behavior. **In addition, Lori made allegations of being a victim of a sexual assault in 2009. The allegations were investigated by the Sheriff's Office and the Muskegon County Equal Employment Opportunity Commission and were unfounded. In 2014, Lori continued to make the allegations (adding to the original claim) and filed complaints with the Michigan Civil Rights Board and the U.S. Civil Rights Commission. Neither complaint was found to be true.**[172]

The clear inference was that Plaintiff was a liar who brought a false claim against Sergeant G and another officer for physical sexual harassment. Sanford said that the Sheriff's Office did an investigation of her sexual assault complaints. There is no evidence that the Sheriff's Office did any investigation; there is only evidence that an investigation was conducted by the EEO office of the County. The Michigan Civil Rights Department and/or the Equal Employment Opportunity Commission issued a right to sue but never made any determination that her complaints were not true. The Muskegon County EEO "investigation" done by Timothy Bracey made a finding of "no cause" after receiving Sergeant G's denial, even though she provided names of witnesses to who she complained at the time. Those witnesses verified that she told them of the assaults and harassment, but of course did not witness it.[173] In his document to Dr. Auffrey, Sanford did not include even the job description of her duties.[174]

In his December 12, 2017, report to Sanford, Dr. Auffrey found Plaintiff unfit for duty for 60 days and pathologically diagnosed her with an anxiety disorder with anxious and depressed mood, [175] which was opposite and completely contrary to the MMPI testing result done in his office the day of the exam which stated:

> **This profile does not clearly indicate the presence of psychopathology** … This person exerts an effort to maintain a positive, optimistic outlook and suppress negative feelings … This person expressed an average level of unusual experience,

---

[172] *See* Exhibit 19 (emphasis added); *see also* Exhibit 9, p. 25-27.
[173] *See* Exhibit 5.
[174] *See* Exhibit 20, p. 34.
[175] *See* Exhibit 21.

uncertainty, and concern with the accuracy of her perceptions. This suggests that she can understand socially constructed reality and distinguish this from individual beliefs and fantasies … This person does not express problems in any measures of affective functioning, including clinical depression, depressive content, manic disorder, anger, and over controlled hostility … **The basic clinical scale profile indicates a normal level of general anxiety. This suggests that there is not a pattern of extreme worry, tension, and agitation.**[176]

These results indicating a normal exam and Sanford's letter to him were suspiciously not sent with the MMPI raw data records in the first subpoena Dr. Auffrey received asking for a copy of his file.[177] His explanation for failing to supply the entirety of the file was that when records are subpoenaed from his file, the practice in his industry is to send the raw data but not the interpretations of that data.[178]

Dr. Auffrey also stated in his report that Plaintiff's "mood and response to stress may also be adversely affected by her current medications, which involve a considerable dose of psychostimulant, which is apparently offset by a considerable daily dose of benzodiazepine (tranquilizer)".[179] These statements, according to Plaintiff's treating psychologist, Diane Streng, were concerning in that they were outside of Dr. Auffrey's licensure qualifications as a psychologist.[180] In Dr. Auffrey's denial of the above he admitted that he had no license to prescribe medications, had no medical degree and had not taken any classes regarding medications in over 20 years.[181]

Someone in management told inmates that Lori was off work because she had a mental breakdown, which could place her in greater danger in her job.[182] Dr. Auffrey never indicated in

---

[176] *See* Exhibit 22 (emphasis added); *see also* Exhibit 20, p. 42-43.
[177] *See* Exhibit 41.
[178] *See* Exhibit 20, p. 37-40.
[179] *See* Exhibit 21.
[180] *See* Exhibit 8, p. 129-130.
[181] *See* Exhibit 20, p. 46-47.
[182] *See* Exhibit 2, 177-178.

his report that Lori suffered from a mental breakdown.[183] Sanford denied making any comments, or having knowledge of others making comments, that she suffered from a mental breakdown.[184] Neither Sanford nor Poulin requested a fitness for duty examination for any male deputies before that of the Plaintiff.[185] When Plaintiff asked to have her pay and benefits reinstated and advised Poulin that he was wrong to indicate to Human Resources that she was under the care of their paid psychologist, he summarily ignored her request. [186]

The actions by the Sheriff and Undersheriff have similarities to *Denhof v. City of Grand Rapids,* in which the Sixth Circuit found that the evidence supported a jury finding of retaliation and reversed a contrary finding as a matter of law by the District Court.[187] In *Denhof*, the female plaintiffs, who were part of a gender discrimination lawsuit in 2001, were sent by the chief to the City psychologist for a fitness for duty examination, and later were terminated based on the City's doctor's recommendation despite their own physicians indication that they were fit for duty. In addition citing her testimony in a hearing in the lawsuit, the Chief included information about other incidents involving Denhof that he collected from other members of his command staff following the hearing.[188] The City doctor found her emotionally unstable contrary to her personal doctors who found that she did not present any evidence of a diagnosable or treatable psychiatric disorder and that she was fit to return to work.[189] The Court in *Denhof* held that a reasonable juror could have concluded that the City's reliance on the opinion of the City's psychologist was unreasonable in light of his actions and the broader actions of the City officials, and that there was significant

---

[183] *See* Exhibit 20, p. 76.
[184] *See* Exhibit 9, p. 43.
[185] *Id.* at p. 28-29.
[186] *See* Exhibit 18; *see also* Exhibit 17.
[187] *Denhof v. City of Grand Rapids*, 494 F.3d 534 (6th Cir. 2007).
[188] *Id*. at 537.
[189] *Id*. at 538.

evidence that the City's actions were taken in retaliation for her filing the state lawsuit.[190]

In the instant case, the actions of Sanford telling their psychologist, that Plaintiff previously filed an unfounded or untrue claim, along with Poulin and Sanford refusing to pay Plaintiff for the time off after receiving records that she was fit for duty and telling Human Resources that she was under the care of their doctor as the reason are all evidence supporting a retaliatory motive for the fact finder to consider.

The final element necessary to establish a *prima facia* case of retaliation is the causal connection between the protected activity and the adverse employment action. As a result of Plaintiff's continued complaints and assertions to Defendant about the sexual assault, the treatment of female deputies compared to the males, the retaliation and harassment by her sexual supervisor abuser, along with the complaint that she was still being retaliated against for filing with the County EEO and the EEOC, Defendant exacted heightened scrutiny upon her. Defendant began closely monitoring Plaintiff's movements and writing her up for offenses for which her co-workers were not written up. All of these complaints, of which they had knowledge was protected activity as it concerned sexual and gender discrimination and retaliation based on complaints of sexual and gender discrimination and harassment. In *Ballanger v. Bunge*, the Sixth Circuit held that despite the three-year lapse in time between plaintiff's protected activity and the adverse action, a causal connection could be found.[191] Similar to Plaintiff Heethuis, the plaintiff in *Ballanger* after filing his charge of discrimination, began experiencing harassment by his supervisors and was subjected to heightened scrutiny concerning his job performance. The Sixth Circuit determined there was a properly established a causal connection despite the lack of temporal proximity between the

---

[190] *Id*. at 543.
[191] *Ballanger v. Bunge Foods*, 238 F.3d 419 (6th Cir. 2000).

protected activity and the adverse employment action.[192]

## F. Eavesdropping

In Michigan, a person is prohibited from using any device to eavesdrop on another's private conversation without the consent of all parties.[193] A person who willfully uses any device to eavesdrop upon the conversation without the consent of all parties thereto is in violation. [194] Eavesdropping is a "means to overhear, record, amplify or transmit any part of the private discourse of others without the permission of all persons engaged in the discourse."[195] Civil remedies and damages, including but not limited to all actual and punitive damages, are provided when a person violates the eavesdropping statute.[196] The Michigan eavesdropping statute protects all private conversations from eavesdropping that is accomplished through the willful use of any device.[197] Deputy Boike admitted to recording a conversation of Plaintiff on March 24th, 2019 without the consent or knowledge of the Plaintiff or the other person on the conversation.[198]

In an eavesdropping case, it is important to determine whether the person alleging the unlawful practice had an expectation of privacy at the time of the recording. In order to identify whether an expectation of privacy exists depends on "whether it was intended for or restricted to the use of a particular person…"[199] Whether one reasonably expects privacy in a conversation presents a question of fact.[200] Plaintiff believed she was in a private location because she entered

---

[192] *Id.*
[193] *Vollmar v. Laura*, 2006 WL 1008995 (C.A. Mich. Apr. 18, 2006).
[194] MCL 750.539c.
[195] MCL 750.539a(2).
[196] MCL 750.539h(b).
[197] *See Vollmar*, 2006 WL 1008995.
[198] *See* Exhibit 27, p. 8, 13, 15.
[199] *Barnett v. Norman Yatooma & Assocs.*, 2007 WL 840880 (C.A. Mich. Mar. 20, 2007).
[200] *Id.*

the bathroom and shut the door before making the phone call.[201] Boike's testified that he was there when Plaintiff arrived, that he buzzed her in, and that she never went to the bathroom before he recorded her conversation while standing near a group of computers.[202] This testimony directly conflicted with Deputy Scott Smith's statement given on April 27, 2019, three days after the recording when it was fresh in his mind.[203] After his recollection was refreshed by seeing his statement, Smith testified unequivocally that he was the only one in the control room when Plaintiff arrived, that Defendant Boike was not there, and that Plaintiff went directly into the bathroom with her phone out. Boike then entered the control room while the Plaintiff was in the bathroom. Smith left Boike there while she was still in the bathroom and on the phone with the door closed.[204] Boike's testimony is also inconsistent with Sergeant VanderLaan's email to Sanford indicating that when Boike came to see him about the recording that Boike told him that Plaintiff was already on the phone when he came to the control room.[205]

At a minimum, there is a question for the fact finder whether Plaintiff intended and reasonably expected it to be private and not recorded at the time and under the circumstances involved.[206] Further, the reasonable expectation of privacy stands if the plaintiff expected that the conversation was private, not whether the subject matter was intended to be private.[207] Boike intentionally recorded this conversation and then without her knowledge or consent distributed it to multiple non-management male employees before giving it to Sergeant VanderLaan the next

---

[201] *See* Exhibit 2, p. 98.
[202] *See* Exhibit 27, p. 16-17, 42-45.
[203] *See* Exhibit 28.
[204] *See* Exhibit 29, p. 7-8, 12-14, 17-21.
[205] *See* Exhibit 30; *see also* Exhibit 27, p. 85-86.
[206] *Dickerson v. Raphael*, 461 Mich. 851 (1999).
[207] *Id*.

day.[208]

### G. Termination with a Forced Last Chance Agreement

The recording by Boike was used as one of the reasons to terminate Plaintiff if she did not agree to sign the last chance agreement. On April 23, 2019, Plaintiff was brought into the office and told that she was being terminated unless she signed the agreement that was being shown to her for the first time. This was a County management, not union decision. The language in the agreement, including the release language in paragraph 9, was a management determination by Sheriff Poulin and Undersheriff Sanford, who were both in the meeting.[209] She asked for time to take it home and review with her husband or others. Nothing prohibited them from giving her that time, but they refused and told her she had to sign it that morning or be fired. [210] They adamantly would not give it to her.[211]

Paragraph 9 of the agreement mandated that Plaintiff was **fully** releasing all claims that she may have against the County and that if she violated any rule within the next two years of the agreement, she would be terminated without union grievance or other recourse:[212]

> In consideration of this agreement, Deputy Lori Heethuis-Johnson **hereby releases the Employer**, and the Union, **their agents and employees, from all claims, damages, liability related to, arising from, touching upon, or concerning her employment** or the negotiation or execution of this Agreement.[213]

Sheriff Poulin knew that this language was in the agreement, knew Plaintiff raised concerns about this language in the meeting, but claimed to not be aware that she had raised complaints of

---

[208] *See* Exhibit 27, p. 26.
[209] *See* Exhibit 31; *see also* Exhibit 9, p. 62-64.
[210] *See* Exhibit 10, p. 81-87; *see also* Exhibit 9, p. 68-69, 70-72; *see also* Exhibit 2, p. 138-141.
[211] *See* Exhibit 23, p. 29-30.
[212] *See* Exhibit 31; *see also* Exhibit 10, p. 88-90.
[213] *See* Exhibit 31 (emphasis added).

retaliation and harassment for having filed prior complaints.[214] Sanford admits that he was aware that she was making prior complaints of retaliation and harassment but denied the clear language of the release and testified that it was not their intent to have her sign the agreement to release the County from all claims, damages and liability.[215] Sanford was aware that Plaintiff, specifically, was claiming that females had been treated differently than males and that female deputies were being harassed.[216] No male that may have had a similar clause in their last chance agreement had made claims of sexual or other protected class harassment or retaliation as Plaintiff.[217] Poulin also claimed to not understand that the plain language in paragraph 9 would be a full release of those claims.[218] Poulin and Sanford, on April 23, 2019, suspended Plaintiff after she signed the agreement under duress and told her that she was not to talk anymore about the sexual harassment she endured in the past by having her sign a document that said "in addition, at no time while you are working for the Muskegon County Sheriff's Office will you discuss any past allegations of misconduct by any member of the Muskegon County Sheriff's Office.[219]

Michigan courts have held that issuance of a last chance agreement in lieu of termination with clauses that give up rights, may, to a reasonable factfinder, be considered an adverse employment action. In *Jewett v Mesick Consolidated School District*,[220] the Court of Appeals discussed the Court's unpublished per curiam opinion of *Miles v City of Bay City*,[221] on which the plaintiff relied, for the principle that a last chance agreement can, if continued employment is

---

[214] *See* Exhibit 10, p. 88-91.
[215] *See* Exhibit 9, p. 62-66.
[216] *Id*. at p. 67-69.
[217] *See* Exhibit 10, p. 134-135.
[218] *Id*. at p. 91-92.
[219] *Id*. at p. 81, s*ee also* Exhibit 32; *see also* Exhibit 40.
[220] *Jewett v. Mesick Consol. Sch. Dist.*, 2020 WL 3005995 (C.A. Mich. June 4, 2020).
[221] *Miles v. City of Bay City*, 2014 WL 2118155 (C.A. Mich. May 20, 2014).

conditioned on signing the agreement, constitute an adverse employment action. In *Miles*, the last chance agreement required the plaintiff to waive his union-grievance rights and forbade him from holding any closed-door or one-on-one meetings. The court found that such restrictions "would cause a material loss of benefits" to the plaintiff.[222] In contrast to the plaintiff in *Miles*, the plaintiff in *Jewett* chose not to sign the last chance agreement for reasons totally unrelated to the "written policies" line, and in any event, the evidence overwhelmingly showed no plausible danger of anyone failing to read aloud anything plaintiff might need read.[223] Plaintiff Heethuis' last chance agreement had the waiver of union rights clause and a full release of any other employment claims. It is clear that she did not want to sign it for those reasons. Under these circumstances there remains a genuine issue of fact whether this last chance agreement amounted to an adverse employment action.

On April 26, 2019, Plaintiff revoked the last chance agreement that she signed under duress knowing that would mean termination since it was clear she could only keep her job if she signed it.[224] Revoking it meant termination.[225] Plaintiff's husband has a serious medical condition, and whether she could keep her health insurance was important to her. She was advised, or understood, that if she resigned, she could keep her insurance. Based on that assumption, she tendered a resignation and retirement.[226] On April 30, 2019, after Lori found out from Ann James that her resignation would not allow her health insurance benefits to continue, she notified Defendant that she revoked her resignation and was not retiring.[227] Ann James' memo of that phone conversation

---

[222] *Id*. (quoting *Chen v. Wayne State Univ.*, 284 Mich.App. 172, 771 N.W.2d 820 (2009)).
[223] *See Jewett*, 2020 WL 3005995, n.5.
[224] *See* Exhibit 33; *see also* Exhibit 2, p. 150.
[225] *See* Exhibit 2, p. 150.
[226] *Id*. at p. 154-156.
[227] *See* Exhibit 34.

confirmed that when she called and told Lori that she could not keep her insurance if she resigned or retired, Lori was confused and now would have to revoke that resignation.[228] Sheriff Poulin refused to accept the change, mandating that her record indicate a resignation/retirement, even though her revocation of the last chance agreement meant termination.[229] Poulin admits, in his testimony, to refusing to accept her resignation.[230]

## H.  CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied.

Dated: April 8, 2021

By:    /s/ Stephen R. Drew
Stephen R. Drew (P24323)
Adam C. Sturdivant (P72285)
DREW, COOPER & ANDING
Attorneys for Plaintiff
80 Ottawa Avenue NW, Suite 200
Grand Rapids, Michigan 49503
Phone: (616) 454-8300
E-mail: sdrew@dca-lawyers.com
E-mail: asturdivant@dca-lawyers.com

---

[228] *See* Exhibit 35; *see also* Exhibit 36.
[229] *See* Exhibit 37.
[230] *See* Exhibit 10, p. 132-133.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI LYNN HEETHUIS,                                    Case No. 1:19-cv-940

     Plaintiff,                                    HON. PAUL L. MALONEY

v

COUNTY OF MUSKEGON; et al.,

     Defendants.
                                                          /

| | |
|---|---|
| Stephen R. Drew (P24323) | Laura S. Amtsbuechler (P36972) |
| Adam C. Sturdivant (P72285) | Melanie M. Hesano (P82519) |
| DREW COOPER & ANDING | ROSATI, SCHULTZ, JOPPICH & |
| Attorneys for Plaintiff | AMTSBUECHLER |
| 80 Ottawa Avenue NW, Suite 200 | Attorneys for Defendants |
| Grand Rapids, Michigan 49503-2648 | 27555 Executive Drive, Suite 250 |
| Phone: (616) 454-8300 | Farmington Hills, Michigan 48331 |
| E-mail: sdrew@dca-lawyers.com | Phone: (248) 489-4100 |
| E-mail: asturdivant@dca-lawyers.com | E-mail: lamtsbuechler@rsjalaw.com |
| | E-mail: mhesano@rsjalaw.com |

                                                           /

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INDEX OF EXHIBITS**

| Exhibit # | Description |
|---|---|
| 1 | 2011 EEO Investigative Report |
| 2 | Plaintiff Lori Heethuis' Deposition Excerpts |
| 3 | Lori Heethuis' EEO Complaint (RESTRICTED) |
| 4 | Addendum to Heethuis' EEO Complaint (RESRICTED) |
| 5 | EEO No-Cause Finding (RESTRICTED) |
| 6 | Mark Burns' Deposition Excerpts |

| Exhibit # | Description |
| --- | --- |
| 7 | Dr. Matt Powell's Deposition Excerpts (RESTRICTED) |
| 8 | Dr. Diane Streng Deposition Excerpts (RESTRICTED) |
| 9 | Kenneth Sanford's Deposition Excerpts |
| 10 | Michael Poulin's Deposition Excerpts |
| 11 | Sheriff Department's Discrimination Policy |
| 12 | Muskegon County Anti-Harassment Policy |
| 13 | Muskegon County Anti-Retaliation Policy |
| 14 | Fitness for Duty Determination by Dr. Powell (RESTRICTED) |
| 15 | Fitness for Duty Determination by Dr. Beyer (RESTRICTED) |
| 16 | Fitness for Duty Determination by Dr. Streng (RESTRICTED) |
| 17 | Plaintiff's Reinstatement E-mail |
| 18 | Poulin's E-mail on Dr. Auffrey as Plaintiff's Doctor |
| 19 | Sanford's Letter to Dr. Auffrey |
| 20 | Dr. Auffrey's Deposition Excerpts (RESTRICTED) |
| 21 | Dr. Auffrey's Report (RESTRICTED) |
| 22 | MMPI Results (RESTRICTED) |
| 23 | Chris Riddle's Deposition Excerpts |
| 24 | David VanderLaan's Deposition Excerpts |
| 25 | VanderLaan's E-mail to Captain Brown |
| 26 | Comcast Phone Records |
| 27 | Ryan Boike's Deposition Excerpts |
| 28 | Scott Smith's Statement about Bathroom Incident |

| Exhibit # | Description |
|---|---|
| 29 | Scott Smith's Deposition Excerpts |
| 30 | VanderLaan E-mail to Sanford |
| 31 | Last Chance Agreement |
| 32 | April 23, 2019 Direct Order to Plaintiff |
| 33 | Plaintiff's Revocation of Last Chance Agreement |
| 34 | Plaintiff's Revocation of Resignation/Retirement |
| 35 | Ann James' April 29, 2019 Phone Memo |
| 36 | Ann James' Deposition Excerpts |
| 37 | Poulin E-mail Refusing Plaintiff's Revocation |
| 38 | November 27, 2017 Written Reprimand |
| 39 | January 24, 2019 Written Reprimand |
| 40 | April 23, 2019 Suspension |
| 41 | Subpoena to Dr. Auffrey for Document Production |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI LYNN HEETHUIS,                                    Case No. 1:19-cv-940
        Plaintiff,                                     HON. PAUL L. MALONEY
v.

COUNTY OF MUSKEGON; and,
RYAN BOIKE, Individually,
        Defendants.
_____/

| | |
|---|---|
| Stephen R. Drew (P24323) | Laura S. Amtsbuechler (P36972) |
| Adam C. Sturdivant (P72285) | Melanie Hesano (P82519) |
| DREW COOPER & ANDING | ROSATI, SCHULTZ, JOPPICH & |
| Attorneys for Plaintiff | AMTSBUECHLER |
| 80 Ottawa Avenue NW, Suite 200 | Attorneys for Defendants |
| Grand Rapids, Michigan 49503-2648 | 27555 Executive Drive, Suite 250 |
| Phone: (616) 454-8300 | Farmington Hills, Michigan 48331 |
| E-mail: sdrew@dca-lawyers.com | Phone: (248) 489-4100 |
| E-mail: asturdivant@dca-lawyers.com | E-mail: lamtsbuechler@rsjalaw.com |
| | E-mail: mhesano@rsjalaw.com |
_____/

## CERTIFICATE OF SERVICE

I, Stephen R. Drew, certify that I am an attorney with the law firm of DREW COOPER &

ANDING, and on April 8, 2021, **Plaintiff's Response in Opposition to Defendants' Motion for**

**Summary Judgment** was electronically filed with the Clerk of the Court using the U.S. District

Court for the Western District of Michigan CM/ECF Filing System, and that copies will be

provided to all Attorneys of Record.


Dated:  April 8, 2021                          By:   /s/ Stephen R. Drew
                                                     Stephen R. Drew (P24323)
                                                     DREW, COOPER & ANDING
                                                     Attorneys for Plaintiff
                                                     80 Ottawa Avenue NW, Suite 200
                                                     Grand Rapids, Michigan 49503
                                                     Phone: (616) 454-8300
                                                     E-mail: sdrew@dca-lawyers.com